# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____
                            )

Joshua Winer,            )

        )

      Plaintiff,      )

        )

v.                )

        ) Civil Action Case No. 1:25-cv-02329

Umaymah Mohammad, AJP Educational  )

Foundation, Inc. A/K/A American Muslims )

For Palestine, WESPAC Foundation, Inc.,  )

Sean Eren as the representative of National )

Students for Justice in Palestine, Doctors  )

Against Genocide Society, Cair-Nga Inc.  )

A/K/A/ CAIR-Georgia, CAIR Foundation  )

Inc., A/K/A Council on Islamic Relations  )

or CAIR, Rupa Marya, Ibrahim Jouja as  )

representative of Emory Students for  )

Justice in Palestine,       )

        )

      Defendants.    )

_____  )

## AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND

Joshua Winer ("**Plaintiff**") by and through his undersigned counsel in collaboration with the National Jewish Advocacy Center, Inc., hereby files this Complaint and alleges the following against Defendants Umaymah Mohammad ("**Mohammad**"), AJP Educational Foundation, Inc. A/K/A American Muslims For Palestine ("**AMP**"), WESPAC Foundation, Inc. (**WESPAC**), Sean Eren as the representative of National Students for Justice in Palestine ("**NSJP**"), Doctors

Against Genocide Society ("**DAG**"), Rupa Marya ("**Marya**"), Cair-Nga Inc. A/K/A/ CAIR-Georgia ("**CAIR-Georgia**"), CAIR Foundation Inc., A/K/A Council on Islamic Relations or CAIR ("**CAIR National**") and Ibrahim Jouja as representative of Emory Students for Justice in Palestine ("**Emory SJP**"), (collectively, the "**Defendants**").

## INTRODUCTION

1.     Mohammad, a Palestinian medical student at Emory University School of Medicine (the "**School of Medicine**"), made false statements about Plaintiff, a Jewish American-Israeli physician and professor at the School of Medicine, which were defamatory per se and placed Plaintiff in a false light.

2.     Mohammad maliciously and falsely stated that Plaintiff directly participated in and aided and abetted a genocide in Gaza as a result of Plaintiff's service in the Israeli Defense Forces ("**IDF**"), further asserting that as a result of his actions in the IDF, Plaintiff is unfit to teach medical students or provide medical care to patients.

3.     Mohammad initially made these statements about Plaintiff during a segment on Democracy Now!, a daily news program broadcast widely online, on television, and on radio. Thereafter, Mohammad reiterated the same false statements and further elaborated upon them on a podcast, in an op-ed that she authored for an online publication, at a press conference, and in an interview with a daily newspaper

reporter.  Mohammad's false statements were subsequently printed in various news outlets, online publications, and on various social media accounts.

4.      Upon information and belief, Mohammad was suspended from the School of Medicine for one year, beginning on or about November 19, 2024, due to her statements about Plaintiff in her interview on Democracy Now! (the "**Democracy Now Interview**"), which were determined to be in violation of the Emory University School of Medicine's Conduct Code (the "**Conduct Code**").

5.      Defendants NSJP, DAG, Marya, CAIR Georgia, CAIR National, and Emory SJP published, reiterated and expanded upon Mohammad's false statements about Plaintiff in an apparent effort to both support Mohammad by pressuring the School of Medicine to reinstate her, and terminate Plaintiff's employment.

6.      Defendants NSJP, DAG, Marya, CAIR Georgia, CAIR National, and Emory SJP each individually worked with Mohammad to provide her with a platform to further amplify and disseminate her false statements about Plaintiff.  By doing so, NSJP, DAG, Marya, CAIR Georgia, CAIR National, and Emory SJP each individually defamed Plaintiff, placed him in a false light, and engaged in a civil conspiracy with Mohammad to further publicize Mohammad's defamatory statements about Plaintiff and place Plaintiff in a false light.

7.      The false and inflammatory statements at issue in this action are not protected under the First Amendment. Rather, they constitute defamation per se and

were made with malice to portray Plaintiff in a false light.  As a direct and proximate result of the widespread dissemination of these false statements, Plaintiff has suffered significant, ongoing and enduring public embarrassment, emotional distress, and harm to his professional reputation.

8.      This action also arises under 42 U.S.C. § 1985(3) for civil conspiracy to deprive Plaintiff of his rights and privileges as a citizen of the United States. Mohammad conspired with the other defendants to target Plaintiff because of his race, ethnicity, and his affiliation with both Israel and the IDF - an institution closely tied to Jewish national identity. Through a coordinated campaign of knowingly false and defamatory statements, Mohammad and her co-conspirators sought to intimidate Plaintiff and suppress his rights to free speech and association with the IDF.

9.      By falsely asserting that Plaintiff, by virtue of serving in the IDF, was guilty of "genocide" and "war crimes," and thus unfit to teach medical students and train residents, Defendants targeted Plaintiff not based on his individual conduct, but on *who he is and what he represents*.  The nature of the accusations—automatically equating Jewish self-defense or military service with crimes against humanity—is emblematic of modern-day antisemitic tropes, condemned by international authorities and civil rights watchdogs.[1] Defendants' actions sought to vilify Plaintiff

---

[1] *See e.g., Working definition of antisemitism*, Int'l Holocaust Remembrance All., https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism (last visited May 11, 2025).

on the basis of his race, ethnicity, national origin, and association with the IDF, and to intimidate him into silence. This class-based animus against Jewish, Israeli, and or Zionist individuals is precisely the kind of invidious discrimination § 1985(3) was designed to address.

10.     Rather than merely expressing a disagreement with Plaintiff's views or background, or even doing any basic inquiring into the nature of his service and his actions, Mohammad and her co-conspirators undertook a coordinated effort to stigmatize, isolate, and eliminate Plaintiff from his professional and academic life. This included publicizing knowingly false statements about Plaintiff with the intent of damaging his reputation and career, and encouraging others to echo and amplify these claims in protest letters, student petitions, and social media campaigns — all designed to coerce institutional censure or dismissal.   Such conduct was not protected speech, but a coordinated effort to suppress Plaintiff's protected rights.

### PARTIES

11.     Plaintiff is a Jewish resident of Atlanta, Georgia with dual American and Israeli citizenship. He is a board-certified surgical oncologist at Emory Winship Cancer Institute, a professor in the Department of Surgery, Division of Surgical Oncology, at the School of Medicine, and serves as the Surgical Clerkship Director at the School of Medicine.  Plaintiff is deeply committed to the care of his patients and education of his students, and he strongly believes that saving lives is his calling.

His role as a surgical oncologist and a professor is integral to his identity. Following the Hamas-led terror attacks in Israel on October 7, 2023 (the "**October 7 attacks**"), Plaintiff felt a religious, moral, and national responsibility to protect the Jewish people and the Jewish homeland, and so he took a leave of absence to volunteer in one of the IDF's elite reconnaissance units, where he served in Gaza in his capacity as a physician to provide medical care to wounded soldiers.

12.     Mohammad, a resident of Georgia, describes herself as an organizer for the Palestine Liberation Movement.[2]  She is an anti-Israel organizer that has repeatedly publicly praised terrorism against Israel and expressed her hatred towards the United States and Israel.  Upon information and belief, Mohammad is a co-founder and active member of DAG, a steering committee member of NSJP, and an active member of Emory SJP.  Mohammad is also an MD/PhD candidate at the School of Medicine and the Sociology Department at Emory University ("**Emory**"). Mohammad was suspended by the School of Medicine for a period of one year because the statements that she made about Plaintiff were found to be in violation of its Conduct Code.

13.     Defendant AMP is a 501(c)(3) non-profit corporation incorporated in California with its principal place of business in Falls Church, Virginia. AMP is the

---

[2] Doctors Against Genocide, "Cultivating Courage", January 14, 2025, YouTube, https://www.youtube.com/watch?v=_02nyIGfjzc (last visited April 24, 2025).

founder of NSJP and upon information and belief, maintains organizational management and control of NSJP.

14.     WESPAC, which is an abbreviation for Westchester People's Action Coalition Foundation, is a New York-based 501(c)(3) nonprofit corporation and has served as the fiscal sponsor for NSJP since at least 2016. NSJP does not itself hold tax-exempt status, and WESPAC receives tax-deductible donations and grants on NSJP's behalf. Pursuant to IRS guidelines governing fiscal sponsorship, WESPAC is required to maintain full control and discretion over the use of donated funds and is legally responsible for ensuring that all disbursed funds are used exclusively for legitimate charitable purposes. Accordingly, WESPAC bears direct responsibility for overseeing and approving the activities and expenditures of NSJP that are funded through this fiscal sponsorship arrangement.

15.     NSJP is an unincorporated association without a formal principal place of business.   Upon information and belief, NSJP is represented by Sean Eren, a steering committee member.  According to its official website, NSJP identifies itself as part of an anti-West movement: "Supporting over 350 Palestine solidarity organizations across occupied Turtle Island (so-called North America), we aim to develop a student movement **connected**, **disciplined**, and **equipped** with the tools necessary to pursue **Palestinian liberation** on our campuses (emphasis in original)." NSJP is an anti-Zionist movement that aims to ensure that "students will continue to

resist Zionism on campus" and that the "world understands the Zionist entity as a fundamentally expansionist, colonial, and genocidal project." NSJP promotes baseless convoluted conspiracy theories alleging that the U.S. government, in coordination with Zionist organizations, the Israeli government, and university board members, are engaged in coordinated efforts to censor, suspend, and deport students who speak out in support of Palestine. They have also been accused of providing material support to terrorist organizations.

16.    DAG is a 501(c)(3) non-profit corporation incorporated in Michigan whose stated mission is to oppose genocide, but has been widely criticized by media outlets and watchdog groups for promoting anti-Israel and anti-Zionist rhetoric. DAG regularly engages in antisemitic Holocaust inversion by comparing Israeli military actions in response to the Hamas led October 7 attacks to those of Nazi Germany. In December 2023, DAG planned an anti-Israel protest at the U.S. Holocaust Memorial Museum. Upon information and belief, Mohammad and Marya are both founders of DAG and are significantly involved with the organization. Both Mohammad and Marya recently presented as DAG panelists and hosted DAG webinars.

17.    Marya, a resident of California, is a professor of medicine at the University of California, San Francisco (**UCSF**). Upon information and belief, UCSF placed Marya on indefinite leave after she questioned its admission of an

Israeli first-year medical student on the basis that he may have served in the IDF, and implored the university to investigate whether this student had participated in genocide. According to Marya's statements on her social media account, she is at risk of having her medical license revoked because of her "activism". Marya has used her social media platform to openly call for the dissolution of the State of Israel, assert that the presence of Zionism in US medicine is a structural impediment to health equity, draw inflammatory comparisons between Zionists and Nazis, characterize the October 7 attacks as a justified form of resistance, and falsely assert that Jewish hostages held captive by Hamas are actually grateful to their Hamas captors for their "care".

18.    CAIR Georgia is a registered 501(c)(3) nonprofit organization registered in Georgia that describes itself on its website as a "Muslim advocacy organization." CAIR Georgia has publicly expressed the view that Israel is a colonialist occupier of Palestinian territory in Gaza, notwithstanding the fact that Israel unilaterally withdrew from Gaza in 2005 and that Hamas, which currently governs Gaza and is designated as a terrorist organization by the United States government, was elected by the residents of Gaza in 2006. CAIR Georgia has also repeatedly referred to Israel as an "apartheid state," despite the fact that Israel's substantial Arab population and non-Jewish population holds full citizenship and have equal civil rights under Israeli law.

19.    CAIR National is a 501(c)(3) organization registered in Washington D.C.  While the group's stated mission is to "enhance understanding of Islam, protect civil rights, promote justice, and empower American Muslims," the group lobbies on national, state and chapter levels for various anti-Israel initiatives.  The group has fought against the Anti-Semitism Awareness Act, promoted the Boycott, Divestment and Sanctions (BDS) movement, and regularly attempts to diminish American support for Israel.  Some of CAIR's leaders, such as Nihad Awad, CAIR National's executive director, previously led the Islamic Association for Palestine (IAP), a now-defunct organization that openly supported Hamas and, according to the U.S. government, functioned as its "propaganda apparatus." The FBI has refused to work with CAIR since it was an unindicted co-conspirator in the largest material support for terror case in US history, and when CAIR publicly expressed support for the October 7th attacks, the White House also stopped working with them.

20.    Emory SJP is a chapter of NSJP that is active at Emory University. Upon information and belief, Ibrahim Jouja is the president of Emory SJP.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.    § 1331.

22.    This Court also has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367.

23.    This Court has personal jurisdiction over the defendants who are domiciled in or conduct substantial and continuous business within the State of Georgia.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this is the judicial district in which a substantial amount of the events giving rise Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

### 1. Background

### A. Mohammad Accused Emory and the School of Medicine of Being Complicit in Palestinian Genocide

25.    On or about January 17, 2024, while Mohammad was a PhD candidate in the Sociology Department at Emory and a medical student at the School of Medicine, she sent an email spanning approximately seven pages to the entire student body and faculty of the School of Medicine, including Plaintiff. The subject line of the email read: "Palestinian Blood Stains Your Hands, Emory University and School of Medicine" (Exhibit A). This email will be referred to hereafter as the "SOM Email".

26.    In the SOM Email, Mohammad praised terrorism against Israel, expressed her hatred towards Israel and the United States, and stated that Israel, the United States, and Emory are perpetrating a genocide against Palestinians in Gaza. The content of the email was laden with misinformation and closely mirrored the

propaganda typically propagated by Hamas, a United States designated Foreign Terrorist Organization. Mohammad's political views about Israel and the United States were the basis of the false and inflammatory statements she would later make regarding the Plaintiff when she discovered that he served in the IDF. These views are consistent with those expressed in her academic writing, in which she asserts that "Zionist Judaism" and "the Zionist Judaic project in Palestine" are "being used to justify the ethnic cleaning of the Palestinians and the illegal acquisition of their lands in order to replace Palestine with the settler colonial project of apartheid Israel." (*See* Exhibit C at 2).

27.    In reality, approximately 2 million Arabs are citizens of Israel and comprise about 21% of the population. Many of these Arabs are Palestinian, being descendants of those who remained in the territory after the establishment of Israel in 1948. In addition to Palestinians, this population also includes other groups such as Druze, Bedouins, and Circassians, each with their own distinct cultural and historical identities. Claims of apartheid are nonsensical because Arab Israeli citizens enjoy full and equal civil rights, including representation in the Knesset (the Israeli House of Representatives), and contribute to Israeli society as doctors, lawyers, and judges. Mohammad's accusations of Israel's engagement in ethnic cleansing is similarly false because the Arab population in Israel, including Judea

and Samaria (also known as the West Bank), has grown annually since the establishment of the State of Israel.

