## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Joshua Winer,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Umaymah Mohammad, AJP Educational Foundation, Inc. A/K/A American Muslims for Palestine, WESPAC Foundation, Inc., Sean Eren as the representative of National Students for Justice in Palestine, Doctors Against Genocide Society, CAIR-Nga Inc. A/K/A CAIR-Georgia, CAIR Foundation Inc., A/K/A Council on Islamic Relations or CAIR, Rupa Marya, Ibrahim Jouja as representative of Emory Students for Justice in Palestine.<br><br>　　　　　Defendants. | Case No. 1:25-CV-02329 |

### DEFENDANT CAIR-NGA, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

　　　Defendant CAIR-Nga, Inc., A/K/A CAIR-Georgia ("CAIR GA"), hereby files this Brief in Support of its Motion to Dismiss Plaintiff's First Amended Complaint for failure to state a claim upon which relief can be granted.

### INTRODUCTION

　　　Since October 2023, American politics and news have been dominated by the Israeli-Palestinian crisis. The Washington Post reported on June 12, 2025, that 56,000 Palestinians, mostly civilians, have been killed in the conflict so far.[1] Many in the U.S.

---

[1] Wafaa Shurafa and Samy Magdy, *Gaza health authorities say Israel kills 44 waiting for aid as war's death toll passes 56,000,* WASH. POST, Jun. 24, 2025. Article

1

and abroad have questioned whether Israel's actions in Gaza constitute genocide. Amnesty International published a report concluding that Israel is committing genocide against Palestinians.[2] An appointed delegate to the United Nations reported that "there are reasonable grounds to believe that the threshold indicating the commission on the crime of genocide . . . has been met."[3] A federal district court agreed with the International Court of Justice that "it is plausible that Israel's conduct amounts to genocide" after being presented with, *inter alia*, "statements made by various officers of the Israeli government indicat[ing] that the ongoing military siege in Gaza is intended to eradicate a whole people . . ." *Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d 1160, 1163, 1167 (N.D. Cal. 2024).

Many Americans disagree. Numerous editorials vehemently deny that genocide has occurred, stressing that Israel's war is against Hamas, not the people of Gaza, and that Hamas is accused of maximizing civilian casualties.[4]

The present dispute concerns this precise conflict of opinion: Is the Israeli army participating in genocide? Plaintiff's reputational claims in this case can only succeed

---

attached as Exhibit A. CAIR GA requests that the Court take judicial notice of the articles cited herein, not for the truth of the articles, but as to the *existence* of discourse around the war and accusations of genocide. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 n.4 (11th Cir. 2015) ("[C]ourts may take judicial notice of documents such as the newspaper articles at issue here for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements).").

[2] The Executive Summary is attached hereto as Exhibit B. The full report is available at https://www.amnesty.org/en/documents/mde15/8668/2024/en/.

[3] The United Nations report is attached as Exhibit C.

[4] Op-eds from the Miami Herald, Washington Post, and New York Times are attached hereto as Exhibit D.

if the Court determines that accusing Israel's army (and its soldiers) of genocide is a false statement of fact, unprotected by the First Amendment. Because such assertions are opinion-based political speech, based on accurate, disclosed facts, such speech cannot be actionable.

Plaintiff's civil rights and conspiracy claims also fail because Plaintiff cannot identify any state action or discriminatory animus. Ironically, this lawsuit is the embodiment of an effort to use the government to silence constitutionally protected political speech, such that the very rights Plaintiff invokes are the same constitutional protections that bar his civil rights claims.

> *It is significant that the guarantee of freedom of speech and press falls between the religious guarantees and the guarantee of the right to petition for redress of grievances in the text of the First Amendment. . . . It partakes of the nature of both, for it is as much a guarantee to individuals of their personal right to make their thoughts public and put them before the community . . . as it is a social necessity required for the "maintenance of our political system and an open society."*

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 149 (1967).

## BACKGROUND FACTS

### I.    Plaintiff's IDF Service

Plaintiff Joshua Winer, a Jewish oncologist at Emory Medical Center and an Emory medical professor, took a leave of absence from his professional duties to serve as a surgeon in the Israeli army in an "elite reconnaissance unit[]" in Gaza. *Id.* ¶ 32–33. He did so because of "religious, moral, and national responsibility." *Id.* ¶ 11.

Defendant Umaymah Mohammad, a Palestinian-American Ph.D. and medical student at Emory and a student organizer for the Palestine liberation movement, sent an email to students and faculty of Emory's School of Medicine in January 2024

expressing her political views that Israel, the United States, and Emory are perpetrating a genocide against Palestinians. *Id.* ¶¶ 25–26. Dr. Winer received the email and was "distraught" because it was sent in furtherance of Ms. Mohammad's "personal political agenda" and contained "false information about Israel as well as political rhetoric with which he vehemently disagreed." *Id.* ¶¶ 29–30.

