# EXHIBIT B



# 'YOU FEEL LIKE YOU ARE SUBHUMAN'

## ISRAEL'S GENOCIDE AGAINST PALESTINIANS IN GAZA

Amnesty International is a movement of 10 million people which mobilizes the humanity in everyone and campaigns for change so we can all enjoy our human rights. Our vision is of a world where those in power keep their promises, respect international law and are held to account. We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and individual donations. We believe that acting in solidarity and compassion with people everywhere can change our societies for the better.

© Amnesty International 2024
Except where otherwise noted, content in this document is licensed under a Creative Commons (attribution, non-commercial, no derivatives, international 4.0) licence.
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
For more information please visit the permissions page on our website: www.amnesty.org
Where material is attributed to a copyright owner other than Amnesty International this material is not subject to the Creative Commons licence.

First published in 2024
by Amnesty International Ltd
Peter Benenson House, 1 Easton Street
London WC1X 0DW, UK

Index: MDE 15/8668/2024
Original language: English



**Cover photo:** *"Eye of heaven", an illustration by Gaza-based Palestinian artist Maisara Baroud depicting Palestinians' experience of Israel's genocide in the occupied Gaza Strip after 7 October 2023. © Maisara Baroud*



# 1. EXECUTIVE SUMMARY

> **"Here in Deir al-Balah, it's like an apocalypse. There is no room for you to pitch a tent; you have to set it up near the coast… You have to protect your children from insects, from the heat, and there is no clean water, no toilets, all while the bombing never stops. You feel like you are subhuman here."**
>
> Mohammed, a 42-year-old father of three, speaking in June 2024 about his experience of displacement from Rafah to Deir al-Balah governorate.

On 7 October 2023, Israel embarked on a military offensive on the occupied Gaza Strip (Gaza) of unprecedented magnitude, scale and duration. Since then, it has carried out relentless aerial and ground attacks, many of them with large explosive weapons, which have caused massive damage and flattened entire neighbourhoods and cities across Gaza, along with their life-supporting infrastructure, agricultural land, and cultural and religious sites and symbols deeply engrained in Palestinians' collective memory. Israel's military offensive has killed and seriously injured tens of thousands of Palestinians, including thousands of children, many of them in direct or indiscriminate attacks, often wiping out entire multigenerational families. Israel has forcibly displaced 90% of Gaza's 2.2 million inhabitants, many of them multiple times, into ever-shrinking, ever-changing pockets of land that lacked basic infrastructure, forcing people to live in conditions that exposed them to a slow and calculated death. It has deliberately obstructed or denied the import and delivery of life-saving goods and humanitarian aid. It has restricted power supplies that, together with damage and destruction, led to the collapse of the water, sanitation and healthcare systems. It has subjected hundreds, if not thousands, of Palestinians from Gaza to incommunicado detention and acts of torture and other cruel, inhuman or degrading treatment that had apparently resulted in at least 53 deaths by August 2024. The unlawful acts inflicted on Palestinians simultaneously, for months without respite, have had a profound, cumulative impact on the mental and physical health of Gaza's entire population: those who survived

were left weakened, hungry or traumatized, with likely permanent effects on their mental and physical health.

Such is the treatment that Israel has inflicted upon Palestinians in Gaza in retaliation for the Hamas-led attacks on southern Israel on 7 October 2023. Early that morning, Hamas fighters indiscriminately fired a barrage of rockets into Israel and, joined by fighters from other Palestinian armed groups, breached the border fence that surrounds Gaza. Hamas and other armed groups attacked civilian and military targets, carrying out deliberate mass killings, summary killings and other abuses, causing suffering and physical injuries. They destroyed civilian property by burning houses, making them uninhabitable and causing the internal displacement of civilians. They abducted 223 civilians, Israeli and foreigners, including children, and captured 27 Israeli soldiers. Some of their actions constituted war crimes under international law. With approximately 1,200 people killed, over 800 of them civilians, including at least 36 children, these were the deadliest single-day attacks in Israel's history. Amnesty International's detailed findings about the crimes perpetrated by Hamas and other Palestinian armed groups in the context of their attacks on Israel on 7 October 2023 are the focus of a forthcoming publication.

