**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JOSHUA WINER,

*Plaintiff*,

v.

UMAYMAH MOHAMMAD, *et al.*,

*Defendants.*

Civil Action No. 1:25-cv-02329-TWT

# PLAINTIFF JOSHUA WINER'S RESPONSE IN OPPOSITION TO DEFENDANT CAIR-NGA, INC.'S MOTION TO DISMISS HIS SECOND AMENDED COMPLAINT

Lauren Israelovitch
Mark Goldfeder
Ben Schlager
NATIONAL JEWISH ADVOCACY CENTER, INC.
3 Times Square, Suite 512
New York, NY 10036
(914) 222-3828
lauren@njaclaw.org
*Pro Hac Vice*

Josh Belinfante
Anna Edmondson
Miles Skedsvold
ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
500 14th Street, NW
Atlanta, GA 30318
T: (678) 701-9320
E: mskedsvold@robbinsfirm.com
Ga. Bar No. 371576

David F. Katz
THE D.F. KATZ LAW FIRM, LLC
1158 Jones Bridge Rd
Ste 420 PMB1090
Johns Creek, GA 30022
T: (404) 918-5707
Dkatz@dfkatzlawfirm.com
Ga. Bar. No. 408738

Esther Panitch
THE PANITCH LAW GROUP, PC
4243 Dunwoody Club Drive
Suite 205
Atlanta, GA 30350
esther@panitchlawgroup.com
Ga. Bar. No. 143197

## INTRODUCTION

This case arises from a coordinated campaign to destroy a man's career. After volunteering to serve in the Israeli Defense Forces ("IDF") following the October 7, 2023 terrorist attacks ("October 7 attacks"), Dr. Winer—a physician and professor at Emory University—was publicly accused by Defendants of personally participating in genocide, war crimes, the destruction of a healthcare system, and the murder of civilians and healthcare workers. Based on those accusations, Defendants declared him unfit to practice medicine, teach students, or treat patients, and launched a public campaign demanding his removal from Emory's faculty.

CAIR-NGA Inc.'s ("CAIR-GA") brief in support of its motion to dismiss ("Motion") attempts to recast this targeted defamation as abstract political debate, disregarding the well-pleaded allegations of the Second Amended Complaint ("SAC"), misstating the governing legal standards, and seeking blanket immunity under the guise of "opinion" and "advocacy."

CAIR-GA's central premise is fundamentally flawed. It contends that Dr. Winer can succeed only if this Court determines that accusing the Israeli army (and its soldiers) of genocide constitutes a false statement of fact unprotected by the First Amendment, and that such accusations are merely "opinion-based political speech, based on accurate, disclosed facts." Dkt. 140-1 at 3. That framing is incorrect.

This case is not about criticism of Israel or its military. Governments and their armed forces do not have standing to sue for defamation—and they are not parties in this action. Dr. Winer is. CAIR-GA did not confine itself to commentary about Israel or the IDF. It publicly accused a private individual—Dr. Winer—of personally aiding and abetting genocide, being complicit in the murder of more than 400 healthcare workers, and so on. It then asserted that those alleged crimes rendered him unfit to teach students and unsafe to treat patients.

The First Amendment does not convert specific accusations of crime and professional unfitness against a specific person into protected opinion merely because they peripherally implicate broader political debates. The assertion that Dr. Winer personally committed or aided genocide (not to mention murder) is not a policy critique or an abstraction; it is a concrete charge that he engaged in one of the most serious crimes recognized under international law. And it is not true. The SAC alleges that Dr. Winer served in the IDF with honor, and his role was limited to providing medical care to wounded soldiers and engaging in defensive combat only when his unit came under direct attack.

This lawsuit does not seek to silence criticism of a government or some political figure. It seeks accountability for the deliberate smearing of an individual's reputation in his community. The First Amendment protects political disagreement. It does not protect the conduct at issue here.

## BACKGROUND

Dr. Winer respectfully refers the Court to the SAC for a complete recitation of the facts underlying this action. Dkt. 130. Dr. Winer is a Jewish-American Israeli surgical oncologist, an Emory medical professor, the Surgical Clerkship Director at Emory, and a faculty member at Emory's Winship Cancer Institute. Following the Hamas-led October 7 attacks, Dr. Winer took a leave of absence to volunteer with the IDF, where he served in Gaza in his capacity as a physician providing medical care to wounded soldiers. His involvement in combat was limited to defensive engagement in the event his unit came under direct attack. At no time did he participate in offensive operations or engage in conduct that could even remotely support an allegation of war crimes, genocide, or murder. Dkt. 130 ¶¶ 12, 66.

