**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JOSHUA WINER,

    *Plaintiff,*

v.

UMAYMAH MOHAMMAD, *et al.*,

    *Defendants.*

Civil Action No.
1:25-cv-02329-TWT

**PLAINTIFF JOSHUA WINER'S RESPONSE
IN OPPOSITION TO DEFENDANT AJP EDUCATIONAL FOUNDATION,
INC.'S MOTION TO DISMISS HIS SECOND AMENDED COMPLAINT**

Lauren Israelovitch*
Mark Goldfeder**
Ben Schlager**
NATIONAL JEWISH
ADVOCACY CENTER, INC.
3 Times Square, Suite 512
New York, NY 10036
(914) 222-3828
lauren@njaclaw.org
*Pro Hac Vice*
*Pro Hac Vice Admission Pending*

Josh Belinfante
Anna Edmondson
Miles Skedsvold
ROBBINS ALLOY BELINFANTE
  LITTLEFIELD LLC
500 14th Street, NW
Atlanta, GA 30318
T:  (678) 701-9320
E:  mskedsvold@robbinsfirm.com
Ga. Bar No. 371576

David F. Katz
THE D.F. KATZ LAW FIRM, LLC
1158 Jones Bridge Rd
Ste 420 PMB1090
Johns Creek, GA 30022
T: (404) 918-5707
Dkatz@dfkatzlawfirm.com
Ga. Bar. No. 408738

Esther Panitch
THE PANITCH LAW GROUP, PC
4243 Dunwoody Club Drive
Suite 205
Atlanta, GA 30350
esther@panitchlawgroup.com
Ga. Bar. No. 143197

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

ARGUMENT ........................................................................................................... 3

    I.    This Court Has Personal Jurisdiction Over AMP ........................................... 3

    II.   The SAC Is Not a Shotgun Pleading ............................................................ 6

    III.  Dr. Winer Alleges Substantive Claims Against AMP ................................ 10

       A.   Dr. Winer States a Claim for Defamation Per Se ..................................... 10

       B.   Dr. Winer States a Claim for False Light Invasion of Privacy ................. 17

       C.   Dr. Winer States a Claim for Civil Conspiracy ........................................ 18

       D.   Dr. Winer States a Claim Under 42 U.S.C. § 1985(3) .............................. 19

       E.   AMP's Conduct Is Not Protected by the First Amendment ...................... 23

       F.   Georgia's Anti-SLAPP Statute Does Not Apply in Federal Court ........... 24

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. D'Souza*, 696 F. Supp. 3d 1332 (N.D. Ga. 2023) ............................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................... 9

*Bollea v. World Championship Wrestling, Inc.*, 610 S.E.2d 92 (Ga. App. 2005).. 18

*Calder v. Jones*, 465 U.S. 783 (1984) ..................................................... 5, 6

*Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018) ............... 24

*Dean v. Warren*, 12 F.4th 1248 (11th Cir. 2021). ................................................. 20

*Del Valle v. Trivago GMBH*, 56 F.4th 1265 (11th Cir. 2022)................................. 5

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010) ................................................................................................. 3

*Doe v. Roe*, 864 S.E.2d 206 (Ga. App. 2021).......................................................... 17

*Dougherty v. Harvey*, 317 F. Supp. 3d 1287 (N.D. Ga. 2018)................................. 9

*Emanuel v. Barry*, 724 F. Supp. 1096 (E.D.N.Y. 1989)........................................ 21

*Florida Abolitionist v. Backpage.com LLC*, 6:17-cv-218, 2018 WL 1587477 (M.D. Fla. Mar. 31, 2018)....................................................................................... 14

*Functional Prods. Trading, S.A. v. JITC, LLC*, 1:12-cv-0355, 2014 WL 3749213 (N.D. Ga. July 29, 2014). ............................................................................... 8

*Gast v. Brittain*, 589 S.E.2d 63 (Ga. 2003) ........................................................ 10

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974)................................................... 23

*Gettner v. Fitzgerald*, 677 S.E.2d 149 (Ga. App. 2009)......................................... 15

*Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020). ...................... 14

*Krass v. Obstacle Racing Media*, LLC, 1:19-cv-05785, 2021 WL 4824110 (N.D. Ga. Feb. 2, 2021)......................................................................................... 15

*Krass v. Obstacle Racing Media, LLC*, 667 F.Supp.3d 1177 (N.D. Ga. 2023) 14, 16

*LeBlanc-Stenberg v. Fletcher*, 781 F. Supp. 261 (S.D.N.Y. 1991)........................ 21

*Lively v. McDaniel*, 522 S.E.2d 711 (Ga. App. 1999)........................................... 12

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) ............. 5

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) .... 13

*Mays v. Laurant Publishing, Ltd.*, 600 F. Supp. 29 (N.D. Ga. 1984)...................... 4

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)............................................... 12

*Mustaqeem-Graydon v. SunTrust Bank*, 573 S.E.2d 455 (Ga. App. 2002)............ 18

*Ryte v. Express Courier Int'l, Inc.*, 1:18-cv-00186, 2018 WL 10847495 (N.D. Ga. Nov. 19, 2018) ...................................................................................................... 8

*Shaare-Tefila Congregation v. Cobb*, 481 U.S. 615 (1987)............................. 21, 22

