**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JOSHUA WINER,

    *Plaintiff*,

v.

UMAYMAH MOHAMMAD, *et al.*,

    *Defendants*.

Civil Action No.
1:25-cv-02329-TWT

**PLAINTIFF JOSHUA WINER'S RESPONSE TO DEFENDANT DOCTORS
AGAINST GENOCIDE SOCIETY'S MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT**

Lauren Israelovitch*
Mark Goldfeder*
Ben Schlager*
Rachel Sebbag**
NATIONAL JEWISH
ADVOCACY CENTER, INC.
3 Times Square, Suite 512
New York, NY 10036
(914) 222-3828
lauren@njaclaw.org
*Admitted Pro Hac Vice*
* *Pro Hac Vice Admission Pending*

David F. Katz
THE D.F. KATZ LAW FIRM, LLC
1158 Jones Bridge Rd
Ste 420 PMB1090
Johns Creek, GA 30022
(404) 918-5707
dkatz@dfkatzlawfirm.com
Ga. Bar. No. 408738

Josh Belinfante
Anna Edmondson
Miles Skedsvold
ROBBINS ALLOY BELINFANTE
LITTLEFIELD LLC
500 14th Street, NW
Atlanta, GA 30318
(678) 701-9320
mskedsvold@robbinsfirm.com
Ga. Bar No. 371576

Esther Panitch
THE PANITCH LAW GROUP, PC
4243 Dunwoody Club Drive
Suite 205
Atlanta, GA 30350
esther@panitchlawgroup.com
Ga. Bar. No. 143197

**INTRODUCTION**

Falsely accusing a man of committing the heinous crime of genocide is defamatory and deeply offensive. When that man is a surgeon and the statements suggest that the non-existent crimes preclude him from teaching medical students or treating patients, those statements also constitute false light invasion of privacy. When multiple people cooperate to commit these torts, they have engaged in a conspiracy. And when the conspiracy targets a particular man because he is a Jew, the conspiracy violates federal civil rights law.

Plaintiff Joshua Winer is a surgical oncologist and medical school professor at Emory Medical School. He volunteered to serve in the Israel Defense Forces ("IDF") following the October 7, 2023, terror attack, working as a physician to treat wounded soldiers. After Dr. Winer returned to Atlanta, he published a blog post reflecting on post-October 7 life, including, briefly, his time volunteering in Israel in both civilian and military contexts. In response, Defendant Umaymah Mohammad, an Emory student, publicly, repeatedly accused Dr. Winer of racism, murder, genocide, war crimes, and the destruction of Gaza's healthcare system. The relevant Defendant here,[1] DAG, conspired with Mohammad and the other

_____

[1] DAG purports to request dismissal of the claims in Plaintiff's Second Amended Complaint, Dkt. 130, as "against DAG and the other Defendants." Dkt. 163-1 at 25. This response is only as to DAG's motion to dismiss, as that is the only party on behalf of which DAG has standing to file a motion. Plaintiff has and will respond to

1

codefendants to smear Dr. Winer's reputation with accusations of unimaginable crimes and pressure his employer to fire him.

## BACKGROUND

Dr. Winer is a Jewish resident of Atlanta, Georgia, with dual American and Israeli citizenship. Dkt. 130, Second Amended Complaint ("SAC"), ¶ 12. He is a board-certified surgical oncologist at Emory Winship Cancer Institute, a professor in the Department of Surgery, Division of Surgical Oncology, and Surgical Clerkship Director at the Emory School of Medicine. *Id.*

Following the October 7 terror attack, Dr. Winer "felt a religious, moral, and national responsibility to protect the Jewish people and the Jewish homeland[.]" *Id.* He, therefore, took a leave of absence to volunteer with Magen David Adom (Israel's national emergency medical, disaster, ambulance and blood bank service), before he was drafted into an elite reconnaissance unit of the Israel Defense Force ("IDF"), providing medical care to soldiers wounded in battle. *Id.* ¶¶ 12, 34. He served "exclusively in his capacity as a physician-medic and engaged in *defensive* combat solely in the event his unit was directly attacked." *Id.* ¶ 37 (emphasis in original). In or about March 2024, Dr. Winer wrote and published a blog post on the *Times of Israel* Blogs platform describing and reflecting on his post-October 7 experiences, which did not discuss combat (much less war crimes or genocide). *Id.* ¶¶ 32–34.

