**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JOSHUA WINER,

  *Plaintiff,*

v.

UMAYMAH MOHAMMAD, *et al.,*

  *Defendants.*

Civil Action No.
1:25-cv-02329-TWT

**PLAINTIFF JOSHUA WINER'S RESPONSE
IN OPPOSITION TO DEFENDANT NATIONAL STUDENTS FOR
JUSTICE IN PALESTINE'S MOTION TO DISMISS HIS SECOND
AMENDED COMPLAINT**

Lauren Israelovitch*
Mark Goldfeder*
Ben Schlager*
NATIONAL JEWISH
ADVOCACY CENTER, INC.
3 Times Square, Suite 512
New York, NY 10036
(914) 222-3828
lauren@njaclaw.org
*Pro Hac Vice*

Josh Belinfante
Anna Edmondson
Miles Skedsvold
ROBBINS ALLOY BELINFANTE
 LITTLEFIELD LLC
500 14th Street, NW
Atlanta, GA 30318
T:  (678) 701-9320
E:  mskedsvold@robbinsfirm.com
Ga. Bar No. 371576

David F. Katz
THE D.F. KATZ LAW FIRM, LLC
1158 Jones Bridge Rd
Ste 420 PMB1090
Johns Creek, GA 30022
T: (404) 918-5707
Dkatz@dfkatzlawfirm.com
Ga. Bar. No. 408738

Esther Panitch
THE PANITCH LAW GROUP, PC
4243 Dunwoody Club Drive
Suite 205
Atlanta, GA 30350
esther@panitchlawgroup.com
Ga. Bar. No. 143197

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND................................................................................................... 2

  *I.   Factual Background* ................................................................................... 2

  *II.  Procedural History* ................................................................................... 5

ARGUMENT ......................................................................................................... 5

  *I.   Dr. Winer Is Not a Public Figure of Any Kind* ........................................ 5

    A.  NSJP Misidentifies the Relevant "Public Controversy".......................... 6
    B.  Dr. Winer Did Not Voluntarily Inject Himself Into Any Such Controversy 7
    C.  The Alleged Defamation Is Not Germane to Any Participation................. 9

  II.  The SAC Plausibly Alleges Actual Malice...................................... 10

  III. NSJP's Statements Are Not Protected Opinion or Rhetorical Hyperbole ... 13

  IV.  The SAC Plausibly Alleges a Civil Conspiracy........................................... 17

  V.   Dr. Winer Plausibly States a Claim Under 42 U.S.C. § 1985(3) ................. 19

  VI.  Georgia's Anti-SLAPP Statute Does Not Apply in Federal Court. ............. 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Almanzar v. Kebe,* No. 1:19-CV-01301-WMR, 2021 WL 5027798 (N.D. Ga. July 8, 2021) ................................................................................................ 6

*Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336 (N.D. Ga. 2009)............ 18

*Berk v. Choy*, 607 U.S. ----, 2026 WL 135974 (U.S Jan. 20, 2026)...................... 25

*Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018) .............. 25

*CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008)............................................. 21

*Dean v. Warren*, 12 F.4th 1248 (11th Cir. 2021). ................................................. 19

*Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984)............................................ 18

*Gast v. Brittain*, 589 S.E.2d 63 (Ga. 2003) .......................................................... 13

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974)................................................ 6, 7

*Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970) ............................... 16

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ........................................................ 21

*Gurmessa v. Genocide Prevention in Ethiopia, Inc.,* No. 21-869-CFC, 2024 WL 4604400 (D. Del. Sept. 11, 2024) ...................................................................... 16

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979). ...................................................... 8

*In re BFW Liquidation, LLC*, 899 F.3d 1178 (11th Cir. 2018) ............................. 22

*Jimenez v. Wellstar Health System*, 596 F.3d 1304 (11th Cir. 2010).............. 21, 22

*Krass v. Obstacle Racing Media, LLC*, 667 F. Supp. 3d 1177  (N.D. Ga. 2023)... 10

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)............................................. 13

*Mustaqeem-Graydon v. SunTrust Bank*, 573 S.E.2d 455 (Ga. Ct. App. 2002)....... 17

*Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264 (1974)............................. 16

*Resnick v. KrunchCash*, LLC, 34 F.4th 1028 (11th Cir. 2022) .............................. 22

*See Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979) ....... 21, 22

*Shaare-Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ............................ 21, 23

*Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491 (11th Cir. 1988) .............. 6

*Straw v. Chase Revel, Inc.*, 813 F.2d 356 (11th Cir. 1987) ..................................... 7

*Veritas v. Cable News Network, Inc.*, 121 F.4th 1267 (11th Cir. 2024)................. 12

*Wright v. Apartment Inv. & Mgmt. Co.*, 315 Ga. App. 587 (2012). ....................... 18

