UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AVRAHAM GOLDSTEIN,<br><br>Plaintiff,<br><br>-v-<br><br>CITY UNIVERSITY OF NEW YORK, et al.,<br><br>Defendants. | : | 25-CV-00475 (JAV)<br><br><u>OPINION AND ORDER</u> |

JEANNETTE A. VARGAS, United States District Judge:

Plaintiff Avraham Goldstein ("Plaintiff") brings this action against Defendants Borough of Manhattan Community College ("BMCC") and the City University of New York ("CUNY"), Tammie N. Velasquez ("Velasquez"), Nadia A. Saleh ("Saleh"), Theresa B. Wade ("Wade"), Odelia Levy ("Levy"), Saly Abd Alla ("Abd Alla"), and Félix V. Matos Rodríguez ("Rodríguez") (collectively, "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983 ("Section 1983"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and the New York Civil Rights Law. ECF No. 99 ("Third Amended Complaint" or "TAC"), ¶¶ 192-349. Presently before the Court are Defendants' motions to dismiss the Third Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 82, 112.[1] Defendants also move to

[1] Saleh filed a separate motion to dismiss from the other Defendants in this matter. ECF No. 82. Her motion was directed at the Second Amended Complaint, and she

strike paragraphs 151-91 of the Third Amended Complaint pursuant to Rule 12(f). ECF No. 112. For the following reasons, the motion to strike is **DENIED** and the motions to dismiss are **GRANTED**.

## BACKGROUND

### A. Factual Background

The following allegations from the Third Amended Complaint are accepted as true and construed in the light most favorable to Plaintiff for the purpose of evaluating the motions to dismiss. *Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405, 411 (2d Cir. 2025).

Plaintiff is a Jewish Israeli man who lives in New York, New York, and works as an Assistant Professor in the BMCC Mathematics Department. TAC, ¶¶ 1, 27-29, 31. BMCC is a public institution that provides higher education services and is a constituent college of CUNY. *Id.*, ¶ 4. CUNY is a New York State public university system. *Id.*, ¶ 2.

#### 1. Palestinian Solidarity Series

On March 15, 2023, the BMCC Women's Resource Center hosted a poster exhibit through its Social Justice and Equity Center ("SJEC") as part of a three-part program titled "Palestinian Solidarity Series." *Id.*, ¶¶ 48-49, 54. When this event was hosted, Velasquez was the Director of the Women's Resource Center and the Project Lead of SJEC, and Saleh was the Coordinator of the Multi-Cultural Center,

---

elected to rest on her briefs in support of that motion in attacking the Third Amended Complaint. ECF No. 103.

one of the SJEC centers. *Id.*, ¶¶ 50-51.

Plaintiff alleges that the poster exhibit was replete with antisemitic statements, including posters that labeled Israel a "colonialist" state. *Id.*, ¶¶ 52, 54. The Palestinian Solidarity Series also featured a lecture by an "anti-Israel activist" on "the structure of apartheid" and the screening of the "anti-Israel" film *Farha*. *Id.*, ¶¶ 55-56.

**2. Plaintiff's Opposition to Poster Exhibit**

On March 15, 2023, Plaintiff forwarded photos of the exhibit to the S.A.F.E. CUNY X account and notified news media. *Id.*, ¶ 60.

The following day, *UnitedWithIsrael* published an article about the program titled "'Horrifying, Antisemitic, Campus-Sponsored' Programs at CUNY; Students Get College Credit for Participating." *Id.*, ¶ 61. The article identifies Plaintiff as a director of S.A.F.E. CUNY, "a non-governmental and nonprofit organization that advocates for Zionist Jews systemically discriminated against and excluded at CUNY." *Id.*, ¶¶ 62-63. Plaintiff is quoted discussing the "discriminatory and upsetting nature of Defendants' antisemitic exhibits and events, and how he felt that they created an unsafe environment for Jewish students and faculty." *Id.*, ¶ 64. The article also identifies Saleh as the Coordinator of the BMCC SJEC Program and refers to her as "an anti-Israel activist." *Id.*, ¶¶ 67-68. The article does not attribute this information or any other description of Saleh to Plaintiff, as at this point Plaintiff was not aware of Saleh's participation in the poster exhibit. *Id.*, ¶¶ 65, 70-78.

Case 1:25-cv-02429-JAV Document 34-1 Filed 08/20/26 Page 4 of 43

### 3. RateMyProfessor.com Comments About Plaintiff

On March 21, 2023, Plaintiff, on behalf of himself and fellow Jewish BMCC professor Jenna Hirsch, emailed every person listed on the BMCC SJEC website (including but not limited to Velasquez and Saleh), asking that it sponsor antidiscrimination education on Jewish indigeneity in Israel. *Id.*, ¶ 79. Plaintiff never received a response. *Id.*, ¶¶ 80-81.

The following day, on March 22, 2023, "false and defamatory reviews accusing Plaintiff and Professor Hirsch of racism against Muslims and Palestinians appeared on RateMyProfessor.com." *Id.*, ¶ 82. These reviews referenced non-existent courses that Plaintiff does not teach or had not taught in the prior decade. *Id.*, ¶ 83.

On March 26, Plaintiff emailed CUNY Chancellor Rodríguez and BMCC President Munroe, copying BMCC Chief Diversity Officer Levy, and requested an immediate investigation into the RateMyProfessor.com reviews. *Id.*, ¶¶ 86, 106. Plaintiff's email noted that the reviews were posted exactly one day after Plaintiff's email to BMCC SJEC staff. *Id.*

The next day, BMCC Deputy Director of Diversity Wade emailed Plaintiff, informing him that his concerns were referred to her office. *Id.*, ¶ 87. On April 4, 2023, Plaintiff met with Wade regarding the email. *Id.*, ¶ 89. During this meeting, Wade asked Plaintiff if he had any suspicions about who may be responsible for the reviews. *Id.*, ¶ 90. Plaintiff reiterated that the reviews immediately followed his email to SJEC staff. *Id.* Wade assured Plaintiff that the matter would be

investigated and promised an update within two to three weeks. *Id.*, ¶ 91.

Several weeks later, on April 24, 2023, Plaintiff emailed Wade for updates on the investigation, and he was informed it was under review. *Id.*, ¶ 93. On June 9, 2023, over two months after Plaintiff complained to Defendants about the statements on RateMyProfessor.com, the BMCC Office of Compliance and Diversity informed Plaintiff that no individuals had been interviewed. *Id.*, ¶ 94. The CUNY bylaws state, "While some complaints may require extensive investigation, whenever possible, the investigation of a complaint should be completed within sixty (60) calendar days of the receipt of the complaint." *Id.*, ¶ 95.