28.    Mohammad also completely mischaracterizes Zionism, which in its essence, is the belief in the right of the Jewish people to self-determination in their ancestral homeland.  Jews are indigenous to the land of Israel, with a historical and religious connection that dates back over 3,000 years, predating Palestinian presence in the region. The term "Jew" is derived from "Judea," the ancient name for the land of Israel.  The Jewish connection to Israel is indisputable and forms a part of the bedrock of Jewish identity for the vast majority of Jews.[3]

29.    Plaintiff was distraught when he received the SOM email, which was rife with verifiably false information about Israel as well as political rhetoric with which he vehemently disagreed.  He was further angered by the fact that a student had exploited the School of Medicine's listserv to disseminate political propaganda. Nonetheless, Plaintiff did not file a complaint with the School of Medicine's administration because he recognized that Mohammad's statements might be protected under the First Amendment and that the administration would act if it found that Mohammad had violated any applicable rules and policies.

---

[3] *See* e.g., Pew Research Center, *Jewish Americans in 2020*, at 57–60 (May 11, 2021), https://www.pewresearch.org/dataset/jewish-americans-in-2020/ (last visited May 13, 2025).

30.    Mohammad misused the School of Medicine's listserv to distribute the SOM Email to the entire faculty and student body in furtherance of her personal political agenda. Despite the inflammatory content of the email and her improper use of institutional resources, there is no indication that Mohammad was suspended or otherwise disciplined in response to this incident. To date, no disciplinary action related to the SOM Email has been publicly disclosed.

## B. The Times of Israel Published Plaintiff's Op-Ed Regarding Plaintiff's Service in the IDF

31.    Nearly two months later, on or about March 7, 2024, the *Times of Israel*, an Israeli news outlet, published an op-ed written by the Plaintiff titled, "An Ongoing Quest to Serve".[4]  In the piece, Plaintiff shared his decision to travel to Israel to volunteer as a physician  following the October 7 attacks, during which Hamas and other Palestinian terrorists infiltrated Israel's borders, violated a cease-fire agreement, murdered over 1200 people, kidnapped over 250 people, and publicly vowed to repeat these atrocities at the next available opportunity.

32.    Although he had lived in the United States for over twenty years since initially leaving to serve in the IDF, Plaintiff explained in his op-ed that he felt a deep sense of duty to return to Israel and rejoin the IDF in order to support the country in its time of need.

---

[4] Joshua Winer, *An Ongoing Quest to Serve,* March 7, 2024, https://blogs.timesofisrael.com/an-ongoing-quest-to-serve/ (last visited April 24, 2025).

33.    Plaintiff shared that he initially volunteered with Magen David Adom (Israel's national emergency medical, disaster, ambulance and blood bank service) and was subsequently drafted as a surgeon into one of the IDF's elite reconnaissance units, where he served in Gaza.

34.    In his reflection on his service, Plaintiff highlighted the profound and far-reaching impact of the October 7 attacks on Jewish communities worldwide, emphasizing that the effects of the attacks transcend borders and have irrevocably altered Jews' sense of security outside of Israel. He stressed the vital importance of Israel's existence for the survival of the Jewish people, asserting that even from abroad, the influence of the State of Israel is profoundly felt.

### C. Mohammad Made False Statements About Plaintiff in an Interview Conducted by Democracy Now!

35.    Nearly two months later, on or about April 26, 2024, Mohammad participated in an interview with reporter Amy Goodman for the independent news program, *Democracy Now!,* which is broadcast on over 1,500 television and radio stations and has over 2.5 million subscribers on YouTube. During the Democracy Now Interview, Ms. Goodman referenced Mohammad's SOM Email and asked Mohammad to discuss the significant number of Palestinians, including doctors and nurses, who had been killed in Gaza. Additionally, Ms. Goodman asked Mohammad to discuss why this issue was of particular concern to her. In response, Mohammad stated:

"… one of the professors of medicine we have at Emory recently went to serve as a volunteer medic in the Israeli Offense Force [sic] and recently came back. **This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called teaching medical students and residents how to take care of patients.** I mean, the disconnect is, for me, very obvious. And it's very frustrating that the School of Medicine and the greater Emory community continues to ignore these major disconnects."[5] (emphasis added).

36.    Mohammad stated that Plaintiff aided and abetted a genocide of Palestinian people in Gaza despite the fact that he had clearly done no such thing. Plaintiff served in the IDF exclusively in his capacity as a physician-medic and engaged in *defensive* combat solely in the event that his unit was directly attacked.

37.    Mohammad also attributed responsibility to Plaintiff for "participating in the destruction of Gaza's healthcare system and murdering its healthcare providers" without any acknowledgment of the fact that hospitals lose protection under the Geneva Convention once they are used as military bases and facilities to hold hostages captive[6] and, of course, despite the fact that *Plaintiff himself had done*

---

[5] *Democracy Now*! *Daily Show*,  Democracy Now!, April 26, 2024, https://www.democracynow.org/2024/4/26/emory_protests (last visited April 24, 2025).

[6] *See* Articles 18 and 19, Geneva Convention Relative to the Protection of Civilian Persons in Times of War (Fourth Geneva Convention), (August 12, 1949), 75 U.N.T.S. 287, https://ihl-databases.icrc.org/en/ihl-treaties/gciv-1949?activeTab=undefined; Articles 12 and 13, Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), (June 8, 1977), https://ihl-databases.icrc.org/en/ihl-treaties/api-1977?activeTab=undefined; Customary IHL Rule 28, ICRC Database (Last Visited March 12, 2024) (discussing treaty provisions and state practice relating to protection and loss of protection for medical facilities), https://ihl-databases.icrc.org/en/customary-ihl/v1/rule28. See also Michael N. Schmitt, Israel-Hamas 2023 Legal Symposium, The Legal Protection of Hospitals During Armed Conflict, Articles of War

*no such thing.*

38.    Lastly, Mohammad stated that it was not feasible for Plaintiff to return from participating in a genocide and subsequently teach medical students and residents how to properly care for patients despite the fact that Plaintiff had actually returned from serving as a physician who cared for injured soldiers in the IDF.

39.    When Ms. Goodman questioned why Mohammad referred to the Israeli Defense Forces as the Israeli Occupation Force, Mohammad replied: "…we reject the idea that the Israeli Offense Force is defending anything legitimate. The Israeli Offense Force has always been on the offensive, effectively enacting ethnic cleansing against the Palestinians, effectively stealing land, creating illegal settlements, checkpoints, creating conditions that are highly unlivable for Palestinians. And that's why we use the language 'Israeli Offense Force,' not the IDF."

40.    Regardless of Mohammad's political views, the fact is that Israel is a legitimate sovereign state and that the Israel-Gaza war began when Gaza's terrorist government illegally infiltrated Israel's borders and committed the worst atrocities against Jewish people since the Holocaust.  The Israeli government has repeatedly stated that it will end the war as soon as Hamas returns Israel's hostages and lays

---

December 29, 2023), https://lieber.westpoint.edu/legal-protection-hospitals-during-armed-conflict/.

down its arms.

41.    Plaintiff did not participate in genocide, the destruction of Gaza's healthcare system or the murder of over 400 healthcare workers at any time during his IDF service.

### D. Mohammad Underwent Disciplinary Investigation and Was Suspended by the School of Medicine

42.    On or about June 18, 2024, Mohammad received a letter from Dr. J. William Eley, the Executive Associate Dean of Medical Education and Student Affairs at Emory, notifying her of allegations that she violated the Conduct Code. Dr. Eley explained that the allegations related to her Democracy Now Interview and requested a meeting with Mohammad to discuss the matter.

43.    Upon information and belief, more than one complaint was actually made to Dr. Eley from faculty members regarding concerns that Mohammad had violated the Conduct Code during her Democracy Now Interview.

44.    On or about July 8, 2024, Dr. Eley received an investigative report from Dr. Monica Farley, a physician employed by the School of Medicine, who had been tasked with determining whether Mohammad should be formally charged for violating the Conduct Code as a result of her statements during the Democracy Now Interview. Dr. Farley recommended that formal charges be brought against Mohammad in accordance with the Conduct Code.  Dr. Farley's report (Exhibit B) stated:

The use of inflammatory language (stating that the man participated in aiding and abetting genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 hundred healthcare workers) directed at an individual faculty member is irresponsible, disrespectful, causes a reasonable apprehension of harm, and exposes the faculty member to public hatred and harassment, all of which appears to be in violation of the Emory Professional Conduct and the Code of Conduct expectations. Although the faculty member was not named in the interview, it is reasonable to expect him to be identified based on the details Ms. Mohammad provided in the interview along with widespread social media information sharing.

45.    In a letter dated July 12, 2024 from Dr. Eley to Mohammad, Dr. Eley conveyed his support for Dr. Farley's recommendation to formally charge Mohammad with multiple violations of the Conduct Code.

46.    Upon information and belief, during a meeting between Dr. Eley and Mohammad to discuss the investigative report, Mohammad asserted that she had not explicitly identified the Plaintiff by name in her Democracy Now Interview. Additionally, Mohammad attempted to argue that if the Plaintiff's identity was discernible from her comments during the Democracy Now Interview, then it was the Plaintiff's own fault, as he had published an op-ed in the *Times of Israel* discussing his service in the IDF.

47.    However, Plaintiff's op-ed did not contain any of the false inflammatory statements at issue.   Furthermore, upon information and belief, Mohammad only became aware of the Plaintiff's service in the IDF through his op-ed in the *Times of Israel*.   As such, Mohammad knew that any viewer of her Democracy Now Interview, upon hearing her remarks about a professor from the

School of Medicine who had served in the IDF, could easily ascertain the identity of Plaintiff through a simple internet search. The op-ed was publicly available and easily accessible.[7]  Moreover, there is no other professor in the School of Medicine that served in the IDF following the October 7 attacks.  Therefore, Mohammad's claim that she did not identify the Plaintiff is without merit.

48.    On or about November 19, 2024, a hearing was conducted by an ad hoc conduct committee to address the charges against Mohammad.  Mohammad has publicly stated that she was issued a one-year suspension on the date of the hearing.

## 2.  Mohammad Continued to Make False Statements About Plaintiff

### A. Mohammad Made False Statements About Plaintiff on a Podcast

49.    On or about November 4, 2024, while Mohammad was still undergoing the disciplinary proceeding process overseen by Dr. Eley, she participated in a panel discussion on a podcast hosted by the International Union of Scientists.[8]  The podcast episode was titled, "International Student Movements Against Genocide in Palestine." During this podcast episode, Mohammad made the following statements:

> At Emory University and other institutions here in the US, there are physicians who have served in the IDF and in fact, a physician at Emory has actually volunteered to serve in both a medical and military capacity in this last year in the genocide. And these physicians returned to teach medical students and

---

[7] As of April 8, 2025, Plaintiff's op-ed, which identifies him by name, is the seventh search result for the query: "Who is the Emory professor that served in the IDF?"

[8] *International Student Movements Against Genocide in Palestine*, International Union of Scientists (November 4, 2024), https://www.youtube.com/watch?v=CJyeyAByREU (last visited April 24, 2025).

see patients … our institutions are literally employing people who are not just complicit in these genocides, but … their hands are directly participating in the taking of life … this simple individual example is a reflection of a system that chooses which lives to save with one hand and which lives to take with the other ... I again just [want] to reiterate in a different way [that] it is truly our professional duty as scientists and physicians and healthcare workers to dismantle the structures that are taking life on such a massive scale, like the State of Israel, like the IDF, like the U.S. Empire."[9]

50.    Thus, Mohammad both reiterated the same false statements she previously made about Plaintiff, while also making additional false statements concerning Plaintiff.

51.    First, Mohammad stated that Plaintiff served in both a medical and military capacity, implying that Plaintiff was a regular combat soldier.  In reality, as even Mohammad had acknowledged in her Democracy Now Interview, Plaintiff served in the military in his medical capacity following the October 7 attacks.  As previously discussed, Plaintiff was engaged in defensive combat solely in the event that his unit was directly attacked and otherwise served in the IDF exclusively in his capacity as a physician.

52.    Second, Mohammad falsely asserted that Plaintiff was not only complicit in the IDF's actions against Palestinians, but that he directly engaged in taking Palestinian lives as part of a genocide.

53.    Lastly, Mohammad falsely stated that Plaintiff and other physicians

---

[9]As stated, except for removal of filler words.

who served in the IDF and later returned to work in the U.S. healthcare system were violating their professional duties by "taking life".

### B. Mohammad Made False Statements About Plaintiff in an Op-Ed Published by *Mondoweiss*

54.    On or about January 21, 2025, *Mondoweiss*, an independent online publication that focuses on news and analysis related to the Israeli-Palestinian conflict, published an op-ed written by Mohammad titled, "I was suspended from Emory over my Palestine activism. I will not let it stop me."

55.    Mohammad used her op-ed to once again make false statements regarding Plaintiff:

> … Amy Goodman asked about my previous comments on Emory School of Medicine's complicity in the genocide in Gaza. I gave the example of our surgery clerkship director who participated in Israel's war crimes by serving in the IDF in early 2024 and was allowed to return to his teaching position at the institution.  What kind of care are patients receiving from doctors who believe in the legitimacy of apartheid, and that some human lives are not as important as others? These physicians are creating a world in which only some people—those who look like them—deserve care and protection … The medical school administration at Emory suspended me on November 19th, 2024, citing violations of "respect" and "professionalism" due to my interview on Democracy Now!. I brought attention to an Emory physician-faculty's aiding and abetting a genocide and the destruction of the healthcare system in Gaza. They have attempted to silence my advocacy to end the genocide and U.S. healthcare's complicity in structural violence. But they have failed to scare or silence me.[10]

---

[10] Umaymah Mohammad, *I was suspended from Emory over my Palestine activism. I will not let it stop me*, January 21, 2025, Mondoweiss, https://mondoweiss.net/2025/01/i-was-suspended-from-emory-over-my-palestine-activism-i-will-not-let-it-stop-me/ (last visited April 24, 2025).

56.    While Plaintiff was already identifiable after Mohammad referred to him as an Emory physician and professor who served in the IDF and returned to teach and practice medicine, she further increased his identifiability in her op-ed by specifically describing him as the surgery clerkship director at the School of Medicine.

57.    In addition, Mohammad used her op-ed to make a new false statement about Plaintiff, asserting that he is a racist who believes in the legitimacy of apartheid and that only those who resemble him deserve care and protection.