In March 2024, the *Times of Israel* published an editorial written by Dr. Winer titled, "An Ongoing Quest to Serve," in which he described volunteering for all "military and civilian" positions in the IDF and serving in an elite reconnaissance unit in Gaza. *Id.* ¶¶ 31-33.[5] The editorial noted his affiliation with Emory.[6]

In April 2024, Ms. Mohammed participated in an interview with *Democracy Now!* in which she discussed Dr. Winer's participation in the IDF:

> [An Emory medical professor] recently went to serve as a volunteer medic in the Israeli Offense Force and recently came back. This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called teaching medical students and residents how to take care of patients. I mean the disconnect is, for me, very obvious.

*Id.* ¶¶ 12, 25, 35. On or about November 19, 2024, Ms. Mohammed was suspended from Emory as a direct result of the *Democracy Now!* interview. *Id.* ¶¶ 42–48.

## II.    CAIR GA's Political Speech

CAIR GA is a nonprofit organization dedicated to Muslim advocacy. *Id.* ¶ 18. On February 11, 2025, CAIR GA held a press conference in which Ms. Mohammed

---

[5] blogs.timesofisrael.com/an-ongoing-quest-to-serve/. The article is incorporated in the FAC at ¶ 31 n.4.
[6] *Id.*

spoke about her suspension from Emory, including the following excerpts:

> . . . I have been suspended for a year from medical school after being subjected to a six-month unjust conduct process. They disciplined me for exposing Emory's complicity in the destruction of Gaza in an interview where I mentioned an unnamed physician who served in the military, actively engaged in the genocidal campaign against the Palestinian people. My people. . . Having a physician faculty member who participated in a military convicted of committing genocide against Palestinians makes me feel unsafe. . . I cannot learn from a physician who might have fired one of the 355 bullets that landed in 6-year-old Hind Rajab's body. Or who might have helped make the decision to bomb one of the hospitals in Gaza. Or who might have celebrated the murder of our communities on the rubble still wet with Palestinian blood.

*Id.* ¶¶ 61, 119. CAIR GA's executive director also spoke at the press conference:

> . . . You just heard from Umaymah Mohammad, an Emory student unjustly suspended from Emory School of Medicine for her advocacy for Palestine. It is evident that at Emory[], voicing support for victims of human rights violations is swiftly punished . . . [The fact] that faculty and students join support for Israel's perpetration of war crimes is conveniently ignored or covered up.

*Id.* ¶ 121. Also on February 11, CAIR GA posted on social media a link to a petition for Ms. Mohammed's benefit and a news story from Atlanta news affiliate WSB, which had republished a portion of Ms. Mohammad's *Democracy Now!* interview. *Id.* ¶¶ 123–24. CAIR GA posted on Instagram on March 24 the following statement:

> Palestinian American student, Umaymah Mohammed, objected to working with an IDF soldier. Emory University unjustly suspended her. CAIR Georgia will continue to support Umaymah Mohammed as she challenges Emory University and its medical professionals' complicity in the genocide in Gaza.

*Id.* ¶ 125. On March 24, 2025, CAIR GA's executive director made the following statement to the *Guardian:*

. . . [A] Palestinian medical student [] specifically joined the field trying to understand inequities and the role of medicine in violence. To have to work side by side with an IDF soldier is exacerbating, and makes it uniquely painful for her.

*Id.* ¶ 126.

Dr. Winer filed the present lawsuit against CAIR GA, Ms. Mohammed, and other organizations that made statements about Ms. Mohammed's suspension, alleging libel, false light, conspiracy, and civil rights violations. He states that the accusations made by CAIR GA "automatically equating Jewish self-defense or military service with crimes against humanity is emblematic of modern-day anti-Semitic tropes." *Id.* ¶ 9. Dr. Winer further claims that "[r]ather than merely expressing disagreement with Plaintiff's views or background, . . . Mohammed and her co-conspirators undertook a coordinated effort to stigmatize, isolate, and eliminate Plaintiff from his professional and academic life" by "encouraging others to echo and amplify these claims in protest letters, student petitions, and social media campaigns." *Id.* ¶ 10. His lawsuit seeks punitive damages, the takedown of all the above statements, and a prior restraint barring future speech. *Id.* ¶¶ 102–03.

## LEGAL ARGUMENT

### I.    Standard

Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss, the Court must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff. *Rivell v. Priv. Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (per curiam). Although a court must accept well-pleaded facts as true and make reasonable inferences in

favor of the plaintiff, it need not accept the plaintiff's legal conclusions or unwarranted deductions of fact. *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). Moreover, a libel claim "is a traditionally disfavored cause of action and the courts tend to construe the complaint by a somewhat stricter standard." *Escort v. Verizon Commc'ns, Inc.*, 2005 WL 8155369, at *3 (N.D. Ga. 2005) (citation omitted). In a motion to dismiss, the Court may consider documents and matters "of which a court may take judicial notice."[7] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citations omitted).