This report focuses on the Israeli authorities' policies and actions in Gaza as part of the military offensive they launched in the wake of the Hamas-led attacks on 7 October 2023 while situating them within the broader context of Israel's unlawful occupation, and system of apartheid against Palestinians in Gaza, the West Bank, including East Jerusalem, and Israel. It assesses allegations of violations and crimes under international law by Israel in Gaza within the framework of genocide under international law, concluding that there is sufficient evidence to believe that Israel's conduct in Gaza following 7 October 2023 amounts to genocide.

Given that the report is based on Amnesty International's field and desk research into violations perpetrated by Israel in Gaza between 7 October 2023 and early July 2024, it focuses on this nine-month period. However, it reflects overarching data until early October 2024 and key international developments until the end of November 2024.

To make a determination on genocide, Amnesty International first examined whether Palestinians in Gaza constitute part of a protected group under the 1948 Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), that is a national, ethnical, racial or religious group. It then focused on three out of the five prohibited acts under the Genocide Convention: "killing members of the group"; "causing serious bodily or mental harm to members of the group"; and "deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part". It finally examined whether Israel committed these acts with the specific "intent to destroy, in whole or in part, [the] group, as such".

To this end, Amnesty International interviewed 212 people as part of its research. They included Palestinian victims, survivors and witnesses of air strikes, displacement, detention, the destruction of farms, homes and agricultural land, as well as individuals who faced the impact of Israel's restrictions on humanitarian aid. Amnesty International also spoke with members of local authorities in Gaza, Palestinian healthcare workers and representatives of

non-governmental organizations (NGOs) and UN agencies involved in the humanitarian response in Gaza.

Amnesty International complemented these interviews with its analysis of an extensive range of visual and digital evidence, including satellite imagery, video footage and photographs posted on social media or obtained directly by its researchers. It authenticated and, where possible, geolocated video footage and photographs. It reviewed an extensive collection of media reports, statements, reports and data sets published by UN agencies and humanitarian organizations operating in Gaza, as well as Palestinian and Israeli human rights groups. It reviewed statements by senior Israeli government and military officials and official Israeli bodies, including spokespersons of the Israeli military and the Coordination of Government Activities in the Territories (COGAT), a unit within Israel's Ministry of Defense tasked with administering civilian matters in the Occupied Palestinian Territory (OPT). Amnesty International also examined submissions made to and decisions taken by the Israeli Supreme Court as well as publicly available material relating to South Africa's case against Israel at the International Court of Justice (ICJ). Despite its repeated attempts to engage with the Israeli authorities through information and meeting requests, the organization received no substantive answer to any of its letters sent between 30 October 2023 and 16 October 2024.

## OVERVIEW OF ISRAEL'S OFFENSIVE

Hours after the 7 October 2023 attacks, Israel conducted a first wave of retaliatory air strikes on Gaza. Prime Minister Benjamin Netanyahu vowed that the offensive would continue "with neither limitations nor respite" until Israel destroyed Hamas's military and governing capabilities and brought all hostages back to Israel. He translated his words into actions. In the first two months of the offensive alone, the Israeli air force carried out about 10,000 air strikes in Gaza. Many used large explosive weapons with wide area effects on densely populated residential areas, including in the vicinity of hospitals and other critical infrastructure. The impact of such attacks on one of the most densely populated places on earth, with about 6,300 people per square kilometre, was devastating.

On 13 October 2023, the Israeli military issued its first mass "evacuation" order, instructing some 1.1 million people – the entire population living north of Wadi Gaza – to move to the area south of Wadi Gaza "for their safety and protection", and failing to take measures to ensure the displaced population's access to basic necessities. The order applied to hundreds of thousands of people who were already displaced and were sheltering in UN schools, as well as all patients and staff working in 23 hospitals and medical facilities in the area. Humanitarian organizations, which had used Gaza City as their hub for years, were also subjected to the order and forced to leave behind warehouse supplies, equipment and vehicles, and to re-establish a humanitarian infrastructure from scratch in Rafah.