In March 2024, Dr. Winer authored and published an op-ed in the *Times of Israel* titled "An Ongoing Quest to Serve," in which he described his decision to volunteer as a physician with the IDF after the October 7 attacks. The op-ed reflected on his medical service and did not discuss combat, make political statements, or contain any reference to military operations, war crimes, or genocide. *Id*. ¶¶ 32–35.

On April 26, 2024, Defendant Umaymah Mohammad, a dual MD/PhD candidate at Emory and organizer affiliated with multiple anti-Israel activist groups, appeared on Democracy Now! and made a series of statements clearly referring to Dr. Winer, though she did not directly name him. She accused him of "aiding and

abetting a genocide," "aiding and abetting the destruction of the healthcare system in Gaza," and contributing to the "murder of over 400 healthcare workers." She further remarked that he was "now back at Emory so-called teaching medical students and residents how to take care of patients." *Id.* ¶ 36.

Although Mohammad did not directly name Dr. Winer, he was clearly identifiable from the context of her remarks. The Emory administration later concluded that the statements clearly referred to him, based on the specificity of the description and the public availability of his op-ed. *Id*. ¶¶ 45, 48. An investigative report prepared by a School of Medicine official described Mohammad's remarks as "inflammatory," "irresponsible," and "disrespectful," and concluded that they caused a "reasonable apprehension of harm." *Id*. ¶ 45. On November 19, 2024, Emory suspended Mohammad from the School of Medicine for one year for violating the institution's Conduct Code. *Id*. ¶¶ 49.

Mohammad continued to publicly reference Dr. Winer in subsequent appearances and publications. On November 4, 2024, she participated in a podcast during which she again referred to a physician at Emory who had served in the IDF, asserting that he had "directly" taken life during a "genocide" and was unfit to teach or treat patients. *Id*. ¶¶ 50–53. On January 21, 2025, she authored an op-ed published by *Mondoweiss*, in which she explicitly identified the physician as the "surgery

clerkship director" at Emory—one of Dr. Winer's official titles—and stated that he had "participated in Israel's war crimes." *Id.* ¶¶ 55–57.

On February 11, 2025, Defendant CAIR-GA hosted a press conference to platform and support Mohammad, and to amplify both her claims about Dr. Winer and her demand that Emory reinstate her. During the CAIR-GA event, Mohammad took the stage and reiterated and expanded upon her earlier statements. She described her suspension as punishment for "exposing" a physician who was "actively engaged in the genocidal campaign against the Palestinian people," and stated that he "might have fired one of the 355 bullets that landed in 6-year-old Hind Rajab's body," "helped make the decision to bomb one of the hospitals in Gaza," and "celebrated the murder of our communities." *Id.* ¶ 62. She also falsely claimed that the IDF had been "convicted of committing genocide against Palestinians." *Id.* ¶ 65.

At the same press conference, CAIR-GA's Executive Director, Azka Mahmood, offered public remarks in which she endorsed Mohammad's characterization and described Mohammad as having been "unjustly suspended" for her "advocacy for Palestine." She further stated that Emory had ignored or concealed faculty members who "join support for Israel's perpetration of war crimes." *Id.* ¶ 122. Given that Dr. Winer is the only medical professor at Emory who participated

in the IDF following the October 7 attacks, Mahmood's statement could only have referred to him.

In the days and weeks that followed, CAIR-GA continued to systematically disseminate and promote these allegations. On social media, it posted the footage of its press conference, republished clips of the Democracy Now! interview, shared a news article containing Mohammad's defamatory statements about Dr. Winer, circulated a hyperlink to an Action Network campaign that explicitly named Dr. Winer, and published an Instagram post referring to Dr. Winer as a "medical professional[] complicit[] in the genocide in Gaza." *Id*. ¶¶ 123-29.

The SAC alleges that these actions were not isolated expressions of opinion but part of a coordinated campaign to target Dr. Winer based on his Jewish Israeli Zionist identity and his association with the IDF. The SAC further alleges that CAIR-GA aligned itself with this effort, amplified defamatory statements about Dr. Winer across multiple platforms, and supported calls for his removal from the university.