*Smith v. DiFrancesco*, 802 S.E.2d 69 (Ga. App. 2017). ....................................... 10

*Stefan Passantino v. United States Of America,* No. 4:23-CV-00300-ELR, 2025 WL 4056751 (N.D. Ga. Jan. 22, 2025). ................................................................ 8

*Tanisha Systems, Inc. v. Chandra*, 1:15-cv-2644, 2015 WL 10550967 (N.D. Ga. Dec. 4, 2015).................................................................................................. 13, 14

*Traub v. Washington*, 591 S.E.2d 382 (Ga. App. 2003)........................................ 19

*Veritas v. Cable News Network, Inc.*, 121 F.4th 1267 (11th Cir. 2024)................. 16

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313 (11th Cir. 2015) ......... 7

*Weinberg v. Nat'l Students for Just. in Palestine*, No. 2:25-CV-03714-MCS-JC, 2026 WL 184302 (C.D. Cal. Jan. 20, 2026) .................................................... 22

## Statutes

42 U.S.C. § 1981 ................................................................................... 20, 21

42 U.S.C. § 1985(3)..................................................................................... 20

42 U.S.C. § 2000d. ............................................................................... 20, 21

42 U.S.C. § 2000e-2(a)(1) ................................................................... 20, 21

O.C.G.A. § 9-10-91(2) .................................................................................. 4

O.C.G.A. § 9-11-11.1(b) ......................................................................... 24, 25

**INTRODUCTION**

This case arises from a coordinated campaign to destroy a physician's career. After volunteering to serve in the Israeli Defense Forces ("IDF") as a physician following the October 7, 2023 terrorist attacks ("October 7 attacks"), Dr. Winer—a surgeon and professor at Emory University—was publicly accused by Defendants of personally participating in genocide and war crimes solely because of that service. Based on those accusations, Defendants declared him unfit to practice medicine, teach students, or treat patients and launched a public campaign demanding his removal from Emory's faculty.

AJP Educational Foundation, Inc. d/b/a American Muslims for Palestine ("AMP") founded and maintains organizational control over National Students for Justice in Palestine ("NSJP"), a central actor in the coordinated campaign against Dr. Winer. Through that control, AMP facilitated the defamatory publications and conspiratorial conduct at issue. In its motion to dismiss the Second Amended Complaint ("SAC"), AMP attempts to portray itself as a stranger to NSJP's misconduct. But taking the SAC's well-pleaded allegations as true—as the Court must at this stage—those allegations more than suffice to establish jurisdiction over AMP and plausibly state actionable claims.

1

## BACKGROUND

Dr. Winer is a Jewish American and Israeli surgical oncologist, a professor of medicine and the Surgical Clerkship Director at the Emory School of Medicine, and a faculty member at the Winship Cancer Institute. Dkt. 130 ¶ 12. In March 2024, Dr. Winer published an op-ed in the *Times of Israel*, an Israeli news outlet, reflecting on his decision to volunteer as a physician after the October 7 terrorist attacks. *Id.* ¶¶ 32–35. His military service was limited to providing medical care to injured soldiers. *Id.* ¶ 12. He never participated in offensive combat or engaged in any conduct that could plausibly support allegations of war crimes or genocide. *Id.* ¶¶ 37, 42.

Shortly after Dr. Winer's op-ed was published, Defendant Mohammad—a dual MD/PhD candidate at Emory University's School of Medicine and a steering committee member of NSJP—appeared on national media and accused Dr. Winer of complicity in genocide and other atrocities, despite not naming him directly. *Id.* ¶¶ 13, 36–37. The School of Medicine determined her remarks clearly referred to Dr. Winer, and an internal investigation found her statements "inflammatory," "irresponsible," and "disrespectful." *Id.* ¶¶ 45–46. She was suspended from the School of Medicine, but rather than retreating, she escalated her campaign— appearing in podcasts and articles where she explicitly identified Dr. Winer as the Surgery Clerkship Director at the School of Medicine. *Id.* ¶¶ 4, 49–51, 55–57.

2

By January 2025, Mohammad's campaign against Dr. Winer escalated. Joining the other co-conspirators, NSJP adopted Mohammad's statements in Instagram posts, circulated them widely, and urged thousands of followers to pressure Emory to investigate and/or terminate Dr. Winer. *Id*. ¶¶ 77–95. These posts linked to coordinated email and phone campaigns directing supporters to contact Emory administrators using prepared email templates and phone scripts that explicitly named Dr. Winer, repeated the false allegations, and demanded his termination. More than 123,000 emails were sent to Emory administrators as a result. This coordinated campaign severely damaged Dr. Winer's reputation, created significant professional and personal risks, and sought to strip him of his position at Emory. *Id.* ¶ 137.

## **ARGUMENT**

### I.  **This Court Has Personal Jurisdiction Over AMP**

AMP wrongly argues that this Court does not have personal jurisdiction over AMP. Dkt. 146-1 at 5-8. To determine if personal jurisdiction is proper under Rule 12(b)(2), a federal court must undertake a two-step inquiry in which it first determines whether the state's long-arm statute is applicable, and then determines whether exercising jurisdiction would be constitutional pursuant to the Due Process Clause of the Fourteenth Amendment. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010). Here, both

3

requirements are satisfied because AMP directed a coordinated defamatory campaign at a Georgia physician through its control of NSJP.