---

motions to dismiss filed by other Defendants separately, as appropriate.

2

In or about April 2024, Defendant Umaymah Mohammad, an MD/PhD candidate at Emory School of Medicine, began to appear on national media to accuse Dr. Winer of "participat[ing] in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza[,] and the murder of over 400 healthcare workers[.]" *Id.* ¶¶ 13, 36–39. Mohammad was subsequently suspended from Emory for making these comments in violation of the school's code of conduct. *Id.* ¶¶ 45–48. Mohammad, however, doubled down, intensifying and broadening her efforts to smear Dr. Winer, including with an op-ed that included a link to a "community led effort . . . to support her." *Id.* ¶¶ 49–58. The link was to the first of two Instagram posts DAG (collectively, the "Posts") published in coordination with the National Students for Justice in Palestine ("NSJP"). *Id.* ¶¶ 55–56, 49–54. The first NSJP-DAG Post, published on or about January 13, 2025, regurgitated Mohammad's statements and linked to a campaign launched against Dr. Winer, which implored readers to contact Emory and demand it "hold [Dr. Winer] accountable" for his crimes by investigating and/or terminating him, using the provided pre-written email template and phone script. *Id.* ¶¶ 59, 76–88.

On or about January 29, 2025, DAG, in coordination and collaboration with NSJP, published a second Instagram post. *Id.* ¶ 91. This one explicitly characterized Mohammad's statements about Dr. Winer as "truthful." *Id.* ¶¶ 91–92. It also

3

encouraged readers, once again, to contact Emory to pressure the school into firing Dr. Winer and provided a link to the email template and phone script. *Id.* ¶¶ 93–94.

Contrary to DAG's baseless accusations, Dr. Winer did not commit, participate in, or aid and abet genocide, *id.* ¶ 4; he is not a racist, *id.* ¶ 42; and he in no way participated in the alleged destruction of the Gazan healthcare system, *id.*

Dr. Winer filed this lawsuit in April 2025, alleging defamation, false light invasion of privacy, and civil conspiracy. Dkt. 1. He amended his complaint about a month later to add a claim for conspiracy to violate civil rights under 42 U.S.C. § 1985(3). Dkt. 22. After several Defendants moved to dismiss, Dr. Winer sought and obtained permission to file a Second Amended Complaint. *See* Dkt. Nos. 129, 130. The SAC now names several Defendants, including DAG, alleging each of the four claims just discussed against them all.

## ARGUMENT

DAG argues that this Court lacks personal jurisdiction over DAG and asserts that none of the four counts in the SAC state a claim for relief against it. DAG is wrong across the board.

### I. This Court Has Personal Jurisdiction Over DAG

First, DAG wrongly argues this Court lacks personal jurisdiction over it. Dkt. 163-1 at 10–12. To determine if personal jurisdiction is proper under Rule 12(b)(2), federal courts undertake a two-step inquiry, starting with the forum state's long-arm

statute, and then asking whether exercising jurisdiction would be consistent with the Due Process Clause of the Fourteenth Amendment. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010). Here, both requirements are satisfied because DAG participated in a coordinated campaign to defame a Georgia physician.

Georgia's Long Arm Statute confers jurisdiction over a nonresident who "commits a tortious act or omission within this state[.]" O.C.G.A. § 9-10-91(2). The claims in this action arise from intentional tortious conduct purposefully directed at Georgia. While subsection (2) of the Long Arm Statute excludes defamation as a basis for jurisdiction, that exclusion is immaterial where, as here, the plaintiff asserts claims over which the court has jurisdiction. *See Mays v. Laurant Publ'g, Ltd.*, 600 F. Supp. 29, 30 (N.D. Ga. 1984). Here, Dr. Winer has also alleged false light invasion of privacy, civil conspiracy, and conspiracy to interfere with his civil rights. Therefore, the statute's exclusion of defamation is immaterial, and the court has personal jurisdiction over DAG for all claims. *See id.* ("If the court has personal jurisdiction as to the privacy claims it has jurisdiction as to all claims." (citing *Mack Truck, Inc. v. Arrow Aluminum Castings Co.*, 510 F.2d 1029, 1032–34 (1975) (deciding the same question under Georgia law)).[2]

---

[2] *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) ("decisions of the United States Court of Appeals for the Fifth Circuit . . . handed down prior to" September 30, 1981, "shall be binding as precedent in the Eleventh Circuit").