**Statutes**

42 U.S.C. § 1981 .............................................................. 19, 20, 21, 22

42 U.S.C. § 1985(3) ........................................................ 19, 21, 22, 23

42 U.S.C. § 2000d. ................................................................ 19, 20, 23

42 U.S.C. § 2000e-2(a)(1) ................................................. 19, 20, 21, 22

O.C.G.A. § 9-11-11 ....................................................................... 24

**Rules**

Rule 12 ............................................................................................... 25

**INTRODUCTION**

This case arises from a coordinated campaign to destroy a physician's career. After volunteering to serve as a physician medic in the Israeli Defense Forces ("IDF") following the October 7, 2023 terrorist attacks ("October 7 attacks"), Defendants publicly accused Dr. Joshua Winer, a surgeon and professor at Emory University, of personally participating in genocide and war crimes and leveraged those accusations to claim he is unfit to teach or practice medicine and to force his removal from Emory.

Defendant National Students for Justice in Palestine ("NSJP") was a central and aggressive participant in that campaign. NSJP is an unincorporated association which, according to its official website, identifies itself as supporting "over 400 Palestine solidarity organizations across occupied Turtle Island (so-called North America)" and aims to develop a "disciplined" student movement to pursue "Palestinian liberation on our campuses." It advances an explicitly anti-Zionist agenda and promotes the view that Israel, or what it refers to as the "Zionist entity," is a "genocidal project." Dkt. 130 ¶ 16. Dr. Winer does not challenge NSJP's right to espouse those views or any rhetoric it chooses about Israel, the United States, or the West, no matter how extreme. The First Amendment protects that speech. It does not protect NSJP's coordinated campaign to publish and amplify false accusations

1

that Dr. Winer personally committed genocide and war crimes, and to use those accusations to pressure Emory to investigate and terminate him.

NSJP's motion to dismiss ("Motion") attempts to recast targeted defamation as abstract political debate, disregarding the well-pleaded allegations of the Second Amended Complaint ("SAC") and claiming immunity under the guise of "opinion" and "advocacy." That premise fails. This case does not concern criticism of Israel or its military. It concerns false accusations that Dr. Winer committed grave crimes.

The First Amendment does not transform specific accusations of criminal conduct and professional unfitness into protected opinion merely because they arise in a broader political context. The claim that Dr. Winer personally committed or aided genocide is not a policy critique; it is a concrete assertion that he engaged in one of the most serious crimes recognized under international law. And it is false. As the SAC makes clear, Dr. Winer served in the IDF with honor, providing medical care to wounded soldiers. The First Amendment protects robust debate. It does not protect defamatory falsehoods. NSJP's Motion should be denied.

## BACKGROUND

### I. Factual Background

Dr. Winer is a Jewish surgical oncologist at the Emory Winship Cancer Institute and a professor and surgical clerkship director at the Emory University School of Medicine. Following the October 7, 2023 terrorist attacks, Dr. Winer took a leave of absence to serve in the IDF as a physician, tasked with providing medical

care to wounded soldiers and authorized to engage in defensive combat only if his unit were directly attacked. Dkt. 130 ¶¶ 12, 32–34, 37, 52.

In March 2024, Dr. Winer authored and published a piece in the *Times of Israel* describing his decision to volunteer as a physician in the IDF. *Id*. ¶¶ 32–35. A true and correct copy is attached hereto as Exhibit A.[1] His piece reflected on his medical service and did not discuss combat, let alone war crimes or genocide. *Id*.

About one month later, Defendant Umaymah Mohammad, a MD/PhD candidate at Emory, appeared on a program called "Democracy Now!" and made a series of defamatory statements accusing Dr. Winer of genocide and other war crimes. *Id*. ¶ 36. Mohammad's underlying statements were not only false, but were deemed a violation of Emory's Student Conduct Code and resulted in her suspension. *Id*. ¶¶ 43–46, 49.

NSJP's involvement in the defamatory campaign against Dr. Winer began in January 2025. On or about January 13, 2025, NSJP collaborated on an Instagram post with Defendant Doctors Against Genocide ("DAG") and others (the "First NSJP DAG Post") promoting a "community-led" initiative to pressure Emory to

---

[1] Dr. Winer's piece in the *Times of Israel* is referenced in and integral to the SAC, which describes and links to it. See Dkt. 130 ¶¶ 32–35. The piece is central to his claim and its contents are undisputed. The Court may consider it on a motion to dismiss under the incorporation-by-reference doctrine. See, e.g., *Parekh v. CBS Corp.*, 820 F. App'x 827, 830 n.1 (11th Cir. 2020); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). A copy is attached as Exhibit A for the Court's convenience.

reinstate Mohammad and investigate and/or terminate Dr. Winer. *Id.* ¶¶ 77–78, 84–89.

The First NSJP DAG Post quoted directly from Mohammad's Democracy Now Interview, including her statement that an Emory physician who had served in the IDF "participated in aiding and abetting a genocide," "the destruction of the healthcare system in Gaza," and "the murder of over 400 healthcare workers," and was now teaching medical students. *Id.* ¶¶ 78, 85.