**4. SJEC Petition**

On April 17, 2023, online posts called on the CUNY community to "Stand Against Zionist Repression at CUNY" and decried "[t]he attack launched against social justice education officers at BMCC following their efforts to educate the student body." *Id.*, ¶ 92. Subsequently, on April 28, 2023, BMCC's SJEC Multi-Cultural Center endorsed an online petition describing Plaintiff's opposition to the poster display as a "Zionist tactic." *Id.*, ¶ 96. Saleh signed this online petition. *Id.*, ¶ 98. The petition stated that the BMCC SJEC display was intended to educate the community regarding the "theft of Palestinian land." *Id.*, ¶ 97. Furthermore, the petition, like the online posts, describes Plaintiff's request for education on Jewish indigeneity in Israel as part of an "intimidation tactic." *Id.*, ¶ 102. The online petition described the March 2023 poster exhibit as the "history of Zionist settler colonial rule." *Id.*, ¶ 100. The petition characterized the 1948 war as "the ethnic

cleansing, sexual assault, and mass murder, or 750,000+ Palestinians . . . by Zionist militias." *Id.*, ¶ 101.

On or about May 5 and May 17, 2023, Plaintiff complained to BMCC about the "retaliatory, discriminatory, antisemitic petition" sponsored by the SJEC. *Id.*, ¶ 103. On June 9, 2023, BMCC's Office of Compliance and Diversity informed Plaintiff that no individuals had been interviewed in connection with Plaintiff's complaint about the petition. *Id.*, ¶ 104.

**5. Advisory Council on Jewish Life**

On May 11, 2023, CUNY announced the formation of an Advisory Council on Jewish Life, in the face of numerous sustained complaints of systemic antisemitism at its campuses. *Id.*, ¶ 105. On the same day, S.A.F.E. CUNY asked Chancellor Rodríguez to appoint members of their organization to the Advisory Council. *Id.*, ¶ 106. Chancellor Rodríguez was aware that Plaintiff was a member of S.A.F.E. CUNY. *Id.*, ¶ 107. In addition, a CUNY constituent college Department Chairperson recommended to Chancellor Rodríguez that Plaintiff serve on the Advisory Council. *Id.*, ¶ 108. He was not selected, however, nor was any other member of S.A.F.E. CUNY. *Id.*, ¶¶ 108, 117.

Several months later, on September 13, 2023, Plaintiff and seven others complained in writing to the CUNY Office of Recruitment and Diversity ("ORD"), copying Chancellor Rodríguez. *Id.*, ¶ 109. The complaint contended that Chancellor Rodríguez had deliberately excluded Plaintiff and other Jewish victims of antisemitism from appointment to the Advisory Council in retaliation for pursuing

antisemitism discrimination complaints against CUNY, and asked CUNY's ORD to investigate this complaint of retaliatory exclusion from the committee. *Id.*, ¶ 109.

Plaintiff asserts that he was and is more qualified to serve on the Advisory Council on Jewish Life than many of those who were selected because he is a full-time tenured Assistant Professor at BMCC (CUNY's largest community college, because he supports the re-establishment of the Jewish state in the Jewish people's ancestral homeland, because he has opposed Defendants' false and defamatory antisemitic statements and actions, and because he has experienced retaliatory false and defamatory public and internal claims that he is a racist. *Id.*, ¶¶ 27, 110. Plaintiff further alleges that the selected members of the Advisory Council on Jewish Life include many individuals who are demonstrably less qualified than Plaintiff because they hold lower-level positions at CUNY, support antisemitic statements, or oppose the existence of the Jewish State of Israel. *Id.*, ¶ 111.

The Third Amended Complaint alleges that Defendants, by refusing to appoint Plaintiff to the Advisory Council on Jewish Life, have excluded him from a professional development opportunity that affects his advancement and compensation. *Id.*, ¶ 115. Plaintiff's service on the Advisory Council would have constituted university service and thereby contributed to Plaintiff's prospects for promotion to Associate Professor. *Id.*, ¶ 113.

### 6. Plaintiff's Complaint of Antisemitic Discrimination

On June 4, 2023, Plaintiff filed a discrimination complaint on CUNY's online portal. The complaint referenced the March 15 poster exhibit, the

RateMyProfessor.com posts, Plaintiff's unanswered request for anti-discrimination education on Jewish indigeneity in Israel, and the April 28 petition. *Id.*, ¶ 118. This portal was run by Abd Alla in her role as CUNY's Chief Diversity Officer and Title IX Coordinator. *Id.*, ¶¶ 119-120. Abd Alla's responsibilities included investigating complaints of antisemitism against executive staff and conducting DEI training at CUNY's constituent community colleges. *Id.*, ¶¶ 120-121.

CUNY's policy states that all portal complaints shall be resolved within forty days of their filing. *Id.*, ¶ 133. Plaintiff alleges that as of January 9, 2026, he had not received a response to his complaint, *id.*, ¶ 134, and that on or about May 13, 2024, Defendants notified Plaintiff that his complaints of discrimination had not been substantiated, *id.*, ¶ 149.

Abd Alla was hired by Rodríguez in or about 2021. *Id.*, ¶ 122. Before she came to CUNY, Abd Alla was Civil Rights Director for the Council on American-Islamic Relations, Minnesota ("CAIR-MN"). *Id.*, ¶ 126. While Abd Alla was the CAIR-MN Civil Rights Director, CAIR-MN called for the boycott, divestment and sanctioning of Israel. *Id.*, ¶ 127. On July 15, 2023, U.S. Representative Elis Stefaniak questioned Chancellor Rodríguez about why he hired and continued to employ Abd Alla as CUNY's Chief Diversity Officer given that she was CAIR-MN's Civil Rights Director when CAIR was an unindicted co-conspirator in a terrorist financing trial and had ties to Hamas. *Id.*, ¶ 123. In response, Chancellor Rodríguez falsely testified that Abd Alla did not have responsibility for investigating discrimination claims involving faculty. *Id.*, ¶ 124.

**7. Saleh's Complaint Against Plaintiff**

On July 13, 2023, Plaintiff was notified by an email from Wade that he was under investigation in connection with a complaint filed four months earlier by Saleh related to his public opposition to the poster exhibit. *Id.*, ¶ 135. The notice stated that he was being investigated for claims that he contributed to publications which wrote false information about Saleh based on her ethnicity and religion and then shared these publications on social media. *Id.*, ¶ 136. Plaintiff alleges that it is plain on the face of the news articles that he was not the source of any information about Saleh, nor did the articles contain statements about Saleh's ethnicity or religion. *Id.*, ¶¶ 138-39.

While CUNY's policies require a preliminary review of complaints before an investigation is commenced, *id.*, ¶ 137, Plaintiff alleges that Wade and Levy "did not conduct a preliminary review of Saleh's complaint before commencing their investigation of Plaintiff, or they willfully ignored the results of that preliminary review that the allegations against Plaintiff were facially baseless," *id.*, ¶ 140. Plaintiff additionally alleges that the investigators failed to contact the authors of the publications to inquire as to the source of the statements. *Id.*, ¶ 141. Wade and Levy also refused to provide Plaintiff with a copy of the complaint against him, despite CUNY's policies requiring they do so. *Id.*, ¶¶ 142-43. When Plaintiff did ultimately receive a copy of Saleh's March 20, 2023 complaint, he noticed it "eerily echoed" the RateMyProfessors.com comments. *Id.*, ¶¶ 144-45. This investigation

remained open until August 12, 2024, when Plaintiff was notified that the claims had not been substantiated. *Id.*, ¶ 150.