58.    The false and defamatory apartheid claim is separate from the false and defamatory genocide claim, has no basis in reality, and is based solely on Plaintiff's identity as a Jew and an Israeli. As Mohammad explains in her academic writing, it is her belief that "Zionist Judaism manifest density [sic] is being used to justify the ethnic cleaning of the Palestinians and the illegal acquisition of their lands in order to replace Palestine with the settler colonial project of apartheid Israel." *See* Exhibit C at 2.

59.    At the conclusion of Mohammad's op-ed in *Mondoweiss*, she provided a link to "a community led effort" that had been launched to support her.  The link was to the First NSJP and DAG Post, which directed readers to follow another hyperlink to a campaign on the Action Network website, which contained additional false statements about Plaintiff and identified by name, discussed *infra* in detail.  In

short, the Action Network campaign demanded Mohammad's reinstatement and that

Plaintiff be investigated and/or terminated due to this participation in "a genocide".

### C. Mohammad Made False Statements About Plaintiff at a Press Conference Held by CAIR Georgia

60.    On February 11, 2025, CAIR Georgia held a press conference (the

"**Press Conference**") to call on Emory and the School of Medicine to reinstate and

drop the charges against Mohammad.

61.    During CAIR Georgia's press conference, Mohammad delivered a pre-

written speech in which she made the following statements:

> …I have been suspended for a year from medical school after being subjected to a six-month unjust conduct process. They disciplined me for exposing Emory's complicity in the destruction of Gaza in an interview where I mentioned an unnamed physician who served in the military, actively engaged in the genocidal campaign against the Palestinian people, my people … Having a physician faculty member who participated in a military convicted of committing genocide against Palestinians makes me feel unsafe. It makes black and brown medical students feel unsafe. It makes black and brown and indigenous patients feel unsafe. I cannot learn from a physician who might have fired one of the 355 bullets that landed in 6 year old Hind Rajab's body. Or who might have helped make the decision to bomb one of the hospitals in Gaza. Or who might have celebrated the murder of our communities on the rubble still wet with Palestinian blood. A doctor who cannot see Palestinians as human beings will return to Atlanta to offer the same disposability to black and brown patients at home (hereinafter referred to as the "**CAIR Speech**").

62.    Mohammad once again falsely stated that Plaintiff participated in the

commission of genocide.  Mohammad further stated that, as a result, Plaintiff was

unfit to teach or treat others in a professional capacity.

63.    Mohammad also implied that Plaintiff is a racist, and falsely asserted

that Black and Brown students were not safe in Plaintiff's presence, and that Plaintiff could not be trusted to provide medical care to Black and Brown patients because he viewed them as disposable.

64.    Furthermore, Mohammad falsely stated that Plaintiff "participated in a military convicted of committing genocide…".  However, the IDF has not been convicted of a genocide by any court in any jurisdiction.  Furthermore, contrary to widespread media coverage that misinterpreted the International Criminal Court of Justice's (**ICJ**) ruling on the matter, the ICJ did not find that the claim of genocide was even plausible.  Rather, the ICJ merely decided that South Africa had a right to bring an action against Israel alleging genocide in Gaza and that Palestinians had "plausible rights to protection from genocide" notwithstanding the fact that Gaza is not a recognized nation state.

65.    Plaintiff served in the Israel Defense Forces (IDF) solely in his capacity as a physician, providing medical care to wounded soldiers. His involvement in combat was limited to situations in which his unit came under direct attack. Without even debating the legitimacy of Israel's defensive efforts against a designated foreign terrorist organization, Defendant Mohammad had no factual basis whatsoever to assert that Plaintiff may have participated in or approved the bombing of hospitals in Gaza, celebrated the killing of Palestinians, was incapable of viewing Palestinians as human beings, or would treat Black and Brown patients in Atlanta as disposable.

### D. Mohammad's False Statements Were Publicized by News Outlets

66.    On or about February 11, 2025, WSB-TV aired a televised segment (the "**WSB-TV Segment**") reporting on CAIR Georgia's Press Conference.    The segment included video footage of Mohammad at the Press Conference making false and inflammatory statements about Plaintiff.    WSB-TV also published an article about the Press Conference on its website, which included the video segment and direct quotations of Mohammad's false statements about Plaintiff.    The article stated, in relevant part:

> Mohammad was suspended for one year for violating the university's code of conduct after providing an interview in April and alleging that an unnamed Emory doctor was volunteering with the Israeli Army.    In an interview still available on Democracy Now's YouTube Channel, Mohammad is seen and heard saying "This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers."[11]

67.    Also on or about February 11, 2025, NBC aired a separate segment covering the same Press Conference, during which footage was broadcast of Mohammad discussing her Democracy Now Interview and the false and inflammatory statements she made about Plaintiff at the time.

---

[11] WSBTV.com News Staff, *Emory student fights for class reinstatement after suspension for Israel-Gaza protests,* February 11, 2025, WSB-TV, https://www.wsbtv.com/news/local/dekalb-county/emory-student-fights-class-reinstatement-after-suspension-israel-gaza-protests/BLCHKVHEBFCTNP52N7DGTYJY2M/ (last visited April 24, 2025).



68.    On or about February 12, 2025, the *Atlanta Community Press Collective* ("***ACPC***") published an article regarding Mohammad's suspension from the School of Medicine (the "**ACPC Article**").[12] The article included an interview with Mohammad and reiterated the false and inflammatory statements that Mohammad made about Plaintiff during her Democracy Now Interview, stating:

> Mohammad interviewed with *Democracy Now!* on April 26, 2024, about the encampment and called out Emory faculty for enabling Israel's genocide. During the interview, she referred to an IDF soldier-physician who works at Emory without naming him. She said that this individual "aided and abetted in a genocide, aided and abetted in the destruction of the healthcare system in Gaza, and in the murder of over 400 healthcare workers, and is now back at Emory, so-called teaching medical students and residents how to take care of patients."

69.    The ACPC Article then specifically identified Plaintiff by name and

---

[12] Timothy Pratt, *A Palestinian American medical student objected to working alongside IDF soldiers, the university suspended her,* The Guardian, March 24, 2025, https://www.theguardian.com/us-news/2025/mar/24/emory-university-student-suspended-gaza-protest (last visited April 24, 2025).

referenced his op-ed in the *Times of Israel*, making it evident to any reader that Mohammad was referring to Plaintiff. The article stated:

> This soldier-physician, Dr. Joshua H. Winer, is an Associate Professor in the Division of Surgical Oncology, Department of Surgery at Emory University School of Medicine. Dr. Winer discussed his experience serving in the IDF in a *Times of Israel* article.

70.   On or about February 13, 2025, Fox5 aired a televised segment that included footage of CAIR Georgia's Press Conference and further publicized the false statements made about Plaintiff during her Democracy Now Interview.[13]

71.   On or about March 25, 2025, *The Guardian* published an article discussing Mohammad's suspension (the "**Guardian Article**"),[14] which article included professional photographs of Mohammad that were taken for the piece and an interview that Mohammad gave *The Guardian*.



---

72.    The Guardian Article also referenced and republished additional false statements that Mohammad made about Plaintiff during her Democracy Now Interview:

> … Mohammad told her Democracy Now! interviewer: "One of the professors of medicine we have at Emory recently went to serve as a volunteer medic" in the IDF. That professor, she continued, "participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called 'teaching' medical students and residents how to take care of patients."

73.    The Guardian Article also discussed and reprinted the false statements Mohammad made about Plaintiff in the *Mondoweiss* op-ed:

> What kind of care are patients receiving from doctors who believe in the legitimacy of apartheid, and that some human lives are not as important as others?

74.    The Guardian Article further reported that Dean Eley had presented Mohammad with a choice between challenging the findings of Dr. Farley's investigation or proceeding to a disciplinary hearing.   Mohammad told *The Guardian* that she chose to proceed with the disciplinary hearing, stating: "[a]ccepting guilt would mean accepting not talking about Palestine and accepting not talking about genocide, and no career is worth that." This statement is significant as it reflects Mohammad's continued intent to make inflammatory statements about Plaintiff, despite being made aware that her statements were harmful to him.

75.    Notably, Mohammad was suspended only after she falsely accused

Plaintiff of participating in genocide and the destruction of Gaza's healthcare system. Her suspension was not the result of her misuse of the School of Medicine's listserv when she disseminated the SOM Email to the entire student body and faculty. Therefore, it stands to reason that Mohammad could have expressed her views on Palestine and the broader geopolitical conflict without incurring suspension. However, she chose instead to make knowingly false and highly inflammatory statements specifically targeting Plaintiff, with reckless disregard for the truth and with the intent to damage his professional reputation and career.

### 3. NSJP and DAG Published False Statements About Plaintiff

76.     On or about January 13, 2025, NSJP and DAG, in collaboration with Atlanta Radical Art Collective, published a post on Instagram (the "**First NSJP DAG Post**")[15] regarding a community-led initiative that was launched in response to Mohammad's suspension from the School of Medicine.

77.     This First NSJP DAG Post stated that Mohammad had been suspended from the School of Medicine due to her Democracy Now Interview during which she "alluded to an Emory physician who recently served in the Israeli Occupation Forces (IOF) [sic]." The post included the following direct quote from Mohammad's

---

[15]National Students for Justice in Palestine (@nationalsjp) and Doctors Against Genocide (@doctorsagainstgenocide), Instagram (January 13, 2025), https://www.instagram.com/p/DExgaxGOLao/?hl=en&img_index=1 (last visited (April 24, 2025).

Democracy Now Interview:

> …one of the professors of medicine we have at Emory recently went to serve as a volunteer medic in the Israeli Offense Force and recently came back. This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called teaching medical students and residents how to take care of patients. I mean, the disconnect is, for me, very obvious.

78.    The post was widely disseminated on social media, receiving over 2,800 shares and more than 4,000 "likes" on Instagram alone.

79.    In the comments section of the post, an Instagram user inquired about the identity of the professor referenced in the Democracy Now Interview. This inquiry was the second comment in response to the post, thus making it highly visible. In response, another user provided a link to the Plaintiff's op-ed in the *Times of Israel*. The original commenter then responded, thanking the user and explicitly and naming Plaintiff, Dr. Joshua Winer, as the individual referred to in the post in order to spare others from having to visit the link and read Plaintiff's op-ed.

80.    Following the disclosure of Plaintiff's identity, additional users posted false and inflammatory statements targeting Plaintiff in the comments section of the post. Despite the identification of Plaintiff and the harmful nature of the commentary, neither NSJP nor DAG has removed the post from their Instagram platforms or taken any steps to moderate, restrict or delete the comments.

81.    One such comment, addressed to the School of Medicine's official

account, stated:

> @emorymedschool … How do you justify suspending a Palestinian medical
> student speaking out about GENOCIDE, while simultaneously condoning a
> professor of medicine who chooses to participate in that same genocide—one
> where healthcare workers are specifically targeted?

82.    Another comment portrayed Plaintiff as a perpetrator of genocide and

framed Mohammad as a resistor thereof, stating:

> Shame on Emory for employing genociders [sic] and murderers, while
> punishing those who resist annihilation.

83.    The First NSJP DAG Post called on readers to contact the deans of the

School of Medicine to demand that the suspension charges against Mohammad be

rescinded and that both Emory and the School of Medicine hold accountable those

students and faculty who have "participated in or legitimized the genocide in Gaza."

84.    True and correct copies of the relevant slides from the First NSJP DAG

Post are reproduced below for the Court's reference.



atlradicalart and 5 others

**atlradicalart** ACTION ALERT: TAKE FIVE MINUTES TO SUPPORT SUSPENDED PALESTINIAN MD/PHD STUDENT, UMAYMAH MOHAMMAD! Take the two necessary actions: 1) Send an email to Emory administrators requesting they drop Umaymah's suspension and remove IDF soldiers from healthcare spaces and 2) Leave a message using the phone script for several Emory admin reiterating those demands.

Umaymah was unjustly suspended from Emory University School of Medicine in November of 2024 for rightfully calling out a physician-faculty member who recently served in the IDF as "aiding and abetting in a genocide" in an interview on Democracy Now. Emory's own Office of Open Expression has found that this is a violation of Umaymah's rights as a student, and has ruled that the medical school is in violation of Emory policy. We join this national campaign to demand that Emory drop Umaymah's suspension, stop its racist targeting of Palestinian students and those in solidarity, and saying NO to IDF SOLDIERS IN HEALTHCARE! Join Umaymah and @doctorsagainstgenocide @healthcareworkersforpalestine @nationalsjp @palestineswg @msjp.national and @palestinianyouthmovement to protect Palestinian students fighting to end the genocide in Gaza and that targeting of healthcare workers and students.

9w

Liked by **rupa.marya** and 4,231 others

January 13

Add a comment...                                    Post



atlradicalart and 5 others

**atlradicalart** ACTION ALERT: TAKE FIVE MINUTES TO SUPPORT SUSPENDED PALESTINIAN MD/PHD STUDENT, UMAYMAH MOHAMMAD! Take the two necessary actions: 1) Send an email to Emory administrators requesting they drop Umaymah's suspension and remove IDF soldiers from healthcare spaces and 2) Leave a message using the phone script for several Emory admin reiterating those demands.

Umaymah was unjustly suspended from Emory University School of Medicine in November of 2024 for rightfully calling out a physician-faculty member who recently served in the IDF as "aiding and abetting in a genocide" in an interview on Democracy Now. Emory's own Office of Open Expression has found that this is a violation of Umaymah's rights as a student, and has ruled that the medical school is in violation of Emory policy. We join this national campaign to demand that Emory drop Umaymah's suspension, stop its racist targeting of Palestinian students and those in solidarity, and saying NO to IDF SOLDIERS IN HEALTHCARE! Join Umaymah and @doctorsagainstgenocide @healthcareworkersforpalestine @nationalsjp @palestineswg @msjp.national and @palestinianyouthmovement to protect Palestinian students fighting to end the genocide in Gaza and that targeting of healthcare workers and students.

9w

Liked by **rupa.marya** and 4,231 others

January 13

Add a comment...                                    Post



In the interview, Umaymah states:

> One of the professors of medicine we have at Emory went to serve in the Israeli Offense Force and recently came back. This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called 'teaching' medical students and residents how to 'take care' of patients. I mean, the disconnect is, for me, very obvious.

4/9

atlradicalart and 5 others

atlradicalart ACTION ALERT: TAKE FIVE MINUTES TO SUPPORT SUSPENDED PALESTINIAN MD/PHD STUDENT, UMAYMAH MOHAMMAD! Take the two necessary actions: 1) Send an email to Emory administrators requesting they drop Umaymah's suspension and remove IDF soldiers from healthcare spaces and 2) Leave a message using the phone script for several Emory admin reiterating those demands.