## II.    Libel

### A.    Burden of Proving Falsity

"Under Georgia law, a claim for defamation has four elements: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting to at least negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *American Civil Liberties Union v. Zeh*, 312 Ga. 647, 650 (2021) (citation omitted). When speech is made about a matter of public concern, the plaintiff must prove fault and falsity. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986). A statement is one of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id* at 453. Thus, at the motion to dismiss stage, "the crucial burden on a plaintiff in making a

---

[7] The articles and reports are provided under judicial notice to illustrate the existence of public discourse over assertions of genocide in Gaza. The articles are not germane to this motion, and in the event the Court chooses not to consider them, the motion stands on its own solely based on the citations to the Amended Complaint.

defamation or defamation-type claim is to show the falsity of the statements made." *Brock v. Viacom Int'l, Inc.*, 2005 U.S. Dist. LEXIS 12217, at *13 (N.D. Ga. Feb. 28, 2005) (dismissing complaint because "[e]ven liberally construing their complaint in the best possible light . . . , the court can find no set of facts that the plaintiffs could prove that would demonstrate that the statements . . . were false.").

Here, the speech at issue is of public concern. The debate regarding Israeli's actions in Gaza, the rights of the Palestinian people, and the ongoing humanitarian crisis have been a matter of intense American and international debate since October 2023 when the conflict began. Because CAIR GA's statements are regarding matters of public concern, it is Dr. Winer's burden to show that those statements are false.

### B.    Opinion

The Supreme Court observed at the outset of its opinion in *Gertz*:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries, but on the competition of other ideas.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974). The logic is simple: a defamation is actionable only if it is false; opinions cannot be false; therefore, opinions are not actionable. Indeed, "[t]he expression of opinion on 'matters with respect to which reasonable men might entertain differing opinions' is not libelous." *Bergen v. Martindale-Hubbell*, 176 Ga. App. 745, 747 (1985). Nonetheless, if an opinion can reasonably be interpreted, according to the context of the entire writing in which it appears, to state defamatory facts about the plaintiff that could be proven false, then an action for defamation may still proceed. *Milkovich v. Lorain Journal Co.*, 497

U.S. 1, 18 (1990). "The pivotal questions are whether [the challenged] statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false." *Jaillett v. Ga. Tv Co.*, 238 Ga. App. 885, 890 (1999). Whether a given statement constitutes fact or opinion is a question of law. *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 283–84 (1974).

Speech about politics and public controversy and impassioned statements "heavily laden with emotional rhetoric and moral outrage" are not likely to be perceived as factual. *Milkovich*, 497 U.S. at 32 (Brennan, J. dissenting); *Bennett v. Hendrix*, 2007 U.S. Dist. LEXIS 102156, at *10 (N.D. Ga. 2007) (Thrash, J.) (Dismissing complaint because flyers "however offensive - were political speech of the highest order and deserving of the highest protection."); *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) (statement is more likely to be opinion when the "surrounding circumstances" are "those of a heated political debate, where certain remarks are necessarily understood as ridicule or vituperation . . ."); *Hoppe v. Hearst Corp.*, 53 Wash. App. 668, 675, 770 P.2d 203, 207 (1989) ("In the context of an ongoing political controversy, 'the audience is prepared for mischaracterizations and exaggerations, and is likely to view such representations with an awareness of the subjective biases of the speaker.'"). The forum and context of the speech also factor into whether the speech is perceived as fact or opinion. *See Glob. Telemedia Int'l, Inc. v. John Doe 1*, 132 F. Supp. 2d 1261, 1267 (C.D. Cal. 2001) (Internet postings "are full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents"); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 545 (S.D.N.Y.

9

2020) ("If the Internet is akin to the Wild West, . . . Twitter is, perhaps, the shooting gallery, where verbal gunslingers engage in prolonged hyperbolic crossfire."); *Mirza v. Amar*, 513 F. Supp. 3d 292 (E.D.N.Y. 2021) ("Yelp" review); *Harris v. Warner*, 255 Ariz. 29, 36 (2023) (political talk radio).

**1.    *Whether the Statements Are Provably False***

a)    The Statements at Issue

The Amended Complaint identifies six alleged statements that Dr. Winer alleges are false, defamatory, and attributable to CAIR GA:

| | |
|---|---|
| . . .one of the professors of medicine we have at Emory recently went to serve as a volunteer medic in the Israeli Offense Force [sic] and recently came back. This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called teaching medical students and residents how to take care of patients. I mean the disconnect is, for me, very obvious. | ¶¶ 118, 123. |
| . . . You just heard from Umaymah Mohammad, an Emory student unjustly suspended from Emory School of Medicine for her advocacy for Palestine. It is evident that at Emory[], voicing support for victims of human rights violations is swiftly punished . . . [The fact] that faculty and students join support for Israel's perpetration of war crimes is conveniently ignored or covered up. | ¶¶ 86, 121. |
| Petition template to Emory: "I'm alarmed by the institution's endorsement of faculty like Dr. Joshua Winer, who recently served in the Israeli Defense Forces. Is supporting genocide and war crimes more acceptable at Emory than resisting them?" | ¶ 124. |
| . . . I have been suspended for a year from medical school after being subjected to a six-month unjust conduct process. They disciplined me for exposing Emory's complicity in the destruction of Gaza in an interview where I mentioned an unnamed physician who served in the military, actively engaged in the genocidal campaign against the Palestinian people. My people. . . Having a physician faculty member who participated in a military convicted of committing genocide | ¶¶ 61, 116. |