Meanwhile, senior Israeli military and government officials intensified their calls for the destruction of Palestinians in Gaza, using racist and dehumanizing language that equated Palestinian civilians with the enemy to be destroyed.

In a widely publicized statement made at a press conference on 12 October 2023, President Isaac Herzog held all Palestinians in Gaza responsible for Hamas's attacks: "It's an entire

nation out there that is responsible. It's not true this rhetoric about civilians not aware, not involved." While he maintained that his words had been misinterpreted, the slogan "there are no uninvolved civilians" was later scrawled near settlements in the occupied West Bank, demonstrating the statement's spread. In another illustrative example, on 11 November 2023, Minister of National Security Itamar Ben-Gvir posted a video clip from a show on Israeli TV in which he said that Palestinians who expressed support for Hamas and its actions were considered "terrorists" and must also be destroyed. He added this comment: "To be clear, when they say that Hamas needs to be eliminated, it also means those who sing, those who support and those who distribute sweets, all of these are terrorists. And they should be eliminated!"

Within weeks of Israel's offensive, genocide and legal scholars, UN experts, as well as civil society organizations, warned that Palestinians in Gaza may be at risk of genocide. On 29 December 2023, South Africa instituted proceedings against Israel before the International Court of Justice (ICJ) over alleged breaches by Israel of its obligations under the Genocide Convention in relation to Palestinians in Gaza. This prompted the court to issue a series of legally binding provisional measures over the following months to guarantee the right of Palestinians in Gaza to be protected from acts of genocide. Yet, Israel failed to implement them. Despite expressing concern over Israel's conduct, and in the face of the ICJ's orders, the international community failed to take sufficient action to modify or stop Israel's actions. When the UN Security Council eventually adopted a three-phase ceasefire plan in June 2024, after an earlier resolution called for a time-limited ceasefire during the month of Ramadan in March 2024, it was too little too late.

On 6 May 2024, Israeli forces went ahead with a long-threatened ground operation in Rafah despite a consensus among humanitarian organizations and repeated warnings by many states, including Israel's staunchest allies, that it would have cataclysmic implications for Palestinian civilians and the humanitarian response. Not only did Rafah provide shelter for over 1 million Palestinians after they were displaced following a series of mass "evacuation" orders by the Israeli military, but it also served at that point as the main hub for the humanitarian response. The operation drew near-unanimous international condemnation and prompted the ICJ to issue new provisional measures ordering Israel to "immediately halt its military offensive". Israeli officials knew precisely the devastation the ground operation in Rafah would inflict on Palestinian civilians.

The offensive on Rafah was launched a week after Minister of Finance Bezalel Smotrich, a member of Israel's security cabinet, explicitly called for the city's destruction by referring to a well-known Biblical story of absolute vengeance in which an entire nation – the people of Amalek – is ordered to be destroyed: "There are no jobs half done. Rafah, Deir al-Balah, Nuseirat, destruction! Blot out the memory of [the people of] Amalek from under heaven," he said at a public event on 29 April 2024. In fact, Minister of Finance Smotrich and Minister of National Security Ben-Gvir, who also made some of the most explicit calls for the destruction of Palestinians in Gaza, threatened to quit the government coalition if Prime Minister Netanyahu abandoned plans to attack Rafah. Minister of Finance Smotrich's statement came months after Prime Minister Netanyahu first referred to the story of the total destruction of the people of Amalek in the first week of Israel's ground offensive in late October and early

November 2023. He used it to garner support for what was, at the time, a new and highly destructive phase of the conflict. As Israel's highest office-holder, who oversaw the offensive on Gaza, Prime Minister Netanyahu would have most certainly known that his words would be understood by soldiers, particularly those affiliated with the settler movement and religious nationalist parties led by the two ministers, as calls for the destruction of Palestinians in Gaza.