CAIR-GA's conduct included hosting the press conference at which Dr. Winer was accused of war crimes, issuing statements that he made Emory students and patients feel "unsafe", *id*. ¶¶ 61–66, promoting a petition explicitly naming him and demanding his investigation or removal, *id*. ¶¶ 86–89, and broadly republishing the demonstrably false and defamatory statements through online channels, *id*. ¶¶

122-27. The SAC further alleges that CAIR-GA did so in coordination with the other defendants, who sought to isolate and punish Dr. Winer not for anything he did, but for who he is and what he represents.

## ARGUMENT

### I. CAIR-GA Defamed Dr. Winer

#### A. CAIR-GA's Burden-of-Proof Argument Is Irrelevant on a Rule 12(b)(6) Motion

CAIR-GA contends that its statements about Dr. Winer are a matter of public concern and that the onus is therefore on Dr. Winer to prove the falsity of such statements in order to succeed on his defamation claim. But the question of who ultimately bears the burden of proving falsity when statements reflect issues of public concern does nothing to advance CAIR-GA's request for dismissal. At the pleading stage, the SAC's well-pleaded allegations must be accepted as true—including the allegation that CAIR-GA's statements about Dr. Winer are false. *Tanisha Sys., Inc. v. Chandra*, No. 1:15-CV-2644-AT, 2015 WL 10550967, at *2, *6 n.5 (N.D. Ga. Dec. 4, 2015) (holding that the Court construes the pleadings in the plaintiff's favor and accepts the allegations of facts therein as true and noting that "[r]esolution of the truth or falsity of these statements is plainly inappropriate at the motion to dismiss stage."). The question of which party bears the ultimate burden of proof with respect to falsity at trial has no role in resolving a Rule 12(b)(6) motion.

*Harris v. Pierce Cnty., Ga.*, No. CV 513-82, 2014 WL 3974668, at *14 n.20 (S.D. Ga. Aug. 14, 2014).

### B. CAIR-GA's Accusations Are Actionable Assertions of Fact, Not Protected Opinion

CAIR-GA invokes the settled principle that pure opinion is not actionable. That proposition is not disputed. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). But *Milkovich* also makes clear that statements implying concrete, provably false facts about a plaintiff are actionable. *Id.* at 18-19.

#### i. Accusations of Genocide, War Crimes, and Professional Unfitness Are Provably False Assertions

CAIR-GA's assertion that its statements constitute non-actionable opinion fails under *Milkovich*. By accusing Dr. Winer, personally, of genocide, war crimes, the destruction of a healthcare system, and murder—and using those accusations to demand his termination—CAIR-GA made specific factual allegations of criminal conduct against an identifiable private individual and tried to hold him personally accountable for them. Its attempt to recast those accusations as mere contributions to "[t]he debate regarding Israeli's [sic] actions in Gaza, the rights of the Palestinian people, and the ongoing humanitarian crisis [which] have been a matter of intense American and international debate since October 2023 when the conflict began," Dkt. 140-1 at 8, purposefully misstates the issue. While Israel's actions in Gaza are a matter of public concern, falsely accusing a specific named physician of personally

committing genocide, war crimes, and murder—and declaring him professionally unfit on that basis—is not abstract geopolitical commentary. It is a direct imputation of criminal conduct and professional unfitness to a particular person, which is plainly the kind of statement that "can reasonably be interpreted . . . to state or imply defamatory facts about the plaintiff that are capable of being proved false," *Gast v. Brittain,* 589 S.E.2d 63, 64 (Ga. 2003), as well as defamatory per se. *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1352 (N.D. Ga. 2023); *Smith v. DiFrancesco*, 341 Ga. App. 786, 788-89 (2017). The First Amendment does not transform personal accusations of crime into protected opinion simply because they arise in a politically charged context.

CAIR-GA further contends that Dr. Winer "does not specify how or why" the statements are false and suggests that his theory turns solely on whether the IDF has been convicted of genocide. That misrepresents the SAC. The SAC alleges that CAIR-GA's statements are false because Dr. Winer did not commit genocide, war crimes, murder, or participate in the destruction of a healthcare system. It expressly pleads that his service was limited to providing medical care to wounded soldiers and engaging in defensive combat only when his unit came under direct attack. Dkt. 130 ¶¶ 12, 37, 42, 52, 66. Those allegations squarely contradict CAIR-GA's accusations that he "participated in aiding and abetting a genocide," aided in "the

destruction of the healthcare system in Gaza," or was complicit in "the murder of over 400 healthcare workers." Dkt. 130 ¶¶ 67, 124–125.