Georgia's Long Arm Statute confers jurisdiction over a nonresident who "commits a tortious act or omission within this state." O.C.G.A. § 9-10-91(2). The claims in this action arise from intentional tortious conduct purposefully directed at Georgia, making subsection (2) the relevant provision. While subsection (2) excludes defamation as a basis for jurisdiction, that exclusion is immaterial where, as here, the plaintiff asserts claims over which the court has jurisdiction. Thus, even where defamation is excluded under subsection (2), personal jurisdiction is proper when the plaintiff also alleges invasion of privacy arising from the same conduct. *Mays v. Laurant Publishing, Ltd.*, 600 F. Supp. 29, 30 (N.D. Ga. 1984). The same reasoning applies here. Because the Court has jurisdiction over AMP with respect to Dr. Winer's false light claim, it necessarily has jurisdiction over the related conspiracy claims predicated on that tort, as well as the accompanying defamation and defamation-based conspiracy claims arising from the same operative facts.

The Court's exercise of personal jurisdiction over AMP also satisfies the three-part due process test, which asks whether (1) the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) the nonresident defendant "purposefully availed" itself of the privilege of conducting activities within the forum state; and (3) exercising jurisdiction comports with

4

"traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013); *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022). With respect to the second prong—purposeful availment—the Eleventh Circuit recognizes two relevant frameworks: the *Calder* effects test and the traditional minimum-contacts analysis. *Del Valle*, 56 F.4th at 1275. Under the *Calder* effects test, purposeful availment exists where a defendant commits an intentional tort expressly aimed at the forum and should reasonably anticipate that the resulting harm will be suffered there. *Id.* at 1276. The traditional minimum-contacts analysis asks whether the defendant's forum contacts (1) relate to the plaintiff's cause of action, (2) reflect purposeful availment of the privilege of conducting activities within the forum, and (3) are such that the defendant should reasonably anticipate being haled into court there. *Id.*

First, Dr. Winer's claims arise directly from AMP's forum-related conduct. Through its control of NSJP, AMP orchestrated a coordinated campaign that targeted a Georgia resident, urged thousands to contact his Georgia employer, and caused injury in Georgia. Dkt. 130 ¶¶ 14, 16, 77–95.

Second, the purposeful-availment prong is satisfied. The SAC alleges that AMP exercised organizational control over NSJP and authorized messaging urging supporters to contact Emory administrators and demand action against Dr. Winer. Dkt. 130 ¶¶ 14, 16, 175. Through that control, AMP purposefully directed the

defamatory and false-light campaign against Dr. Winer in Georgia, where he lives and works. *See Calder v. Jones*, 465 U.S. 783, 789–90 (1984) (jurisdiction proper where defendants intentionally directed tortious conduct at the forum and knew the brunt of the injury would be felt there). NSJP then carried out that campaign by targeting a Georgia resident in its social media posts, directing communications to his Georgia employer, and orchestrating efforts to damage his standing in the Emory and Georgia medical community. Dkt. 130 ¶¶ 14, 16, 77–95. AMP could readily foresee being sued in Georgia for directing a campaign targeting a Georgia resident.

Finally, exercising jurisdiction comports with traditional notions of fair play and substantial justice. Georgia has a strong interest in providing redress to residents harmed by out-of-state actors, and litigating in this forum imposes no unfair burden on AMP, which purposefully directed the challenged conduct at a Georgia resident.

## II.  The SAC Is Not a Shotgun Pleading

AMP argues that the SAC constitutes a "shotgun pleading" and further claims that Dr. Winer's allegations of AMP's control over NSJP are conclusory and unsupported. Both arguments fail. Dkt. 146-1 at 8-11.

The SAC clearly identifies the conduct giving rise to each count and distinguishes the roles of each defendant. It alleges that AMP is the founder of NSJP and maintains organizational management and control (Dkt. 130 ¶ 14); that through this relationship, AMP enabled and supported NSJP's dissemination of false,

6

targeted rhetoric against Dr. Winer (Dkt. 130 ¶ 146); and that AMP, through its organizational control and oversight over NSJP, knowingly authorized its use of official channels and social media to disseminate false and defamatory statements about Dr. Winer. SAC ¶ 175. These allegations specify who acted, what they did, and how the injury occurred—satisfying Rules 8 and 10.

This is not a case where "a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1324 (11th Cir. 2015). Each claim is clearly pleaded and logically builds on the prior one: the facts supporting Defamation (Count I) also support False Light (Count II) and the predicate torts for conspiracy (Counts III–IV). AMP's ability to brief jurisdictional and merits defenses tailored to its conduct confirms that it fully understands the claims against it. "This may explain why the defendants did not move for a more definite statement under Federal Rule of Civil Procedure 12(e) or otherwise assert that they were having difficulty knowing what they were alleged to have done and why they were liable for doing it." *Id.*

AMP's assertion that Dr. Winer's allegations regarding its control over NSJP are an "unsupported conclusion" misunderstands the pleading standard. Dkt. 146-1 at 9-11. Allegations may properly be made upon information and belief "where the facts are peculiarly within the possession and control of the defendant[.]" *Ryte v.*

7

*Express Courier Int'l, Inc.*, 1:18-cv-00186, 2018 WL 10847495, at *2 (N.D. Ga. Nov. 19, 2018). The precise structure, funding, and operational control governing the relationship between AMP and NSJP are matters peculiarly within AMP's knowledge. *See Functional Prods. Trading, S.A. v. JITC, LLC*, 1:12-cv-0355, 2014 WL 3749213, at *8 (N.D. Ga. July 29, 2014).