In the alternative, the Court may exercise jurisdiction over DAG pursuant to subsection (3) of the Long Arm Statute, which provides a nonresident defendant is subject to the court's jurisdiction where they "commit[] a tortious injury in this state caused by an act or omission outside this state if the tort-feasor . . . engages in any other persistent course of conduct . . . in this state" O.C.G.A. § 9–10–91(3). Upon information and belief, DAG has sufficient contacts with Georgia outside of the defamation itself. *Weinstock v. Gannett, Inc.*, No. 1:00-CV-2935-ODE, 2001 WL 1147214, at *2–*3 (N.D. Ga. June 20, 2001). Upon information and belief, the SAC alleges that DAG has co-founders and/or members (including Defendant Mohammad) who live and work in Georgia and create and/or implement DAG programming from within the state, target individuals in the state with its programming, and generally support DAG's mission from within the state, separate and apart from DAG's tortious conduct against Plaintiff.[3]

The Court's exercise of personal jurisdiction over DAG also satisfies the three-part due process test, which asks whether (1) the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) the nonresident defendant "purposefully availed" itself of the privilege of conducting activities within the forum state; and (3) exercising jurisdiction comports with

---

[3] At the very least, jurisdictional discovery is warranted to establish DAG's Georgia contacts. *Kolb v. Daruda*, 829 S.E.2d 881, 885 (Ga. 2019) (applying O.C.G.A. § 9– 11– 12(j)(4) which provides for jurisdictional discovery as of right).

"traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). With respect to the second prong of purposeful availment the traditional minimum-contacts analysis asks whether the defendant's forum contacts (1) relate to plaintiff's cause of action, (2) reflect purposeful availment of the privilege of conducting activities within the forum, and (3) are such that defendant should reasonably anticipate being haled into court there. *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022).

*First*, Dr. Winer's claims arise directly from DAG's forum-related conduct. DAG is a co-conspirator in a coordinated campaign that targeted Dr. Winer, a Georgia resident, and directed thousands to contact his Georgia employer, and caused injury in Georgia. Dkt. 130 ¶¶ 5–6, 12, 84–89, 93. *Second*, the purposeful availment prong is satisfied. The SAC alleges DAG published messages urging supporters to contact Emory and demand action against Dr. Winer. *Id.* ¶¶ 84, 86–89, 93. DAG targeted Dr. Winer in the Posts, directed communications to his Georgia employer, and orchestrated efforts to damage his reputation in Georgia. *Id.* ¶¶ 5–6, 12, 84, 86–89, 93. DAG therefore purposefully directed tortious conduct against Dr. Winer in Georgia. *See Calder v. Jones*, 465 U.S. 783, 789–90 (1984) (developing the "effects" test of purposeful availment). DAG could readily foresee being sued in Georgia for directing a campaign targeting a Georgia resident and aimed at his Georgia employer. *Third*, exercising jurisdiction comports with traditional notions

7

of fair play and substantial justice. Georgia has a strong interest in providing redress to residents harmed by out-of-state actors. *Paul, Hastings, Janofsky & Walker, LLP v. City of Tulsa, OK*, 245 F. Supp. 2d 1248, 1259 (N.D. Ga. 2002); *Jekyll Island-State Park Auth. v. Polygroup Macau Ltd.*, 140 F.4th 1304, 1328 (11th Cir. 2025). Litigating in this forum imposes no unfair burden on DAG.

## II.     All of Dr. Winer's claims state a claim for relief.

To survive DAG's motion to dismiss, the SAC need only be "plausible on its face," which means "it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018). The Court must accept all allegations in the complaint as true and construe in the light most favorable to the plaintiff. *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1345 (11th Cir. 2011). So viewed, Dr. Winer's SAC sufficiently alleges claims against DAG for defamation per se, false light invasion of privacy, civil conspiracy, and a violation of 42 U.S.C. § 1985(3).