About two weeks later, NSJP escalated its efforts. On or about January 29, 2025, NSJP and DAG published a second Instagram post (the "Second NSJP DAG Post") that further disseminated the same accusations and defamed Dr. Winer. *Id.* ¶¶ 91–95.

In the Second NSJP DAG Post, NSJP asserted that Mohammad's statements about Dr. Winer were "truthful" and declared that "any physician-faculty who served in the IDF these last 16 months perpetuated a genocide." *Id.* ¶¶ 92, 95. The post also falsely suggested that Dr. Winer had "identified himself as an IDF reservist ready for deployment to perpetuate genocidal crimes in Gaza," despite the fact that he had never said or written any such thing. *Id.* ¶¶ 32–35, 37; Exhibit A.  Nonetheless, the post questioned how individuals like him, who "inflict dismemberment, torture, and slaughter" could continue practicing medicine. Dkt. 130 ¶¶ 92, 95.

The Second NSJP DAG Post again urged coordinated action against Dr. Winer. It directed followers to contact Emory's leadership and included a link to an email template and phone script that explicitly identified Dr. Winer by name, repeated the same false accusations, and demanded that Emory investigate and/or terminate his employment. *Id*. ¶¶ 93, 95.

## II. Procedural History

Dr. Winer commenced this action in April 2025. Dkt. 1. He subsequently filed an amended complaint adding a claim under 42 U.S.C. § 1985(3). Dkt. 22. After several defendants moved to dismiss, Dr. Winer sought and obtained leave to amend. Dkt. 129. The operative SAC asserts claims for defamation, false light, civil conspiracy, and violation of § 1985(3) against all Defendants. Dkt. 130 ¶¶ 138–200.

With respect to Defendant NSJP, the Court authorized service by publication, and a Notice of Service by Publication was filed on November 19, 2025. Dkts. 122-1, 123-1. Counsel for NSJP appeared on February 23, 2026. Dkt. 143. NSJP filed its Motion on March 18, 2026. See Dkt. 166. Pursuant to a consent motion, this Court set Dr. Winer's deadline to respond as April 29, 2026. See Dkt. 165.

## ARGUMENT
### I. Dr. Winer Is Not a Public Figure of Any Kind

Dr. Winer states a claim for defamation, but NSJP seeks dismissal on the ground that its statements are protected because Dr. Winer is a public figure who has

not pleaded actual malice. Dkt. 166 at 10–14. That premise fails because Dr. Winer is not a public figure of any kind.

Dr. Winer's roles as a physician and professor fall well short of the "pervasive fame or notoriety" required to render him a public figure for any purpose. *See Almanzar v. Kebe,* No. 1:19-CV-01301-WMR, 2021 WL 5027798, at *6 (N.D. Ga. July 8, 2021) (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351 (1974)).

NSJP's argument that Dr. Winer is "at minimum, a limited-purpose public figure" similarly fails. Dkt. 166 at 10–14. To qualify as a limited-purpose public figure, a defendant must show that (1) there is a specific public controversy, (2) the plaintiff voluntarily injected himself into that controversy, and (3) the alleged defamation is germane to that participation. *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988). A "public controversy" is not simply any issue that attracts attention or is newsworthy. A private individual is not transformed into a public figure merely by becoming associated with a matter that generates public interest. Rather, a public controversy exists only where an issue is actually being debated publicly and its resolution has foreseeable and substantial consequences for individuals beyond the immediate participants. *Id.* at 1494–95.

**A. NSJP Misidentifies the Relevant "Public Controversy"**

NSJP first posits that the relevant public controversy is a broad debate about "the nature and legality of Israel's military campaign in Gaza following the October

6

7, 2023 Hamas attacks, including whether that campaign constitutes 'genocide,' 'war crimes,' or 'apartheid,' and whether U.S. institutions, including universities and medical systems, are 'complicit' in that campaign. Dkt. 166 at 10. It then takes the illogical leap of recasting the issue to include "whether participation in that campaign is ethically compatible with medical practice[.]" *Id*. at 11.

NSJP's attempt to broaden the controversy to encompass its accusations fails the first prong of *Silvester*. No recognized public debate exists over whether physicians who serve as medical personnel in the IDF are war criminals or should be excluded from their professions. The only identifiable controversy concerns the Israel-Gaza conflict itself, not whether a physician who provides medical care in a conflict zone is thereby guilty of genocide or unfit to teach or practice medicine.

## B. Dr. Winer Did Not Voluntarily Inject Himself Into Any Such Controversy

Second, NSJP incorrectly asserts that Dr. Winer voluntarily injected himself into a public controversy. Dkt. 166 at 11–13. Dr. Winer merely authored a piece in the *Times of Israel* describing his personal experience serving as a physician in the IDF and the motivations underlying that decision. Dkt. 130 ¶¶ 32–35. His piece recounts a personal experience. It does not, and could not reasonably be expected to, influence any broader public debate. It therefore does not transform Dr. Winer into a public figure of any kind. *See Gertz*, 418 U.S. at 345; *see also Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987).