**8. Pattern of Allegations Against Jewish Employees**

Plaintiff's Third Amended Complaint alleges a pattern of CUNY targeting Jewish employees by pursuing facially baseless allegations in retaliation for their complaints about antisemitic treatment. *Id.*, ¶¶ 151-52. Plaintiff alleges that rather than treating Jewish victims of facially baseless discrimination complaints the same as non-Jewish victims of similar complaints, by engaging in a preliminary review to determine whether an investigation is warranted, as required by CUNY policies, CUNY instead subjects Jewish employees to prolonged multi-month investigations. *Id.*, ¶ 153. These investigations, according to Plaintiff, are intended to retaliate against, intimidate, and punish Jewish people who speak up against antisemitism, and they have their intended chilling effect on many Jewish employees. *Id.*, ¶ 154.

The Third Amended Complaint catalogues several incidences of this "weaponization of the investigation process against CUNY employees who oppose antisemitism." *Id.*, ¶ 158. In February 2018, the CUNY Kingsborough Community College ("KCC") faculty union (the "Union") president sent an email to all KCC faculty soliciting discrimination complaints to be discussed at an event scheduled for a Friday night, knowing that Jewish faculty would not be able to attend an event held on the sabbath which begins at sundown on Friday. *Id.*, ¶ 159. In response to complaints of religious discrimination, then-KCC Chief Diversity Officer

Victoria Ajibade ("Ajibade") emailed the KCC faculty about the complaint and stated her "fervent hope" that the faculty union would consider rescheduling. *Id.*, ¶ 160. Almost immediately, the Inion filed a professional misconduct claim against Ajibade, and she left her position several weeks later. *Id.*, ¶ 161.

In May 2018, a Union officer filed a complaint of harassment against KCC Professor Jeff Lax ("Lax"), whom the Union officer had never spoken to, because "she was bothered that he was documenting claims based on religious discrimination." *Id.*, ¶ 162. This allegation revolved around a single email which the officer admitted was "cordial." *Id.*

In 2020, CUNY allowed its third-party investigator to send letters to Jewish CUNY college professors who had complained of on campus antisemitism, stating that their claims were not substantiated, even though the third-party investigator's report itself stated that the Jewish professors' claims could be substantiated in part. *Id.*, ¶ 163.

In 2021, the U.S. Equal Employment Opportunity Commission ("EEOC") found that CUNY failed to take immediate corrective action to address discrimination against observant Jews, creating a hostile work environment. *Id.*, ¶ 164. In 2022, in the wake of the EEOC determination, CUNY and KCC established a committee to search for an Assistant Dean for Diversity, Equity, and Inclusion ("DEI"). *Id.*, ¶ 165. In August of 2022, Lax complained to the CUNY Diversity Office's investigator about discrimination, retaliation, and a hostile work environment, in part because of the appointment of Lili Shi ("Shi"), an "anti-Israel

advocate," to the DEI hiring committee while no "Zionist or observant Jews" were appointed. *Id.*, ¶ 166. Another Jewish KCC professor, Michael Goldstein (unrelated to Plaintiff), likewise tweeted that Shi was antisemitic. *Id.*, ¶ 166. Following these events, in September 2022, Shi filed a complaint against Lax and Goldstein alleging race and gender discrimination and expressing concerns about her "vulnerability as an immigrant." *Id.*, ¶ 167. The complaint stemmed from Twitter messages and online media articles that targeted Shi. *Id.*, ¶ 167. The investigation into this complaint remained open for nearly six months, and Lax and Goldstein were refused a copy of the complaint. *Id.*, ¶¶ 169-70.

In 2023, upon appointment by New York State Governor Kathy Hochul, former New York Chief Judge Jonathan Lippman conducted an independent review of CUNY's policies and procedures related to antisemitism and discrimination. *Id.*, ¶ 175. In his report, Judge Lippman noted that there had been an alarming number of unacceptable antisemitic incidents targeting members of the CUNY community, including highly publicized allegations of incidents involving claims of antisemitism and retaliation against faculty members at BMCC. *Id.*, ¶¶ 176-77.

### B. Procedural History

On January 16, 2025, Plaintiff initiated this action against CUNY and BMCC. ECF No. 1. On May 23, 2025, the Court granted Plaintiff leave to amend, ECF No. 27, and Plaintiff filed the First Amended Complaint on June 3, 2025, ECF No. 29.

CUNY and BMCC filed a motion to dismiss the First Amended Complaint on June 23, 2025. ECF No. 31. The Court issued an order setting a deadline for Plaintiff to file an amended complaint in response to the motion to dismiss. ECF No. 37. The order put Plaintiff "on notice that there will likely not be any further opportunity to amend the complaint to address issues raised by the motion to dismiss." *Id.*

Plaintiff filed the Second Amended Complaint on July 31, 2025. ECF No. 41. The Second Amended Complaint added the individually-named defendants to the action. *Id.*

On October 30, 2025, Defendant Saleh filed a motion to dismiss the Second Amended Complaint. ECF No. 82. The remaining defendants filed a separate motion to dismiss. ECF No. 83. In light of the newly-added defendants, the Court granted Plaintiff an opportunity to amend his complaint to address issues raised in the motions to dismiss but again cautioned that "there will likely not be any further opportunity to amend the complaint to address issues raised by the motions to dismiss." ECF No. 89.

The Third Amended Complaint was filed on January 9, 2026. ECF No. 99. Defendant Saleh elected to rest on her motion to dismiss the Second Amended Complaint. ECF No. 103. Saleh did, however, file a motion to strike paragraphs 34-36 of the Third Amended Complaint pursuant to Rule 12(f). ECF No. 102. That motion was granted. ECF No. 130.

The remaining defendants filed their motion to dismiss the Third Amended Complaint on March 6, 2026. ECF No. 112.

**LEGAL STANDARDS**

On a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all well-pleaded allegations and draws all reasonable inferences in favor of the non-moving party. *Romanova v. Amilus Inc.*, 138 F.4th 104, 108 (2d Cir. 2025). The Court, however, does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is not enough for a plaintiff to allege facts consistent with liability; the complaint must "nudge[] [plaintiff's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).

Pursuant to Rule 12(f), a court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "'Immaterial' matter is that which has no essential or important relationship to the claim for relief, and 'impertinent' material consists of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 402 F. Supp. 2d 434, 437 (S.D.N.Y.

2005) (citation omitted). Motions to strike material on the ground that the matter is impertinent and immaterial are "disfavored." *Brown v. Maxwell*, 929 F.3d 41, 51 n.42 (2d Cir. 2019). To prevail on a Rule 12(f) motion to strike allegations as immaterial, "the movant must show (1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 63 (E.D.N.Y. 2011) (cleaned up).

## DISCUSSION

Plaintiff has asserted claims for religion and national origin discrimination, hostile work environment, and retaliation in violation of Title VII, the NYSHRL, the NYCHRL, and New York Civil Rights Law 40 and 40-c. TAC, ¶¶ 192-275, 303-49. He further asserts claims under Section 1983 for violations of his right to procedural due process and equal protection under the Fourteenth Amendment. *Id.*, ¶¶ 276-302. The TAC fails to state a claim for relief under Title VII and Section 1983, and those claims are therefore dismissed. The Court declines to exercise supplemental jurisdiction over the remaining state law claims.