Umaymah was unjustly suspended from Emory University School of Medicine in November of 2024 for rightfully calling out a physician-faculty member who recently served in the IDF as "aiding and abetting in a genocide" in an interview on Democracy Now. Emory's own Office of Open Expression has found that this is a violation of Umaymah's rights as a student, and has ruled that the medical school is in violation of Emory policy. We join this national campaign to demand that Emory drop Umaymah's suspension, stop its racist targeting of Palestinian students and those in solidarity, and saying NO to IDF SOLDIERS IN HEALTHCARE! Join Umaymah and @doctorsagainstgenocide @healthcareworkersforpalestine @nationalsjp @palestineswg @msjp.national and @palestinianyouthmovement to protect Palestinian students fighting to end the genocide in Gaza and that targeting of healthcare workers and students.

9w

Liked by rupa.marya and 4,231 others

January 13

Add a comment...                    Post



The repression against Umaymah is not isolated. In October 2023, Emory also fired a Palestinian physician for her private social media posts in support of Palestinians.

What does it say about our medical and educational institutions when it is more punishable to resist genocide than to legitimize or even participate in one?

Rather than standing on the side of justice, the administration at Emory School of Medicine continues to side with white supremacy, genocide, and racial violence - participating in what Dr. Ghassan Abu-Sittah terms the "genocide enablement apparatus."

6/9

atlradicalart and 5 others

atlradicalart ACTION ALERT: TAKE FIVE MINUTES TO SUPPORT SUSPENDED PALESTINIAN MD/PHD STUDENT, UMAYMAH MOHAMMAD! Take the two necessary actions: 1) Send an email to Emory administrators requesting they drop Umaymah's suspension and remove IDF soldiers from healthcare spaces and 2) Leave a message using the phone script for several Emory admin reiterating those demands.

Umaymah was unjustly suspended from Emory University School of Medicine in November of 2024 for rightfully calling out a physician-faculty member who recently served in the IDF as "aiding and abetting in a genocide" in an interview on Democracy Now. Emory's own Office of Open Expression has found that this is a violation of Umaymah's rights as a student, and has ruled that the medical school is in violation of Emory policy. We join this national campaign to demand that Emory drop Umaymah's suspension, stop its racist targeting of Palestinian students and those in solidarity, and saying NO to IDF SOLDIERS IN HEALTHCARE! Join Umaymah and @doctorsagainstgenocide @healthcareworkersforpalestine @nationalsjp @palestineswg @msjp.national and @palestinianyouthmovement to protect Palestinian students fighting to end the genocide in Gaza and that targeting of healthcare workers and students.

9w

Liked by rupa.marya and 4,231 others

January 13

Add a comment...                    Post





85.     The final slide of the First NSJP DAG Post contained a hyperlink to the Action Network campaign, which contained a pre-written email template ("**Email Template**") and phone script ("**Phone Script**").   In the post, NSJP and DAG implored its supporters to use the Email Template and Phone Script to contact administrators at Emory University and the School of Medicine to demand the rescission of Mohammad's suspension and investigate and/or terminate Plaintiff's employment.[16]

86.     The Email Template and Phone Script explicitly identified Plaintiff by name, repeated false and inflammatory allegations against him, and demanded that Emory and the School of Medicine investigate Plaintiff and/or terminate his employment.  The following is a reproduction of the Phone Script:[17]

> **CALL: (404) 712-9979**
> Associate Dean of Medical Education and Student Affairs at Emory School of Medicine
> Dr. Bill Eley
> *[this is the dean who escalated the reports about me and essentially facilitated my suspension]*
>
> **CALL: (404) 727-5631**
> Dean of Emory School of Medicine
> Dr. Sandra Wong
> *[rejected Umaymah's appeal]*

---

[16] Rupa Marya (@rupamarya), Instagram (January 14, 2025), https://www.instagram.com/rupa.marya/p/DEzq7_cpDs_/palestinian-american-medical-student-umaymah-mohammad-spoke-the-unspeakable-and-/ (last visited April 24, 2025).

[17] We Stand with Umaymah! IOF out of Healthcare!, Action Network, available at, https://actionnetwork.org/letters/we-stand-with-umaymah-iof-out-of-healthcare?ref=iuscientists.org (last visited April 24, 2025).

**CALL: (404) 727-0018**
Office of the MD/PhD Program

Hello, my name is ==[Your Name]==, and I am a ==[community member/medical student/other identifier]==. I'm calling to express my concern over the suspension of Umaymah Mohammad, a Palestinian MD/PhD student at Emory. This decision is part of a troubling pattern of anti-Muslim and anti-Palestinian actions at Emory, including the firing of Dr. Abeer AbouYabis.

Additionally, I'm alarmed by the institution's endorsement of faculty like Dr. Joshua Winer, who recently served in the Israeli Defense Forces. Is supporting genocide and war crimes more acceptable at Emory than resisting them? This erodes my trust in Emory as a safe and ethical place for students, faculty, and patients.

I call on Emory to:

1. Drop the suspension against Umaymah Mohammad without delay.
2. Investigate faculty and students endorsing Israel's apartheid regime and remove them for patient safety and compliance with international demands.
3. Publicly apologize for your shameful targeting of students and faculty alike who are using their voice to call for the end of the genocide in Gaza.

Failure to act will forever tarnish your institution's legacy. History will not forget your complicity in genocide.

The reference to Dr. Eley as "*the dean who escalated the reports about me and essentially facilitated my suspension*" suggests that Mohammad is the author of the Phone Script or at the very least, assisted in its drafting.

87.    The Email Template similarly makes false and professionally damaging statements about Plaintiff:

Umaymah is completing her training as an MD/PhD in the Social Sciences, a field that is valued precisely because it provides physician-scientists with unique tools to analyze the processes through which systems of violence produce disease, injury, and premature death. Her training has prepared her to recognize the insidious forms of violence embedded in the structures that appear as the background of everyday life, as "just the way things are." She compared Emory's disgraceful firing of Palestinian physician Dr. Abeer AbouYabis to Dr. Joshua Winer's warm institutional welcome to illustrate a glaring disparity that reflects Emory's longstanding pattern of anti-Palestinian and anti-Muslim racism (further outlined in the Title VI complaint recently filed against Emory).

…It is the duty of every healthcare professional to ensure the safety of patients as well as medical students and trainees. How can we feel safe knowing Emory employs and protects physicians like Dr. Joshua Winer who has written openly about his participation in a military campaign that has been condemned as a genocide by countless international authorities in human rights and international law? … Why does Emory allow a physician who participated in this genocidal campaign to provide care without any investigation into his involvement in war crimes committed by the IDF in Gaza, war crimes that have now been documented in thousands of videos and widely shared across the Internet? Hold faculty and students accountable for their participation in or legitimization of the genocide of Palestinians.

88.    The Phone Script expressly demanded that Plaintiff be fired from the School of Medicine, while the Email Template urged that Plaintiff be investigated. While the Phone Script requested that phone calls be made to two deans from the School of Medicine, emails sent via the Action Network platform were disseminated to 41 faculty members affiliated with Emory University and its School of Medicine.

89.    At the time of this writing, 123,041 emails were sent to the deans of the School of Medicine via the Action Network website.

90.    On or about January 29, 2025, NSJP, in collaboration with DAG,

published an additional post again requesting support for Mohammad and further

disseminating false and professionally damaging statements regarding Plaintiff (the

"**Second NSJP DAG Post**"). The post stated, in part:

> We [at NSJP] stand unequivocally with Umaymah and her truthful statements,
> that any physician-faculty who served in the IDF these last 16 months
> perpetuated a genocide…Although the IDF soldier physician was never
> identified as a result of the interview, despite the IDF solider and faculty
> member having published his own op ed for the Times of Israel titled, "An
> ongoing quest to serve," in which he proudly identified himself as an IDF
> reservist ready for deployment to perpetuate genocidal crimes in Gaza … How
> can individuals who inflict dismemberment, torture, and slaughter return to
> their daily routines as medical professionals, claiming to be healers at US
> healthcare institutions."[18]

91.    The Second NSJP DAG Post falsely and misleadingly characterized

Mohammad's statements about Plaintiff as "truthful".   Contrary to the false and

professionally damaging assertion made by NSJP and DAG, Plaintiff has never

identified himself as an IDF reservist "ready for deployment to perpetuate genocidal

crimes in Gaza."   Plaintiff's service during the referenced period was limited to

providing medical care to injured soldiers and did not involve participation in or

support for any military operations against civilians.

92.    In the final two slides of the NSJP DAG Post, defendants NSJP and

DAG again encouraged their followers to contact the deans of Emory University and

---

[18] National Students for Justice in Palestine, (@nationalsjp) and Doctors Against
Genocide (@doctorsagainstgenocide), Instagram (January 29, 2025),
https://www.instagram.com/p/DFa5u96yFQj/?hl=en&img_index=1(last visited April 24, 2025).

its School of Medicine. The post called for the School of Medicine to rescind Mohammad's suspension and for Emory and the School of Medicine to investigate Plaintiff and/or terminate his employment. A link to the Email Template and Phone Script, which explicitly identified Plaintiff by name, repeated false and inflammatory allegations against him, and demanded that Emory and the School of Medicine investigate Plaintiff and/or terminate his employment, was included in the post.

93. The Second NSJP DAG Post received over 1,080 "likes" and was widely viewed and shared on social media, contributing to the continued dissemination of false and harmful statements about Plaintiff.

94. True and correct copies of the slides from the Second NSJP DAG Post are reproduced below for the Court's reference.





nationalsjp and 2 others

nationalsjp 7w
DROP THE CHARGES AGAINST
UMAYMAH MOHAMMED: EMORY
STUDENT UNDER ATTACK

We stand unequivocally with Umaymah
and her truthful statements, that any
physician-faculty who served in the IDF
these last sixteen months perpetuated
genocide. Support Umaymah against
Emory University's reprehensible and
baseless accusations by taking the
following actions:

1. Send an email to the Deans of Emory
through Action Network asking them to
drop the suspension from Umaymah's
record

2. Call the Emory University and the
School of Medicine Dean's offices and

1,087 likes
January 29

Add a comment...



nationalsjp and 2 others

nationalsjp 7w
DROP THE CHARGES AGAINST
UMAYMAH MOHAMMED: EMORY
STUDENT UNDER ATTACK

We stand unequivocally with Umaymah
and her truthful statements, that any
physician-faculty who served in the IDF
these last sixteen months perpetuated
genocide. Support Umaymah against
Emory University's reprehensible and
baseless accusations by taking the
following actions:

1. Send an email to the Deans of Emory
through Action Network asking them to
drop the suspension from Umaymah's
record

2. Call the Emory University and the
School of Medicine Dean's offices and

1,087 likes
January 29

Add a comment...













### 4. Marya Published False Statements About Plaintiff

95.    Mohammad and Marya are well acquainted.  They spoke together during a panel discussion hosted on YouTube titled, "No Room for Neutrality: Marya, Mansour, Tahir, Mohammad, Smith".[19] During Mohammad's opening remarks, she introduced Marya as "a personal hero of mine."  More recently, on or about March 31, 2025, Mohammad and Marya presented on another panel together after which Marya congratulated Mohammad for her presentation via Instagram, "What an incredible presentation by med student Umaymah Mohammad…"[20] Upon information and belief, Marya and Mohammad also work together as founders of DAG.

96.    Marya has repeatedly made false and damaging statements about Plaintiff. Upon information and belief, Marya learned about Plaintiff and his participation in the IDF from Mohammad.

97.    Marya has frequently identified Plaintiff by name and used her social media platforms to spread harmful and reputationally damaging statements about him. Marya has posted about the Plaintiff on X numerous times, although her

---

[19] Science and Nonduality,  "No Room for Neutrality: Marya, Mansour, Tahir, Mohammad, Smith, YouTube, June 20, 2024, https://www.youtube.com/watch?v=4g7gFp1_hQw (last visited April 24, 2025).

[20] Rupa Marya (@rupamarya), Instagram, March 25, 2025, https://www.instagram.com/rupa.marya/p/DHm-eWvRenk/ (last visited April 24, 2025).

account was deactivated on or about March 24, 2025. As of the time of this writing, Marya's Instagram account remains active.

98.    On or about December 16, 2024, Marya posted a thread on X[21] blaming Plaintiff for the termination of Dr. Abeer AbouYabis, another professor at the School of Medicine, and asserting that it was a double standard that Plaintiff was permitted to continue his work at the School of Medicine after serving in a genocide in the IDF. This post received over 6000 views.

> Palestinian Hematologist Oncologist Professor fired at Emory in October 2023 for a social media post which was maliciously framed. They silence us here while they kill us there. The witch hunt this time was by the IDF soldier/medical school professor Joshua Winer at Emory who went to serve a genocide and then return to work at Emory. He's still employed.



---

[21] Rupa Marya (@DrRupaMarya), X, December 16, 2024, https://x.com/DrRupaMarya/status/1868747909396939268 (last visited March 20, 2025).

99.    In a separate comment on the thread, which received over 490 views, Marya falsely asserted that Plaintiff had served in Gaza during a genocide and that as a result, he should not be permitted to return to work at the School of Medicine. This time, Marya included a photograph of Plaintiff in her post:

> Palestinian female [Dr. Abeer AbouYabis] fired for her words uplifting Palestinian resistance to apartheid/occupation while white man IDF soldier serves in Gaza during the genocide and returns to work at Emory. This is what healthcare look like in US universities.



100.    In this post, Marya conveniently omitted that the School of Medicine placed Dr. Abeer AbouYabis on administrative leave and ultimately terminated her employment after she posted on social media praising the "glory" of Palestinian terrorists shortly after the October 7 attacks. In her posts, Dr. Abeer AbouYabis celebrated the terrorists that infiltrated Israel's borders via paragliders, called for Israel to become occupied Palestinian land, and vowed that Palestinians would make

the ultimate sacrifice to ensure the slaughter of Israelis.

> They got walls we got gliders
> Glory to all resistance fighters
> Palestine is our demand
> No peace on stolen land
> Not another nickel not another dime
> We will pay For israel [sic] slaughter[22]

101.    Furthermore, upon information and belief, AbouYabis had also posted a photo of Adolf Hitler along with a quote attributed to him, which read, "Jews are not people; they are animals."