10

| | |
|---|---|
| against Palestinians makes me feel unsafe. It makes black and brown medical students feel unsafe. It makes black and brown indigenous patients feel unsafe. . . | |
| You have a Palestinian medical student who specifically joined the field trying to understand inequities and the role of medicine in violence. To have to work side by side with an IDF soldier is exacerbating, and makes it uniquely painful for her. | ¶ 125. |
| Palestinian American student, Umaymah Mohammed, objected to working with an IDF soldier. Emory University unjustly suspended her. CAIR_Georgia will continue to support Umaymah Mohammed as she challenges Emory University and its medical professionals' complicity in the genocide in Gaza. | ¶ 125. |

Dr. Winer does not specify how or why these statements are false within the actual count alleged against CAIR GA. *See* FAC, ¶¶ 119–27. Piecing together the complaint, it appears that Dr. Winer asserts falsity because the Israeli army has not been "convicted" of genocide. *Id.* ¶¶ 62, 64. He further alleges that it is false to "impl[y] that Plaintiff is a racist" or that "Black and Brown students were not safe in Plaintiff's presence." *Id.* ¶ 63. Dr. Winer states that his combat involvement was "limited to situations in which his unit came under direct attack." *Id.* ¶ 65. Notably Dr. Winer does not deny that he served in combat in the Israeli army in Palestine; in fact he publicized his combat service in his *Times of Israel* editorial. *Id.* ¶ 32–33. Indeed, it was Dr. Winer's op-ed that set this entire set of circumstances into action. In short, Dr. Winer's combat service in the IDF is a true fact that was disclosed, and was the basis for all the statements at issue here.

b)      Statements Relating to "Genocide"

In regard to the statements referring to "genocide," the question is this: Would an accusation, made on social media or in a press conference by a Palestinian-American activist or rights organization, of "abetting a genocide," "engaging in a

genocidal campaign," or "complicity in genocide" be reasonably understood to disclose a false statement of fact about Dr. Winer?

The references to genocide would be, unequivocally, perceived as the opinion of the speaker. Dr. Winer appears to understand this himself. Citing to Ms. Mohammed's January 2024 email expressing her views that Israel was perpetrating a genocide against Palestinians, Dr. Winer characterizes the content of that email as "Mohammed's political views about Israel and the United States" (*id.* ¶ 26); "views consistent with those expressed in [Ms. Mohammed's] academic writing" (*id.*); "political rhetoric with which [Dr. Winer] vehemently disagreed" (*id.* ¶ 29), and "political propaganda" (*id.*). Dr. Winer further describes the dispute in this case as having escalated beyond "a disagreement with Plaintiff's views," based on Ms. Mohammed's "personal political agenda." *Id.* ¶¶ 10, 29, 30, 40. Dr. Winer himself could not be more clear: this lawsuit is about Defendants' political speech.

Moreover, Israel's actions in Palestine have been characterized as genocidal by numerous world leaders and scholars. Whether Israel is guilty of genocide (and, *ergo*, whether IDF combat soldiers are also guilty of genocide) is a topic of current international debate, not a fact that can be proven or disproven.

This near-exact issue was discussed by a Delaware magistrate judge in *Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, in which the statements at issue accused the plaintiff of "support[ing] genocide, glorifying torture, lynching, massacre, and ethnic cleansing of Amhara ethnic groups" in Africa. 2024 U.S. Dist. LEXIS 141596, at *13–15 (D. Del. Aug. 8, 2024) (*adopted in relevant part at Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, 2024 U.S. Dist. LEXIS 197686,

12

at *4 (D. Del. Sep. 11, 2024). The court recommended dismissal of the claim, finding that "ordinary readers . . . would understand [defendant's] use of words like "support[ing] genocide" as expressing its subjective interpretation of the tone and objective of [plaintiff's] social media posts," and that "[t]hat interpretation . . . is not, without more, objectively verifiable as true or false." *Id.* at *15. The court expressly rejected the plaintiff's claim that "genocide is both well-defined and codified," finding instead that the word is an "amorphous phrase" that is "not objectively verifiable as true or false." *Id.* at *17. The magistrate noted that "genocide" is a statement that is not actionable because it expresses a "subjective view, an interpretation, a theory, conjecture, or surmise," rather than one "claiming to be in possession of objectively verifiable facts." *Id.* (quoting *Cousins v. Goodier*, 283 A.3d 1140, 1155 n.84, 1157 n.99) (Del. 2022)).