Following the operation, almost the entirety of Rafah's population, residents and displaced people, were forced to look for new temporary shelters in the governorate of Khan Younis, which had been made nearly uninhabitable due to the large-scale destruction caused by Israeli attacks and fighting with Palestinian armed groups, and in the Israeli-designated "humanitarian zone" of Al-Mawasi and "expanded humanitarian area" of Deir al-Balah, where newly displaced families struggled to find space to set themselves up amid tightly packed tents. Those forced out of Rafah were not able to return, and neither were those forced out of the area north of Wadi Gaza. The Rafah crossing, largely destroyed by Israeli forces, closed, cutting off Gaza's lifeline to Egypt.

By 7 October 2024, the Gaza-based Ministry of Health had recorded 42,010 Palestinian fatalities in Gaza, the vast majority of which were of Palestinians killed during Israel's offensive, and 97,590 other Palestinians injured since 7 October 2023. The actual toll of those killed during the offensive may be higher and will only become apparent once the conflict is over, including when rescue teams are able to count the dead and retrieve missing bodies from under the rubble. The armed conflict in Gaza has seen some of the highest known death tolls among children (13,319 by 7 October 2024), journalists, as well as health and humanitarian workers of any recent conflict in the world.

The level and speed of damage to and destruction of homes and infrastructure across all sectors of economic activity has similarly not been seen in any other conflict in the 21st century, with remote sensing experts noting that it was "much faster and more extensive" than anything they had mapped before. About 62% of all homes in Gaza were damaged or destroyed by January 2024, affecting approximately 1.08 million people, according to a joint Interim Damage Assessment published by the World Bank, the EU and the UN in March 2024. By July 2024, around 63% of the total structures in Gaza had been damaged or destroyed, according to a UN Satellite Centre (UNOSAT) satellite imagery-based assessment. Amnesty International estimated that there was, on average, one damaged or destroyed building every 17 metres in Gaza by then. Meanwhile, some 625,000 students missed out on an entire academic year, with an estimated 85% of schools having sustained some form of damage.

In May 2024, the announcement by the Prosecutor of the International Criminal Court (ICC) that he had applied to the court for arrest warrants against Israeli Prime Minister Netanyahu and Minister of Defense Yoav Gallant over their alleged criminal responsibility for war crimes and crimes against humanity prompted Israel's Military Advocate General to publicly confirm that the military police had opened criminal investigations into 70 incidents where the commission of a criminal offence was suspected. This included allegations of deaths under torture, killings and other incidents of violence. However, as far as Amnesty International has

been able to confirm from publicly available sources, by 30 September 2024, there had been only one indictment of an Israeli soldier in relation to the torture of Palestinian detainees, demonstrating a near-total lack of accountability in line with a well-documented long-standing pattern of impunity.

Finally, instead of complying with the ICJ advisory opinion issued in July 2024, which concluded that Israel's 57-year-old occupation and annexation of Palestinian territory is unlawful and called on Israel to withdraw all of its military forces and remove civilian settlements and settlers, Israel entrenched its military presence in Gaza by establishing and maintaining a linear military zone that it referred to as the "Netzarim Corridor" on either side of an existing east-west road south of Gaza City, which cut off the area north of Wadi Gaza from the area south of it. The zone threatened to perpetuate displacement and the fragmentation of Gaza.

## GENOCIDE UNDER INTERNATIONAL LAW

Genocide is a crime under international law, whether committed in times of peace or armed conflict. It is prohibited and criminalized under the Genocide Convention, which Israel ratified in 1950, and the Rome Statute.

Under Article II of the Genocide Convention, five specific acts constitute the underlying criminal conduct of the crime of genocide, including: killing members of the group; causing serious bodily or mental harm to members of the group; deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; imposing measures intended to prevent births within the group; and forcibly transferring children of the group to another group. Each of these acts must be committed with a general intent to commit the underlying act. However, to constitute the crime of genocide, these acts must also be committed "with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such…" This specific intent is what distinguishes genocide from other crimes under international law.

Regardless of whether individual Palestinians are citizens of Israel living in Israel, are living under Israeli military rule in the OPT or are Palestinian refugees, they overwhelmingly identify as Palestinian and have deep and shared political, ethnic, social and cultural ties. Palestinians share a common language and have similar customs and cultural practices, despite having different religions. They, therefore, constitute a distinct "national", "ethnical" and "racial" group protected under the Genocide Convention, as established by the ICJ's preliminary finding in its order of 26 January 2024.