Even if the IDF had been convicted of genocide—which it factually has not—it would not follow that Dr. Winer personally committed genocide. CAIR-GA's attempt to collapse alleged institutional wrongdoing into individual criminal liability is legally unsound. The SAC plainly pleads falsity: Dr. Winer did not commit the crimes Defendants publicly attributed to him and then used as the basis for a campaign to remove him from his profession. *See* Dkt. 130 ¶ 42.

CAIR-GA's reliance on *Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, No. 21-869, 2024 WL 3728020 (D. Md. Aug. 8, 2024), only underscores the weakness of its position. The plaintiff in *Gurmessa* was not accused of personally committing genocide. Rather, he was accused of posting a Facebook image that allegedly expressed support for the occurrence of Amharan genocide in Ethiopia. The court treated that allegation as a subjective interpretation of the plaintiff's political advocacy. That type of generalized claim about political beliefs bears no resemblance to the specific and inflammatory accusations at issue here: that Dr. Winer personally participated in genocide, aided in the destruction of Gaza's healthcare system, and was complicit in the murder of hundreds of healthcare workers.

CAIR-GA's argument—that Dr. Winer can be accused of genocide and war crimes simply because he served in the IDF—rests on a legally untenable premise. For starters, it ignores the distinction between general and personal accusations. But even assuming, arguendo, that a military force had been found guilty of genocide—which, to be clear, the IDF has not—such a finding would not automatically impute criminal liability to every soldier. Under established international law, including decisions from the International Criminal Tribunal for Rwanda (ICTR), the International Criminal Tribunal for the former Yugoslavia (ICTY), and the International Criminal Court (ICC), individual criminal responsibility for genocide requires direct participation in genocidal acts or knowing and intentional assistance of those acts. *See, e.g.*, *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Judgment ¶¶ 471–75 (Sept. 2, 1998). Similarly, under U.S. law, including the Genocide Accountability Act, 18 U.S.C. § 1091, criminal liability attaches only where there is proof of specific intent and affirmative conduct. Courts have likewise rejected guilt by association. *See, e.g,. Scales v. United States*, 367 U.S. 203, 228–30 (1961).

Even if CAIR-GA subjectively believed that the IDF or the Israeli government was engaged in genocide—which no court has found to be the case—that does not absolve it of liability for accusing Dr. Winer, himself, of such horrific crimes, and certainly not for the purposes of having him terminated.

### ii. Statements Associating Dr. Winer with Violence and Claiming He Makes "Black and Brown" Students and Patients Feel "Unsafe" Imply Professional Unfitness

CAIR-GA argues that its March 24 Instagram post contains "no defamatory statement." The post states:

> A Palestinian medical student [] specifically joined the field trying to understand inequities and the role of medicine in violence. To have to work side by side with an IDF soldier is exacerbating, and makes it uniquely painful for her.

Dkt. 130 ¶ 128. Viewed in context, the post reinforces the same defamatory narrative. The reference to "an IDF soldier" unmistakably refers to Dr. Winer, dkt. 130 ¶¶ 47–48, and follows public accusations that he aided genocide, war crimes, and murder. Against that backdrop, the statement implies not merely emotional discomfort, but that Dr. Winer is associated with violence in a manner incompatible with the ethical practice of medicine. By invoking "the role of medicine in violence" and asserting that working alongside him is uniquely painful, the post conveys that his professional presence is morally and professionally untenable because of the crimes attributed to him.

The same is true of statements claiming Dr. Winer's presence makes "black and brown medical students feel unsafe" and "black and brown indigenous patients feel unsafe." Dkt. 130 ¶¶ 61–64, 120. In context, those statements imply that Dr. Winer poses an actual threat and cannot be trusted to provide equal treatment to

students or medical care to patients. That is not abstract political opinion; it is a factual assertion about his professional fitness and ethical conduct.

Statements imputing professional incompetence or unfitness are actionable. By tying alleged genocide and war crimes to assertions that Dr. Winer is unsafe and unfit to treat or teach—particularly students and patients of color—CAIR-GA anchored those claims to the same false factual predicate. If the accusations of genocide and war crimes are false, the derivative claim of professional unfitness necessarily falls with them.