However, there are publicly available materials that further support the plausibility of the SAC's allegations with respect to AMP's funding, control and governance of NSJP. For example, the Court may take judicial notice that AMP's national board chair, Dr. Hatem Bazian, is identified in official congressional records as the founder of NSJP.[1] *See Stefan Passantino v. United States Of America,* No. 4:23-CV-00300-ELR, 2025 WL 4056751, at *3 (N.D. Ga. Jan. 22, 2025). Additionally, AMP has stated on its own website that it provides NSJP with "information, materials, speakers, trainings and financial support."[2] In written testimony before the House Foreign Affairs Committee, former Treasury terrorism-finance analyst Jonathan Schanzer further explained that:

> AMP is arguably the most important sponsor and organizer for [National] Students for Justice in Palestine ([N]SJP), which is the most visible arm of the

---

[1] Letter from Rep. James Comer, Chairman, House Committee on Oversight and Accountability, to National Students for Justice in Palestine (May 29, 2024), available at https://oversight.house.gov/wp-content/uploads/2024/05/Letter-to-National-SJP-5.29.24.pdf

[2] American Muslims for Palestine**,** *Help AMP Bring Palestine to the American Public* (Dec. 7, 2011), https://www.ampalestine.org/media/media-room/statements/help-amp-bring-palestine-american-public

BDS campaign on campuses in the United States. AMP provides speakers, training, printed materials, a so-called "Apartheid Wall," and grants to [N]SJP activists. AMP even has a campus coordinator on staff whose job is to work directly with [N]SJP ... According to an email it sent to subscribers, AMP spent $100,000 on campus activities in 2014 alone.[3]

The Court may also take judicial notice of this testimony. *See id.* These public materials corroborate the plausibility that AMP not only founded, but continues to direct NSJP's activities and communications, thereby satisfying the *Twombly* standard's requirement that a complaint allege sufficient factual matter to render the claim "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

AMP's argument that WESPAC has served as NSJP's fiscal sponsor since 2016 does not undermine these allegations. Dkt. 146-1 at 2, 10. A fiscal sponsor merely serves as a financial conduit; it does not preclude another organization from exercising operational or messaging control.

Relying on *Dougherty v. Harvey*, 317 F. Supp. 3d 1287, 1293 (N.D. Ga. 2018), AMP asserts that liability could arise only if Dr. Winer alleged that AMP expressly directed or authorized NSJP's statements. Dkt. 146-1 at 10–11. That reliance is misplaced. *Dougherty* addresses respondeat superior liability in an employment context, which is irrelevant here. In any event, the SAC does exactly

---

[3] Jonathan Schanzer, Written Testimony Before the U.S. House Committee on Foreign Affairs, Subcommittees on Terrorism, Nonproliferation, and Trade and on the Middle East and North Africa (Apr. 19, 2016), available at https://docs.house.gov/meetings/FA/FA18/20160419/104817/HHRG-114-FA18-Wstate-SchanzerJ-20160419.pdf

what AMP claims is required: it alleges that AMP exercised organizational control and oversight over NSJP and knowingly authorized its use of official channels and social media to disseminate defamatory statements about Dr. Winer. Dkt. 130 ¶ 175. At the pleading stage, those allegations more than plausibly establish AMP's role in directing and enabling NSJP's conduct and are sufficient to proceed to discovery.

## III.      Dr. Winer Alleges Substantive Claims Against AMP

### A. Dr. Winer States a Claim for Defamation Per Se

Imputing criminal conduct and professional unfitness to a particular person are plainly the kind of statements that "can reasonably be interpreted . . . to state or imply defamatory facts about the plaintiff that are capable of being proved false," *Gast v. Brittain*, 589 S.E.2d 63, 64 (Ga. 2003), as well as defamatory per se. *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1352 (N.D. Ga. 2023); *Smith v. DiFrancesco*, 802 S.E.2d 69, 72 (Ga. App. 2017).

The NSJP statements concerning Dr. Winer, for which AMP is answerable, fall squarely within those categories of defamatory per se statements. The posts and campaign materials accused him of participating in genocide and war crimes, labeled him a member of the "Israeli Offense Force," and further accused him of endorsing apartheid and threatening patient safety. Dkt. 130 ¶¶ 78–95; Dkt. 146-1 at 11–12. Such allegations inherently impute criminal conduct and moral depravity incompatible with the standards of the medical profession and suggest that Dr. Winer

endangers patients and students—striking at the core of his reputation as a physician and medical school professor.

AMP nevertheless contends that NSJP's posts lack defamatory meaning because they constitute "opinions and matters to which reasonable persons may disagree." Dkt. 146-1 at 18–20. AMP attempts to recast the accusations as mere political commentary about whether Dr. Winer "was participating in a genocide or an 'apartheid regime' or 'war crimes' by virtue of his admitted service in the Israeli military." *Id*. at 19. But NSJP did not merely express views about Israeli policy or the conflict in Gaza. It accused Dr. Winer personally of committing genocide and war crimes and urged Emory to investigate or terminate him on that basis.