### A. Dr. Winer stated a claim for defamation per se.

Imputing criminal conduct and professional unfitness to a particular person are plainly the kind of statements that "can reasonably be interpreted . . . to state or imply defamatory facts about the plaintiff that are capable of being proved false," *Gast v. Brittain*, 589 S.E.2d 63, 64 (Ga. 2003), as well as defamatory per se. *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1352 (N.D. Ga. 2023).

8

The Posts, which repeated and presented as true Defendant Mohammad's false statements about Dr. Winer as participating, being complicit in, or aiding and abetting war crimes and genocide, fall squarely within the category of defamation per se. Dkt. 130 ¶¶ 77–95. The Posts, and the campaign materials encouraging the public to pressure Emory to terminate Dr. Winer, imputed criminal conduct and moral depravity incompatible with the standards of the medical profession and suggested Dr. Winer endangers patients and students, striking at the core of his reputation as a physician and medical school professor.

DAG attempts to recast its defamatory statements as mere "political opinion and hyperbole . . . not subject to being proven false." Dkt. 163-1 at 17–18. But the Posts and campaign materials were not political commentary or expressions of opinion regarding Israeli policy or the war in Gaza. The Posts accused Dr. Winer personally of committing or aiding and abetting genocide and war crimes, and urged Emory to investigate and terminate him on that basis. DAG stated "*[t]his man* [i.e., Dr. Winer] *participated in* aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza," "*perpetuated* a genocide"; and "*inflict[ed]* dismemberment, torture, and slaughter." Dkt. 130 ¶ 91 (emphasis added).

The First Amendment does not transform accusations of heinous crimes committed by a specific individual into protected opinion simply because those

accusations arise in a politically charged context. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990) ("[There is no] wholesale defamation exemption for anything that might be labeled 'opinion.'"). Even if the unfounded belief that the Israel-Hamas war was a genocide could be characterized as "opinion"—in the most abstract sense that any idea about any world event may be called an "opinion," however ridiculous[4]—the Posts go much further. They assert as a matter of fact that Dr. Winer personally participated and abetted in criminal acts, which he did not. This is defamation. *Holmes v. Dominique*, No. 1:13-CV-04270-HLM, 2015 WL 11236539, at \*5 (N.D. Ga. Jan. 20, 2015) (holding average person would find false accusations of criminal activity facially defamatory). DAG's insistence in its Motion that it merely expressed "opinion" is belied by the Posts' explicit description of Mohammad's lies as "truthful." To the extent DAG means to suggest that it is not false Dr. Winer committed genocide by virtue of his service in the IDF because any IDF service constitutes "committing genocide," regardless of what a person actually did, *see* Dkt. 163-1 at 18–19, & n.6, that suggestion is not only profoundly offensive, it is an impermissible inference in DAG's favor.

---

[4] The Court should reject DAG's improper assertion that "this Court may take judicial notice" of DAG's false statements about Israel's defensive war in Gaza. Dkt. 163-1 at 2–3. Pursuant to Rule 201(b) of the Federal Rules of Evidence, the "kinds of facts that may be judicially noticed" are those that are "not subject to reasonable dispute." Suffice it to say, the "facts" that DAG would have the Court notice are inherently subject to dispute.

Nor is DAG's defamation of Dr. Winer protected by Section 230 of the Communications Decency Act ("CDA"). *Id.* at 16–18. The statute provides "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *Tanisha Sys., Inc. v. Chandra*, 1:15-cv-2644, 2015 WL 10550967, at *8 (N.D. Ga. Dec. 4, 2015) ("[P]roviders and users of interactive computer services are immunized from liability when the defamatory or obscene material is provided by someone else." (cleaned up)). Section 230 thus protects only those who publish content wholly created by others, not those who participate in developing it to any extent. *See Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 16 (2020) (Thomas, J., denying certiorari) ("[A]n information content provider is not just the primary author or creator; it is anyone 'responsible, *in whole or in part*, for the creation or development' of the content." (quotation omitted) (emphasis in original)). The statute protects those who are a mere passive conduit for content; those who solicit, actively shape, target, or materially contribute to unlawful content cannot claim Section 230 immunity. *Tanisha*, WL 10550967, at *8–*9; *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1165 (9th Cir. ) ("The CDA does not grant immunity for inducing third parties to express illegal preferences. Roommate's own acts—posting

11

the questionnaire and requiring answers to it—are entirely its doing and thus section 230 of the CDA does not apply to them.").