7

Writing about one's personal experience providing medical care in a conflict zone differs fundamentally from injecting oneself into a political debate about that conflict. Dr. Winer did not advocate for or against military action, did not address whether the IDF's conduct constitutes genocide, and did not influence public opinion on those issues by writing about his own inclination to serve and his subsequent experience serving. NSJP's contrary assertion, and its reliance on CAIR-Foundation's claim that Dr. Winer "injected himself into that exact public controversy," are untenable. *See* Dkt. 166 at 12. A private individual does not become a public figure by describing his personal decision to provide medical care to wounded soldiers during a controversial war.

NSJP's further contention that Dr. Winer's "prestigious role in Emory's leadership is precisely the arena at issue" only underscores its confusion. Dkt. 166 at 12–13. There was no preexisting public controversy concerning Dr. Winer's role at Emory, his fitness to teach, or his ability to treat patients. That "arena" came into existence only after NSJP and its co-defendants publicly accused him of war crimes and demanded his investigation and/or removal. A defendant cannot manufacture public-figure status by targeting a private individual and then claiming that the resulting controversy was "public" all along. *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).

### C. The Alleged Defamation Is Not Germane to Any Participation

Third, the alleged defamation is not "germane" to any participation by Dr. Winer. NSJP asserts that its statements about Dr. Winer are germane because, by authoring his piece in the *Times of Israel* and "going on at some length about his decision to join the IDF in Gaza, in explicitly moral and political terms, [Dr. Winer] voluntarily injected himself into the central controversy—whether the IDF's Gaza campaign is justifiable[.]" Dkt. 166 at 12.

Dr. Winer's piece does not discuss genocide or address the nature or legality of the IDF's actions. It simply recounts his personal decision to serve and his experience in the IDF as a physician providing medical care to wounded soldiers. Dkt. 130 ¶¶ 32–35; Exhibit A. NSJP's accusations that Dr. Winer is complicit in war crimes, unfit to teach, and should be removed from his position are not "germane" to Dr. Winer's participation in any such controversy because they do not relate to any position he expressed or any issue he injected into public discourse or otherwise respond to the subject matter of his piece in the *Times of Israel*.

NSJP's theory is not just wrong; it is unworkable. Under its logic, any individual who serves in a military or government institution could be personally accused of committing whatever crimes critics choose to attribute to that institution, irrespective of the individual's actual conduct. That would collapse the distinction between institutional criticism and personal defamation. It would permit defendants

9

to convert sweeping political accusations into specific factual claims about private individuals, and then shield those claims as "related" to a public controversy. The law does not permit defendants to elide that distinction.

## II.  The SAC Plausibly Alleges Actual Malice

If Dr. Winer were a public figure (he is not), he would be required to plead actual malice to prevail. The SAC satisfies that standard by alleging that NSJP's accusations lacked any factual basis and were made with reckless disregard of the truth.

Actual malice requires "knowledge that a statement is false or a reckless disregard as to its truth[.]" *Krass v. Obstacle Racing Media, LLC*, 667 F. Supp. 3d 1177, 1210 (N.D. Ga. 2023) (quotation omitted). At the pleading stage, Dr. Winer need only allege facts that make such a state of mind plausible. The SAC does far more than that. It alleges that NSJP accused Dr. Winer of participating in genocide and war crimes despite having no factual basis and despite information available to it demonstrating the contrary. Exhibit A; Dkt. 130 ¶¶ 41–42, 80, 91, 95.

NSJP's own assertions, and the materials it chose to rely on, establish that point. NSJP repeatedly invoked Dr. Winer's piece in the *Times of Israel* as the supposed basis for its accusations. *Id*. ¶¶ 91, 95; Dkt. 166 at 12, 16–17, 20. But that piece does not support, or even remotely suggest, the claims NSJP published. It does not describe participation in combat operations, let alone "genocide," "war crimes,"

10

or the "murder of over 400 healthcare workers." It states, plainly, that Dr. Winer volunteered "to help those in need," served "as a surgeon," and provided care to "our most precious sons, our soldiers." *See* Dkt. 130 ¶¶ 32–35; Exhibit A. It recounts his efforts to obtain a placement where he could "assist," his initial volunteer work with MADA (Israel's national emergency medical service and blood services organization), and his subsequent service in the IDF in a medical capacity. *Id.* Nothing in the piece supports the assertion that he participated in or facilitated any kind of violence against civilians.

That disconnect is dispositive. Where a defendant purports to rely on a source, but the source does not support the challenged statements, an inference of reckless disregard is not only plausible—it is straightforward. NSJP cannot rely on Dr. Winer's own words as its factual predicate while attributing to him conduct those words do not describe. *See Id*.