### A. Motion to Strike

As an initial matter, the Court denies Defendants' motion to strike paragraphs 151-191 of the Third Amended Complaint. ECF No. 113 ("Def. Mem.") at 30. These paragraphs largely concern Plaintiff's allegations that CUNY has engaged in a pattern of targeting other Jewish employees by pursuing facially

baseless allegations in retaliation for their complaints about antisemitic treatment, as well as the results of Judge Lippman's independent investigation. Defendants argue that these allegations are not material because they involve third parties. *Id.*

Defendants fail to show that no evidence in support of these allegations would be admissible. *Lynch*, 278 F.R.D. at 63. These allegations could be relevant to whether CUNY acted with discriminatory intent, by demonstrating that CUNY routinely applied its policies in a disparate way to employees who share a protected characteristic. The motion to strike is therefore denied.

### B. Interplay Between the First Amendment and Antidiscrimination Laws

Plaintiff's claims under Title VII, the NYSHRL, the NYCHRL, and Section 1983 are largely premised upon expressions of political speech regarding Israel, Zionism, and the Palestinian conflict that the Third Amended Complaint characterizes as antisemitic. This raises a preliminary question as to what extent such expressive conduct, no matter how personally offensive or hateful to individuals based upon a protected characteristic, can be actionable as workplace discrimination or harassment under federal or state antidiscrimination laws.

Title VII prohibits "harassment so severe or pervasive as 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Saxe v. State Coll. Area School Dist.*, 240 F.3d 200, 205 (3d Cir. 2001) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Abusive and offensive speech, no less than abusive conduct, can undoubtedly cause a multitude of psychic harms that would render a workplace hostile. *See, e.g.*, *Banks v. Gen. Motors, LLC*,

81 F.4th 242, 266 (2d Cir. 2023) ("perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet" (citation omitted)).

Antidiscrimination laws do not create a categorical "'harassment exception' to the First Amendment's free speech clause," however. *Saxe*, 240 F.3d at 204. "[T]he Supreme Court has consistently held that expression motivated by bias, hatred, or bigotry falls within the First Amendment's protection." *Volokh v. James*, 148 F.4th 71, 88 (2d Cir. 2025) (collecting cases). "[I]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Saxe*, 240 F.3d at 209 (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

Accordingly, while there is "no question that non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," it is equally clear that "[w]here pure expression is involved, anti-discrimination law steers into the territory of the First Amendment." *Id.* at 206 (cleaned up).

The potential conflict between the First Amendment and federal and state antidiscrimination laws is heightened when the offensive speech concerns matters of public concern. Political speech is at the core of the First Amendment. *Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 146 (2d Cir. 2000). Governmental regulation of such speech faces "exacting scrutiny." *Id.* And restriction of political speech based upon the viewpoint expressed will almost never pass constitutional

muster. The First Amendment abhors political orthodoxy. *See generally W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943).

Speech is no less protected when it occurs in the context of higher education. To the contrary, universities are the incubators of the next generation of philosophers, scientists, politicians, artists, writers, journalists, advocates, business leaders, and teachers. Arguably, there is no setting where the open and vigorous exchange of ideas should be more vigilantly protected.

> The primary function of a university is to discover and disseminate knowledge by means of research and teaching. . . . It follows that the university must do everything possible to ensure within it the fullest degree of intellectual freedom. The history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable. To curtail free expression strikes twice at intellectual freedom, for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.

*Bonnell v. Lorenzo*, 81 F. Supp. 2d 777, 798 n.19 (E.D. Mich. 1999) (quoting Yale Univ., *Report of the Committee on Freedom of Expression at Yale* (1975)), *rev'd on other grounds*, 241 F.3d 800 (6th Cir. 2001); *see also Gartenberg v. Cooper Union for the Advancement of Science and Art*, 765 F. Supp. 3d 245, 261 (S.D.N.Y. 2025) ("[R]equiring schools to censor or punish political speech to avoid liability for a hostile environment would burden not only their students' freedom of expression, but the academic freedom of the institution itself to create an educational environment centered around the free exchange of ideas.").

"In light of the competing interests . . . , courts have emphasized the need to exercise special caution when applying anti-discrimination law to matters involving traditionally protected areas of speech." *Gartenberg*, 765 F. Supp. 3d at 264 (S.D.N.Y. 2025) (cleaned up). "A statute that burdens protected speech must comport with the First Amendment regardless of whether it does so directly, such as by prohibiting certain speech outright, or indirectly, such as by requiring a court adjudicating a civil lawsuit between private parties to apply a rule of law that has the effect of imposing invalid restrictions on the defendant's constitutional freedom of speech." *Id.* at 260 (cleaned up).

In determining where the line between protected speech under the First Amendment and actionable harassment falls, the reasoning behind the prohibition on harassment in the workplace is instructive. "[G]overnment may constitutionally prohibit speech whose *non-expressive* qualities promote discrimination. For example, a supervisor's statement 'sleep with me or you're fired' may be proscribed not on the ground of any expressive idea that the statement communicates, but rather because it facilitates the threat of discriminatory conduct." *Saxe*, 240 F.3d at 208; *see also Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) ("[R]acial insults or sexual advances directed at particular individuals in the workplace may be prohibited on the basis of their non-expressive qualities, as they do not 'seek to disseminate a message to the general public, but to intrude upon the targeted [listener], and to do so in an especially offensive way.'" (citation omitted) (quoting *Frisby v. Schultz*, 487 U.S. 474, 486 (1988))). Thus, "[h]arassment

law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment." *Rodriguez*, 605 F.3d at 710.

When reconciling discrimination claims with the First Amendment, courts have explained that "the objective measure of what conduct is severe or pervasive . . . will distinguish between speech on matters of public concern directed to the community at large through generally accepted methods of communication, and speech that constitutes targeted, personal harassment aimed at a particular individual or individuals." *Garett v. City University of New York*, 24-CV-09710 (VSB) (RWL), 2025 WL 3096550, at *7 (S.D.N.Y. Oct. 10, 2025) (cleaned up); *see also Kopmar v. Ass'n of Legal Aid Att'ys, Amalgamated Loc. Union 2325 of the Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. (UAW), AFL-CIO*, No. 24-CV-05158 (JPO), 2025 WL 1939048, at *6 (S.D.N.Y. July 15, 2025) (holding that a resolution criticizing Israel with "intense and provocative rhetoric" constitutes "pure political speech" outside the scope of Title VII); *Landau v. Corp. of Haverford Coll.*, 789 F. Supp. 3d 401, 414-15 (E.D. Pa. 2025); *cf. Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 13 (1st Cir. 2025) (holding that Title VI did not require MIT "to restrict students' expression merely because those students opposed Israel and favored the Palestinian cause," as "using Title VI to compel adherence to a preferred political viewpoint would . . . implicate students' First Amendment freedoms").