102.    Dr. AbouYabis's use of her social media platform to post a message

---

[22] *See* Stop Antisemitism (@stopantisemites), X, October 16, 2023, available at, https://x.com/stopantisemites/status/1714098926637257049 (last visited April 24, 2025). *See also* Committee for Open Expression Investigation report , "Investigation into firing of Prof. AbouYabis", Emory University, January 22, 2024, available at, https://senate.emory.edu/_includes/documents/sections/committees/cfoe/cfoe-24-01-22-som-faculty-firing-deidentified-senate-edits1.pdf; https://nypost.com/2023/10/17/atlanta-cancer-doctor-put-on-leave-after-pro-hamas-post-celebrating-glory-of-terrorist-group/ (last visited April 24, 2025).

glorifying Hamas fighters who infiltrated Israel's borders during the October 7 attacks received significant media attention.[23] Upon information and belief, her post was broadly condemned by members of the Atlanta community, many of whom submitted complaints to the administration of the School of Medicine. Plaintiff did not lead or coordinate any effort to seek Dr. AbouYabis's termination from the School of Medicine.

103.   On or about January 3, 2025, in an article that Marya self-published on Substack entitled, "Sick From Genocide,"[24] Marya praised her own persistence in criticizing Jews that served in the IDF.   The article went further to specifically target Plaintiff by falsely asserting that medical students are fearful of him because of his prior service in the IDF during what Marya wrongly referred to as a "genocide."

---

[23] *See e.g.,* Alyssa Guzman, *Atlanta cancer doctor put on leave after post celebrating Hamas' 'glory,'* N.Y. Post, (October 17, 2023), https://nypost.com/2023/10/17/atlanta-cancer-doctor-put-on-leave-after-pro-hamas-post-celebrating-glory-of-terrorist-group/ (last visited April 24, 2025).

[24] Rupa Marya, *Sick from Genocide*, Substack (January 3, 2025), https://rupamarya.substack.com/p/sick-from-genocide (last visited April 24, 2025).

> She kept talking. So did I.
>
> Then came my suspension for naming that med students were afraid because they didn't know the status of someone on campus who had just come from a genocide zone--did they participate? Military service is mandatory. Med students all over the country are afraid of this, because some of their professors are actually going to serve in the genocide like <u>this professor of surgery at Emory</u>, who went to serve in a combat and medic unit during the ongoing genocide. He returned to work as if it was the most normal thing in the world to do. The students who are speaking up are getting hammered too.

The underlined portion of the text contains a link to Plaintiff's op-ed in the *Times of Israel* and the rest of the sentence falsely accuses him of participating in a genocide.

104.   On January 14, 2025, in an Instagram post that received over "700" likes, Marya directed her followers to the Email Template and Phone Script that identified Plaintiff.  Additionally, Marya falsely stated that Plaintiff served in the IDF for the purpose of participating in a genocide and is therefore unfit to teach:

> Palestinian American medical student Umaymah Mohammad spoke the unspeakable, and now she's been suspended by Emory medical school. She called into question why her professor should leave school, go to the IDF to participate in a genocide and return home as if nothing happened to resume his teaching.



105.   Marya posted a similar message on X on or about January 14, 2025,[25]

which received over 440 views, and again directed her followers to support

Mohammad "for her resistance to the genocide of her people" by following the

hyperlink the Email Template and Phone Script, which both directly named the

_____

[25]Rupa Marya (@DrRupaMarya), X,  January 14, 2025,
https://x.com/DrRupaMarya/status/1879180889982472502 (last visited March 20, 2025).

Plaintiff.



106.   On or about January 18, 2025, Defendant Marya published an article on Substack entitled "Decolonizing Medicine." In that article, Marya falsely stated that Plaintiff had participated in genocide and war crimes, characterized Plaintiff as racist, and asserted that he was unfit to teach medical students.  Marya's intent here is clear: Plaintiff is not a racist, but is a Zionist, and for Marya that is disqualifying since she is on the record advocating that "Zionism is a supremacist, racist ideology," and that "The presence of Zionism in US medicine should be examined as a

structural impediment to health equity."[26]

107.    Additionally, Marya included a hyperlink directing readers to the Email

Template and Phone Script, which explicitly identified Plaintiff by name, repeated

false and inflammatory allegations against him, and demanded that Emory and the

School of Medicine investigate Plaintiff and/or terminate his employment:

> I am grateful to medical students like Umaymah Mohammad, whose courage shines as she shares her horror that *a professor at Emory went to serve a combat unit during the genocide* and came back as if everything was perfectly normal. It is not. Genocide is the most intense expression of racism. *Dr. Josh Winer at Emory University is not fit for teaching medical students* in a pluralistic society, especially not ones whose family is currently being annihilated by Israel. Umaymah was suspended for speaking up about this violation of her safety and civil rights. Her stance is a moral one—and a missing one—in a colonial medical system that supports genocidal physicians and silences ones who speak up to stop a genocide. The agenda could not be clearer. Please support Umaymah here. (Emphasis added).[27]

On or about January 26, 2025, the same article—published under a different title—

was republished by *Common Dreams*, an online news outlet, which further

disseminated the false and defamatory statements concerning Plaintiff to a broader

audience.[28]

108.    On or about January 18, 2025, in an X post that received over 300

---

[26] Katy Grimes, *UCSF Med School Professor Claims Med Students Are Triggered by Israeli Student*, Cal. Globe (Sept. 30, 2024), https://californiaglobe.com/fr/ucsf-med-school-professor-claims-med-students-are-triggered-by-israeli-student/ (last visited May 20, 2025).

[27] Rupa Marya, *Decolonizing Medicine*, Deep Medicine (Feb. 3, 2024), https://rupamarya.substack.com/p/decolonizing-medicine (last visited April 24, 2025).

[28] *See* Rupa Marya, "Moving from Colonial to Liberation Medicine in a Time of Genocide", *Common Dreams*, https://www.commondreams.org/opinion/from-colonial-to-liberation-medicine.

views, Marya expressed continued support for Mohammad and once again directed her followers to the Email Template and Phone Script that explicitly identified Plaintiff by name, repeated false and inflammatory allegations against him, and demanded that Emory and the School of Medicine investigate Plaintiff and/or terminate his employment: "I am grateful for students like Umaymah Mohammad. Support her here."[29] Marya then provided a link to the Email Template and Phone Script, which explicitly identified Plaintiff by name, repeated false and inflammatory allegations against him, and demanded that Emory and the School of Medicine investigate Plaintiff and/or terminate his employment.



---

[29]Rupa Marya (@DrRupaMarya), X, January 18, 2025, https://x.com/DrRupaMarya/status/1880629547282071883 last visited (April 24, 2025).

Responding to her own post in thread format, Marya then referred to Plaintiff as a genocidal war criminal who "is bad for patient outcomes."[30] This comment received over 300 views.



109.   In this thread, Marya made further false statements about Plaintiff by comparing him to a well-known Jewish doctor who publicly apologized for conducting unethical experiments during the 1960s and 1970s.  Marya asserted that it was the physician's Zionist beliefs that were to blame, and that his and Plaintiff's shared Zionist beliefs negatively affected patient outcomes.  Zionism, in its essence, is the belief in the right of the Jewish people to self-determination in their ancestral homeland, and the vast majority of Jews are Zionists. Marya's false assertion that Plaintiff is unfit to practice medicine merely because he is a Zionist  is not only false, but overtly antisemitic.

110.   On or about January 31, 2025, Marya published an Instagram post— receiving over 240 likes—in which she expressed support for Mohammad and again

---

[30] *Id.*

made false and inflammatory statements about Plaintiff. Specifically, Marya falsely

claimed that Plaintiff served in a combat unit during a genocide and, as a result, was

unfit to teach. In the same post, Marya again directed her readers to the Email

Template and Phone Script that explicitly identified Plaintiff by name, repeated false

and inflammatory allegations against him, and demanded that Emory and the School

of Medicine investigate Plaintiff and/or terminate his employment:

> Emory suspended Palestinian American student Umaymah Mohammad after
> she publicly spoke about her concern that a professor of surgery went to
> serve in the IDF in combat unit during the genocide and returned to teach, as
> if it's totally normal and acceptable. It's not. Physicians should never
> normalize, endorse or participate in genocide. Genocide is the most
> egregious expression of racism. Join me in sending a letter of support for
> Umaymah here! Every voice helps. Please lift yours. bit.ly/4jbxfgE[31]

111.    In    the    same    post,    Marya    further    publicized

Mohammad's *Mondoweiss* op-ed, posting excerpts from Mohammad's piece that

falsely stated that there is a genocide in Gaza as a result of IDF soldiers like Plaintiff

and that such soldiers are unfit to teach medical students or treat patients:

> This genocide relies not only on IDF soldiers pulling the trigger … What kind
> of care are medical students learning when these are our mentors and
> educators? What kind of care are patients receiving from doctors who believe
> in the legitimacy of apartheid, and that some human lives are not as important
> as others?[32]

---

[31] Rupa Marya (@rupamarya), Instagram, January 31, 2025,
https://www.instagram.com/rupa.marya/p/DFf5ETsyFXB/?img_index=1 (last visited April 24,
2025).

[32] *Id.*

Marya had no basis on which to make the false and inflammatory statement that

Plaintiff believes in the legitimacy of apartheid or that some human lives are not as

important as others. It was based solely on Plaintiff's identity, as a Jew and an Israeli.





**"This genocide relies not only on IDF soldiers pulling the trigger, but also on U.S. physicians and institutions legitimizing the destruction of Gaza's health system."**

UMAYMAH
MOHAMMAD

**"What kind of care are medical students learning when these are our mentors and educators? What kind of care are patients receiving from doctors who believe in the legitimacy of apartheid, and that some human lives are not as important as others?"**

UMAYMAH
MOHAMMAD

112.   On or about February 11, 2025, Marya published a post that received

over 580 "likes" in collaboration with UCSD Divest Coalition on Instagram, which falsely stated that Plaintiff was unfit to be in a position of authority over Palestinian students after he returned from participating in a genocidal military campaign that the International Criminal Court (ICC) deemed to be genocidal. However, the ICC never issued any such ruling. The ICC's jurisdiction is limited to prosecuting individuals, not states or their militaries. Furthermore, Israel is not a member state of the ICC, and a number of countries, including the United States and the United Kingdom, have issued statements holding that the ICC lacks the necessary jurisdiction to even prosecute Israeli nationals. Marya then again directed her followers to the Email Template and Phone Script, which explicitly identified Plaintiff by name, repeated false and inflammatory allegations against him, and demanded that Emory and the School of Medicine investigate Plaintiff and/or terminate his employment:[33]

> @emorymedschool has suspended MD/PhD Candidate Umaymah Mohammad for a brilliant interview with DemocracyNow in which she asked WHY an Emory physician who volunteered with an IDF combat unit in Gaza and participated in a military campaign that the ICC has deemed an attempt to exterminate an entire people--her people--was allowed to return to Emory School of Medicine and remain in a position of power and authority over Palestinian students like herself as her teacher.
>
> Tell Emory you stand with Umaymah!
>
> bit.ly/emoryno

---

[33] Rupa Marya (@rupamarya), Instagram, February 11, 2025, https://www.instagram.com/ucsd.divest/reel/DF8_kBhyk9r/ (last visited April 24, 2025).



113.   On or about February 17, 2025, Marya made further false statements about Plaintiff on X, posting: "…There are an estimated 23,000 Americans serving in the IDF, murdering Arabs for sport.  When these people come back home, what protection do we have? Studies show that veterans of genocides (i.e. war criminals) can be deeply violent people."34 This post received over 87,000 views.   In a comment to this post, Marya added, "Some of them are professors of surgery at places like @EmoryMedicine[.] Dr Josh Weiner [sic] has been working hard to push

---

34 Rupa Marya (DrRupaMarya), X, February 17, 2025, https://x.com/DrRupaMarya/status/1891514266420703373 (last visited 3/20/25).

Palestinian doctors and med students out of the university." This comment, which

contained a photo of Plaintiff, received over 2000 views.



114.   In this post, Marya sought to legitimize her false statement that Plaintiff is a veteran of genocide and a war criminal by referencing alleged studies finding that veterans of genocides can be "deeply violent people" and implying that Plaintiff is a deeply violent person, which he is not.   Furthermore, Marya falsely and baselessly asserted that the Plaintiff was "working hard to push Palestinian doctors and med students out of the university."

115.   On or about February 24, 2025, in a post on X that received 1000 views, Marya falsely stated that Plaintiff's medical license would be revoked due to his service in the IDF:[35]

_____

[35] Rupa Marya (@DrRupaMarya), X, February 24, 2025,
https://x.com/DrRupaMarya/status/1894050607880638528 (last visited April 24, 2025).

They've been at my license for 17 months and counting. Funny/not funny thing is that it's doctors who have served in the IDF during a genocide like Dr Josh Weiner [sic] at Emory who will get his license revoked. Not those of us who insisted the killing stop.



116.   On or about March 26, 2025, Marya published another post on Instagram in which she again made false and inflammatory statements about Plaintiff. In the post, Marya again directed her readers to the hyperlink containing the Email Template and Phone Script that explicitly named Plaintiff, repeated false

and inflammatory allegations against him, and demanded that Emory and the School of Medicine investigate him and/or terminate his employment:

> Support med student Umaymah Mohammad who is experiencing intense racist repression of her speech and her expression of concern for her own safety after publicly sharing her concerns about active IDF as a professor in her medical school. What role should military personnel who actively participate in genocide have in medicine? Should war criminals be welcome to practice medicine in our hospitals? How does that impact the safety of patients and students? How is it impacting our own Constitutional Rights and Civil Rights to have foreign military agents in our universities driving disciplinary proceedings that suspend and fire us?[36]



---

[36] Rupa Marya (@rupamarya), Instagram, March 26, 2025, https://www.instagram.com/rupa.marya/p/DHqtKosJ8t2/?img_index=1 (last visited April 24, 2025).

117.   In this post, Marya asserted that Mohammad should be applauded for publicly sharing her concerns about Plaintiff, who Marya wrongly described as an "active" IDF soldier.  Marya also falsely stated that Plaintiff actively participated in a genocide, is a war criminal that should not be permitted to practice medicine, and is not safe to teach students or treat patients.  Marya further falsely asserted that Plaintiff is a foreign military agent that should not be permitted to drive disciplinary proceedings resulting in the suspension of students or firing of staff, such as Dr. Abou-Yabis.  In fact, Plaintiff is a US citizen who concluded his IDF service upon his return to the United States and is no longer an active member of the IDF. Additionally, Plaintiff did not "drive" or supervise the disciplinary service that resulted in Mohammad's suspension or Dr. Abou-Yabis' suspension.