Just as an accusation of genocide is political opinion, so are the other similar statements referenced in the lawsuit, including "destruction of Gaza's healthcare system" and complicity in "war crimes." All such statements are opinion expressed in moral outrage, based on the internationally documented death and destruction in Palestine, by the very military in which Dr. Winer was proud to serve.

c)    Statements "Inferring" Racism

In the February 11 press conference, Ms. Mohammed stated that Dr. Winer's participation in the Israeli army "makes black and brown medical students feel unsafe" and "black and brown indigenous patients feel unsafe." FAC, ¶ 61. Dr. Winer asserts that these statements are libelous because they "impl[y] that Plaintiff is a racist," "falsely assert[] the Black and Brown students were not safe in Plaintiff's

presence," and falsely assert that he "could not be trusted to provide medical care to Black and Brown patients because he viewed them as disposable." *Id.* ¶ 63.

As an initial matter, the statements at issue do not assert that Dr. Winer is "racist." The statements assert that Dr. Winer's participation in the Israeli army makes his students and patients of color feel "unsafe," a claim that is supported by the context of Ms. Mohammed's full speech, and which is obviously incapable of being proven false. Dr. Winer could never prove that none of his students or patients have felt unsafe as a result of his military participation in the Israeli army.

Even if the statements did "infer" racism, they would not be actionable because even a direct allegation of racism is incapable of provable, factual meaning. *See, e.g., Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably false assertions of fact); *Squitieri v. Piedmont Airlines, Inc.*, 2018 U.S. Dist. LEXIS 25485, at *12 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false"); *Cousins*, 283 A.3d 1140 (dismissing libel claim because allegations of racism "turn on [defendant's] personal view of what is racist" and are not "provably false," particularly because "America is in the midst of an ongoing national debate about what it means to be racist"); *Richards v. Union Leader Corp.*, 324 A.3d 908, 917 (N.H. 2024) (holding that various statements in an op-ed calling plaintiff a racist and "white supremacist" were opinions about his political views when read in context).

14

### 2.    Remaining Statement

The last of Dr. Winer's cited statements does not contain any negative statement about him. He cites to a March 24 Instagram post stating as follows:

> [A] Palestinian medical student [] specifically joined the field trying to understand inequities and the role of medicine in violence. To have to work side by side with an IDF soldier is exacerbating, and makes it uniquely painful for her.

FAC, ¶ 126. It is unclear what in this post could possibly be argued to be libelous.

## III.    False Light

In order to sustain a false light claim under Georgia law, a plaintiff must show that the defendant knowingly or recklessly published falsehoods about him and placed him in a false light that would be highly offensive to a reasonable person. *Smith v. Stewart*, 291 Ga. App. 86 (Ga. Ct. App. 2008). In false light cases, "the interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation." *Cabaniss v. Hipsley*, 114 Ga. App. 367, 370 (1966). "[A] constitutionally privileged statement of opinion cannot form the basis of a claim for invasion of privacy by placing a person in a false light." *S & W Seafoods Co. v. Jacor Broad. of Atlanta*, 194 Ga. App. 233, 237 (1989). Here, all of the statements at issue are protected opinion, and therefore cannot form the basis of a false light claim.

## IV.    Civil Conspiracy

Dr. Winer brought a claim for civil conspiracy based on CAIR GA's alleged agreement to defame Dr. Winer and place him in a false light. FAC, ¶¶ 162–76. The Eleventh Circuit defines civil conspiracy as "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal

objective, and a resulting injury to the plaintiff." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc).

The only statements Dr. Winer has alleged as the basis for his civil conspiracy claim against CAIR GA are statements that CAIR GA made or republished. FAC, ¶ 170. Dr. Winer has not alleged that CAIR GA agreed to, took part in, or even had any knowledge of any torts allegedly committed by any of the other Defendants. *Id.* Therefore, the only at-issue statements supporting a claim for civil conspiracy against CAIR GA are the same statements that form the bases of Dr. Winer's defamation and false light claims. Because Plaintiff's underlying tort claims against CAIR GA fail, his claim that they conspired to commit those torts also fails. *Mustaqeem–Graydon v. SunTrust Bank*, 258 Ga. App. 200, 207 (2002) ("Absent the underlying tort, there can be no liability for civil conspiracy.").

## V.    Civil Rights Claim Pursuant to 42 U.S.C. § 1985(3)

Dr. Winer's claim under the first clause of 42 U.S.C. § 1985(3) also fails. FAC, ¶¶ 179–90. To state a claim, he must plausibly allege, *inter alia*, "(1) that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action,' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993) (citations omitted). Here, Dr. Winer's claim fails under both elements.