An intent to destroy a group "in part" is sufficient to establish the requisite specific intent for the crime of genocide. In determining what constitutes "part" of the group, international jurisprudence has adopted a requirement of substantiality rather than a specific numeric threshold. This standard requires that the perpetrator must intend to destroy at least a "substantial part" of the group in question, which must be "significant enough to have an impact on the group as a whole". In applying it to Israel's offensive, Amnesty International considers that Palestinians in Gaza constitute a "substantial part" of the whole group of Palestinians, in line with the ICJ's preliminary finding mentioned above. In 2023, Palestinians

living in Gaza comprised approximately 40% of the nearly 5.5 million Palestinians living in the OPT.

Importantly, the perpetrator does not need to succeed in destroying the targeted group, either in whole or in part, for genocide to be established. International jurisprudence recognizes that "the term 'in whole or in part' refers to the *intent*, as opposed to the actual destruction". Equally important, finding or inferring specific intent does not require finding a single or sole intent. A state's actions can serve the dual goal of achieving a military result and destroying a group as such. Genocide can also be the means for achieving a military result. In other words, a finding of genocide may be drawn when the state intends to pursue the destruction of a protected group in order to achieve a certain military result, as a means to an end, or until it has achieved it. Amnesty International does not consider international jurisprudence, including that of the ICJ, to preclude either instrumental or dual intent, as long as genocidal intent is clearly assessed to be the state's intent based on the totality of the evidence. Allowing for dual or instrumental intent is the only way to ensure that genocide remains prohibited during times of war. International law places certain conduct, including genocide, outside the permissible methods of war, meaning there are acts which can never be justified by military necessity.

Amnesty International considered the possible commission of genocide by Israel from the perspective of state responsibility, and did not engage in an analysis of the possible criminal responsibility of individuals.

## KILLINGS AND SERIOUS INJURIES

**"My body survived but my spirit died with my children, it was crushed under the rubble with them."**

Ahmad Nasman, whose parents, sister, wife and three children were killed in an Israeli air strike on 14 December 2023.

To constitute the act of "killing members of the group" as prohibited under the Genocide Convention, killings must be intentional. Within the context of armed conflict, "killing" may include causing the deaths of civilians through direct attacks on civilians and civilian objects, as well as through indiscriminate attacks that are directed deliberately at the civilian population alongside military objectives. Meanwhile, the act of "causing serious bodily or mental harm to members of the group" requires the infliction of harm so serious as to threaten or contribute to the physical or biological destruction of the group. Although the harm does not need to be permanent or irreversible, international jurisprudence has required it to cause "grave and long-term disadvantage to a person's ability to lead a normal and constructive life."

Amnesty International has focused on the acts of "killing members of the group" and "causing [them] serious mental and bodily harm" perpetrated by Israel in the context of its aerial attacks. It reviewed the results of investigations it had conducted into 15 air strikes that took place in northern, central and southern Gaza between 7 October 2023 and 20 April

2024. These air strikes hit 12 homes and other residential buildings, a church, a street and a public market – all of them located in densely populated urban areas. They killed at least 334 civilians, including at least 141 children, and wounded hundreds of others. The organization concluded that they constituted direct attacks on civilians and civilian objects or deliberately indiscriminate attacks, and likely amount to war crimes.

Amnesty International's in-depth investigation found that all 15 locations that were struck were civilian objects, and that it was Israel which had launched the air strikes. Amnesty International did not find any evidence that any of the strikes were directed at a military objective. A review of all available evidence showed that all those killed were civilians not taking a direct part in hostilities.

These attacks were conducted in ways that were designed to cause a very high number of fatalities and injuries among the civilian population. This is evidenced through Israel's use of explosive weapons with wide area effects, the timing and location of the attacks and the lack of an effective warning, in one case, or of any warnings at all, in all others.