The broader public discourse surrounding the war reinforces that conclusion. CAIR-GA asks the Court to take judicial notice of widespread accusations of genocide made by organizations such as Amnesty International. Dkt. 140-1 at 2 n.1. But that is not a remotely fit subject of judicial notice, at least for its truth, and to the extent it is relevant for what those accusations contain, CAIR-GA is still not entitled to its own version of the facts at this stage. Further, the existence of that public debate only heightens the risk that uninformed readers and audience members would understand Defendants' statements as factual assertions about Dr. Winer personally. In that environment, such readers and listeners could easily conclude that Dr. Winer himself committed genocide simply because he served in the IDF. Neither Mohammad nor CAIR-GA disclosed the critical facts alleged in the SAC—that Dr. Winer served in a medical capacity providing care to wounded soldiers and engaged

in combat only when his unit came under direct attack. By omitting those facts while accusing him of genocide, war crimes, and professional unfitness, Defendants ensured that readers and listeners would interpret the statements as factual claims about Dr. Winer himself.

CAIR-GA crossed the constitutional line when it publicly accused a specific physician of committing genocide, war crimes, and murder—and demanded his removal from his profession on that basis. The First Amendment protects political advocacy. It does not immunize false accusations of criminal conduct directed at an identifiable individual for the purpose of destroying his career. The statements at issue are false accusations of criminal conduct and professional unfitness, and they are fully actionable.

## II. CAIR-GA's Statements Support a False Light Claim

To state a claim for false light, a plaintiff must allege publicity that places him in a false light that would be highly offensive to a reasonable person. *Doe v. Roe*, 362 Ga. App. 23, 32 (2021). As CAIR-GA itself acknowledges, "the interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation." Dkt. 140–1 at 15 (quoting *Cabaniss v. Hipsley*, 114 Ga. App. 367, 375 (1966)).

The SAC alleges precisely that harm. CAIR-GA publicly portrayed Dr. Winer, personally, as a genocidal war criminal, actively involved in the destruction

of a healthcare system and the murder of civilians, and as a physician and professor that is unfit to practice and teach. That depiction is false. It casts him as morally corrupt, racially biased, and professionally dangerous—all of which are highly offensive to a reasonable person.

CAIR-GA does not meaningfully contest these elements. Instead, it repeats its refrain that the statements are "opinion" and therefore constitutionally privileged. But as discussed above, the statements at issue are not protected opinion. They are concrete accusations of criminal conduct and resulting professional unfitness.

Publicly branding a physician as a dangerous, violent, genocidal war criminal who engages in and celebrates murder—based solely on his service in the IDF following the October 7 terrorist attacks—falls squarely within the core of false light liability. The SAC plausibly alleges that CAIR-GA cast Dr. Winer in a false and highly offensive light before the public. The claim should proceed.

## III. The SAC Adequately Pleads Civil Conspiracy

"To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort." *Mustaqeem-Graydon v. SunTrust Bank*, 573 S.E.2d 455, 461 (Ga. App. 2002). Civil conspiracy is not an independent tort; it attaches where multiple actors combine or act together to commit an underlying wrong.

The SAC alleges precisely that. CAIR-GA did not act in isolation. It acted in concert with Defendant Mohammad and Defendant CAIR-Foundation, Inc. to amplify and disseminate the defamatory campaign against Dr. Winer. The SAC alleges that CAIR-GA provided Mohammad a public platform at a press conference to repeat her accusations; republished and promoted those statements across its own social media channels; circulated the same Action Network materials Mohammad shared in her *Mondoweiss* op-ed; and jointly issued an Instagram post with CAIR-Foundation containing direct quotations accusing Dr. Winer of participating in genocide and linking to the campaign urging Emory to act. Dkt. 130 ¶¶ 61–62, 124–128, 178–179.

These are not allegations of parallel, coincidental conduct. They describe coordinated messaging, joint publication, and overt collective efforts directed toward the same unlawful objective: branding Dr. Winer a genocidal war criminal and pressuring Emory to terminate him as professionally unfit. Concerted action may be inferred from circumstantial evidence and coordinated conduct; an express agreement need not be pleaded. *See Aque v. Home Depot U.S.A., Inc*., 629 F. Supp. 2d 1336, 1346 (N.D. Ga. 2009); *Wright v. Apartment Inv. and Management Co*., 315 Ga. App. 587, 595 (2012) (quotation omitted). The SAC plausibly alleges such coordinated action. That is more than sufficient to state a claim for civil conspiracy.