The First Amendment does not transform accusations that a specific individual committed genocide or war crimes into protected opinion simply because those accusations arise in a politically charged context. Even if the belief that the Israel-Hamas war was a genocide could be characterized as an opinion—in the most abstract sense that any idea about world events may be called an opinion, however unfounded—NSJP's statements go further. They plainly assert as a matter of fact that Dr. Winer personally participated in such acts. Statements are actionable if they are false assertions of facts capable of being proven true or false. Dr. Winer has pled and can show that each of the defamatory statements NSJP made about him are false.

11

AMP's related assertion that describing Dr. Winer as having served in the so-called "Israeli Offense Force" ("IOF") carries no defamatory meaning fares no better. *See* Dkt. 146-1 at 19–20. The term "IOF" refers to no actual military body and conveys the false impression that Dr. Winer served in an organization engaged in offensive or unlawful military operations. *See Lively v. McDaniel*, 522 S.E.2d 711, 713 (Ga. App. 1999) ("expressions of opinion may often imply an assertion of objective fact"); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–20 (1990) (couching a statement as opinion does not negate its implication of a false assertion of fact). That implication directly contradicts Dr. Winer's *Times of Israel* op-ed, which made clear that his service was limited to providing medical care to wounded soldiers. Dkt. 130 ¶¶ 32, 34, 37. Within this context, the use of "IOF" was not rhetorical hyperbole but a calculated distortion reinforcing the defamatory claim that Dr. Winer personally participated in war crimes and genocide.

1. *The Communications Decency Act Does Not Bar Dr. Winer's Claims.*

AMP argues that Section 230 of the Communications Decency Act ("CDA") preempts Dr. Winer's claims because the Instagram post at issue was published by NSJP, not AMP, and AMP therefore cannot be held liable for that post or for comments made in response to it. Dkt. 146-1 at 12–14. The statute provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content

provider." 47 U.S.C. § 230(c)(1) (emphasis added). "Essentially," this means that "'providers and users of interactive computer services' are immunized from liability 'when the defamatory or obscene material is provided by someone else.'" *Tanisha Systems, Inc. v. Chandra*, 1:15-cv-2644, 2015 WL 10550967, at *8 (N.D. Ga. Dec. 4, 2015) (brackets omitted) (quoting 47 U.S.C. § 230(c)(1) and *Batzel v. Smith*, 333 F.3d 1018, 1020 (9th Cir. 2003))). Section 230 protects only those who publish content created by others, not those who participate in developing it. 47 U.S.C. § 230(c)(1); *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 16 (2020) (Thomas, J., respecting the denial of certiorari) ("an information content provider is not just the primary author or creator; it is anyone 'responsible, *in whole or in part*, for the creation or development' of the content. § 230(f)(3)" (emphasis in original)).

AMP cannot claim immunity where the SAC alleges it founded, managed, and directed NSJP's activities—including the adoption of defamatory statements and dissemination of the defamatory campaign against Dr. Winer. Dkt. 130 ¶¶ 14, 16, 146, 175. Dr. Winer does not seek to hold AMP liable merely for hosting or republishing NSJP's statements. Rather, the SAC alleges that AMP exercised organizational control over NSJP and authorized and enabled the campaign targeting Dr. Winer. These allegations describe active involvement in developing the content.

13

*See Tanisha Systems*, 2015 WL 10550967, at \*8 (defendant not immune where alleged to have collaborated in creating or reinforcing defamatory online content).

Section 230 immunity is also an affirmative defense, not an element of Dr. Winer's claims. *See Florida Abolitionist v. Backpage.com LLC*, 6:17-cv-218, 2018 WL 1587477, at \*4–5 (M.D. Fla. Mar. 31, 2018). A plaintiff "need not anticipate and negate affirmative defenses" in the pleadings, and dismissal is proper only where the defense is apparent on the face of the complaint. *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020). Courts consistently deny motions to dismiss based on Section 230 immunity for precisely this reason. *Florida Abolitionist*, 2018 WL 1587477, at \*5 (collecting cases).

Accordingly, because the SAC plausibly alleges that AMP exercised oversight of NSJP's communications, directed its online campaigns, and provided the infrastructure through which the defamatory materials were published, Section 230 immunity is plainly inapplicable here.