DAG argues that it cannot be held liable for the "defamatory comments by unidentified third parties in response to DAG's Instagram posts." Dkt. 163-1 at 16. But that misses the point. DAG not only created and/or published the Posts that defamed and libeled Dr. Winer, it solicited and encouraged further defamatory comments, literally providing the script for the public to use in contacting Emory. This is more than enough to show that DAG's conduct is unprotected by Section 230. *Tanisha*, 2015 WL 10550967, at *9 ("[I]t would make little sense to allow an individual to work in concert with another to defame someone, but allow him to disclaim liability because he worked behind the scenes, did not initially publish the defamatory statement he helped create and only 'passed along' the defamatory statement once it was out in the air.").[5]

DAG also wrongly argues Dr. Winer is some level of public figure who must and failed to plead actual malice. Dkt. 163-1 at 18–19. DAG's arguments fail because (i) Dr. Winer is not any level of public figure and, (ii) even if he was, the SAC does plead actual malice.

---

[5] Also, Section 230 immunity is an affirmative defense, not an element of Dr. Winer's claims, meaning the burden is not on Dr. Winer to overcome it. *See Florida Abolitionist v. Backpage.com LLC*, 6:17-cv-218, 2018 WL 1587477, at *4–*5 (M.D. Fla. Mar. 31, 2018).

12

First, Dr. Winer is certainly not a public figure writ large, since that requires "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Riddle v. Golden Isle Broad.*, 621 S.E.2d 822, 825 (Ga. 2005) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974)). DAG argues that Dr. Winer is such a person "by virtue of both his position and his publications." Dkt. 163-1 at 18. But simply being a surgeon—Dr. Winer's professional "position"—does not make someone a public figure. *See Ga. Soc. of Plastic Surgeons, Inc. v. Anderson*, 363 S.E.2d 140, 142 (Ga. 1987) (holding that surgeons are not public figures, even for a controversy involving publications related to their medical expertise). The only authority DAG cites for this proposition is a case involving a plaintiff-doctor who "*described himself as a public figure* in the community and as a 'national figure,' and claims credit for several national slogans of civil rights prominence." *Jackson v. Atl. Monthly Co.*, 324 F. Supp. 1302, 1303 (N.D. Ga. 1971) (emphasis added).

As for the "publications" that could supposedly render Dr. Winer a public figure (presumably) single blog post Dr. Winer wrote about his personal experience in Israel, which is discussed in the SAC at paragraphs 32–34, DAG points to no authority that supports the proposition that a surgeon who writes a solitary blog post regarding a private experience transforms this private person into an all-purpose public figure.

Second, Dr. Winer is not a limited-purpose public figure. DAG purports to "adopt" its codefendant CAIR Foundation's argument that Plaintiff is a limited-purpose public figure on the topic of the Israel-Hamas war by virtue of his single blog post. Dkt. 163-1 at 18. This, too, is wrong. A limited-purpose public figure is one who has "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. The court engages in a three-part analysis to determine if an individual is a limited-purpose public figure. The court must (1) isolate a public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether the alleged defamation was germane to the plaintiff's participation in the controversy. *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988). Here, the "public controversy" that DAG would like to drag Dr. Winer into is "the topic of the war in Gaza." Dkt. 163-1 at 18. However, Dr. Winer did not opine on the war in Gaza. Rather, his blog post[6] reflected on the emotional impact the October 7 Massacre had on him. Dkt. 130 ¶¶ 32–35. Dr. Winer directly discusses volunteering in Israel for fewer than 200 words, even fewer of which involve volunteering in the IDF (Dr. Winer also volunteered in a civilian program). *Id.*

---

[6] Dr. Winer's blog post, sometimes referred to as an "op-ed," was published on the *Times of Israel* Blogs, which is an unmoderated, unedited platform on which any member of the public may publish.

14

The level of involvement in the "public controversy" is germane to the determination of whether a plaintiff is a limited-purpose public figure. Where, as here, the involvement is, at best, negligible, the status as a private person is maintained. Dr. Winer did not purport to influence the course of the conflict or advance broader policy arguments about the war but instead described his personal motivations and experiences post-October 7. *See, e.g.*, *Little v. Breland*, 93 F.3d 755, 758 (11th Cir. 1996) (explaining public figure status turns on if the plaintiff *sought* to influence the outcome of a public controversy); *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987) (noting a limited purpose public figure is an individual who voluntarily injects himself or is drawn into a public controversy).