NSJP attempts to avoid this conclusion by characterizing its statements as "value-laden" interpretations of disclosed facts and "widely debated" issues. Dkt. 166 at 17–18. That argument fails for a simple reason: NSJP did not merely express a view about the IDF or the Israel-Gaza war. It made specific factual assertions about Dr. Winer—namely, that he "participated in aiding and abetting a genocide," the "destruction of the healthcare system in Gaza," and the "murder of over 400 healthcare workers," and that he therefore poses a danger to patients and trainees.

11

Dkt. 130 ¶¶ 78, 85, 87–88, 95. Those are not abstract moral judgments; they are concrete accusations of criminal conduct. The SAC alleges that NSJP published materially false statements about Dr. Winer's conduct with absolutely no basis to believe they were true. That is the definition of reckless disregard. Dkt. 130 ¶¶ 91, 95. *See Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283–84 (11th Cir. 2024) ("at the pleadings stage, [the plaintiff] must merely allege sufficient facts to permit the inference that [the defendant] published her statements with knowledge or a reckless disregard for the truth."). The SAC does not rely on formulaic recitations of malice; it pleads specific facts showing the absence of any factual basis for NSJP's accusations and the existence of readily available information contradicting them. Dkt. 130 ¶¶ 32–35, 37, 42, 91, 95.

Finally, NSJP's suggestion that its "ideological" opposition to Zionism negates malice only highlights the defect in its argument. Dkt. 166 at 18–19. Actual malice is not defeated by asserting a political viewpoint. Nor does the existence of a broader debate about whether Israel's actions constitute "genocide" give NSJP license to accuse a particular individual of committing that crime without factual support. The question is not whether NSJP held strong views about the IDF; it is whether it acted with reckless disregard for the truth when it attributed specific criminal conduct to Dr. Winer. The SAC plausibly alleges that it did.

Taking the SAC's allegations as true, as the Court must at this stage, Dr. Winer has more than plausibly alleged actual malice.

## III.  NSJP's Statements Are Not Protected Opinion or Rhetorical Hyperbole

NSJP next argues that its statements are non-actionable because they constitute opinion or rhetorical hyperbole. *See id*. at 19–21. That argument fails as well. NSJP attempts to recast its accusations against Dr. Winer as part of a broader political debate about Israel and Gaza, but that framing collapses when the statements themselves are examined.

NSJP invokes the settled principle that pure opinion is not actionable. That proposition is not disputed. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). But *Milkovich* makes equally clear that statements implying concrete, provably false facts about a plaintiff are actionable. *Id*. at 18–19. That is precisely what occurred here. *See also Gast v. Brittain*, 589 S.E.2d 63, 64 (Ga. 2003) (statements are actionable where they "can reasonably be interpreted . . . to state or imply defamatory facts about the plaintiff that are capable of being proved false").

NSJP's statements cross the line from protected opinion to actionable defamation by making specific factual assertions about Dr. Winer's conduct. Accusing an individual of war crimes is not a generalized expression of political disagreement; it is a charge of participation in defined criminal acts carrying legal

13

consequences. NSJP did not frame these statements as conjecture or opinion, but as factual conclusions about what Dr. Winer did during his IDF service.

NSJP did not merely express a "view" about Israel, the IDF, or the war in Gaza. It made and amplified specific factual accusations about Dr. Winer. In the First NSJP DAG Post, NSJP repeated Defendant Mohammad's statement that "this man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called 'teaching' medical students and residents how to 'take care' of patients." Dkt. 130 ¶¶ 78, 85. That is not rhetorical hyperbole. Such statements are direct assertions that Dr. Winer committed specific acts—aiding and abetting genocide, the destruction of a healthcare system, and murder. Those are factual allegations of criminal conduct.

NSJP's accompanying call-to-action materials confirm that these statements were intended factual assertions. The email template asked, "why does Emory allow a physician who participated in this genocidal campaign to provide care without any investigation into his involvement in war crimes committed by the IDF in Gaza," and the phone script similarly asserted that Dr. Winer "recently served in the Israeli Defense Forces" and questioned whether "supporting genocide and war crimes" is acceptable at Emory. Dkt. 130 ¶¶ 87–88. These statements were deployed as factual predicates to demand that Dr. Winer be investigated and terminated.

14

The Second NSJP DAG Post confirms the same point. There, NSJP doubled down, stating that it stood "unequivocally with Umaymah [Mohammad] and her truthful statements, that any physician-faculty who served in the IDF in the last sixteen months perpetuated genocide." Dkt. 130 ¶¶ 91, 95. NSJP cannot now recast statements it literally labeled "truthful" as mere rhetorical hyperbole.

The Second NSJP Post escalated further, asserting that Dr. Winer "identified himself as an IDF reservist ready for deployment to perpetuate genocidal crimes in Gaza" and questioning how "individuals who inflict dismemberment, torture, and slaughter" could continue practicing medicine. These are not expressions of opinion about public policy; they are specific allegations that Dr. Winer personally engaged in violent criminal conduct and poses a danger to patients. NSJP reinforced those same accusations by again distributing email and phone scripts urging recipients to contact Emory and demand action against Dr. Winer, expressly invoking those allegations as grounds for investigation and termination. *Id.* ¶ 95.