For example, in *Gartenberg v. Cooper Union*, the district court held that political speech—including peaceful pro-Palestinian student demonstrations, an

alumni letter that "attempted to justify the sickening Hamas attack of October 7," a pro-Palestinian student newspaper article that criticized the conflation of Zionism and Judaism, an art installation advocating resistance to colonialism, a vigil to honor Palestinian martyrs, and flyers supporting the Palestinian cause—could not form the basis of a hostile work environment claim. 765 F. Supp. 3d at 270-71. Such expression "qualifies as pure speech on matters of public concern because 'it can be fairly considered as relating to [a] matter of political, social, or other concern to the community' and was communicated in a manner reasonably calculated to contribute to an ongoing public debate of considerable political significance." *Id.* at 271 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

Accordingly, before the Court considers whether Plaintiff has stated a claim under federal or state antidiscrimination laws, the Court must first filter out all "allegations deemed to be non-actionable political speech" from its analysis. *Garett*, 2025 WL 3096550, at *8; *see also Gartenberg*, 765 F. Supp. 3d at 264 ("[B]ecause interpreting Title VI to impose liability for a hostile environment created in part by pure speech on matters of public concern would cast significant doubt on the statute's constitutionality, the Court must adopt a permissible construction of Title VI that avoids placing its application in First Amendment jeopardy."); *cf. Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) ("When a serious doubt is raised about the constitutionality of an Act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (cleaned up)).

Applying this test, the Court holds that Plaintiff's discrimination claims based upon CUNY's sponsorship of the Palestinian Solidarity Series, TAC, ¶ 209, are not actionable under either federal or state antidiscrimination laws. A poster exhibit, the screening of a film, and a political discussion are all instances of speech that are "reasonably designed or intended to contribute to an ongoing debate regarding the Israeli-Palestinian conflict." *Garett*, 2025 WL 3096550, at *8 (citation omitted). There is no allegation that any of this speech was directed specifically at Plaintiff, or any other Jewish student or CUNY employee. Nor is there any allegation that Plaintiff or any other individual was physically threatened or intimidated during these events. This speech on matters of public and academic concern occurring in a university setting is protected under the First Amendment.

The SJEC Multi-Cultural Center's circulation of a petition, endorsed by Saleh, in response to the media coverage criticizing the Palestinian Solidarity Series is likewise political speech. According to the Third Amended Complaint, the petition stated that the BMCC SJEC display was intended to educate the community regarding the "theft" of Palestinian land. TAC, ¶ 97. It described the March 2023 poster exhibit as the "history" of "Zionist settler colonial rule." *Id.*, ¶ 100. "[A] college professor's expression on a matter of public concern, directed to the college community, [does not] constitute unlawful harassment . . . ." *Rodriguez*, 605 F.3d at 710.

Although the Third Amended Complaint alleges that the petition mentions Plaintiff, TAC, ¶¶ 96, 102, this too is protected free speech. "[T]he First

Amendment provides speakers with latitude to criticize others, particularly authority figures, in the context of a genuine public debate." *Garett*, 2025 WL 3096550, at *14 (citing *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52 (1988)). The Third Amended Complaint alleges that the petition described "Plaintiff's request for anti-discrimination education on Jewish indigeneity in Israel" as part of an "intimidation tactic." TAC, ¶ 102. The petition also described Plaintiff's opposition to the poster display as a "Zionist tactic." *Id.*, ¶ 96. Even if the petition explicitly referred to Plaintiff by name, it did so in the context of commenting on statements made by Plaintiff on a topic of urgent national debate, directed to the college community at large. *Gartenberg*, 765 F. Supp. 3d at 265. Robust exchanges on matters of widespread public concern fall within the heartland of the First Amendment.

Concededly, First Amendment protection does not extend to speech that is defamatory, and thus discrimination claims can be premised upon the circulation of false statements regarding an individual. *See Noviello v. City of Boston*, 398 F.3d 76, 93 (1st Cir. 2005) ("the case law recognizes that false accusations of misconduct can contribute to the creation of a hostile work environment"). Yet defamation law distinguishes between expressions of opinion, which cannot be defamatory because they cannot be proven false, and false statements of fact. *See, e.g.*, *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 459-60 (S.D.N.Y. 2012). Inherent in this distinction is the principle that there is "no such thing as a false idea" under the First Amendment. *Ganske v. Mensch*, 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020) (quoting

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)). Accordingly, courts have been reticent to permit liability under the antidiscrimination laws for speech that is not factually false. *See Jew v. Univ. of Iowa*, 749 F. Supp. 946, 961 (S.D. Iowa 1990) ("Free speech and academic freedom considerations might preclude Title VII liability if the sexual relationship rumors were true . . . ."); *Garett*, 2025 WL 3096550, at *14 (holding that an email directed to the community at large and specifically mentioning the plaintiff would likely not give rise to liability if not "false and defamatory").

The statements in the petition are not false assertions of fact. Thus, the statements in the petition did not lose their First Amendment protection merely because Plaintiff is referenced by name.

The RateMyProfessor.com reviews stand on a different footing. As alleged in the TAC, these statements did not take place in the context of a public debate, but were "targeted, personal harassment aimed at a particular individual." *Garett*, 2025 WL 3096550, at *15 (cleaned up). The reviews purported to provide commentary on Plaintiff in his role as a professor and accused him of exhibiting racism towards Muslim and Palestinian students. TAC, ¶¶ 82-83. In doing so, they referenced non-existent classes or classes that Plaintiff did not teach. *Id.*, ¶ 83. False accusations of misconduct can permissibly be considered as contributing to the creation of a hostile work environment. *See Noviello v. City of Boston*, 398 F.3d 76, 93 (1st Cir. 2005). The Court will therefore consider this allegation in determining whether Plaintiff has stated a claim under his various causes of action.

## C. Title VII

Plaintiff asserts Title VII claims against Defendants BMCC and CUNY.[2] The TAC fails to plausibly allege claims of discrimination, hostile work environment, or retaliation under Title VII. Plaintiff's Title VII claims are therefore dismissed for failure to state a claim.

### 1. Discrimination

#### a. Legal Standard

"Title VII makes it unlawful for an employer 'to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). "[T]o defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015); *see also Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) ("[F]or a discrimination claim to survive a motion to dismiss, absent direct evidence

---

[2] The TAC also names each of the individual defendants in the Title VII counts. *See, e.g.*, TAC, ¶¶ 211-15. The individually-named defendants have moved to dismiss the Title VII claims against them on the grounds that Title VII does not permit suits against individuals. ECF No. 113 at 7. In his opposition brief, Plaintiff clarified that the Title VII claims are asserted solely against BMCC and CUNY. ECF No. 125 ("Opp'n") at 1 n.1. The motion to dismiss the Title VII claims against the individual defendants is therefore granted. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) ("individuals are not subject to liability under Title VII" (citation omitted)).

of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff (1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) has at least minimal support for the proposition that the employer was motivated by discriminatory intent." (cleaned up)).

As to the first element, a plaintiff must plead "*some* harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 355 (emphasis added). While the harm need not be "significant[,] [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar," *id.* (cleaned up), the employment decision must still leave the plaintiff "worse off," *id.* at 359.

As to the second element, "a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87. A plausible inference of discrimination can be alleged by "identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Id.* (cleaned up). Such "bits and pieces" may include, for example, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New*

*York*, 795 F.3d 297, 312 (2d Cir. 2015) (citation omitted). "[T]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination, but rather need only give plausible support to a minimal inference of discriminatory motivation." *Buon*, 65 F.4th at 83 (cleaned up).