**5.  CAIR Georgia and CAIR National Made False Statements About Plaintiff**

118.   On February 11, 2025, CAIR Georgia held the Press Conference in which it called on Emory and the School of Medicine to reinstate Mohammad and rescind the disciplinary charges against her.[37]  In advance and in promotion of the Press Conference, CAIR Georgia issued a press release, which included a hyperlink

---

[37] CAIR-Georgia, *Emory Faculty and Students Ask Emory School of Medicine to Reinstate, Facebook* (Feb. 11 2025), https://www.facebook.com/CAIRGA/videos/cair-georgia-emory-faculty-and-students-ask-emory-school-of-medicine-to reinstat/674551304896516/https://www.facebook.com/watch/live/?ref=watch_permalink&v=674 551304896516 (last visited April 24, 2025).

to Mohammad's Democracy Now Interview, thereby further disseminating the false and inflammatory statements that Mohammad had made about Plaintiff during the interview.[38]

119.    During the Press Conference, Mohammad delivered her pre-written CAIR Speech, in which she made numerous false and inflammatory statements about Plaintiff, discussed in detail *infra*.

120.    Upon information and belief, CAIR Georgia was aware of the false and reputationally damaging statements Mohammad would make about Plaintiff in her CAIR Speech, and knowingly provided her with a platform to do so.

121.    Immediately following the statements Mohammad made about Plaintiff in her CAIR Speech, CAIR Georgia's executive director, Azka Mahmood ("**Mahmood**"), falsely stated that Plaintiff supported the perpetration of war crimes:

> …You just heard from Umaymah Mohammad, an Emory student unjustly suspended from Emory School of Medicine for her advocacy for Palestine. It is evident that at Emory School of Medicine, voicing support for victims of human rights violations is swiftly punished ... [The fact] that faculty and students join support for Israel's perpetration of war crimes is conveniently ignored or covered up.

122.    Notwithstanding the falsity of the statements made during the Press

---

[38] CAIR-Georgia, *Emory Faculty and Students Call on Emory School of Medicine to Reinstate Wrongfully Suspended Palestinian-American Student*, (Feb. 11, 2025), https://www.cair.com/press_releases/cair-ga-emory-faculty-and-students-call-on-emory-school-of-medicine-to-reinstate-wrongfully-suspended-palestinian-american-student/ (last visited April 24, 2025).

Conference by both Mohammad and Mahmood, CAIR Georgia published the complete video recording of the Press Conference on its official Facebook page, thereby further disseminating the false and reputationally damaging statements concerning Plaintiff to the public.

123.    On or about February 11, 2025, both CAIR Georgia and CAIR National published the WSB-TV Segment on their respective Instagram accounts in a post that they collaborated on (the "**CAIR Team Post**"). The WSB-TV Segment included footage from the Democracy Now Interview in which Mohammad made false statements about at Plaintiff, including the following:

> WBS-TV Reporter: [Mohammad's] violation came from an interview with Democracy Now back in April during the protests and arrests on [Emory] campus. Mohammad directed allegations at an unnamed Emory doctor volunteering with the Israeli army. Here's a portion from [Democracy Now's] YouTube channel.

The WSB-TV Segment then showed a clip from Mohammad's Democracy Now Interview, during

which Mohammad made the following false statements about Plaintiff:

> This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza.

124.    In the comments section of CAIR Team Post, a user inquired about how to support Mohammad and whether a petition was available. CAIR Georgia replied to the comment by providing a link to the previously circulated Email Template and Phone Script—which explicitly identified Plaintiff by name, repeated false and

inflammatory allegations against him, and demanded that Emory and the School of

Medicine investigate Plaintiff and/or terminate his employment.



125.    On or about March 24, 2025, CAIR Georgia posted a screen shot of the

Guardian Article on its Instagram account and issued the following statement:[39]

> Palestinian American student, Umaymah Mohammad, objected to working
> with an IDF soldier. Emory University unjustly suspended her.  CAIR-
> Georgia will continue to support Umaymah Mohammad as she challenges
> Emory University and its medical professionals' complicity in the genocide
> in Gaza.

---

[39] CAIR-Georgia (@cairgeorgia), Instagram, March 24,  2025,
https://www.instagram.com/p/DHla3oUOpg8/ (last visited April 24, 2025).

Upon information and belief, Plaintiff is the only medical professional at Emory University that Mohammad has accused of being complicit in genocide in Gaza.

126.    The same Instagram post quoted an excerpt from the Guardian Article, in which CAIR Georgia's executive director provided the following the statement for publication:

> You have a Palestinian medical student who specifically joined the field trying to understand inequities and the role of medicine in violence. To have to work side by side with an IDF soldier is exacerbating, and makes it uniquely painful for her.



127.    Although Plaintiff was not named directly in CAIR Georgia's post featuring the Guardian Article, he is readily identifiable as the individual being referenced. Plaintiff is the only faculty member at the School of Medicine who

served in the IDF following the October 7 attacks.

### 6.  Emory SJP Published False Statements About Plaintiff

128.   On or about January 14, 2025, Emory SJP shared the First NSJP and DAG Post on its Instagram account, thereby further disseminating the false and reputationally damaging statements made therein about Plaintiff.[40]

129.   On or about February 13, 2025, Emory SJP collaborated on another Instagram post[41] that recounted the false and reputationally damaging statements made by Mohammad during her Democracy Now Interview:

> During the [Democracy Now!] interview, [Mohammad] referred to an IDF soldier-physician who works at Emory without naming him.  She said that this individual, "aided and abetted in a genocide, aided and abetted in the destruction of the healthcare system in Gaza, and in the murder of over 400 healthcare workers, and is now back at Emory, so called teaching medical students and residents how to take care of patients.

130.   Emory SJP then explicitly identified Plaintiff as the IDF soldier-physician referenced in the interview:

> This soldier-physician, Dr. Joshua H. Winer, is an Associate Professor in the Division of Surgical Oncology, Department of Surgery at Emory School of Medicine.  Dr. Winer discussed his experience of serving in the IDF in a Times of Israel article.

---

[40] Emory Students for Justine in Palestine (@Emorysjp), Instagram, January 14, 2025, https://www.instagram.com/p/DE0dxA6vNB-/?img_index=2 (last visited April 24, 2025).

[41] Emory Students for Justine in Palestine (@Emorysjp), Instagram, February 13, 2025, https://www.instagram.com/p/DGBfxG0J2gT/?img_index=4 (last visited April 24, 2025).



This post also included a video clip of Mohammad during the Democracy Now Interview.

131.  On or about March 28, 2025, Emory SJP collaborated on a third Instagram post, "welcoming" Plaintiff to the School of Medicine's so-called "Bloody Hall of Shame".[42] The post included the following caption, which was positioned next to a photograph of Mohammad:

> In the last week, Emory School of Medicine has made national headlines for suspending Palestinian medical student Umaymah Mohammad for critiquing a faculty of medicine who served in the IDF as it was committing a genocide against Palestinians.

---

[42] Emory Students for Justine in Palestine (@Emorysjp), Instagram, March 27, 2025, https://www.instagram.com/emorydivest/p/DHtYwfRuGOS/welcome-to-emory-universitys-bloody-hall-of-shame-started-during-the-encampment-/?img_index=1 (last visited April 24, 2025).



132.   In a separate slide of the same post, Emory SJP, in collaboration with Emory Divest Coalition and other Instagram users, attempted to minimize Mohammad's responsibility for identifying Plaintiff by asserting that she never named him directly.  The post stated:

> Although Umaymah never mentioned the name of the IOF soldier-doctor, he wrote an article identifying himself for the Times of Israel in which he says, "I started to volunteer for all positions [in the IDF], military and civilian" – Joshua Winer.

133.   In its effort to defend Mohammad, Emory SJP inadvertently highlighted the extent to which Mohammad's false statements unmistakably pointed to Plaintiff as the individual referenced.

134.   In the same slide, alongside a photograph of Plaintiff against the backdrop of exploding buildings, Emory SJP also falsely asserted that Plaintiff had described himself as "a physician with military combat experience against Palestinians," a characterization that is entirely inaccurate and unsupported by any public statement or writing by Plaintiff.



135.   As a direct and proximate result of the widespread dissemination of these false statements, Plaintiff has suffered significant, ongoing and enduring public embarrassment, emotional distress, and harm to his professional reputation.  Plaintiff fears for his personal safety, the safety of his family, and the risk of targeted harassment or violence due to the public and inflammatory nature of the accusations

made against him. Additionally, the damage to Plaintiff's professional reputation, the public pressure placed on his employer through the dissemination of the Email Template and Phone Script, and the Defendants' coordinated social media campaign have caused Plaintiff to fear for the future of his medical career and financial livelihood.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of OCGA § 51-5-4
### Defamation Per Se

136.   Plaintiff repeats and re-alleges each of the forgoing paragraphs as if set forth fully herein.

137.   A statement is defamatory per se when it is injurious on its face and does not require innuendo. In such cases, damages are inferred.

138.   Charges made against a person in reference to their trade, office, or profession that are calculated to injure them in that regard constitute defamation per se.

139.   Georgia courts have held that the legal standard for slander per se applies equally to libel per se.

140.   An opinion is defamatory per se if it can reasonably be interpreted, according to the context of the entire writing or statement, to state or imply defamatory facts that are capable of being proved false.

141.   Here, Defendants made numerous false and defamatory statements about Plaintiff with the intent to damage his professional reputation.  These statements were widely distributed, including via social media, news publications, and television broadcasts. Defendants cannot avoid liability for those defamatory statements that did not identify Plaintiff by name because Plaintiff was easily identifiable based on the specific details that Defendants provided in such statements.

142.   Mohammad made the following false and defamatory statements about Plaintiff:

a.   On or about April 26, 2025, during the Democracy Now Interview, Mohammad falsely stated the following:

> One of the professors of medicine we have at Emory recently went to serve as a volunteer medic in the Israeli Offense Force [sic] and recently came back. This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called teaching medical students and residents how to take care of patients. I mean, the disconnect is, for me, very obvious. And it's very frustrating that the School of Medicine and the greater Emory community continues to ignore these major disconnects.

b.   On or about November 4, 2024, during a podcast episode entitled "International Student Movements Against Genocide in Palestine" hosted by the International Union of Scientists, Mohammad falsely

stated that Plaintiff was complicit in genocide and that he directly

participated in the taking of life:

> At Emory University and other institutions here in the US,
> there are physicians who have served in the IDF and in fact,
> a physician at Emory has actually volunteered to serve in
> both a medical and military capacity in this last year in the
> genocide… our institutions are literally employing people
> who are not just complicit in these genocides, but … their
> hands are directly participating in the taking of life … this
> simple individual example is a reflection of a system that
> chooses which lives to save with one hand and which lives
> to take with the other.

c.  On or about January 21, 2025, Mondoweiss published an op-ed

authored by Mohammad titled, "I was suspended from Emory over

my Palestine activism. I will not let it stop me." In the op-ed,

Mohammad falsely stated that Plaintiff believes in the legitimacy

of apartheid and participated in aiding and abetting a genocide and

the destruction of Gaza's healthcare system:

> … Amy Goodman asked about my previous comments on
> Emory School of Medicine's complicity in the genocide in
> Gaza. I gave the example of our surgery clerkship director
> who participated in Israel's war crimes by serving in the IDF
> in early 2024 and was allowed to return to his teaching
> position at the institution.  What kind of care are patients
> receiving from doctors who believe in the legitimacy of
> apartheid, and that some human lives are not as important as
> others? These physicians are creating a world in which only
> some people—those who look like them—deserve care and
> protection … The medical school administration at Emory
> suspended me on November 19th, 2024, citing violations of
> "respect" and "professionalism" due to my interview on

Democracy Now!. I brought attention to an Emory physician-faculty's aiding and abetting a genocide and the destruction of the healthcare system in Gaza. They have attempted to silence my advocacy to end the genocide and U.S. healthcare's complicity in structural violence. But they have failed to scare or silence me.

This op-ed included a hyperlink to the First NSJP and DAG Post, which in turn linked to the defamatory Phone Script and Email Template urging Plaintiff's termination.

d.  On or about February 11, 2025, during the Press Conference hosted by CAIR- Georgia, Mohammad delivered her CAIR Speech, falsely stating:

> … I mentioned an unnamed physician who served in the military, actively engaged in the genocidal campaign against the Palestinian people, my people … Having a physician faculty member who participated in a military convicted of committing genocide against Palestinians makes me feel unsafe. It makes black and brown medical students feel unsafe. It makes black and brown and indigenous patients feel unsafe. I cannot learn from a physician who might have fired one of the 355 bullets that landed in 6 year old Hind Rajab's body. Or who might have helped make the decision to bomb one of the hospitals in Gaza. Or who might have celebrated the murder of our communities on the rubble still wet with Palestinian blood. A doctor who cannot see Palestinians as human beings will return to Atlanta to offer the same disposability to black and brown patients at home.

143.  NSJP and DAG jointly published two posts on Instagram, the First NSJP DAG Post and the Second NSJP DAG Post, in which they made the following defamatory statements:

a. In the First NSJP DAG Post, NSJP and DAG falsely stated that

Plaintiff had recently served in the "IOF", an abbreviation of

"Israeli Offense Force," which is a deliberately inflammatory

mislabeling of the Israeli Defense Forces (IDF), that

mischaracterized Plaintiff's medical service and implied his

participation in war crimes:

> …Umaymah [Mohammad] expressed concern over the silencing
> of Palestinian voices and alluded to an Emory physician who
> recently served in the IOF …

b. NSJP and DAG also permitted defamatory third-party comments to

remain publicly visible in the comments section of the First NSJP

DAG Post. These comments explicitly accused Plaintiff of

participating in genocide and murder:

> i. @emorymedschool … How do you justify suspending a
> Palestinian medical student speaking out about GENOCIDE,
> while simultaneously condoning a professor of medicine who
> chooses to participate in that same genocide—one where
> healthcare workers are specifically targeted?

> ii. Shame on Emory for employing genociders [sic] and
> murderers, while punishing those who resist annihilation.

c. The First NSJP DAG Post included a hyperlink to the defamatory

Phone Script hosted on the Action Network website, which

encouraged readers to contact the School of Medicine's deans and

make false statements about Plaintiff. The Phone Script directed

readers to make the following defamatory statements about

Plaintiff to the School of Medicine's deans:

> I'm alarmed by the institution's endorsement of faculty like Dr.
> Joshua Winer, who recently served in the Israeli Defense
> Forces. Is supporting genocide and war crimes more acceptable
> at Emory than resisting them? Investigate faculty and students
> endorsing Israel's apartheid regime and remove them for patient
> safety and compliance with international demands.

d. The First NSJP DAG Post also included a hyperlink to the Email

Template hosted on the Action Network campaign website,

directing readers to send defamatory emails to 41 Emory faculty

members. The Email Template falsely asserted that Plaintiff

endorsed apartheid and participated in genocide, stating:

> …[Mohammad] compared Emory's disgraceful firing of
> Palestinian physician Dr. Abeer AbouYabis to Dr. Joshua Winer's
> warm institutional welcome to illustrate a glaring disparity that
> reflects Emory's longstanding pattern of anti-Palestinian and anti-
> Muslim racism (further outlined in the Title VI complaint recently
> filed against Emory).