### A. **Dr. Winer Failed to Plead that CAIR GA Conspired to Interfere with Rights Protected by Private Encroachment.**

Dr. Winer alleges that Defendants conspired to deprive him of his rights to (1) free speech, (2) freedom of association, and (3) freedom to access and participate in professional and academic life on equal terms.[8] FAC, ¶ 179. Where "the alleged § 1985(3) conspirators are private actors," a plaintiff may only recover for conspiracies that were "aimed at rights constitutionally protected against private impairment." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (citations omitted). As the Eleventh Circuit has explained: "These rights include only *select serious constitutional rights.* … The only rights the Supreme Court has expressly declared enforceable against private conspirators under § 1985(3) are the right to interstate travel and the right against involuntary servitude." *Jimenez*, 596 F.3d at 1312 (cleaned up); *Prunty v. Arnold & Itkin LLP*, 753 F. App'x 731, 736 (11th Cir. 2018) ("The only rights the Supreme Court has expressly declared enforceable against private conspirators under § 1985(3) are the right to interstate travel and the right against involuntary servitude.") (quoting *Jimenez*, 596 F.3d at 1312); *Shuler v. Swatek*, 465 F. App'x 900, 903 (11th Cir. 2012) ("[T]he only claims that have been recognized by the Supreme Court as viable under § 1985(3) against private defendants are claims for deprivation of the right to interstate travel and freedom from involuntary servitude.").

Because neither interstate travel nor the right against involuntary servitude are at issue here, Dr. Winer has failed to state an actionable claim in Count IV.

---

[8] Dr. Winer acknowledges that his right to free speech and freedom of association stem from the First Amendment (FAC, ¶ 184) but has not indicated any basis for his claimed right to access and participate in professional and academic life on equal terms.

17

1. *Dr. Winer failed to state a claim based on First Amendment deprivations because the alleged conspiracy did not involve the State nor did it aim to influence the State.*

"[A]n alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the State." *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 830 (1983). Dr. Winer has not and cannot state a claim that CAIR GA conspired with the State or aimed to influence the activities of the State.

Indeed, the alleged conspiracy does not involve a state actor. Dr. Winer has alleged a private conspiracy among non-governmental organizations and individuals acting in their individual capacities. FAC ¶¶ 12–20, 179. Moreover, he does not allege that the aim of the conspiracy was to influence the activity of the state, but rather Emory University (a private school), the public, and Dr. Winer's students. *Id.* ¶¶ 180, 185–86. Accordingly, Dr. Winer's complained-of First Amendment deprivations cannot substantiate his claim because the alleged conspiracy neither involved a state actor nor sought to influence the activities of a state actor.

2. *Dr. Winer failed to state a claim based on purported employment-related deprivations because such alleged rights are not cognizable under § 1985(3).*

Lastly, Dr. Winer's purported "right[] to … freedom to access and participate in professional and academic life on equal terms" (FAC, ¶ 179) is not cognizable under § 1985(3). His Complaint does not identify a specific constitutionally protected right as a predicate for his claim. It instead vaguely asserts a "constitutional

right to pursue … employment" "as a physician and educator" and "equal access in academic and professional spaces" without interference or denial of those purported rights "based solely on discriminatory basis." *Id.* ¶ 186(a), (d). Generously construed, the Complaint invokes a federal right to be free from employment discrimination by private actors, a right protected by Title VII.[9] "Congress enacted Title VII of the Civil Rights Act … to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin," *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974), addressing precisely what Dr. Winer alleges in this case.

The Supreme Court has expressly held that "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 377–78; *see also Jimenez*, 596 F.3d at 1312 ("[T]he Supreme Court has declared … the rights protected under Title VII insufficient to form the basis of § 1985(3) actions against private conspirators.") (citations omitted); *Gilmore v. Nat'l Mail Handlers Union Local*, 318, 517 F. App'x 784, 788–89 (11th Cir. 2013) ("Conspiracies to violate rights protected by Title VII … are not cognizable under § 1985(3).").

One particular instructive case is *Jones v. Int'l Assoc. of Bridge Structural Ornamental & Reinforcing Iron Workers*. 864 F. Supp. 2d 760 (E.D. Wis. 2012). In *Jones*, the court dismissed a plaintiff's § 1985(3) claim where the asserted basis for

---

[9] Indeed, absent invoking a Title VII right, Dr. Winer would have no claim for additional reasons. "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).

relief was a conspiracy to discriminate against the plaintiff on the basis of his race and religious beliefs by causing him to be denied employment by a third party. The court construed the plaintiff's claim as one arising under Title VII and explained:

> The plaintiff alleges that [defendants] conspired to discriminate against him on the basis of his race and religious beliefs in that they caused him not to be given [an employment] position. . . However, the "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." []. "If a violation of Title VII could be asserted through § 1985(3), . . . the complainant could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII."[] Accordingly, the plaintiffs § 1985 claims . . . will be dismissed.