In several cases, Amnesty International's analysis of weapons fragments showed that Israel used large bombs, such as US-manufactured Joint Direct Attack Munitions (JDAM). At least five of the attacks struck homes and other residential buildings between 11pm and 4am when their residents were likely to be sleeping. In addition, 11 of the 15 attacks were carried out on homes and other buildings south of Wadi Gaza, where people living north of Wadi Gaza were ordered to flee following the mass "evacuation" order of 13 October 2023. These locations, known for their population density, were even more overcrowded than usual due to the influx of displaced people, with many homes hosting extended families.

In one illustrative case, Abdallah Shehada, a 69-year-old retired surgeon, was killed after an Israeli air strike destroyed his home in Rafah. The attack, which occurred at 11.45am on 14 December 2023, killed 30 other civilians: 11 children, eight men and 11 women. At least 10 others were wounded. Some 45 people had been residing in the three-storey building. Among them were 20 members of the Nasman family who were displaced from Gaza City to the south and sought safety at their relative's house.

The oldest victim of the attack was Hamdi Abu Daff, a displaced 86-year-old man, while the youngest was Ayla Nasman, aged only three months. Ayla Nasman's grandparents, mother and two siblings, aged five and four, were all killed in the attack. Her father, Ahmad Nasman, a physiotherapist, was among the few members of the extended Nasman family to survive the attack. He said that it took him four days to retrieve Ayla's body from the rubble; the blast had decapitated his five-year-old child, Arwa.

While Amnesty International's investigation has focused only on a small fraction of Israel's aerial attacks, they are indicative of a pattern of repeated direct or indiscriminate attacks by the Israeli military in Gaza over the nine-month period under review. The Israeli authorities argue that their military forces lawfully targeted Hamas and other Palestinian armed groups throughout Gaza, including when they were operating in and near critical infrastructure and other objects indispensable to the survival of the civilian population, and that the resulting unprecedented death and destruction were the outcome of Hamas' co-location among

Palestinian civilians. Amnesty International's 15 specific investigations do not support that defence.

Crucially, even where Israeli forces targeted what could be considered military objectives, Israel's attacks use of explosive weapons with wide area effects, especially aerial bombs of 250 pounds (110kg) to 2,000 pounds (900kg), on residential buildings and in the proximity of hospitals in one of the world's most densely populated areas likely constitute indiscriminate and/or disproportionate attacks. Amnesty International recognizes that Hamas and other Palestinian armed groups endangered Palestinian civilians through their conduct by operating from, or in the vicinity of, densely populated residential areas, and violated their obligation to take all feasible precautions to protect civilians and civilian objects under their control against the effects of attacks. However, such conduct by these groups does not release Israel from its own obligations under international humanitarian law to spare civilians and avoid attacks that would be indiscriminate or disproportionate.

The tens of thousands of air strikes that Israel has launched on Gaza have resulted in unprecedented numbers of killings and injuries among the Palestinian population. Of the 40,717 fatalities that the Gaza-based Ministry of Health fully identified by 7 October 2024, children, women and older people constituted just under 60%. The remaining 40% were men under 60, with no independent source able to establish how many of those were fighters and how many were civilians.

Additionally, of the total number of injured people, already in late July 2024, approximately 22,500 were facing life-changing injuries requiring long-term rehabilitation, according to the World Health Organization (WHO). By 30 September 2024, the Gaza-based Ministry of Health had registered 1,200 conflict-related amputations but estimated that the actual number of amputees would be around 4,500, given a significant reporting lag resulting from the collapse of the healthcare system; the WHO had also recorded some 2,000 cases of major burns and 2,000 spinal cord and severe traumatic brain injuries. Medical professionals consider that many of those injured will face trauma and mental health issues for years to come.

Amnesty International concluded that the direct or indiscriminate attacks carried out by Israel constitute the acts of "killing members of the group" and "causing serious bodily or mental harm to members of the group", as prohibited under Articles II(a) and (b) of the Genocide Convention, respectively, in that these strikes caused deliberate and unlawful deaths of and injuries to Palestinian civilians. Amnesty International assesses the underlying intent of these and other strikes below, taking into account the full scale, intensity and scope of Israel's campaign, as well as other relevant factors.