CAIR-GA's argument is purely derivative. It contends that because the underlying tort claims fail, the conspiracy claim fails. But the defamation and false light claims are adequately pleaded. Where multiple actors act in concert to commit those torts, conspiracy liability follows. Dismissal is unwarranted.

## IV. Dr. Winer Plausibly States a Claim Under 42 U.S.C. § 1985(3)

To state a cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving either directly or indirectly, a person or class of persons of the equal protection of the laws, or the equal privileges and immunities; (3) an overt act in furtherance; and (4) an injury or deprivation of a right. *Dean v. Warren*, 12 F.4th 1248, 1255 (11th Cir. 2021).

Count IV alleges that Defendants conspired to deprive Dr. Winer "of the equal protection of the laws and his rights and privileges" under the laws "on account of his Jewish identity and/or Zionist beliefs," including

> his [1] "right in every state to make and enforce contracts" on the same terms "as is enjoyed by white citizens," 42 U.S.C. § 1981, his right to be free from employment discrimination on the basis of "race . . . religion . . . or national origin," 42 U.S.C. § 2000e-2(a)(1), and his right not to be "subjected to discrimination under any program or activity receiving Federal financial assistance" "on the ground of race . . . or national origin." 42 U.S.C. § 2000d.

Dkt. 130 ¶ 189. Specifically, "Defendants undertook a coordinated effort to interfere with [Dr. Winer's] rights by publicly demanding that Emory investigate and/or terminate his employment because of their false accusations," *id*. ¶ 190, which were

predicated on "[Dr. Winer's] lawful military service and expressed sense of duty to serve the Jewish homeland, which is integral to his racial identity as a Jew," *id.* ¶ 191. In doing so, "Defendants sought to" induce Emory "to terminate his employment [because of his race], a result that would violate Titles VI and VII of the Civil Rights Act, as well as 42 U.S.C. § 1981." *Id.* ¶ 193.

**A. Title VI Provides a Valid Predicate for Plaintiff's § 1985(3) Claim**

Title VI prohibits discrimination based on race, color, or national origin in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Dr. Winer does not assert a standalone Title VI claim against Emory. Rather, he alleges that Defendants conspired to deprive him of rights secured by federal law, including rights protected by Title VI. *See* 42 U.S.C. § 1985(3) (covering conspiracies "for the purpose of depriving," even "indirectly," "equal protection" or "privileges and immunities under the laws").

CAIR-GA's reliance on *Jones v. Metro. Atlanta Rapid Transit Auth.*, 681 F.2d 1376, 1378 (11th Cir. 1982), is misplaced. *Jones* addresses the elements of a direct Title VI employment action against a funding recipient, including the limitation in 42 U.S.C. § 2000d-3 that federal funds must be provided to the federally funded institution for employment purposes. Dr. Winer asserts no such claim here; he alleges that Defendants conspired to pressure Emory—a federally funded

institution—to terminate him based on his Jewish identity. That is a *result* that would violate Title VI—not the direct Title VI claim at issue in *Jones*.

Title VI also applies where employment discrimination affects the beneficiaries of federally funded programs. As the Seventh Circuit explained, "Title VI authorizes remedial action if employment practices tend to exclude from participation, deny benefits to, or otherwise subject the primary beneficiaries of a federal program to discrimination in violation of 42 U.S.C. § 2000d." *Ahern v. Bd. of Educ. of City of Chicago*, 133 F.3d 975, 977 (1998). That principle is particularly relevant in educational settings, where discriminatory treatment of faculty may directly affect students, the primary beneficiaries of federal funding in educational institutions. *Id*. Dr. Winer is a professor and Surgical Clerkship Director who teaches, mentors, and supervises medical students in clinical training. Discriminatory termination of a faculty member in that role necessarily affects the educational opportunities and training of the students those federally funded programs are designed to serve.

Thus, at the pleading stage, Dr. Winer's allegations easily suffice to state a § 1985(3) claim predicated on interference with Title VI rights.