2. *Dr. Winer is Not a Limited Public Figure and, Even if He Is, the Amended Complaint Alleges Actual Malice.*

AMP argues that Dr. Winer's defamation claims fail because he has not demonstrated that AMP acted with actual malice. However, Dr. Winer is not a public figure (limited or otherwise) and therefore need not show that AMP acted with malice. *See Krass v. Obstacle Racing Media, LLC*, 667 F.Supp.3d 1177, 1206 (N.D. Ga. 2023). Whether a person is a public figure is a question of law requiring the

14

court to assess the nature and extent of the individual's participation in the specific controversy that gave rise to the defamation. Under this three-part analysis, the court must (1) isolate the public controversy, (2) examine the plaintiff's involvement in it, and (3) determine whether the alleged defamation was germane to that participation. *Gettner v. Fitzgerald*, 677 S.E.2d 149, 154–55 (Ga. App. 2009). Although the Israeli–Palestinian conflict is a matter of public controversy, AMP wrongly asserts that Dr. Winer injected himself into that controversy through his op-ed in the *Times of Israel*, an Israeli news outlet. Dkt. 146-1 at 17. Dr. Winer's op-ed reflected on his personal experience serving in the IDF as a physician following the October 7 terrorist attacks and the sense of duty that motivated his decision to volunteer. Dkt. 130 ¶¶ 32–35. The piece did not purport to influence the course of the conflict or advance broader policy arguments about the war, but instead described his personal motivations and experiences. *See Little v. Breland*, 93 F.3d 755, 758 (11th Cir. 1996) (explaining that public-figure status depends on whether the plaintiff sought to influence the outcome of a public controversy). Finally, because determining whether a plaintiff is a private individual or a limited-purpose public figure is a fact-intensive inquiry, it cannot properly be resolved at the pleading stage prior to discovery. *Krass v. Obstacle Racing Media*, LLC, 1:19-cv-05785, 2021 WL 4824110, at *3 (N.D. Ga. Feb. 2, 2021).

15

In any event, the SAC sufficiently alleges actual malice, which is "knowledge that a statement is false or a reckless disregard as to its truth." *Krass*, 667 F. Supp. 3d at 1210 (quotation omitted). Dr. Winer's op-ed made clear that following the October 7 terrorist attacks, he served in the IDF solely as a physician providing medical care to wounded soldiers. Dkt. 130 ¶¶ 34. No reasonable reader could extract from Dr. Winer's op-ed the accusations NSJP leveled against him—that he is a genocidal war criminal, that he endangers his patients, or that he endorses apartheid. The complete disconnect between the op-ed and those allegations itself shows Defendants acted with actual malice. In other words, based on the information AMP knew from the Op-Ed, Dr. Winer "had clearly done no such thing[s]," Dkt. 130 ¶ 37. *See Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024) ("at the pleadings stage, [the plaintiff] need only allege sufficient facts to permit the inference that [the defendant] published [the offending] statements with actual malice," and allegations "that [the defendant] actually entertained serious doubts about the veracity" of the statements is sufficient).

Accordingly, because the SAC alleges defamation per se, Dr. Winer need not plead actual malice. But even if the heightened public-figure standard were applied contrary to the allegations of the SAC, the SAC plausibly alleges that Defendants made the defamatory statements with at least reckless disregard for their falsity.

16

**B. Dr. Winer States a Claim for False Light Invasion of Privacy**

To plead false light under Georgia law, a plaintiff must allege "false publicity that depicts the plaintiff as something or someone which he is not" and that "the false light in which he was placed would be highly offensive to a reasonable person." *Doe v. Roe*, 864 S.E.2d 206, 216 (Ga. App. 2021) (citing *Williams v. Cobb County Farm Bureau*, 718 S.E.2d 540 (Ga. App. 2011)).

The SAC satisfies both elements. Under AMP's direction and control, NSJP published statements portraying Dr. Winer as a genocidal war criminal that endorses apartheid and threatens patient safety. Dkt. 130 ¶¶ 14, 16, 78–95, 175. Those false depictions present Dr. Winer—who served in the IDF solely as a physician treating wounded soldiers (*id*. ¶¶ 12, 37, 66)—as someone he is not. While AMP insists that Dr. Winer merely "dislikes the characterizations of his military service" (dkt. 146-1 at 20-21), that argument misses the mark. Depicting him as a genocidal war criminal who supports apartheid and is unfit to work is not an accurate characterization of his service—it is a malicious falsehood that casts him as profoundly morally corrupt, racially biased, and professionally dangerous, which would be highly offensive to any reasonable person.

AMP's assertion that it had "no involvement" in these statements (*id*. at 20) raises a factual dispute that cannot be resolved on a motion to dismiss. The SAC plausibly alleges that AMP founded NSJP and exercised control over its messaging.

17

Dkt. 130 ¶¶ 14, 16, 175. Nor can AMP avoid liability by recasting the posts as "truthful" or "opinion." The issue is not the undisputed fact that Dr. Winer served in the IDF, but the false light created by NSJP's distortion of that fact.

If the Court finds these statements constitute defamation per se, the false-light claim is subsumed. *Bollea v. World Championship Wrestling, Inc.*, 610 S.E.2d 92, 96 n.1 (Ga. App. 2005). If any of the statements at issue fall short of defamation yet still portray Dr. Winer in a false and deeply offensive manner, Count II remains independently actionable. Either way, dismissal is unwarranted.

## C. Dr. Winer States a Claim for Civil Conspiracy

AMP's contention that Count III fails because the underlying torts fail is circular, and its insistence that Dr. Winer's allegations of a civil conspiracy are "conclusory" ignores both the pleading standard and the plain text of the SAC. Dkt. 146-1 at 21–22. "To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort." *Mustaqeem-Graydon v. SunTrust Bank*, 573 S.E.2d 455, 461 (Ga. App. 2002).