Moreover, any widespread attention to Dr. Winer was created by DAG and the other Defendants, through the actions that are the very subject of Plaintiff's defamation claim. Defendants cannot manufacture public figure status by libeling a plaintiff. *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("To the extent the [plaintiff] became a matter of controversy, it was a consequence of [defendant's actions]. Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

Regardless, because determining whether a plaintiff is a private individual or a limited-purpose public figure is a fact-intensive inquiry, it often cannot properly

15

be resolved at the pleading stage prior to discovery. *Krass v. Obstacle Racing Media, LLC*, 1:19-cv-05785, 2021 WL 4824110, at *3 (N.D. Ga. Feb. 2, 2021).

Third, even if the Court were to conclude that Dr. Winer has become some level of public figure, he has sufficiently pled actual malice. To prove actual malice requires showing "actual knowledge that a statement is false or a reckless disregard as to its truth or falsity." *Doherty-Heinze v. Chrisley*, No. 3:21-CV-105-TCB, 2023 WL 8351550, at *6 (N.D. Ga. Oct. 12, 2023) (quoting *Atlanta Humane Soc. v. Mills*, 618 S.E.2d 18, 24 (Ga. Ct. App. 2005)). DAG claims that Dr. Winer cannot prove actual malice because its defamatory statements about Dr. Winer are "based upon Plaintiff's own op ed," and suggests that Winer would need to prove that Israel did not commit genocide in Gaza to show actual malice. Dkt. 163-1 at 19. Neither assertion is true.

Dr. Winer need only demonstrate that (1) DAG's smears on his reputation are false and (2) DAG knowingly or recklessly accused him specifically of criminal acts. *See Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024) ("at the pleadings stage, [the plaintiff] need only allege sufficient facts to permit the inference that [the defendant] published [the offending] statements with actual malice," and allegations "that [the defendant] actually entertained serious doubts about the veracity" of the statements is sufficient (internal quotation marks omitted)). And Dr. Winer can plainly make that showing. Dr. Winer alleges that he

16

did not aid and abet genocide, war crimes, the destruction of the Gazan healthcare system and that he is not a racist that supports apartheid, dkt. 130 ¶ 42, and that Mohammad's statements were made with *at least* reckless disregard for the truth because, based on the information Mohammad knew from the blog, Dr. Winer "had clearly done no such thing[s]," *id.* ¶ 37.

That is more than sufficient at the motion to dismiss stage.

### B. Dr. Winer States a Claim for False Light Invasion of Privacy

A plaintiff pleading false light must show (1) the existence of false publicity depicting plaintiff as someone he is not, and (2) the "false light in which he was placed would be highly offensive to a reasonable person." *D'Souza*, 696 F. Supp. 3d at 1356. The SAC satisfies both elements.

DAG falsely depicted Dr. Winer as, among other things, a racist who actually committed genocide, apartheid, the destruction of Gaza's healthcare system, dismemberment, torture, and slaughter. Dkt. 130 ¶¶ 77–95. Accusations of such tremendously horrific crimes would clearly be "highly offensive to a reasonable person," as false assertions that a person engaged in criminal activity are treated under Georgia law as "obviously offensive." *Andrews*, 696 F. Supp. 3d at 1356–58. Additionally, DAG's attempt to wave the magic wand of the First Amendment because its offensive statements were "opinion," Dkt. 163-1 at 19, fails for the same

17

reason it failed in the defamation context: calling Dr. Winer specifically a war criminal who committed specific crimes is not "opinion." *Id.*

Finally, DAG's argument that the SAC's pleading of both defamation and false light should be disallowed, Dkt. 163-1 at 11, is wrong because, at the pleading stage, a plaintiff may assert both causes of action as alternative theories. *Andrews*, 696 F. Supp. 3d at 1357. If the Court finds DAG's statements are defamatory per se, the false light claim is subsumed; if the Court finds any of the statements at issue do not constitute defamation yet still portray Dr. Winer in a false and deeply offensive manner, Count II remains independently actionable. *Bollea v. World Championship Wrestling, Inc.*, 610 S.E.2d 92, 96 n.1 (Ga. App. 2005).