Those allegations are demonstrably false. Dr. Winer's *Times of Israel* piece describes his service as a physician providing medical care to wounded soldiers. Dkt. 130 ¶¶ 32–35; Exhibit A. It does not state or suggest that he participated in combat operations or committed war crimes. *Id.* NSJP's attempt to ground its accusations in Dr. Winer's *Times of Israel* piece only underscores their falsity.

15

NSJP attempts to insulate its statements by pointing to a broader public debate in which organizations and commentators have accused Israel of committing "genocide." Even setting aside that no court has found Israel to have committed genocide, the existence of such accusations does not render NSJP's statements protected. If anything, it heightens the risk of defamation. In an environment where sweeping and highly charged allegations of "genocide" are circulating, an ordinary reader could readily interpret NSJP's statements as factual assertions that Dr. Winer himself committed those acts, especially given that NSJP demanded professional consequences on that basis. The broader discourse does not transform NSJP's statements into protected opinion; it makes their defamatory meaning more, not less, likely to be understood as factual.

NSJP's reliance on *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–14 (1970) and *Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264, 283–86 (1974) is misplaced. Those cases involved figurative language that no reasonable reader would interpret literally. Here, NSJP accused a named physician of participating in genocide, war crimes, and murder, and then used those accusations to demand his removal from his profession. That is not hyperbole; it is a factual assertion of criminal conduct which NSJP clearly meant people to take literally. Nor does *Gurmessa v. Genocide Prevention in Ethiopia, Inc.,* No. 21-869-CFC, 2024 WL 4604400 (D. Del. Sept. 11, 2024) assist NSJP. There, the plaintiff was accused of

16

"supporting" genocide in the abstract—not personally participating in it. That distinction is dispositive.

NSJP crossed the constitutional line when it publicly accused Dr. Winer of committing genocide, war crimes, and murder—and used those accusations to demand his termination. The First Amendment protects political advocacy. It does not immunize false accusations of criminal conduct directed at an identifiable individual for the purpose of destroying his career.

## IV.  The SAC Plausibly Alleges a Civil Conspiracy

NSJP's challenge to the civil conspiracy claim is derivative, cursory, and incomplete. *See* Dkt. 166 at 21–22. It rests entirely on its assertion that the underlying defamation claim fails—a premise that is incorrect for the reasons set forth above. That alone defeats its argument. Further, NSJP does not meaningfully engage with Dr. Winer's false light claim; its sole reference is a conclusory assertion that the claim is deficient. *Id.* at 21. Having failed to address one of the predicate torts, NSJP identifies no basis for dismissal of the civil conspiracy claim.

NSJP's argument that Dr. Winer has not pled facts to show an "actual agreement" also reflects a misunderstanding of the governing standard. *Id*. Civil conspiracy attaches where multiple actors, acting in concert, engage in conduct that constitutes a tort. *Mustaqeem-Graydon v. SunTrust Bank*, 573 S.E.2d 455, 461 (Ga. Ct. App. 2002). It does not require a formal or express agreement; concerted conduct

17

may be inferred from coordinated activity and circumstantial evidence. *See Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336, 1346 (N.D. Ga. 2009); *Wright v. Apartment Inv. & Mgmt. Co.*, 315 Ga. App. 587, 595 (2012).

NSJP and DAG jointly published the challenged statements as part of a coordinated campaign targeting Dr. Winer's employment at Emory. Dkt. 130 ¶¶ 77–94. Those allegations reflect shared authorship, adoption of the same accusations, and coordinated messaging urging action against Dr. Winer. This is not parallel or coincidental conduct; it is coordinated activity aimed at a single objective—publicly accusing Dr. Winer of genocide and securing his removal from his profession.

The Second NSJP DAG Post further identifies co-Defendant Mohammad as "an integral member" of the NSJP movement who "has served on the steering committee for NSJP for several years," and states that NSJP "stand[s] unequivocally with Umaymah [Mohammad] and her truthful statements." *Id.* ¶ 95. That admission is significant. NSJP is not describing an outside advocate whose views it independently echoed; it is describing one of its own leadership-level participants and expressly adopting her accusations. NSJP's reliance on *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984), is misplaced. NSJP argues that Dr. Winer has alleged only "parallel conduct" among the Defendants, but *Fullman* nowhere discusses "parallel conduct," and in any event, the SAC alleges far more than mere parallel conduct. This is not a case of unrelated actors engaging in similar conduct.

It involves coordinated actors jointly creating, publishing, and amplifying the same defamatory statements as part of a unified campaign targeting a specific individual, including joint publication, adoption of the same accusations, and concerted efforts to pressure Emory to investigate and terminate Dr. Winer.