**b. Application**

**i. CUNY's Investigation into Plaintiff Following Defendant Saleh's Complaint**

Prior to *Muldrow*, courts in this circuit recognized that an "employer's investigation of an employee arising out of allegations of discrimination or harassment filed against that employee is not inherently an adverse employment action." *McGrath v. Arroyo*, No. 17-CV-01461 (NGG) (RER), 2019 WL 3754459, at *5 (E.D.N.Y. Aug. 8, 2019) (citing *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 146 (2d Cir. 2014)). This is because refusing to investigate an accusation of discrimination or harassment could, in fact, make an employer liable for that discrimination or harassment. *Id.* Thus, "the law must give breathing room for such investigations to be carried out." *Id.* (quoting *Cox*, 760 F.3d at 146).

Although *Muldrow* significantly lowered the standard for an adverse employment action in a Title VII discrimination claim, it remains the case that "not every change in working conditions, by itself, can be an adverse employment action." *Bonaffini v. City Univ. of N.Y.*, 751 F. Supp. 3d 67, 75 (E.D.N.Y. 2024). "[T]he anti-discrimination provision at issue [still] requires that the employee show

some injury." *Muldrow*, 601 U.S. at 358. Moreover, "[i]t requires that the injury asserted concern the terms or conditions of her employment." *Id.*

CUNY's investigation into Plaintiff arising from Saleh's complaint does not result in a cognizable harm. Because "an employer's investigation of a . . . complaint is not a gratuitous or optional undertaking" but rather "under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer," *Malik v. Carrier Corp.*, 202 F.3d 97, 105-06 (2d Cir. 2000) (holding that, to ensure that "federal policies are not undermined by imposing on employers legal duties enforceable by damages that reduce their incentives to take reasonable corrective action as required by federal law," investigations undertaken by employers in response to a harassment complaint cannot give rise to legal liability), the investigation into Plaintiff cannot in itself constitute an "injury in employment terms or conditions," *Muldrow*, 601 U.S. at 356.

True, Plaintiff alleges the investigation was needlessly kept open for 15 months. TAC, ¶ 202. Yet the Complaint fails to allege any facts indicating that this made Plaintiff "worse off." *Id.* at 359. *Compare Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112-13 (1st Cir. 2024) (holding that "mere admonition by a supervisor without any formal consequences . . . does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment"), *with Hayes v. G&E Real Est. Mgmt. Servs.*, No. 24-CV-01459 (ER), 2025 WL 769162, at *8 (S.D.N.Y. Mar. 11, 2025) (holding that a negative performance review can constitute an adverse action when plaintiff alleges it "plausibly deprived her of the

opportunity to receive a raise or bonus"). There are no allegations, for example, that plausibly suggest that Plaintiff was denied promotions or other career opportunities as a result of the pending investigation. *See, e.g.*, *Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006). Accordingly, Plaintiff's Title VII discrimination claim based upon CUNY's investigation is dismissed.

#### ii. CUNY's Failure to Appoint Plaintiff to the Advisory Council on Jewish Life

Plaintiff fails to allege facts that directly or indirectly give rise to a plausible inference that he was not appointed to the Advisory Council at least in part because of his Jewish religion or Israeli national origin. *See Vega*, 801 F.3d at 87. Plaintiff conclusorily asserts that he "was and is more qualified to serve on Defendant's Advisory Council on Jewish Life" than those who were chosen. TAC, ¶¶ 110-11. Yet he does not outline the qualifications for a position on the Advisory Council. For example, he alleges that certain individuals appointed to the Advisory Council held "lower level positions at CUNY" than did Plaintiff, *id.*, ¶ 111, but nowhere explains how this correlates with the qualifications to serve on the Advisory Council.

Moreover, Plaintiff has not provided the religion or nationality of those chosen for the Advisory Council in his stead. *See id.* He thus fails to establish that any of the individuals who were appointed were "outside his protected class." *Cretella v. Liriano*, 633 F. Supp. 2d 54, 71 (S.D.N.Y. 2009), *aff'd*, 370 F. App'x 157 (2d Cir. 2010) (summary order).

### iii. BMCC's Alleged Failure to Conduct a Good Faith Investigation into Plaintiff's Claims

Plaintiff alleges that CUNY and BMCC failed to conduct a good faith reasonable investigation of Plaintiff's reports of antisemitic, anti-Israeli treatment. TAC, ¶¶ 211-13. Specifically, he claims that they did not timely investigate or provide redress for his March 2023 complaint regarding the RateMyProfessor.com reviews; his May 2023 complaints regarding the petition; or his June 2023 submission to the online portal regarding the poster exhibit, the circulation of the April 2023 petition, the RateMyProfessor.com comments, and his unanswered request for education on Jewish indigeneity in Israel. *Id.*, ¶¶ 86-95, 103-04, 118-34.

Prior to the Supreme Court's decision in *Muldrow*, courts in this Circuit routinely held that a failure to investigate a plaintiff's complaint did not rise to the level of a materially adverse employment action. *See, e.g.*, *Royall v. City of Beacon*, No. 24-CV-00003 (KMK), 2024 WL 4266546, at *15 (S.D.N.Y. Sept. 23, 2024) (observing that "courts have consistently held that an employer's failure to investigate discrimination claims is *not* an adverse employment action" (cleaned up) (collecting cases)); *Asiedu v. Broadreach Med. Res.*, No. 19-CV-11825 (ER), 2022 WL 4237077, at *10 (S.D.N.Y. Sept. 13, 2022) (holding that "the failure to investigate does not itself constitute an adverse employment action").

Following *Muldrow*, a categorical rule that a failure to investigate cannot result in an injury with respect to the terms and conditions of employment would be inappropriate. Rather, the relevant inquiry is whether the plaintiff has plausibly alleged that the failure to investigate resulted in an injury with respect to the terms

and conditions of employment, *Revan v. Univ. of Denver Dep't of Campus Safety*, No. 25-CV-00528 (NYW) (CYC), 2026 WL 376809, at *5 (D. Colo. Feb. 11, 2026), or did not remediate such an injury, *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011). In *Revan*, for example, the district court held that a failure to investigate "a campaign of unwanted romantic overtures" had "caused a harm to [the plaintiff] that is cognizable under Title VII" because the harassing behavior was permitted to continue. 2026 WL 376809, at *5, *9.

Plaintiff does not plausibly allege that CUNY's failure to investigate his claim resulted in a "demonstrable harm." *Id.* at *5. The conduct that was the subject of Plaintiff's complaints was largely protected First Amendment activity. Plaintiff thus did not suffer any cognizable harm from CUNY and BMCC's inaction.

Plaintiff offers no explanation as to how BMCC and CUNY's decision not to provide education on Jewish indigeneity in Israel, as requested by Plaintiff, caused Plaintiff to suffer an injury to the terms and conditions of his employment. Certainly, Plaintiff is not entitled to dictate to CUNY and BMCC the contents of its course offerings or educational materials.