> It is the duty of every healthcare professional to ensure the safety of
> patients as well as medical students and trainees. How can we feel
> safe knowing Emory employs and protects physicians like Dr.
> Joshua Winer who has written openly about his participation in a
> military campaign that has been condemned as a genocide …

e. In the Second NSJP DAG Post, NSJP and DAG again included a

hyperlink to the Email Template and Phone Script.  Additionally,

NSJP and DAG reiterated their false accusations, asserting that any

physician who served in the IDF within the prior sixteen months

had perpetuated genocide:

> We stand unequivocally with Umaymah and her truthful
> statements, that any physician-faculty who served in the IDF
> these last sixteen months perpetuated genocide…
>
> Emory issued several allegations against Umaymah
> [Mohammad] after she anonymously compared the cases of
> two faculty of medicine. The comparison was made
> [between] one Palestinian physician who was terminated in
> October 2023 for a social media posts about Palestine and
> another faculty of medicine who was allowed to serve in the
> IDF during the genocide in early 2024 and resumed teaching
> at the institution. In her interview, she mentioned that the IDF
> solider-physician "aided and abetted a genocide, aided and
> abetted the destruction [of] the healthcare system in Gaza, and
> in the murder of over 400 healthcare workers.
>
> Although the IDF solider and physician was never identified
> as a result of the interview, despite the IDF solider and faculty
> member having published his own op ed for the Times of
> Israel titled, "An ongoing quest to serve," in which he proudly
> identified himself as an IDF reservist ready for deployment to
> perpetuate genocidal crimes in Gaza…
>
> How can individuals who inflict dismemberment, torture, and
> slaughter return to their daily routines as medical
> professionals, claiming to be healers at US healthcare
> institutions."

144. AMP founded and maintains control over NSJP, and through this

relationship, enabled and supported NSJP's dissemination of false, targeted

rhetoric against Plaintiff. AMP's control over NSJP includes responsibility for its

coordinated campaigns against individuals like Plaintiff.

145.    WESPAC, as NSJP's fiscal sponsor, knowingly funded and facilitated NSJP's coordinated efforts to vilify Plaintiff and pressure Emory to discipline Plaintiff, including through the distribution of false statements and hyperlinks to defamatory action tools.

146.    Marya made numerous false and defamatory statements about Plaintiff across various platforms, falsely portraying Plaintiff as a racist genocidal war criminal and an unfit educator. These statements were sometimes accompanied by Plaintiff's name, photograph or hyperlinks that directly identified him.  More specifically, Marya made the following defamatory statements:

a.  On or about December 16, 2024, Marya published a post on X that included Plaintiff's name and photograph.  In the post, Marya falsely stated Plaintiff returned from serving in a genocide and then instigated a malicious campaign to remove a Palestinian faculty member from the School of Medicine:

Palestinian Hematologist Oncologist Professor fired at Emory in October 2023 for a social media post which was maliciously framed.  They silence us here for while they kill us here. The witch hunt this time was by the IDF soldier/medical school professor Joshua Winer at Emory who went to serve a genocide and then return to work at Emory. He's still employed.

Palestinian female [Dr. Abeer AbouYabis] fired for her words uplifting Palestinian resistance to apartheid/occupation while white man IDF soldier serves in Gaza during the genocide and

returns to work at Emory. This is what healthcare look like in US universities.

b. On or about January 3, 2025, Marya self-published an article on Substack titled, "Sick From Genocide," in which she falsely asserted that medical students are fearful of Plaintiff because of his service in what Marya inaccurately referred to as a "genocide". Marya included a hyperlink to Plaintiff's *Times of Israel* op-ed in order to explicitly identify him:

> She kept talking. So did I. Then came my suspension for naming that med students were afraid because they didn't know the status of someone on campus who had just come from a genocide zone--did they participate? Military service is mandatory. Med students all over the country are afraid of this, because some of their professors are actually going to serve in the genocide like this professor of surgery at Emory [link to Plaintiff's *Times of Israel* op-ed], who went to serve in a combat and medic unit during the ongoing genocide. He returned to work as if it was the most normal thing in the world to do. The students who are speaking up are getting hammered too.

c. On January 14, 2025, Marya used Instagram to direct users to the defamatory Phone Script and Email Template. In her post, she falsely claimed Plaintiff joined the IDF to participate in genocide and was unfit to teach:

> Palestinian American medical student Umaymah Mohammad spoke the unspeakable, and now she's been suspended by Emory medical school. She called into question why her professor should leave school, go to the IDF to participate in a genocide and return home as if nothing happened to resume

his teaching. Support Emory medical student Umaymah Mohammad suspended for her resistance to the genocide of her people. [Link provided to Phone Script and Email Template].

d. On the same date, Marya directed X users to the defamatory Email Template and Phone Script:

> Support Emory medical student Umaymah Mohammad suspended for her resistance to the genocide of her people. Here: bit.ly/emoryno

e. On or about January 18, 2025, Marya published a Substack article titled *"Decolonizing Medicine"*, and on January 26, 2025, the same article—under a different title—was republished by *Common Dreams*. In both versions, Marya included links to the defamatory Phone Script and Email Template and made the following false statements about Plaintiff, portraying him as a racist war criminal unfit to teach:

> I am grateful to medical students like Umaymah Mohammad, whose courage shines as she shares her horror that a professor at Emory went to serve a combat unit during the genocide and came back as if everything was perfectly normal. It is not. Genocide is the most intense expression of racism. Dr. Josh Winer at Emory University is not fit for teaching medical students in a pluralistic society, especially not ones whose family is currently being annihilated by Israel. Umaymah was suspended for speaking up about this violation of her safety and civil rights. Her stance is a moral one—and a missing one—in a colonial medical system that supports genocidal physicians and silences ones who speak up to stop a genocide. The agenda could not be clearer. Please support Umaymah here [link provided to Phone Script and Email Template].

f.  On or about January 18, 2025, Marya posted again on X, linking to

the defamatory Email Template and Phone Script and referring to

Plaintiff as a genocidal war criminal unfit to treat patients.  She

further compared Plaintiff to a notorious medical abuser:

> Having a genocidal/war criminal for a physician is bad for patient
> outcomes. We don't have to study it.  We can just look at Howard
> Maibacj, a devout Zionist who injected 2600 imprisoned people
> (Black/brown) with poison without their informed consent.  It's
> really not good.

g.  On or about January 31, 2025, Marya published an Instagram post

that reiterated and disseminated the defamatory statements made by

Mohammad about Plaintiff in her *Mondoweiss* op-ed.  Marya further

falsely claimed that Plaintiff served in a combat unit during a

genocide and was therefore unfit to teach:

> Emory suspended Palestinian American student Umaymah
> Mohammad after she publicly spoke about her concern that a
> professor of surgery went to serve in the IDF in combat unit
> during the genocide and returned to teach, as if it's totally
> normal and acceptable. It's not. Physicians should never
> normalize, endorse or participate in genocide. Genocide is the
> most egregious expression of racism. Join me in sending a
> letter of support for Umaymah here! Every voice helps.
> Please lift yours. bit.ly/4jbxfgE (link to Phone Script and
> Email Template).
>
> This genocide relies not only on IDF soldiers pulling the
> trigger … What kind of care are medical students learning
> when these are our mentors and educators? What kind of care
> are patients receiving from doctors who believe in the

legitimacy of apartheid, and that some human lives are not as important as others? (Phone Script and Email Template were linked, thus explicitly identifying Plaintiff)

h. On or about February 11, 2025, Marya published an Instagram post again directing readers to the defamatory Email Template and Phone Script. She also falsely claimed that Plaintiff had returned from participating in a genocidal military campaign and was unfit to be in a position of authority over Palestinian students.  Marya falsely stated that the ICC had deemed the IDF's actions genocidal, despite no such ruling ever being issued:

> @emorymedschool has suspended MD/PhD Candidate Umaymah Mohammad for a brilliant interview with Democracy Now in which she asked WHY an Emory physician who volunteered with an IDF combat unit in Gaza and participated in a military campaign that the ICC has deemed an attempt to exterminate an entire people--her people--was allowed to return to Emory School of Medicine and remain in a position of power and authority over Palestinian students like herself as her teacher. Tell Emory you stand with Umaymah! bit.ly/emoryno (link to Phone Script and Email Template).

i. On or about February 17, 2025, Marya posted a photograph of Plaintiff alongside a defamatory statement accusing him of being a genocidal war criminal who had murdered Arabs for sport and then returned to the School of Medicine to persecute Palestinian doctors and students:

> …There are an estimated 23,000 Americans serving in the IDF, murdering Arabs for sport. When these people come back home, what protection do we have? Studies show that veterans of genocides (i.e. war criminals) can be deeply violent people…Some of them are professors of surgery at places like @EmoryMedicine[.] Dr Josh Weiner has been working hard to push Palestinian doctors and med students out of the university.

j. On or about February 24, 2025, Marya posted on X falsely stated that Plaintiff's medical license would be revoked due to his service in the IDF:

> They've been at my license for 17 months and counting. Funny/not funny thing is that it's doctors who have served in the IDF during a genocide like Dr Josh Weiner at Emory who will get his license revoked. Not those of us who insisted the killing stop.

k. On or about March 26, 2025, Marya again used Instagram to direct readers to the defamatory Phone Script and Email Template. Additionally, Marya falsely stated that Plaintiff is a genocidal war criminal, an "active" IDF soldier, a foreign military agent, and a danger to medical students and patients:

> Support med student Umaymah Mohammad who is experiencing intense racist repression of her speech and her expression of concern for her own safety after publicly sharing her concerns about active IDF as a professor in her medical school. What role should military personnel who actively participate in genocide have in medicine? Should war criminals be welcome to practice medicine in our hospitals? How does that impact the safety of patients and students? How is it impacting our own Constitutional Rights and Civil Rights to have foreign military

agents in our universities driving disciplinary proceedings that suspend and fire us?

147. CAIR-Georgia published, endorsed, and disseminated false and defamatory statements concerning Plaintiff, including by republishing content created by others that explicitly defamed Plaintiff and by independently making statements that falsely attributed genocidal conduct and war crimes to him. CAIR-Georgia made the following defamatory statements about Plaintiff:

a. On or about February 11, 2025, CAIR-Georgia issued a press release on Facebook that included hyperlinks to the defamatory Phone Script, Email Template, and Mohammad's Democracy Now Interview.

b. On or about February 11, 2025, CAIR-Georgia published Mohammad's defamatory CAIR Speech on its official Facebook page, thereby further disseminating Mohammad's false and defamatory statements about Plaintiff in which she accused him of engaging in genocidal acts while serving in the IDF.

c. During the Press Conference, immediately following the defamatory statements Mohammad made about Plaintiff in her CAIR Speech, CAIR-Georgia's executive director falsely stated that Plaintiff's employment at the School of Medicine is indicative of its institutional complicity in war crimes:

…You just heard from Umaymah Mohammad, an Emory student unjustly suspended from Emory School of Medicine for her advocacy for Palestine. It is evident that at Emory School of Medicine, voicing support for victims of human rights violations is swiftly punished ... [The fact] that faculty and students join support for Israel's perpetration of war crimes is conveniently ignored or covered up.

d.  On or about March 24, 2025, CAIR-Georgia promoted the Guardian Article on its Instagram account alongside its defamatory statement that Plaintiff was complicit in genocide:

Palestinian American student, Umaymah Mohammad, objected to working with an IDF soldier. Emory University unjustly suspended her.  CAIR-Georgia will continue to support Umaymah Mohammad as she challenges Emory University and its medical professionals' complicity in the genocide in Gaza.

e.  On or about March 24, 2025, CAIR-Georgia's executive director defamed Plaintiff in a statement she issued to the *Guardian* in support of Mohammad, falsely asserting that Plaintiff used his medical license in furtherance of violence:

You have a Palestinian medical student [Umaymah Mohammad] who specifically joined the field trying to understand inequities and the role of medicine in violence. To have to work side by side with an IDF soldier is exacerbating, and makes it uniquely painful for her.

148.  CAIR National collaborated with CAIR-Georgia on Instagram to further disseminate false and defamatory statements about Plaintiff through joint social media posts:

a. On or about February 11, 2025, CAIR-Georgia and CAIR National collaborated on the CAIR Team Post in which they published the WSB-TV Segment regarding CAIR Georgia's Press Conference. The segment featured a reporter explaining that Mohammad was disciplined following her Democracy Now Interview in which she "directed allegations at an unnamed Emory doctor volunteering with the Israeli army". The news segment then cut to Mohammad's Democracy Now Interview in which she made the following false and defamatory statement about Plaintiff:

> This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza.

b. In the comments section of the CAIR Team Post, CAIR-Georgia provided a link to the defamatory Email Template and Phone Script.

149. Emory SJP republished and reinforced the false and defamatory narrative regarding Plaintiff through multiple posts on its Instagram platform, thereby amplifying the reputational harm Plaintiff incurred:

a. On or about January 14, 2025, Emory SJP reposted the First NSJP and DAG Post on its Instagram account, thereby further disseminating the false and reputationally damaging statements made therein about Plaintiff.

b. On or about February 13, 2025, Emory SJP reiterated the false and defamatory statements that Mohammad made about Plaintiff during her Democracy Now Interview, included a clip of Mohammad making the defamatory statements during the Democracy Now Interview, and then explicitly identified Plaintiff as the IDF soldier to whom Mohammad referred:

> During the [Democracy Now!] interview, [Mohammad] referred to an IDF soldier-physician who works at Emory without naming him. She said that this individual, "aided and abetted in a genocide, aided and abetted in the destruction of the healthcare system in Gaza, and in the murder of over 400 healthcare workers, and is now back at Emory, so called teaching medical students and residents how to take care of patients.