*Id.* at 770; *see also Joyner v. Sanders*, 2020 U.S. Dist. LEXIS 154128, at *12–13 (M.D. Ala. 2020) (granting motion to dismiss "[b]ecause the alleged co-conspirators in this cause are all private actors and the only right at issue is the statutorily-created right to the racially equal opportunity to make contracts [in furtherance of plaintiff's livelihood]"); *Fox v. Cummins, Inc.*, 2020 U.S. Dist. LEXIS 74886, at *5 (S.D. Ga. Apr. 27, 2020) (concluding plaintiff's claim failed as a matter of law where plaintiff claimed defendants, motivated by plaintiff's status as a pregnant woman, conspired to terminate her employment in violation of Title VII because private conspiracies to violate rights protected by Title VII are not cognizable under § 1985(3)).

Dr. Winer thus has failed to allege the deprivation of a right enforceable under § 1985(3), and the Court should dismiss Count IV.

### B. **No Racial or Other Class-Based, Invidiously Discriminatory Animus Motivated Defendants.**

Additionally and alternatively, Dr. Winer failed to state a claim under the first element of § 1985(3), which requires "some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirators' action . . ." *Dean v. Warren*, 12 F.4th 1248, 1255 (11th Cir. 2021) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)). As the basis for class-based discrimination, Dr. Winer pled that Defendants' actions were based on his race or ethnicity (FAC, ¶¶ 179, 185, 187), IDF military service (*id.* ¶¶ 181-85(a)), Zionist religious belief (*id.* ¶¶ 179, 182–85(a), 187), Israeli citizenship (*id.* ¶¶ 182, 185, 187), and political beliefs (*id.* ¶ 187).

Courts have routinely held that religious beliefs, national identity, and political beliefs do not qualify as protected classes pursuant to § 1985(3). *See Fiske v. Lockheed-Georgia Co., Div. of Lockheed Corp.*, 568 F. Supp. 590 (N.D. Ga. 1983) (holding that § 1985(3) does not reach politically motivated conspiracies); *Smith v. Turner*, 764 F. Supp. 632, 1991 U.S. Dist. LEXIS 7131 (N.D. Ga. 1991) (explaining that "§ 1985(3) does not provide remedy for "every concerted effort by one political group to nullify influence of or do other injury to competing group by use of otherwise unlawful means."), *Word of Faith World Outreach Ctr. Church v. Sawyer*, 90 F.3d 118 (5th Cir. 1996), cert. denied, 520 U.S. 1117 (1997) (holding that § 1985(3) does not apply to conspiracies motivated by religious rather than racial animus); *Bauge v. Jernigan*, 671 F. Supp. 709 (D. Colo. 1987) (holding that the plaintiff's claim of discrimination based on his Norwegian citizenship alone is not within the scope of § 1985 protection). As foreign citizenship is not a protected class for the purposes of § 1985(3) analysis, it follows that service to a foreign military likewise fails to constitute a protected class.

All that is left for the Court to determine is whether the allegation that Defendants' alleged conspiracy was motivated by Dr. Winer's "Jewish identity."

FAC, ¶ 179. The motion to dismiss standard bears repeating here: A motion to dismiss under Rule 12(b)(6) should be granted unless the complaint contains "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

When read as a whole, the FAC reveals that Dr. Winer has no factual support for his conclusory allegations that Defendants' alleged conspiracy was motivated by Dr. Winer's racial or ethnic identity. To the contrary, these allegations are belied by Plaintiff's own assertions. Indeed, the FAC is replete with acknowledgements of the Defendants' actual motivation: expressing their political views. *See* FAC, ¶ 28 ("Mohammad's **political views** about Israel and the United States were the basis of the false and inflammatory statements she would later make regarding the Plaintiff when she discovered that he served in the IDF.") (emphasis added).[10]

---

[10] *See also* FAC, ¶ 29 ("Plaintiff was distraught when he received the SOM email, which was rife with verifiably false information about Israel as well as political rhetoric with which he vehemently disagreed." and "[Dr. Winer] was further angered by the fact that a student had exploited the School of Medicine's listserv to disseminate political propaganda."), ¶ 30 ("Mohammad misused the School of Medicine's listserv to distribute the SOM Email to the entire faculty and student body in furtherance of her personal political agenda."), ¶ 40 ("Regardless of Mohammad's political views, the fact is that Israel is a legitimate sovereign state and that the Israel-Gaza war began when Gaza's terrorist government illegally infiltrated Israel's borders and committed the worst atrocities against Jewish people since the Holocaust."), ¶ 75 ("Therefore, it stands to reason that Mohammad could have expressed her views on Palestine and the broader geopolitical conflict without incurring suspension.").

Rather than supporting a claim that Defendants acted with racial animus, Dr. Winer's purported factual support reveals the actual bases for Defendants' protected speech. For example, Dr. Winer has alleged the following:

- "Defendants plotted, coordinated, and executed a common plan to deprive Plaintiff of his constitutional rights and privileges on account of his Jewish identity and/**or Zionist beliefs**, including his rights to freedom of speech, freedom of association, and freedom to access and participate in professional and academic life on equal terms." *Id.* ¶ 179 (emphasis added).