**B. 42 U.S.C. § 1981 is a valid predicate for a § 1985(3) claim.**

CAIR-GA argues that § 1981 cannot serve as a predicate for a conspiracy claim against private actors. That argument overreads existing precedent and ignores

the materially different posture of this case. It is true that in *Jimenez v. Wellstar Health System*, the Eleventh Circuit rejected a § 1985(3) claim predicated on § 1981. 596 F.3d 1304, 1312 (11th Cir. 2010). But the decision in that case was principally based on the Court's conclusion that "even if interference with contract and property rights could sustain a § 1985(3) claim, Jimenez ha[d] not adequately pled interference with any such rights" because interference with his relationship with patients and the "suspension of medical staff privileges" did not "implicate any contractual relationship" as a matter of Georgia law. *Id.*

Here, by contrast, Dr. Winer alleges that CAIR-GA defamed him and placed him in a false light for the purpose of directly interfering with his employment relationship with Emory—a contractual relationship that plainly exists and is recognized under Georgia law. The deficiency that proved fatal in *Jimenez* is not present here.

To be sure, the Eleventh Circuit in *Jimenez* also stated that "conspiracies to violate rights protected under § 1981 are . . . insufficient to form the basis of a § 1985(3) claim" because (it thought) Title VII claims were barred, and "[t]his Circuit has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes." *Id*. at 1312. But because Jimenez could not even plead a contract, this broader statement is dicta. *See In re BFW Liquidation, LLC*, 899 F.3d 1178, 1186 (11th Cir. 2018) ("If a statement is not necessary to the result the Court reached in

the case, then that statement is dictum." (quotation omitted)). And indeed, *Jimenez* acknowledged that "[o]ther than the few rights the Supreme Court has addressed, district and circuit courts differ as to which rights warrant § 1985(3) protection," including claims under § 1981. *Id*. at 1312 n.7 (collecting cases).

Regardless, even if *Jimenez* imposes a categorical bar on using § 1981 as a predicate for claims under § 1985(3), Plaintiff respectfully preserves his position that such precedent should be revisited by the Eleventh Circuit *en banc*.

**C. Title VII Is a Valid Predicate for a § 1985(3) Claim**

Title VII rights have been held "insufficient to form the basis of § 1985(3) actions against private conspirators." *Jimenez*, 596 F.3d at 1312 (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979)). But *Jimenez* and *Novotny* asserted that a plaintiff cannot use 42 U.S.C. § 1985(3) to do an end-run around the remedial framework for asserting a Title VII claim against *one's employer. Id.* at 376–77 (explaining that, "[i]f a violation of Title VII could be asserted through § 1985(3), a complaint could avoid most if not all of" the detailed remedial provisions of Title VII.") Here, by contrast, the SAC does not seek to bypass the remedial scheme for a Title VII claim against Emory, but rather to hold Defendants accountable for a conspiracy to *provoke* Emory to terminate Dr. Winer because of his Jewish identity—a *result* that would violate Title VII. *See* 42 U.S.C. § 1985(3) (conspiracies are actionable if their "purpose" is to deprive the plaintiff of rights,

"either directly or indirectly," so long as the plaintiff is "injured in his person or property" even if his rights are not ultimately violated). Therefore, properly understood, *Novotny* and *Jimenez* pose no bar to Dr. Winer's § 1985(3) claims predicated on Title VII.

Under these circumstances, Dr. Winer has a good faith argument that courts have overread *Novotny*, such that precedent does not reject all use of Title VII as a predicate violation for § 1985(3). *See* Dkt. 109 at 14–15.

**D. The SAC Plausibly Alleges Class-Based, Invidiously Discriminatory Animus**

The second element of a § 1985(3) claim "requires a showing of some 'racial...invidiously discriminatory animus behind the conspirators' action." *Childree v. UAP/GA CHEM, Inc*., 92 F.3d 1140, 1147 (11th Cir. 1996). CAIR-GA argues that the SAC fails to plead the class-based, invidiously discriminatory animus required under § 1985(3) because Defendants' actions were allegedly motivated not by Dr. Winer's Jewish identity, but by opposition to his Zionism and his service in the IDF. In CAIR-GA's telling, its conduct reflects nothing more than disagreement with Dr. Winer's political views. Dkt. 140-1 at 20–23. That framing mischaracterizes both the law and the allegations in the SAC.