The SAC satisfies that standard. It alleges that AMP—NSJP's founder and controlling entity—directed, authorized, and enabled NSJP's coordinated campaign with other defendants to defame Dr. Winer and portray him in a false light. Dkt. 130 ¶¶ 14, 16, 77–95, 146, 175. The SAC further alleges that NSJP, acting in concert

18

with its co-conspirator defendants, amplified the accusations against Dr. Winer through coordinated posts and campaign materials that urged supporters to contact Emory administrators and demand his investigation or termination. *Id*. ¶¶ 84–95. AMP cannot reframe the statements as merely expressing the opinion that Israeli military service in Gaza constitutes "aiding and abetting" genocide; at the motion-to-dismiss stage, any such inference must be drawn in Dr. Winer's favor—not Mohammad's.

AMP's reliance on *Twombly* and related Eleventh Circuit precedent does not change that result. The SAC does not rely on bare assertions of "agreement" (dkt. 146-1 at 22); it pleads concrete facts from which coordinated conduct can reasonably be inferred. Whether AMP's direction and control involved express instruction or tacit coordination is a factual issue not properly resolved on a Rule 12(b)(6) motion. *See Traub v. Washington*, 591 S.E.2d 382, 387 (Ga. App. 2003) ("Because civil conspiracy is by its very nature a secret endeavor, concert of action, amounting to a conspiracy, is best suited for jury resolution.")

Accordingly, Count III is properly pled, and AMP's motion to dismiss it should be denied.

### D. Dr. Winer States a Claim Under 42 U.S.C. § 1985(3)

AMP contends that Dr. Winer fails to allege that AMP acted with specific class-based animus or that AMP injured his person or property, or deprived him of

19

any right or privilege. Dkt. 146-1 at 23. To state a cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving either directly or indirectly, a person or class of persons of the equal protection of the laws, or the equal privileges and immunities; (3) an overt act in furtherance; and (4) an injury or deprivation of a right. *Dean v. Warren*, 12 F.4th 1248, 1255 (11th Cir. 2021). Count IV alleges that *all* Defendants, which plainly includes AMP, conspired to deprive Dr. Winer "of the equal protection of the laws and his rights and privileges" under the laws "on account of his Jewish identity and/or Zionist beliefs," including

> his [1] "right in every state to make and enforce contracts" on the same terms "as is enjoyed by white citizens," 42 U.S.C. § 1981, his right to be free from employment discrimination on the basis of "race . . . religion . . . or national origin," 42 U.S.C. § 2000e-2(a)(1), and his right not to be "subjected to discrimination under any program or activity receiving Federal financial assistance" "on the ground of race . . . or national origin." 42 U.S.C. § 2000d.

Dkt. 130 ¶ 189. Specifically, "Defendants undertook a coordinated effort to interfere with [Dr. Winer's] rights by publicly demanding that Emory investigate and/or terminate his employment because of their false accusations," *id*. ¶ 190, which were predicated on "[Dr. Winer's] lawful military service and expressed sense of duty to serve the Jewish homeland, which is integral to his racial identity as a Jew," *id*. ¶ 191. In doing so, "Defendants sought to" induce Emory "to terminate his

20

employment [because of his race], a result that would violate Titles VI and VII of the Civil Rights Act, as well as 42 U.S.C. § 1981." *Id.* ¶ 193.

The SAC plausibly alleges AMP's participation in that conspiracy. It alleges that AMP founded NSJP, exercises organizational control over its messaging, and authorized and enabled NSJP's dissemination of the materials used in the campaign targeting Dr. Winer. Dkt. 130 ¶¶ 14, 16, 146, 175. It further alleges that NSJP, acting with the other co-conspirator defendants and operating under AMP's direction and control, published posts accusing Dr. Winer of genocide and war crimes and linked those posts to coordinated email and phone campaigns urging supporters to pressure Emory University to investigate or terminate him. Id. ¶¶ 77–95.

These allegations plausibly allege coordinated conduct undertaken to deprive Dr. Winer of his civil rights. AMP's argument to the contrary improperly conflates plausibility with proof and asks the Court to disregard well-pleaded allegations that must be accepted as true at the pleading stage.

AMP's argument that the SAC fails to allege class-based animus likewise ignores the pleadings. It is well settled that Jewish identity is a protected racial group under the Civil Rights Act. *See Shaare-Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987); *LeBlanc-Stenberg v. Fletcher*, 781 F. Supp. 261, 267 (S.D.N.Y. 1991); *Emanuel v. Barry*, 724 F. Supp. 1096, 1101 (E.D.N.Y. 1989). Here, the SAC expressly alleges that all Defendants—including AMP through its direction and

21

control of NSJP—targeted Dr. Winer because of his Jewish identity and his identification as a Zionist Jew. Dkt. 130 ¶¶ 8–10, 14, 16, 146, 175. Defendants seized on Dr. Winer's Jewish identity, his connection to Israel, and his expression of Zionism to brand him a genocidal war criminal, declare him unfit to teach or treat patients, and demand that Emory terminate his employment. *Id*. ¶¶ 170–86.

For many Jews, including Dr. Winer, Zionism reflects the historic connection of the Jewish people to Zion—a place in Jerusalem identified in the Hebrew Bible as the origin of Jewish peoplehood. Treating that identity and connection as grounds for professional exclusion is precisely the type of discrimination civil rights law forbids. *See Shaare-Tefila Congregation*, 481 U.S. at 617–18. At the pleading stage, these allegations are more than sufficient to allege class-based animus.