## C. Dr. Winer States a Claim for Civil Conspiracy

To plead civil conspiracy, a plaintiff must demonstrate a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means, which constitutes a tort. *Weissman v. Cheokas*, No. 1:17- CV- 00220, 2023 WL 11964409, at *25 (M.D. Ga. Mar. 31, 2023). The SAC plausibly alleges DAG conspired with its codefendants to defame Dr. Winer or place him in a false light, through the defamatory, libelous statements cross-posted with codefendant NSJP. Dkt. 130 ¶¶ 64, 77–95.

It is immaterial whether DAG's actions are characterized as intent to destroy Dr. Winer's reputation or, as DAG claims, intervention in defense of Mohammad.

18

Dkt. 163-1 at 20. Civil conspiracy may be demonstrated by showing the defendant sought to accomplish a *lawful* end but by *unlawful* means. Therefore, even if the Court were to credit DAG's assertion regarding its intent—which it cannot do at this stage—it is irrelevant because DAG chose to help Mohammad through unlawful attacks on Dr. Winer's reputation. *Cook v. Robinson*, 116 S.E.2d 742, 745–46 (Ga. 1960) (holding conspiracy claim actionable where lawful business goals effectuated through unlawful means). The Court should deny the motion to dismiss Count III.

### D. Dr. Winer States a Claim Under Section 1985(3)

To state a cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving either directly or indirectly, a person or class of persons of the equal protection of the laws, or the equal privileges and immunities; (3) an overt act in furtherance; and (4) an injury or deprivation of a right. *Dean v. Warren*, 12 F.4th 1248, 1255 (11th Cir. 2021). Count IV alleges that all Defendants, including DAG, conspired to deprive Dr. Winer "of the equal protection of the laws and his rights and privileges . . . on account of his Jewish identity and/or Zionist beliefs," including his rights to, free from discrimination on the basis of his race, religion, or national origin, (i) make and enforce contracts, 42 U.S.C. § 1981; (ii) be free from employment discrimination, 42 U.S.C. § 2000e-2(a)(1); and (iii) not to be subjected to discrimination under any program or activity receiving federal financial assistance, 42 U.S.C. § 2000d. Dkt. 130 ¶ 189. Specifically, Defendants

19

undertook a coordinated effort to interfere with Dr. Winer's rights by weaponizing his Jewish identity to attempt to induce Emory to investigate and/or terminate his employment based on his identity. *Id.* ¶¶ 190–93.

The SAC plausibly alleges DAG's participation in that conspiracy. It alleges DAG created/published/disseminated, in whole or in part, materials used in the smear campaign targeting Dr. Winer. *Id*. 130 ¶¶ 5–6, 77–95. It alleges DAG and its codefendants published Posts accusing Dr. Winer of genocide and war crimes and, in a coordinated campaign, urged supporters to pressure Emory to investigate/terminate him. *Id.* ¶¶ 77–84, 86–91, 93. These allegations plausibly allege coordinated conduct undertaken to deprive Dr. Winer of his civil rights.

DAG recycles its already-rejected argument that only the constitutional rights to travel and against involuntary servitude can be vindicated under Section 1985 against private actors. Dkt. 163-1 at 21–22. The Court has already properly found that contention to be baseless. Dkt. 129 at 13 ("[T]he fact that neither the Supreme Court nor the Eleventh Circuit appear to have expressly" accepted any other claims against private parties does not mean that the use of any other predicate violation "is . . . barred by precedent."); *see also Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) ("Other than the few rights the Supreme Court has addressed, *district and circuit courts differ as to which rights warrant § 1985(3) protection*."

20

(emphasis added)); *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1979) (holding § 1985(3) can be used to enforce the 13th Amendment and the right to travel).

DAG also argues that Dr. Winer's Title VII and Section 1981 claims are barred by precedent. Dkt. 163-1 at 21–22. But, as this Court has already correctly noted, the case law DAG cites is not directly on point. Dkt. 129 at 11–12. The SAC does not allege a violation of Title VII by an employer, here Emory, as the precedent addressed, but rather by third parties to the employment relationship, i.e., the Defendants, who attempted to induce the employer to violate Title VII.