The SAC thus plausibly alleges that NSJP and its co-defendants acted in concert to commit the underlying torts. That is sufficient to state a claim for civil conspiracy, and NSJP's motion to dismiss should be denied.

## V. Dr. Winer Plausibly States a Claim Under 42 U.S.C. § 1985(3)

To state a cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving either directly or indirectly, a person or class of persons of the equal protection of the laws, or the equal privileges and immunities; (3) an overt act in furtherance; and (4) an injury or deprivation of a right. *Dean v. Warren*, 12 F.4th 1248, 1255 (11th Cir. 2021).

The SAC alleges that Defendants conspired to deprive Dr. Winer "of the equal protection of the laws and his rights and privileges" under the laws "on account of his Jewish identity and/or Zionist beliefs," including

> his [1] "right in every state to make and enforce contracts" on the same terms "as is enjoyed by white citizens," 42 U.S.C. § 1981, his right to be free from employment discrimination on the basis of "race . . . religion . . . or national origin," 42 U.S.C. § 2000e-2(a)(1), and his right not to be "subjected to discrimination under any program or activity receiving Federal financial assistance" "on the ground of race . . . or national origin." 42 U.S.C. § 2000d.

19

Dkt. 130 ¶ 189. Specifically, "Defendants undertook a coordinated effort to interfere with [Dr. Winer's] rights by publicly demanding that Emory investigate and/or terminate his employment because of their false accusations," *id*. ¶ 190, which were predicated on "[Dr. Winer's] lawful military service and his expressed sense of duty to serve the Jewish homeland, which is integral to his racial identity as a Jew," *id*. ¶ 191. In doing so, "Defendants sought to" induce Emory "to terminate his employment [because of his race], a result that would violate Titles VI and VII of the Civil Rights Act, as well as 42 U.S.C. § 1981." *Id*. ¶ 193.

The SAC plausibly alleges the required conspiracy. It alleges that Defendants, including NSJP, undertook a coordinated effort to interfere with Dr. Winer's employment by publicly accusing him of genocide and demanding that Emory investigate and terminate him because of his Jewish identity and associated Zionist beliefs. *Id.* ¶¶ 189–193. It alleges facts supporting an agreement between, at minimum, NSJP and DAG, as well as coordinated conduct by NSJP. NSJP and DAG jointly published the First and Second NSJP DAG Posts, conduct that itself establishes agreement. The posts adopted Mohammad's accusations as "truthful," and steered followers to campaign materials calling for Dr. Winer's investigation and termination, including prompts to contact Emory leadership. Id. ¶¶ 77–95. That conduct establishes the requisite agreement and the overt acts necessary to sustain the conspiracy claim.

20

NSJP's reliance on cases limiting § 1985(3) claims against private actors is misplaced. As this Court has already concluded, dkt. 129 at 7–15, Dr. Winer's claim is *at least* colorable because the Supreme Court has held that a §1985(3) reaches purely private conspiracies where the right at issue is one that can be violated without state action, *see Griffin v. Breckenridge*, 403 U.S. 88 (1971), and Jewish identity qualifies as a protected class and racial group, *Shaare-Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 448, (2008); *see also* dkt. 129 at 12 (Plaintiff's argument under Title VII and § 1981 is "colorable," and the Title VI claim "facially satisf[ies] the elements of a § 1985(3) claim[.]").

Indeed, while "the rights protected under Title VII" have been held "insufficient to form the basis of § 1985(3) actions against private conspirators," *Jimenez v. Wellstar Health System*, 596 F.3d 1304, 1312 (11th Cir. 2010), those cases relied on the detailed remedial scheme in place for a Title VII plaintiff against their employer. *See Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979). Here, by contrast, the SAC does not seek to bypass the remedial scheme for a Title VII claim against Emory, but rather to hold Defendants accountable for a conspiracy to provoke Emory to terminate Dr. Winer because of his Jewish identity—a *result* that would violate Title VII. *See* 42 U.S.C. § 1985(3) (conspiracies are actionable if their "purpose" is to deprive the plaintiff of rights, "either directly

21

or indirectly," so long as the plaintiff is "injured in his person or property" even if his rights are not ultimately violated). Therefore, properly understood, *Novotny* and *Jimenez* pose no bar to Dr. Winer's § 1985(3) claims predicated on Title VII. *See Resnick v. KrunchCash*, LLC, 34 F.4th 1028, 1038 (11th Cir. 2022) (agreeing that the plaintiffs' "Fourteenth Amendment claim [was] not 'clearly foreclosed' by" a U.S. Supreme Court case because "Plaintiffs say that their claim is distinguishable from" that case for plausible reasons).

Similarly, while the Eleventh Circuit has also rejected a § 1985(3) claim predicated on § 1981 in *Jimenez*, that was principally based on the Court's conclusion that Jimenez failed to plead interference with any contractual relationship. 596 F.3d at 1312. Here, Dr. Winer alleges straightforward interference with his employment relationship with Emory, which is a proper subject of a contractual relationship under Georgia law.