That leaves only the unaddressed RateMyProfessor.com reviews. If these comments were sufficiently severe and pervasive to create a hostile work environment for Plaintiff, then CUNY and BMCC's failure to adequately investigate and remediate his working conditions could have resulted in an injury actionable under Title VII. *See id.* Yet, as will be discussed in more detail below, the Third Amended Complaint does not sufficiently allege that these reviews were sufficiently

severe or pervasive. Thus, because Plaintiff has failed to allege that the "uncorrected action would . . . be of enough significance to qualify as an adverse action," he has not adequately pleaded a claim for discrimination under Title VII. *Id.*

**2. Hostile Work Environment**

"Title VII . . . prohibit[s] employers from subjecting employees to a hostile work environment." *White v. Orange Urgent Care, PLLC*, No. 24-CV-06827 (KMK), 2026 WL 867141, at *5 (S.D.N.Y. Mar. 30, 2026) (citing *Littlejohn*, 795 F.3d at 320). Yet a plaintiff must meet a high bar to state a claim for a hostile work environment. "[T]he workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (citation omitted).

To survive a motion to dismiss, a plaintiff must allege conduct that (1) is objectively severe or pervasive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic. *See, e.g.*, *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). Accordingly, the test for hostile work environment "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21 (1993)). Further, "generalized hostility or generally uncivilized behavior is not actionable." *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 580 (S.D.N.Y. 2023).

Much of Plaintiff's hostile work environment claim is premised on speech that the Court has determined to be non-actionable. *See* TAC, ¶¶ 209-10. Plaintiff also points to the failure to appoint him to the Advisory Council and the RateMyProfessor.com comments that accused him of being a racist. Opp'n at 18-19, 21.[3]

Yet Plaintiff has not plausibly alleged facts from which it can be inferred that the failure to appoint him to the Advisory Council was on account of his religion or national origin. Although conduct which is neutral as to religion or national origin can constitute actionable harassment, it must nonetheless be on account of a protected characteristic. The Court has already concluded, however, that Plaintiff has not alleged a causal nexus between his religion or national origin and the decision not to appoint him to the Advisory Council.

Assuming *arguendo* that liability for the RateMyProfessor.com comments can be imputed to CUNY or BMCC,[4] Plaintiff has not alleged conduct that is severe or

---

[3] Plaintiff also cites CUNY's investigation of Plaintiff following Saleh's complaint, Opp'n at 18-19, but as stated earlier, without more, an employer's mandatory investigation into a discrimination complaint cannot give rise to liability under Title VII.

[4] Although Plaintiff has not alleged any facts from which it can plausibly be inferred that it was a BMCC or CUNY employee who left the RateMyProfessor.com comments, Plaintiff argues that BMCC and CUNY can be held liable for their negligent failure to take appropriate action once he alerted the administration. Opp'n at 21. Liability can be imputed to an employer for harassment committed by

pervasive. In determining whether the first prong of the test has been met, courts "consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23). Ultimately, "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (citation omitted).

The anonymous comments on a third-party website, even when coupled with the other actionable allegations, do not cumulatively rise to the level of severe and pervasive. They were of limited duration and frequency. *See, e.g.*, *Johnson*, 827 F. Supp. 3d at 168-69 (dismissing hostile work environment claim based on online doxxing campaign); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d

---

a non-supervisory employee or a non-employee if the employer acted negligently by failing "to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (citation omitted). "In determining the appropriateness of an employer's response, we look to whether the response was immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility the employer has" over the behavior of the responsible individual. *Id.* (cleaned up). Plaintiff argues that BMCC and CUNY did not act immediately or timely in response to his complaints relating to the petition or the anonymous RateMyProfessor.com comments. Opp'n at 21; *see also* TAC, ¶¶ 89-95, 103, 104, 118, 134. In light of the anonymous nature of the comments, it is unclear to what extent CUNY had any level of control over the individuals who posted online. *See Johnson v. Georgetown Univ.*, 827 F. Supp. 3d 133, 168 (D.D.C. 2026). For purposes of this motion, the Court assumes, without deciding, that Plaintiff has pleaded facts sufficient to impute liability to CUNY and BMCC for the reviews.

62, 69 (2d Cir. 2000) (holding that "[i]ncidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment" (cleaned up)). Plaintiff was not subject to epithets based on his religion or national origin, let alone a "steady barrage" of such comments. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (noting that "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" to create a hostile work environment (cleaned up)). None of the alleged conduct rose to the level of physical threat or humiliation. The hostile work environment claim is therefore dismissed.

**3. Retaliation**

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Vega*, 801 F.3d at 89-90 (quoting 42 U.S.C. § 2000e-3(a)). In other words, Title VII "prohibits an employer from discriminating against an employee because the employee has engaged in protected activity." *Banks*, 81 F.4th at 275.

To survive a motion to dismiss, Plaintiff must plausibly allege facts showing that (1) he was engaged in a protected activity; (2) the employer was aware of that activity; (3) he suffered a materially adverse employment action; and (4) there was a

causal connection between the protected activity and the adverse action. *Littlejohn*, 795 F.3d at 315-16.

As relevant here, "[a]n adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Tyson-Phipps v. Rubio*, 779 F. Supp. 3d 440, 459 (S.D.N.Y. 2025) (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). In *Muldrow*, the Supreme Court reaffirmed that this standard still applies in the retaliation context. 601 U.S. at 357. "The test [is] meant to capture those (and only those) employer actions serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* In contrast, "[i]f an action causes less serious harm . . . it will not deter Title VII enforcement; and if it will not deter Title VII enforcement, it falls outside the purposes of the ban on retaliation." *Id.* (cleaned up). "Examples of such [an adverse employment action] include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Mathirampuzha*, 548 F.3d at 78 (citation omitted).

Plaintiff alleges that he was subjected to retaliation by (1) the failure to adequately and promptly investigate his complaints regarding the petition and the RateMyProfessor.com comments, (2) the decision not to appoint him to the Advisory Council, and (3) the length of the investigation regarding Saleh's complaint. Opp'n at 20-22. None of these actions rise to the level of materially adverse.

As discussed *infra*, Plaintiff has not alleged an injury arising from the length of the investigation for purposes of a discrimination claim and thus cannot satisfy the higher standard applicable to retaliation claims. *See Muldrow*, 601 U.S. at 357. Similarly, the failure to appoint Plaintiff to the Advisory Council on Jewish Life did not result in a materially adverse change in the terms and conditions of employment. *Hamada v. State Univ. of N.Y. at Farmingdale*, No. 23-CV-06786 (NRM) (SIL), 2025 WL 916899, at *3 (E.D.N.Y. Mar. 25, 2025) (holding, under pre-*Muldrow* standard for discrimination claims, that "removal from university committees alone is generally insufficient to constitute an adverse employment action"); *Scafidi v. Baldwin Union Free Sch. Dist.*, 295 F. Supp. 2d 235, 239-40 (E.D.N.Y. 2003) (holding that exclusion from a school committee does not rise to level of adverse employment action). Finally, the Second Circuit has made clear that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010).

Even when considered in the aggregate, these actions are *de minimis* in nature. Plaintiff did not experience any alteration in his pay, his title, his job responsibilities, or his working conditions. The complained-of actions would not cumulatively "dissuade a reasonable worker from making or supporting a charge of discrimination." *Carr v. N.Y. City Transit Auth.*, 76 F.4th 172, 179 (2d Cir. 2023) (citation omitted).