> This soldier-physician, Dr. Joshua H. Winer, is an Associate Professor in the Division of Surgical Oncology, Department of Surgery at Emory School of Medicine. Dr. Winer discussed his experience of serving in the IDF in a Times of Israel article.

c. On or about March 28, 2025, via Instagram, Emory SJP "welcomed" Plaintiff to the School of Medicine's so-called "Bloody Hall of Shame." In the accompanying caption, Emory SJP reiterated false claims that Plaintiff had served in the IDF during the alleged genocide in Gaza and mischaracterized his own writings to support its defamatory assertions:

i.  In the last week, Emory School of Medicine has made national headlines for suspending Palestinian medical student Umaymah Mohammad for critiquing a faculty of medicine who served in the IDF as it was committing a genocide against Palestinians…

ii.  Although Umaymah [Mohammad] never mentioned the name of the IOF soldier-doctor, he wrote an article identifying himself for the Times of Israel in which he says, "I started to volunteer for all positions [in the IDF], military and civilian" – Joshua Winer… On his physician profile, he … describes himself as a physician with "military combat experience" against Palestinians. (This statement appeared alongside a photograph of Plaintiff again the backdrop of exploding buildings).

150.  Defendants made the above statements with the intent to harm Plaintiff's professional standing and career.

151.  Defendants' false and defamatory statements were especially injurious because Plaintiff is a physician and medical school professor. Defendants stated that Plaintiff engaged in violent, racist, and criminal behavior—attributes wholly incompatible with Plaintiff's professional and ethical obligations under the Hippocratic Oath and standards of care.

152.  Plaintiff is entitled to recover compensatory damages, punitive damages, and all other relief permitted by law.

## COUNT II
## False Light Invasion of Privacy

153.  Plaintiff repeats and re-alleges each of the forgoing paragraphs as if set

forth fully herein.

154.  "To establish a claim of false light invasion of privacy, a plaintiff must show the existence of false publicity that depicts the plaintiff as something or someone which he is not. Next, the plaintiff must demonstrate that the false light in which he was placed would be highly offensive to a reasonable person." *Doe v. Roe*, 362 Ga. App. 23, 32, 864 S.E.2d 206 (2021) (quoting *Williams v. Cobb Cnty. Farm Bureau*, 312 Ga. App. 350, 353, 718 S.E.2d 540 (2011)).  *See also Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 685, 689–90, 500 S.E.2d 1 (1998).

155.  In the course of their coordinated campaign against Plaintiff, Defendants published numerous false statements that portrayed Plaintiff as someone who condones or engages in violence, lacks moral integrity, devalues certain human lives, and is unfit to treat patients or teach students—particularly those from marginalized communities.

156.  Defendants' statements, whether disseminated through interviews, podcasts, press conferences, social media, or digital publications, were made with actual malice and reckless disregard for the truth. Defendants either knew these statements were false or acted with a high degree of awareness of their probable falsity.

157.  These statements presented Plaintiff in a deeply misleading and offensive light, including but not limited to: suggesting that Plaintiff celebrated the

killing of civilians, that he was indifferent to the suffering of Black and Brown patients, that he supported apartheid, and that he posed a safety risk to students and patients due to his ethnicity, military service, or religious beliefs.

158.   Such portrayals would be highly offensive to a reasonable person and were intended to arouse public outrage, professional condemnation, and reputational harm.

159.   Under Georgia law, a false light invasion of privacy claim may be subsumed by a defamation claim where both are based on the same defamatory statements. Accordingly, in the event the Court finds that each of the false statements alleged in this Complaint constitutes defamation per se, Plaintiff's false light claim will be subsumed. However, to the extent any of the challenged statements, in whole or in part, are found not to be defamatory per se——but nonetheless convey a highly offensive and misleading portrayal of Plaintiff to the public, such statements independently support a viable claim for false light invasion of privacy. Plaintiff is entitled to plead alternative and inconsistent theories at the pleading stage under applicable federal law, and therefore pleads false light to preserve all available rights and remedies.

160.   As a direct and proximate result of Defendants' false and misleading public portrayals, Plaintiff has suffered significant, ongoing and enduring public embarrassment, emotional distress, and harm to his professional reputation.

161. Plaintiff is entitled to recover compensatory damages, punitive damages, and all other relief permitted by law.

## COUNT III
## Civil Conspiracy

162. Plaintiff repeats and re-alleges each of the forgoing paragraphs as if set forth fully herein.

163. To recover damages for a civil conspiracy claim under Georgia law, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort.

164. Here, the Defendants, acting in concert, combined and conspired with one another to defame Plaintiff and to place him in a false light, with the shared unlawful objective of damaging Plaintiff's professional reputation, pressuring the School of Medicine to reinstate Mohammad, and seeking Plaintiff's termination and public condemnation.

165. Mohammad initiated this conspiracy by making false, defamatory statements about Plaintiff during the Democracy Now Interview, including that he had participated in genocide, war crimes, and the destruction of Gaza's healthcare system, *despite knowing that Plaintiff served in the IDF in his capacity as a physician.* Mohammad ensured that her false statements were widely disseminated by reiterating them on a podcast, at the Press conference, and in her *Mondoweiss* op-

eds. Mohammad's statements were designed to invite widespread public scrutiny, outrage, and retaliation against Plaintiff.  Mohammad then conspired with the other defendants herein to further disseminate and publicize her false and defamatory statements regarding the Plaintiff and place him in a false light.

166.    NSJP and DAG, organizations with which Mohammad is affiliated as a steering committee member and co-founder respectively, collaborated to amplify and disseminate Mohammad's defamatory statements.  They did so through coordinated social media campaigns, including "First NSJP DAG Post" and the "Second NSJP DAG Post," which contained defamatory statements, directly identified Plaintiff, and linked to call-to-action materials instructing Mohammad's supporters to demand Plaintiff's termination.

167.  AMP, as the founder of NSJP, is responsible for enabling and facilitating NSJP's participation in the conspiracy. Upon information and belief, AMP has organizational control and oversight over NSJP and knowingly permitted its use of official channels and social media to disseminate false and defamatory statements about Plaintiff.

168.    WESPAC, as NSJP's fiscal sponsor, knowingly funded and facilitated NSJP's coordinated campaign to target and exert pressure on Emory University to investigate and terminate Plaintiff.  This campaign included the dissemination of false and defamatory statements about Plaintiff, as well as the promotion of online

tools designed to further those defamatory efforts.

169.    Marya, a close associate of Mohammad's and co-founder of DAG, joined the conspiracy by repeatedly posting false and inflammatory statements about Plaintiff on social media and in articles, including that Plaintiff is a racist, a war criminal, and unfit to teach medical students or treat patients. Marya identified Plaintiff by name and photograph and linked to the same defamatory Email Template and Phone Script circulated by NSJP and DAG.

170.    CAIR-Georgia, through its public events and social media platforms, worked with Mohammad to further disseminate her false statements. At the Press Conference held on February 11, 2025, CAIR-Georgia provided Mohammad with a platform to deliver a speech containing further defamatory statements about Plaintiff. Following the event, CAIR Georgia republished the speech and promoted related media coverage, including the Democracy Now interview.  CAIR-Georgia also shared the same defamatory Email Template and Phone Script.

171.   CAIR National collaborated with CAIR-Georgia to disseminate defamatory materials online, including via a joint Instagram post that included direct quotations from Mohammad falsely accusing Plaintiff of participating in genocide, the Email Template and Phone Script.

172.    Emory SJP, a local chapter of NSJP, joined in the conspiracy by reposting the NSJP and DAG materials, explicitly naming Plaintiff as the physician

referenced in Mohammad's Democracy Now Interview, and creating additional posts characterizing Plaintiff as a perpetrator of genocide and a threat to students and patients of color.  Upon information and belief, Mohammad is an active member of Emory SJP.  Her membership in Emory SJP, combined with the organization's repeated dissemination of her defamatory statements demonstrates the coordinated and collective nature of the conspiracy among them.

173.  Each Defendant took overt acts in furtherance of the conspiracy to defame Plaintiff and place him in a false light, including but not limited to publishing defamatory statements, amplifying false narratives through coordinated social media posts, promoting public campaigns targeting Plaintiff, and pressuring the School of Medicine to act against Plaintiff under false pretenses.

174.  Defendants acted intentionally and with actual malice by publishing and disseminating false statements that directly impugned Plaintiff's professional integrity, fitness, and conduct as a physician and educator. These statements are defamatory per se because they falsely accused Plaintiff of participating in genocide, war crimes, and racial discrimination, and were calculated to injure Plaintiff in his trade, profession, and occupation. In addition, Defendants conspired to place Plaintiff in a false light before the public by knowingly or recklessly attributing to him false and highly offensive conduct, thereby portraying him as morally depraved and professionally dangerous.  This portrayal would be highly objectionable to a

reasonable person and was intended to subject Plaintiff to public scorn, ridicule, and professional ostracization.

175.   As a direct and proximate result of the Defendants' civil conspiracy, Plaintiff has suffered significant, ongoing and enduring public embarrassment, emotional distress, and harm to his professional reputation.

176.   Plaintiff is entitled to recover compensatory damages, punitive damages, and all other relief permitted by law.

## COUNT IV
## 42 U.S.C. § 1985(3)
## Conspiracy to Interfere with Civil Rights

177.   Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

178.   Section 1985 of the Ku Klux Klan Act provides that "[i]f two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the law, or of equal privileges and immunities under the laws … the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one of more of the conspirators." 42 U.S.C. § 1985(3).

179.   Defendants plotted, coordinated, and executed a common plan to deprive Plaintiff of his constitutional rights and privileges on account of his Jewish identity and/or Zionist beliefs, including his rights to freedom of speech, freedom of

association, and freedom to access and participate in professional and academic life on equal terms.

180.  Defendants undertook a coordinated effort to interfere with Plaintiff's constitutionally protected rights by publicly demanding that Emory investigate and/or terminate his employment because he is a war criminal who participated in a genocide and a racist who believes in apartheid.

181.  The false claims of participation in genocide and war crimes were not predicated on any allegation of professional or any other misconduct, but rather on Plaintiff's lawful military service, which is closely tied to his racial, political, ethnic, religious, and Israeli national identity.

182.  The false claims of racism and apartheid were not predicated on any allegation of professional or any other misconduct, but rather on Plaintiff's identity as a Jewish Zionist and an Israeli.

183.  In framing Zionism as a colonial, racialized ideology equivalent to apartheid and genocide, Defendants provided the ideological foundation for the conspiracy to strip Plaintiff of his rights based solely on his association with Zionism as well as his service in the IDF.

184.  By targeting Plaintiff for expressing his personal and religious experiences and political affiliations, Defendants sought to punish and deter the exercise of his First Amendment rights, including his freedom of speech and freedom

of association — specifically, his right to associate with Zionism (his religious belief) and Zionist institutions, including the IDF, a lawful military institution and Israel, a close U.S. ally.

185.   In furtherance of this conspiracy, Defendants engaged in numerous overt acts, including but not limited to:

    a.   publishing knowingly false and defamatory statements accusing Plaintiff of genocide, war crimes, racism, and posing a danger to "black and brown" students and patients due to his racial, ethnic, or national identity as well as his military affiliation; and

    b.   organizing public campaigns and social media efforts that explicitly demanded Plaintiff's termination or investigation;

    c.   disseminating Plaintiff's name, photograph, and professional title to encourage public targeting and institutional discipline;

    d.   circulating coordinated mass-email and phone campaigns pressuring Emory to launch an investigation against Plaintiff or terminate his employment on the basis of his protected identity, speech, and affiliation.

186.   Through these acts, Defendants sought to:

    a.   interfere with Plaintiff's employment as a physician and educator— despite his constitutional right to pursue such employment—

by, *inter alia*, fostering distrust, disrespect, and doubt among his students through repeated defamatory statements falsely alleging that he had participated in war crimes;

b. prevent Plaintiff from speaking freely about his experiences in the IDF and his Zionist beliefs;

c. intimidate Plaintiff into silence or resignation; and

d. deny Plaintiff equal access in academic and professional spaces, based solely on discriminatory bias.

187. Defendants' actions were intended to deprive Plaintiff of the same rights and privileges afforded to others who were not similarly targeted based on their racial, political, ethnic, religious, or national identity. Defendants' campaign was driven by the erroneous and discriminatory belief that individuals affiliated with Zionism or Israel are inherently racist and complicit in apartheid, a crime against humanity, and that anyone affiliated in any way with the IDF is complicit in acts of genocide, ethnic cleansing, and colonial violence, and thus undeserving of equal access to academic and professional opportunities.

188. Defendants' actions constitute a racially and politically motivated conspiracy to deprive Plaintiff of his constitutional rights to employment, free speech, and free association. Defendants' conduct is neither lawful dissent nor protected opinion — it is targeted, discriminatory, and coercive conduct aimed at

silencing and excluding a member of a protected class from public and professional life.

189.   As a direct and proximate result of Defendants' conspiracy and the acts committed in furtherance thereof, Plaintiff has suffered significant harm, including reputational damage, emotional distress, fear for his safety, economic injury, and impairment of his constitutional rights.

190.   Defendants acted maliciously, willfully, and with reckless disregard for Plaintiff's rights, entitling Plaintiff to compensatory damages, punitive damages, and all other relief permitted by law.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief as against the Defendants:

A. Award compensatory damages in an amount to be determined at trial;

B. Award punitive damages in an amount to be determined at trial;

C. Declare that the statements authored and published by Defendants identified within this

complaint, individually and collectively, were and are false;

D. Grant injunctive relief requiring Defendants to remove their false and defamatory statements about Plaintiff from any website and/or social media accounts

under their control;

E. Grant injunctive relief enjoining Defendants and anyone acting in privity with the Defendants from further engaging in the torts of defamation and false light;

F. Disbursements, costs and attorneys' fees; and

G. For such other further relief to this Court may seem just and proper.

Dated: May 16, 2025                                    Respectfully Submitted,


/s/ *David F. Katz*_____

**Weissmann Zucker Euster + Katz P.C.**          **National Jewish Advocacy Center,**
**Inc.**
DAVID F. KATZ                                    MARK GOLDFEDER*
The Fountains at Piedmont Center                 mark@njaclaw.org
Building 11, Suite 950                           LAUREN ISRAELOVITCH *
3495 Piedmont Road                               lauren@njaclaw.org
Atlanta, Georgia 30305                           BEN SCHLAGER**
T. 404-390-2941                                  ben@njaclaw.org
dkatz@wzlegal.com                                3 Times Square
GA Bar No. 408738                                New York, NY 10036
                                                 T. 800-269-9895

/s/ *Esther Panitch*_____                  *\*Admitted Pro Hac Vice*
                                                 *\*\*Pro Hac Vice Application Forthcoming*

**Panitch Ivory Law Group, PC**
ESTHER PANITCH
4243 Dunwoody Club Dr.,  #201
Atlanta, GA 30350
T. 770-364-6952
esther@panitchivory.com
GA Bar No. 143197

**Exhibit A**

**Exhibit B**

**Exhibit C**