- "The false claims of participation in genocide and war crimes were not predicated on any allegation of professional or any other misconduct, but rather on Plaintiff's lawful **military service**, which is closely tied to his racial, political, ethnic, religious, and Israeli national identity." *Id.* ¶ 181 (emphasis added).

- "The false claims of racism and apartheid were not predicated on any allegation of professional or any other misconduct, but rather on Plaintiff's identity as a **Jewish Zionist and an Israeli**." *Id.* ¶ 182 (emphasis added).

- "In framing Zionism as a colonial, racialized ideology equivalent to apartheid and genocide, Defendants provided the ideological foundation for the conspiracy to strip Plaintiff of his rights based solely on his association with **Zionism as well as his service in the IDF**." *Id.* ¶ 183 (emphasis added).

- "By targeting Plaintiff for expressing his **personal and religious experiences and political affiliations**, Defendants sought to punish and deter the exercise of his First Amendment rights, including his freedom of speech and freedom of association — specifically, his right to associate with **Zionism** (his religious belief) and Zionist institutions, including the **IDF**, a lawful military institution and **Israel**, a close U.S. ally." *Id.* ¶ 184 (emphasis added).

- "publishing knowingly false and defamatory statements accusing Plaintiff of genocide, war crimes, racism, and posing a danger to "black and brown" students and patients due to his racial, ethnic, **or national identity** as well as his **military affiliation**; . . ." *Id.* ¶ 185(a) (emphasis added).

Finally, and most fatally, Dr. Winer plainly and succinctly explains his position regarding the animating force behind Defendants' actions:

> Defendants' actions were intended to deprive Plaintiff of the same rights and privileges afforded to others who were not similarly targeted based on their racial, political, ethnic, religious, **or** national identity." Defendants' campaign was driven by the erroneous and discriminatory belief that individuals affiliated with **Zionism or Israel** are inherently racist and complicit in apartheid, a crime against humanity, and that anyone affiliated in any way with the **IDF** is complicit in acts of genocide, ethnic cleansing, and colonial violence, and thus undeserving of equal access to academic and professional opportunities.

*Id.* ¶ 187 (emphasis added).

A careful reading makes explicit that Dr. Winer understands that Defendants' speech was rooted in their opposition to his military service in the IDF and political affiliations with Israel, *not* his race or ethnicity. Accordingly, Defendants' at-issue speech was not motivated by racial or otherwise class-based, invidiously discriminatory animus, and Count IV should be dismissed.

## CONCLUSION

Dr. Joshua Winer *chose* to take a leave of absence and re-enlist in the Israeli army for the express purpose of serving in Gaza where the devastating conflict that has resulted in mass civilian casualties, the morality of which has been debated relentlessly on the international stage. Dr. Winer then *chose* to publicize his combat service in a self-authored editorial in a national publication. He then went back to his teaching position, apparently expecting that these actions would be applauded by all, including his Palestinian-American students.

One such student, Umaymah Mohammed, responded, *predictably,* with moral outrage. Dr. Winer is clear in his complaint—he thinks she should have kept her outrage, and the rest of her political beliefs, to herself.

Her university agreed. Ms. Mohammed was severely punished by Emory for her advocacy. But that was not enough. Dr. Winer now asks this Court to intensify the punishment, not just for Ms. Mohammed, but for every organization that stood by her side and brought awareness to her suspension.  Dr. Winer's complaint seeks punitive damages, a takedown of CAIR GA's advocacy speech, and a prior restraint. The goal here is clear—to intimidate Ms. Mohammed, CAIR GA, and the remaining defendants—to silence their political speech resulting from the decisions he made and publicized within the context of the most high-profile international conflict of our times.

The law is unequivocal—the Constitution protects political speech, advocacy, and opinion. His lawsuit must be dismissed, and the punishment must stop.

> *"The dissemination of the individual's opinions on matters of public interest is for us, in the historic words of the Declaration of Independence, an unalienable right that governments are instituted among men to secure."*

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 149 (1967).

Respectfully submitted this 27th day of June, 2025.

**BUCHALTER APC**

/s/ *Amanda G. Hyland*
Amanda G. Hyland

25

Georgia Bar No. 325115
Austin C. Vining
Georgia Bar No. 362473
3475 Piedmont Road NE, Ste. 1100
Atlanta, GA 30305
(404) 832-7350 Telephone
ahyland@buchalter.com
avining@buchalter.com

*Attorneys for Defendant CAIR-Georgia*

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 5.1</u>

I HEREBY CERTIFY that the foregoing document was prepared in Times

New Roman, 14-point font, as approved by Local Rule 5.1.

/s/ *Amanda G. Hyland*
Amanda G. Hyland
Georgia Bar No. 325115

*Attorney for Defendant CAIR-Georgia*