It is well settled that discrimination against Jews constitutes discrimination against a protected racial group for purposes of the Civil Rights Act. *Shaare-Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987); *LeBlanc-Stenberg v. Fletcher*,

781 F. Supp. 261, 267 (S.D.N.Y. 1991); *Emanuel v. Barry*, 724 F. Supp. 1096, 1101 (E.D.N.Y. 1989). The SAC expressly alleges that Defendants targeted Dr. Winer because of his Jewish identity and associated markers of that identity, including his Zionism and his service in the IDF following the October 7 terrorist attacks. SAC ¶¶ 189–197.

Courts have likewise rejected attempts to reframe hostility toward Jewish symbols or identity as mere political opposition to Israel. In *Sumrall v. Ali*, the court held that "[p]urposefully yanking on an Israeli flag tied around a Jewish person's neck to choke them is direct evidence of racial discrimination … [because] the Star of David—emblazoned upon the Israeli flag—symbolizes the Jewish race." 793 F. Supp. 3d 199, 209 (D.D.C. 2025). The court rejected the argument that the Israeli flag represents only the State of Israel and not the Jewish people, explaining that the symbol reflects "Jewish . . . racial heritage." *Id.*

The SAC alleges the same kind of racial identity-based targeting here. According to CAIR-GA, Dr. Winer brought the attacks on himself by traveling to Israel to defend his ancestral homeland after Hamas-led terrorists infiltrated Israel's borders on October 7, 2023 and committed the worst massacre of Jews since the Holocaust, and by later writing about that service in an op-ed in *The Times of Israel*. Dkt. 140-1 at 23. But those facts only underscore the point. Defendants seized on Dr. Winer's Jewish identity, his connection to Israel, and his expression of Zionism

to brand him, personally, a genocidal war criminal, declare him unfit to teach or treat patients, and demand that Emory terminate his employment. Zionism, for many Jews, reflects the historic connection of the Jewish people to *Zion*—a place in Jerusalem identified in the Hebrew Bible as the origin of Jewish peoplehood. Treating that identity and connection as grounds for professional exclusion is precisely the type of discrimination civil rights law forbids.

At the pleading stage, that is more than sufficient. Accepting the well-pleaded allegations as true, the SAC plausibly alleges that Defendants' campaign was motivated by hostility toward Dr. Winer's protected racial identity as a Jew. Section 1985(3) was enacted to reach conspiracies driven by exactly this kind of class-based animus. CAIR-GA's motion to dismiss Count IV should therefore be denied.

## CONCLUSION

The First Amendment protects political debate. It does not license false accusations that a private individual personally committed genocide, war crimes, or murder.

For the foregoing reasons, the Court should deny CAIR-GA's Motion to Dismiss in its entirety.

[*Signature Page Follows*]

Respectfully submitted this 4th day of March, 2026

*/s/ Lauren Israelovitch*
Lauren Israelovitch
Mark Goldfeder
Ben Schlager
NATIONAL JEWISH ADVOCACY CENTER, INC.
3 Times Square, Suite 512
New York, NY 10036
(914) 222-3828
lauren@njaclaw.org
*Pro Hac Vice*

*/s/ Miles C. Skedsvold*
Josh Belinfante
Anna Edmondson
Miles Skedsvold
ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
500 14th Street, NW
Atlanta, GA 30318
T: (678) 701-9320
E: mskedsvold@robbinsfirm.com
Ga. Bar No. 371576

*/s/ David F. Katz*
David F. Katz
THE D.F. KATZ LAW FIRM, LLC
1158 Jones Bridge Rd
Ste 420 PMB1090
Johns Creek, GA 30022
T: (404) 918-5707
Dkatz@dfkatzlawfirm.com
Ga. Bar. No. 408738

*/s/ Esther Panitch*
Esther Panitch
THE PANITCH LAW GROUP, PC
4243 Dunwoody Club Drive
Suite 205
Atlanta, GA 30350
esther@panitchlawgroup.com
Ga. Bar. No. 143197

**CERTIFICATE OF COMPLIANCE**

By signature below, counsel certifies that the foregoing pleading was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1(C).

*/s/ Lauren Israelovitch*
Lauren Israelovitch

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the within and foregoing **PLAINTIFF JOSHUA WINER'S RESPONSE TO CAIR-NGA INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF electronic filing system, which suffices for service on all counsel of record who have entered an appearance in the case under L.R. 5.1(A)(3).

This 4th day of March, 2026

*/s/ Lauren Israelovitch*
Lauren Israelovitch