Lastly, AMP argues that Dr. Winer's § 1985(3) claim should be dismissed for the same reasons relied upon in *Weinberg v. Nat'l Students for Just. in Palestine*, No. 2:25-CV-03714-MCS-JC, 2026 WL 184302 (C.D. Cal. Jan. 20, 2026). But *Weinberg* is inapposite. There, the court dismissed the claim because the complaint failed to plausibly connect AMP to the specific conduct underlying the alleged conspiracy. Id. at *11–12. The SAC here alleges precisely the connection that was missing in *Weinberg*: that AMP founded NSJP, exercised organizational control over its messaging, and authorized and enabled the campaign targeting Dr. Winer. Dkt. 130 ¶¶ 14, 16, 146, 175.

22

Accordingly, Dr. Winer has plausibly alleged a conspiracy motivated by class-based animus that resulted in concrete injury to his rights. The § 1985(3) claim should not be dismissed.

### E. AMP's Conduct Is Not Protected by the First Amendment

AMP's argument that Dr. Winer cannot hold it liable for "mere speech, under any claim, without trampling the inherent meaning of the First Amendment" (dkt. 146-1 at 24) is misplaced. This case does not seek to punish AMP for expressing political opinions or engaging in advocacy for Gaza, or any matter of public concern. It challenges AMP's direction of NSJP's campaign of provably false factual statements accusing Dr. Winer—a private individual—of genocide, war crimes, and endangering patients. As the Supreme Court has long recognized, "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S., at 270). Courts consistently hold that defamatory statements, even when made in political or social contexts, fall outside the First Amendment's protection. *Id*.

Accordingly, AMP's argument fails on its own premise. The First Amendment does not shield defamatory falsehoods. Holding AMP accountable for

23

its role in creating and disseminating provably false statements is fully consistent with, not contrary to, constitutional principles.

**F. Georgia's Anti-SLAPP Statute Does Not Apply in Federal Court**

AMP argues that this Court must award them attorney's fees under Georgia's anti-SLAPP statute. Dkt. 146-1 at 24-25. *See* O.C.G.A. § 9-11-11.1(b). That argument is foreclosed. The Eleventh Circuit has held unequivocally that federal courts cannot apply Georgia's anti-SLAPP dismissal provision. *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018). As the court explained, Georgia's statute requires a higher showing of merit (probability) that is inconsistent with Federal Rules 8 and 12 (plausibility), and 56 (genuine issue of material fact). It also imposes an evidentiary burden before discovery, absent a showing of good cause.

Even if the anti-SLAPP statute could apply, AMP's argument fails on the merits. The SAC pleads actionable claims for defamation, false light, civil conspiracy, and violation of 42 U.S.C. § 1985(3), each grounded in detailed factual allegations. This case is not a strategic lawsuit against public participation; it is a legitimate effort by a private individual to hold accountable those who conspired to defame him and place him in a false light for the purpose of destroying his professional reputation, depriving him of his rights, and compelling his employer to

terminate him. The anti-SLAPP statute has no application here, and AMP's request

for dismissal or fees under O.C.G.A. § 9-11-11.1 should be denied.

## CONCLUSION

For the foregoing reasons, Defendant AMP's Motion to Dismiss the

SAC should be denied in its entirety.

Dated: March 17, 2026                              Respectfully Submitted,

*/s/ Lauren Israelovitch*                          Josh Belinfante
Lauren Israelovitch*                               Anna Edmondson
Mark Goldfeder**                                   Miles Skedsvold
Ben Schlager**                                     ROBBINS ALLOY BELINFANTE
NATIONAL JEWISH                                        LITTLEFIELD LLC
ADVOCACY CENTER, INC.                              500 14th Street, NW
3 Times Square, Suite 512                          Atlanta, GA 30318
New York, NY 10036                                 T:  (678) 701-9320
(914) 222-3828                                     E:  mskedsvold@robbinsfirm.com
lauren@njaclaw.org                                 Ga. Bar No. 371576
*Pro Hac Vice*
*Pro Hac Vice Pending*

*/s/ David F. Katz*                                Esther Panitch
David F. Katz                                      THE PANITCH LAW GROUP, PC
THE D.F. KATZ LAW FIRM, LLC                        4243 Dunwoody Club Drive
1158 Jones Bridge Rd                               Suite 205
Ste 420 PMB1090                                    Atlanta, GA 30350
Johns Creek, GA 30022                              esther@panitchlawgroup.com
T: (404) 918-5707                                  Ga. Bar. No. 143197
Dkatz@dfkatzlawfirm.com
Ga. Bar. No. 408738

25

# CERTIFICATE OF COMPLIANCE

By signature below, counsel certifies that the foregoing pleading was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1(C).

*/s/ Lauren Israelovitch*
Lauren Israelovitch

26

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the within and foregoing **RESPONSE IN OPPOSITION TO AJP EDUCATIONAL FOUNDATION, INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF electronic filing system, which suffices for service on all counsel of record who have entered an appearance in the case under L.R. 5.1(A)(3).

This 17th day of March, 2026

*/s/ Lauren Israelovitch*
Lauren Israelovitch