Similarly, DAG's argument that it cannot be liable for conspiracy to violate Dr. Winer's Title VII rights because it did not conspire with Emory misses the point entirely. Dkt. 163-1 at 23–24. The SAC seeks to hold Defendants accountable for conspiring to provoke Emory to terminate Dr. Winer because of his Jewish identity, which would have violated Title VII as a deprivation of his employment rights.

DAG also wrongly argues Dr. Winer's § 1985(3) claim fails because it is predicated on rights that require state action, relying on *Jimenez*, 596 F.3d at 1312 and *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979). Dkt. 163-1 at 22–23. But while those cases held that Title VII rights cannot "form the basis of § 1985(3) actions against private conspirators," it was only to prevent use of § 1985(3) as an end-run around the remedial framework for asserting a Title VII claim against *one's employer*. *Novotny*, 442 U.S. at 376–77. Again, here, the SAC

21

does not seek to bypass the remedial scheme for a Title VII claim against Emory, but rather to hold Defendants accountable for a conspiracy to provoke Emory into a Title VII violation by terminating Dr. Winer because of his Jewish identity. Therefore, properly understood, *Novotny* and *Jimenez* pose no bar to Dr. Winer's § 1985(3) claims predicated on Title VII. *See* Dkt. 109 at 14–15. In any event, Dr. Winer preserves the argument for appellate review.

Similarly, DAG's Title VI arguments miss the mark. Title VI prohibits discrimination based on race, color, or national origin in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Once again, Dr. Winer does not assert a Title VI claim against Emory, but rather, he alleges that Defendants conspired to deprive him of rights secured by federal law, including rights protected by Title VI. Thus, DAG's reliance on *Jones v. Metro. Atlanta Rapid Transit Auth.*, 681 F.2d 1376, 1378 (11th Cir. 1982), is misplaced as *Jones* considered a complaint of employment discrimination by the funding recipient itself. Dr. Winer asserts no such claim here; he alleges Defendants conspired to pressure a federally funded institution, Emory, to terminate him based on his Jewish identity, a *result* that would have violated Title VI. Dr. Winer makes no direct Title VI claim against Emory.

Finally, DAG's argument that the SAC fails to allege class-based animus, Dkt. 163-1 at 24–25, ignores the facts alleged and the law. It is well settled that Jewish identity is a protected racial group under the Civil Rights Act, and that a foundational

22

element of Jewish identity includes a profound tie to Zion, the birthplace of Jewish peoplehood, located in modern-day Israel. *See Shaare-Tefila Cong. v. Cobb*, 481 U.S. 615, 617–18 (1987); *LeBlanc-Stenberg v. Fletcher*, 781 F. Supp. 261, 267 (S.D.N.Y. 1991); *Sinai v. New Eng. Tel. & Tel. Co.*, 3 F.3d 471, 474–75 (1st Cir. 1993). Defendants seized on Dr. Winer's Jewish identity, including his connection to Israel, to brand him a genocidal war criminal, declare him unfit to teach medical students or to treat patients, and demand that Emory terminate his employment. Dkt. 130 ¶¶ 9–11, 77–95, 189–200. Exploiting Dr. Winer's protected identity as grounds for professional exclusion is precisely the type of discrimination civil rights law forbids. *See Shaare-Tefila*, 481 U.S. at 617–18. At the pleading stage, these allegations are more than sufficient to allege class-based animus.

Thus, at the pleading stage, Dr. Winer's allegations easily suffice to state a § 1985(3) claim predicated on interference with Title VII and Title VI rights.

**CONCLUSION**

For the foregoing reasons, Defendant DAG's Motion to Dismiss the SAC should be denied in its entirety.

23

## CERTIFICATE OF COMPLIANCE

By signature below, counsel certifies that the foregoing pleading was prepared

in Times New Roman, 14-point font, in compliance with Local Rule 5.1(C).


*/s/ Lauren Israelovitch*
Lauren Israelovitch

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the within and foregoing **PLAINTIFF JOSHUA WINER'S RESPONSE TO DEFENDANT DOCTORS AGAINST GENOCIDE SOCIETY'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF electronic filing system, which suffices for service on all counsel of record who have entered an appearance in the case under L.R. 5.1(A)(3).

This 28th day of April, 2026.

/s/ *Lauren Israelovitch*
Lauren Israelovitch

25