Of course, *Jimenez* also stated that "conspiracies to violate rights protected under § 1981 are . . . insufficient to form the basis of a § 1985(3) claim" because (it thought) Title VII claims were barred, and "[t]his Circuit has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes." *Id*. But given the fact that Jimenez could not even plead a contract, this broader statement is dicta. *See In re BFW Liquidation, LLC*, 899 F.3d 1178, 1186 (11th Cir. 2018) ("If a

22

statement is not necessary to the result the Court reached in the case, then the statement is dictum." (quotation omitted)).

Finally, neither the Supreme Court nor the Eleventh Circuit has ever held that Title VI is not a valid predicate for a § 1985 claim. See Dkt. 109 at 15–16 (explaining why a Seventh Circuit decision on this point is wrong); see also Dkt. 129 at 13.

The SAC also plausibly alleges the required class-based, invidiously discriminatory animus. NSJP argues that its conduct reflects only anti-Zionist political ideology and opposition to the IDF. Dkt. 166 at 23. That mischaracterizes the SAC. The SAC does not assert that all criticism of Israel or Zionism is antisemitic. It alleges that Defendants seized on Dr. Winer's Jewish identity— expressed through his Zionist beliefs and his service in the IDF—to brand him a genocidal war criminal, declare him unfit to teach or practice medicine, and demand that Emory terminate his employment. *See, e.g.*, Dkt. 130 ¶¶ 8–11, 189–197.

For many Jews, including Dr. Winer, Zionism reflects the historic connection of the Jewish people to Zion, a place in Jerusalem identified in the Hebrew Bible as the origin of Jewish peoplehood.[2] Treating that identity and connection as grounds for professional exclusion is precisely the type of discrimination civil rights law forbids. *See, e.g., Shaare-Tefila Congregation*, 481 U.S. at 617–18. At the pleading

---

[2] Mark Goldfeder, *Codifying Antisemitism*, 127 Penn St. L. Rev. 405, 421–22 (2023) ("the primary collective expression of Jewish identity is through Jewish self-determination in their nation state").

stage, these allegations are more than sufficient to allege class-based animus. NSJP's contention that Zionism is merely political ideology—as opposed to a component of Jewish identity—simply because not all Jews are Zionists is as untenable as arguing that civil rights protections depend on universal adherence within a group. Zionism, for many Jews, is not an abstract policy preference; it is bound up with Jewish peoplehood as an expression of the historic and religious connection to Zion itself. The fact that not all Jews share or prioritize that aspect of identity is legally irrelevant. Not all Jews keep kosher, but that does not permit discrimination against those who do on the ground that kosher observance is merely a "choice" rather than an aspect of Jewish identity. The same principle applies here: one cannot single out Jews who identify with Zionism and strip them of protection by recharacterizing that identity as a mere political viewpoint. Civil rights law does not allow defendants to redefine the contours of a protected class to exclude the very individuals they target.

Accordingly, Dr. Winer has plausibly alleged a conspiracy motivated by class-based animus that resulted in concrete injury to his rights. The § 1985(3) claim should not be dismissed.

## VI.  Georgia's Anti-SLAPP Statute Does Not Apply in Federal Court.

NSJP argues that this Court must dismiss Dr. Winer's claims and award attorneys' fees under O.C.G.A. § 9-11-11, Georgia's anti-SLAPP statute. Dkt. 166 at 25–29. That argument is foreclosed. The Eleventh Circuit has specifically held

24

that "[federal courts] cannot apply the dismissal provision of Georgia's anti-SLAPP statute." *Carbone v. Cable News Network, Inc*., 910 F.3d 1345, 1350–51 (11th Cir. 2018). NSJP repeats its Rule 12 arguments in this section, and those arguments fail for the reasons already set forth above.

To its credit, NSJP acknowledges *Carbone*, but it fails to acknowledge still more recent precedent that would bind even the en banc Eleventh Circuit. *See Berk v. Choy*, 607 U.S. ----, 2026 WL 135974, at *3 (U.S Jan. 20, 2026) ("when a Federal Rule of Civil Procedure is on point," even "state substantive law must yield" as long as the Federal Rule "answers the disputed question" and does not "exceed[ ] statutory authorization or Congress's rulemaking power.")

## CONCLUSION

For the foregoing reasons, Defendant NSJP's Motion to Dismiss the SAC should be denied in its entirety.

## CERTIFICATE OF COMPLIANCE

By signature below, counsel certifies that the foregoing pleading was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1(C).

*/s/ Lauren Israelovitch*
Lauren Israelovitch

26

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the within and foregoing **RESPONSE IN OPPOSITION TO NATIONAL STUDENT FOR JUSTICE IN PALESTINE'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF electronic filing system, which suffices for service on all counsel of record who have entered an appearance in the case under L.R. 5.1(A)(3).

This 29th day of April, 2026

*/s/ Lauren Israelovitch*
Lauren Israelovitch