## D. Section 1983 Claims

Section 1983 "creates a private right of action" for damages against "every person who acts under color of state law to deprive another of" the "rights, privileges, or immunities secured by the Constitution and laws of the United States." *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) (cleaned up). Section 1983 requires that "(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). The Third Amended Complaint fails to plausibly allege that Plaintiff was deprived of his Fourteenth Amendment rights to equal protection and procedural due process. These claims are therefore dismissed for failure to state a claim.

### 1. Equal Protection Clause

A public employee alleging workplace discrimination may bring a claim under Section 1983 for violations of the Equal Protection Clause. *Naumovski v. Norris*, 934 F.3d 200, 212 & n.22 (2d Cir. 2019). "[O]nce the color of state law requirement is met, except for the issue of individual liability, an equal protection claim parallels a plaintiff's Title VII claim." *Vega*, 801 F.3d at 82 (cleaned up). For an Equal Protection claim, however, an injury must meet the higher materially adverse standard. *Naumovski*, 934 F.3d at 212 & n.24. Like with Title VII claims, "a plaintiff may allege both traditional 'disparate treatment' claims and 'hostile

work environment' claims." *Id.* at 212. Additionally, a retaliation claim can also be brought under Section 1983. *Vega*, 801 F.3d at 80.

Because Plaintiff's claims of discrimination, hostile work environment, and retaliation fail under Title VII, they likewise fail when brought under the Equal Protection Clause. Plaintiff does bring two Equal Protection claims against individual defendants that were not addressed in the discussion above. These claims similarly do not survive.

First, Plaintiff claims that Saleh filed a complaint falsely accusing him of contributing to publications that contained false information about Saleh based on her ethnicity and religion. TAC, ¶¶ 280, 297. Yet Saleh's complaint did not result in an adverse employment action. Plaintiff has not plausibly alleged that the complaint resulted in a suspension, disciplinary action, or other injury that rises to the level of an adverse action. While Plaintiff does allege he was subjected to an investigation as a result of the false complaint, an investigation alone does not qualify as an adverse employment action. *See McGrath*, 2019 WL 3754459, at *5.

A false discrimination complaint can itself be actionable as harassment if made with requisite intent. *See Cox*, 760 F.3d at 146. Yet this single complaint, standing alone, does not constitute conduct that is sufficiently severe and pervasive to create a hostile work environment.

Second, Plaintiff seeks to hold Saleh and Velasquez individually liable for leaving false RateMyProfessor.com reviews. TAC, ¶ 294. Yet Plaintiff's representation that the comments accusing him of being anti-Muslim and racist

were "eerily echoed" in Saleh's complaint, *id.*, ¶ 145, fail to push Plaintiff's claim that either Velasquez or Saleh personally posted those comments "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 683 (citation omitted).

Plaintiff's Section 1983 Equal Protection claims are therefore dismissed.

**2. Due Process Clause**

To prevail on a due process claim, Plaintiff must allege that he "possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *McMenemy v. City of Rochester*, 241 F.3d 279, 286 (2d Cir. 2001) (citation omitted). Because Plaintiff fails to plead deprivation of a protected interest, the Court does not reach whether the second prong of this test has been met.

Plaintiff alleges that he was deprived of his liberty interest in his employment and professional reputation. TAC, ¶¶ 286-87. A plaintiff may bring a "stigma plus" due process action when "that plaintiff can demonstrate a stigmatizing statement plus a deprivation of a tangible interest." *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (cleaned up). To establish such a claim a plaintiff must show "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Id.* (cleaned up). In addition, the statements "must be made public by the government employer." *Brandt v. Bd. of Co-op Educ. Servs.*, 820 F.2d 41, 43 (2d Cir. 1987) (cleaned up).

Importantly, the "state-imposed alteration of status or burden must be in addition to the stigmatizing statement." *Lantz*, 596 F.3d at 81 (cleaned up). As such, "[d]eleterious effects which flow directly from a sullied reputation would normally . . . be insufficient." *Filteau v. Prudenti*, 161 F. Supp. 3d 284, 294 (S.D.N.Y. 2016) (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)). Thus, while "the deprivation of a plaintiff's property, and the termination of a plaintiff's government employment" may qualify as state-imposed burdens or alterations, "the impact that defamation might have on job prospects . . . romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation" are not sufficient to raise a stigma plus due process claim. *Id.* (first quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004); and then quoting *Valmonte*, 18 F.3d at 1001).

The TAC fails to plead a distinct "state-imposed burden or state-imposed alteration of . . . status or rights." *Id.* (citation omitted). While the Third Amended Complaint alleges that Plaintiff's "substantial liberty interest in his employment and professional reputation . . . were at stake during the investigation," TAC, ¶¶ 286-87, the only purported alteration of status or burden Plaintiff points to are the 17-month investigation and the denial of his appointment to the Advisory Council, Opp'n at 8. Neither of these amounts to an alteration of his status or burden. *See, e.g.*, *Patterson v. City of Utica*, 370 F.3d 322, 332 (2d Cir. 2004) (holding that a two-week dismissal followed by reinstatement was not "a significant alteration of [the] plaintiff's employment status").

**E. Supplemental Jurisdiction**

The parties in this action are not diverse under 28 U.S.C. § 1332(a)(1), *see* TAC, ¶¶ 1-2, and the Court has dismissed all claims within its original jurisdiction. Under 28 U.S.C. § 1367(c)(3), "a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." *Schaefer v. Town of Victor*, 457 F.3d 188, 210 (2d Cir. 2006). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Indeed, "[c]ourts typically refrain from exercising supplemental jurisdiction over state-law claims if all federal claims are dismissed." *Jones v. Bloomingdale's*, No. 17-CV-01974 (RA), 2018 WL 6067227, at *7 (S.D.N.Y. Nov. 20, 2018).

The values of judicial economy, convenience, fairness, and comity can support the exercise of supplemental jurisdiction over NYSHRL and NYCHRL claims where deciding the state-law claims does not require the investment of additional judicial resources. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 413 (S.D.N.Y. 2014). In this case, the Court finds that the *Cohill* factors weigh in favor of supplemental jurisdiction over Plaintiff's state law discrimination claims only to the extent they raise concerns under the First Amendment, as those claims are subject to dismissal for the same reasons as Plaintiff's federal claims.

With respect to the merits of Plaintiff's remaining state law claims, the Court

declines to exercise supplemental jurisdiction. The pleading standards for claims arising under the NYSHRL and the NYCHRL are more liberal than their federal counterparts. Under those statutes, "a plaintiff must allege only that the plaintiff was treated less well because of a discriminatory intent, *i.e.*, that the unequal treatment was based, at least in part, on a protected characteristic." *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 275 (S.D.N.Y. 2024) (cleaned up). These laws do not require an injury that rises to the level of an adverse employment action, but rather only a showing of differential treatment. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

The Court therefore declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and dismisses those claims without prejudice.

**CONCLUSION**

Accordingly, the motions to dismiss are **GRANTED**. Plaintiff's federal and state claims based upon the content of the Palestinian Solidarity Series and the April 2023 petition are dismissed with prejudice against all Defendants. The Title VII claims and the Section 1983 claims are likewise dismissed with prejudice. The remaining NYCHRL and NYSHRL claims are dismissed without prejudice. The Clerk of Court is directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: August 27, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge