IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JOSHUA WINER,<br><br>Plaintiff,<br><br>v.<br><br>UMAYMAH MOHAMMAD, et al.,<br><br>Defendants. | CIVIL ACTION FILE<br>NO. 1:25-CV-2329-TWT |

**OPINION AND ORDER**

This is a defamation case. It is before the Court on Defendants Umaymah Mohammad, Rupa Marya, and Ibrahim Jouja's Motions to Dismiss [Docs. 152, 153, 154], the Plaintiff's Motion to Strike [Doc. 185] the reply briefs to Defendants Mohammad and Marya's Motions to Dismiss, and the Defendants Mohammad and Marya's Motion for an Extension of Time [Doc. 188]. For the following reasons, Mohammad and Jouja's Motions to Dismiss are GRANTED in part and DENIED in part, Marya's Motion to Dismiss is GRANTED, the Plaintiff's Motion to Strike is DENIED, and Mohammad and Marya's Motion for Extension of Time is DENIED as moot.

**I. Background**

The facts of this case are well known to the Court and the parties. This action arises out of alleged defamatory statements that Defendant Umaymah Mohammad, a student at the Emory University School of Medicine, made about Plaintiff Joshua Winer, a physician and professor at Emory. (2nd Am.

Compl. ¶¶ 1-2). Mohammad, who is Palestinian, sent an email to the entire School of Medicine student and faculty body on January 17, 2024, in which the Plaintiff alleges she "praised terrorism against Israel, expressed her hatred towards Israel and the United States, and stated that Israel, the United States, and Emory are perpetrating a genocide against Palestinians in Gaza." (*Id.* ¶¶ 26-27). Nearly two months later, in March 2024, the Plaintiff published an op-ed piece in an Israeli news publication sharing his decision to travel to Israel to volunteer as a physician in the Israeli Defense Force ("IDF") following the October 7th Hamas attack on Israel. (*Id.* ¶¶ 31-32). The Plaintiff identifies as Jewish and maintains dual American and Israeli citizenship. (*Id.* ¶ 12). He is a surgical oncologist at Emory Winship Cancer Institute, a professor in the Department of Surgery, Division of Surgical Oncology at the School of Medicine, and serves as the School of Medicine Surgical Clerkship Director. (*Id.*).

In April 2024, Mohammad participated in an interview for a news organization called Democracy Now!. (*Id.* ¶ 36). In the interview, Mohammad was asked about the email she sent and was asked to explain the importance of the issue to her. (*Id.*). As part of her response, Mohammad referenced Winer by stating that

> one of the professors of medicine we have at Emory recently went to serve as a volunteer medic in the Israeli Offense Force [sic] and recently came back. This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the

> healthcare system in Gaza and the murder of over 400 healthcare workers, and is now back at Emory so-called teaching medical students and residents how to take care of patients.

(*Id.*). Mohammad was ultimately suspended from the School of Medicine for one year based on her comments in the Democracy Now! interview. (*Id.* ¶ 49). In November 2024, Mohammad participated in a podcast hosted by the International Union of Scientists in which she made similar statements about the Plaintiff. (*Id.* ¶¶ 50-51). In January 2025, she made more statements about the Plaintiff's IDF service in the online publication Mondoweiss. (*Id.* ¶¶ 55-56). In the Mondoweiss piece, Mohammad claimed that the Plaintiff "believe[d] in the legitimacy of apartheid, and that some human lives are not as important as others." (*Id.* ¶ 56). At the end of the piece, she provided a link to a social media post by Defendants National Students for Justice in Palestine ("NSJP") and Doctors Against Genocide ("DAG"), which ultimately led to a campaign on the website of Action Network that "contained additional false statements about Plaintiff and identified him by name." (*Id.* ¶ 60). NSJP and DAG also published posts on Instagram regarding the Action Network campaign, which directly quoted Mohammad's Democracy Now! interview. (*Id.* ¶¶ 78-87). These Defendants made a second Instagram post a few weeks later. (*Id.* ¶¶ 91-95). The Plaintiff alleges that Defendant WESPAC is NSJP's fiscal sponsor and, therefore, "knowingly funded and facilitated NSJP's coordinated efforts to vilify Plaintiff and pressure Emory to discipline [him]." (*Id.* ¶ 147).

In February 2025, Defendant CAIR Georgia held a press conference on the subject of Mohammad's suspension, during which she made the following statement:

> [Emory] disciplined me for exposing Emory's complicity in the destruction of Gaza in an interview where I mentioned an unnamed physician who served in the military, actively engaged in the genocidal campaign against the Palestinian people, my people . . . I cannot learn from a physician who might have fired one of the 355 bullets that landed in 6 year old Hind Rajab's body. Or who might have helped make the decision to bomb one of the hospitals in Gaza. Or who might have celebrated the murder of our communities on the rubble still wet with Palestinian blood. A doctor who cannot see Palestinians as human beings will return to Atlanta to offer the same disposability to black and brown patients at home.

(*Id.* ¶¶ 62-63). CAIR Georgia, along with CAIR Foundation Inc. ("CAIR Foundation"), also issued a press release with a link to Mohammad's Democracy Now! interview and rebroadcasted this speech on its Instagram account on February 11, 2025. (*Id.* ¶¶ 119, 124). In this post, (the "IG Post"), CAIR Georgia also replied to comments by providing a link to a previously circulated email template and phone script that identified the Plaintiff by name and called for Emory to investigate him and/or terminate his employment. (*Id.* ¶ 126). Mohammad's statements were later broadcasted and published by television stations and news outlets. (*Id.* ¶¶ 67-76). Defendant Ibrahim Jouja was the President of Emory SJP when it shared NSJP and DAG's posts on the Emory SJP Instagram account, and also made or collaborated on similar posts sharing the Democracy Now! interview and

identifying the Plaintiff "as a physician with military combat experience against Palestinians." (*Id.* ¶¶ 130-137). Defendant Rupa Marya works with Mohammad as a cofounder of DAG and, the Plaintiff alleges, she has "frequently identified Plaintiff by name and used her social media platforms to spread harmful and reputationally damaging statements about him," including blaming him for the termination of a Palestinian professor at Emory School of Medicine and accusing him of participating in a genocide. (*Id.* ¶¶ 98-118).

The Plaintiff brought this action in April 2025 asserting four counts against all of the Defendants: defamation per se, in violation of O.C.G.A. § 51-5-4 (Count I); false light invasion of privacy, under state common law (Count II); civil conspiracy, under state common law (Count III); and conspiracy to interfere with civil rights, in violation of 42 U.S.C. § 1985(3) (Count IV). (*Id.* ¶¶ 138-200). The Plaintiff filed an amended complaint as of right before any of the Defendants filed a responsive pleading. [Doc. 22]. The Plaintiff then moved for leave to file a Second Amended Complaint, and the Court granted that motion. [Doc. 129]. Shortly thereafter, several Defendants moved to dismiss the Second Amended Complaint, including Defendants Mohammad, Marya, and Jouja. Their Motions to Dismiss are presently before the Court. [Docs. 152, 153, 154].

## II. Discussion

**A. Motion to Strike [Doc. 185]**

The Court begins with addressing the Plaintiff's Motion to Strike Defendants Mohammad's and Marya's reply briefs to their Motions to Dismiss. Mohammad and Marya's reply briefs were filed 13 days late with no request for leave to file out of time or explanation as to the untimeliness. [*See* Docs. 181-182]. The Plaintiff asks the Court to strike the reply briefs on this basis. In response, Mohammad and Marya's counsel explains that he is a solo practitioner working pro bono with limited resources, but that he has since hired a paralegal and updated his calendaring software, and he asks the Court to excuse his late replies on that basis. The Court has discretion not to consider any brief that is not filed in compliance with the Local Rules, including the 14-day deadline for filing a reply brief. LR 7.1(F), N.D.Ga. The Court declines to exercise that discretion here; the Plaintiff has not demonstrated any prejudice owed to the late filings and defense counsel has indicated he has made improvements to his practice to prevent further calendaring errors. The Court will thus deny the Plaintiff's Motion to Strike [Doc. 185], so Mohammad and Marya's Motion for an Extension of Time [Doc. 188] will be denied as moot.

**B. Defendant Marya's Motion to Dismiss [Doc. 153]**

Marya asserts that the Court lacks personal jurisdiction over here because there are no allegations of any contacts with Georgia or any acts specifically aimed into Georgia. (Def. Marya's Mot. to Dismiss, at 3-8). She

argues that because the alleged acts at issue in this matter involve First Amendment concerns, haling her into Court in Georgia would violate due process by eliminating the requirement of a minimum contact with the state. (*Id.* at 8-9). Additionally, Marya argues that the Plaintiff cannot evade the restriction in Georgia's long-arm statute on defamation claims by recharacterizing his claims as false light or another tort. (*Id.* at 10-11).

The Plaintiff opposes Marya's position, contending that Marya's conduct targeted a Georgia physician and professor "in a coordinated campaign designed to induce his Georgia employer to investigate and terminate him." (Pl.'s Resp. in Opp'n to Def. Marya's Mot. to Dismiss, at 5-6). He argues that the exercise of personal jurisdiction over Marya comports with due process because his claims arise directly out of Marya's contacts with Georgia based on the fact that he suffered his injuries in Georgia. (*Id.* at 7-8). And, he asserts, she purposefully aimed her actions at Emory, which is a Georgia-based institution. (*Id.* at 8-9).

Marya raises arguments under Rule 12(b)(6) as well, but the Court is obligated to first consider the personal jurisdiction challenge. On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff has the burden of establishing a prima facie case by presenting enough evidence to withstand a motion for directed verdict." *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1356 (11th Cir. 2021). In evaluating a plaintiff's

case, "[t]he district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits or deposition testimony." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988). Where the defendant contests the allegations of the complaint through affidavits, "the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). "And where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must draw all reasonable inferences in the plaintiff's favor." *Mortg. Invs.*, 987 F.3d at 1356 (quotation marks omitted).

A federal court sitting in diversity undertakes a two-step inquiry to determine whether it has personal jurisdiction over a nonresident defendant: "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257-58 (11th Cir. 2010) (citation omitted). "When a federal court uses a state long-arm statute, because the extent of the statute is governed by state law, the federal court is required to construe it as would the state's supreme court." *Id.* at 1258 (quotation marks

omitted). Thus, this Court must interpret and apply Georgia's long-arm statute in the same manner as the Georgia Supreme Court. The statute, codified at O.C.G.A. § 9-10-91, confers specific personal jurisdiction over an out-of-state defendant if, among other things, it "[c]ommits a tortious act or omission within [Georgia][.]" O.C.G.A. § 9-10-91(2). However, "it is essential in each case that there be some act by which the defendant purposefully avails [her]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 518 (2006).

The Court will first address the applicability of Georgia's long-arm statute. As an initial matter, the Plaintiff alleges only O.C.G.A. § 9-10-91(2) as the basis for personal jurisdiction under the Georgia long-arm statute, so the Court will not address the other prongs of that statute. (*See* Pl.'s Resp. in Opp'n to Def. Marya's Mot. to Dismiss, at 4). As the Court reads the Complaint and the Plaintiff's response to Marya's Motion to Dismiss, the Plaintiff's only alleged theories of personal jurisdiction over Marya are (1) that Marya made false and/or defamatory statements about the Plaintiff, who is a Georgia resident, and he suffered resulting injuries in Georgia; and (2) she asserted that he should not be permitted to work at Emory, a Georgia institution, and supported efforts to remove him from the Emory medical community. (*Id.* at 5-6); (2nd Am. Compl. ¶¶ 99-118).

The crux of the Plaintiff's argument is that "Marya carried out a sustained effort to leverage Dr. Winer's Georgia-based employment to produce consequences in Georgia," which he asserts is "forum-directed conduct." (Pl.'s Resp. in Opp'n to Marya's Mot. to Dismiss, at 6). But the Plaintiff purports to proceed under subsection (2) of the Georgia long-arm statute, and the Georgia Supreme Court has made clear that injury occurring in Georgia is not sufficient under that prong; the tortious act itself must take place in Georgia. *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*, 279 Ga. 672, 673-74. In contrast, under subsection (3), a court may exercise personal jurisdiction over a nonresident who causes injury in Georgia by an act committed outside Georgia, but only if the nonresident regularly interacts with the state in certain specified ways. *See id.* at 674. The Plaintiff has not alleged that Marya physically committed the allegedly tortious actions in Georgia, but only that she caused injury here and directed her actions at a Georgia-based institution.[1] That is not enough to allege personal jurisdiction under subsection (2) of the long-arm statute. The Plaintiff alleges that Marya is a California resident and does not allege any other interactions with Georgia. Thus, even construing these allegations as true, the Plaintiff has failed to

---

[1] For the sake of completeness, there would be no support for an argument that the Instagram or X posts could be considered made in Georgia based on the fact that they were accessible in the state. *Kifle v. X Corp.*, 2025 WL 3523569, at *2 n.2 (N.D. Ga. June 9, 2025); *LABMD, Inc. v. Tiversa, Inc.*, 509 F. App'x 842, 844-45 (11th Cir. 2013).

establish a prima face case of personal jurisdiction under subsection (2) of the Georgia long-arm statute as to Marya.

Because the Court cannot exercise personal jurisdiction over Marya under the Georgia long-arm statute, it need not address the due process considerations or Marya's arguments under Rule 12(b)(6). Accordingly, Marya's Motion to Dismiss [Doc. 153] will be granted on personal jurisdiction grounds.

### C. Defendants Mohammad and Jouja's Motions to Dismiss [Docs. 152, 154][2]

#### a. Shotgun Pleading

The Defendants argue that the Second Amended Complaint is an impermissible shotgun pleading because it contains "numerous irrelevant and prejudicial assertions" about them. (Mohammad's Mot. to Dismiss, at 6-7). They also appear to argue that the counts impermissibly incorporate by reference all preceding counts. (*See id.* at 8-9 (citing cases with parentheticals recounting this standard). The Defendants contend that many of the factual allegations are aimed at "justifying and defending activities of the state of Israel." (*Id.* at 9). Finally, they assert that the Second Amended Complaint is "full of language alleging discrimination but does not actually include a Title

---

[2] Jouja's Motion to Dismiss [Doc. 154] joins and adopts the arguments presented in Mohammad's Motion to Dismiss [Doc. 152]. [*See* Doc. 154-1]. Accordingly, the Court will cite Mohammad's brief for both parties' arguments. Throughout the remainder of this Order, the Court will use "Defendants" to refer only to Mohammad and Jouja.

VI or VII claim." (*Id.* at 10).

"A shotgun pleading is a complaint that violates either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (citation omitted). "Shotgun pleadings are flatly forbidden by the spirit, if not the letter, of these rules because they are calculated to confuse the enemy, and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked." *Id.* (citation modified). "A district court has the 'inherent authority to control its docket and ensure the prompt resolution of lawsuits,' which includes the ability to dismiss a complaint on shotgun pleading grounds." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (citation omitted).

There are "four rough types" of shotgun pleadings. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015).

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying

> which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

*Id.* at 1321-23.

None of the Defendants' shotgun pleading arguments are persuasive. For starters, the use of any "language alleging discrimination" in the Second Amended Complaint is clearly tied to the Plaintiff's § 1985 claim, which is predicated in part on Title VI and Title VII. (*See* 2nd Am. Compl. ¶¶ 193-96). In any event, the inclusion of this language would not, without more, mandate a shotgun pleading finding; the § 1985 count gives the Defendants "adequate notice of the claim[ ] against them and the grounds upon which [it] rests." *Weiland*, 792 F.3d at 1323. To that end, the inclusion of allegedly "irrelevant and prejudicial" assertions or allegations that "justif[y] and defend[ ] activities of the state of Israel" is also not grounds for dismissal as a shotgun pleading. As the Plaintiff points out, such an argument might have been better aimed in a motion to strike under Fed. R. Civ. P. 12(f), but the time to file such a motion has passed. *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter . . . on motion made by a party . . . before responding to the pleading.").

This leaves the only true shotgun pleading argument—that the Second

Amended Complaint impermissibly references the preceding counts. But the Second Amended Complaint does not do this in the manner that the Eleventh Circuit forbids. Although the beginning of each count "repeats and realleges" the factual paragraphs, each count clearly identifies the facts relevant to each claim and links the facts to the elements of the claim. (*See, e.g.*, 2nd Am. Compl. ¶¶ 161-168). As the Eleventh Circuit explained in *Weiland*, the "mortal sin" of realleging occurs when the plaintiff realleges all preceding counts, not the factual allegations that support the counts. *Weiland*, 792 F.3d at 1321, 1324 ("What we have here is different. The allegations of each count are not rolled into every successive count down the line."). "More importantly, this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count." *Id.* at 1324. Neither the Court nor the Defendants have had trouble understanding the Plaintiff's claims or which facts support each claim. Accordingly, the Court denies the shotgun pleading portion of the Defendants' Motion to Dismiss.

**b. Merits Arguments**

**i. Legal Standard**

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may

survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

**c. Section 1985 Claim**[3]

The Defendants first argue that the Court lacks federal question jurisdiction because the Plaintiff fails to state a § 1985 claim. (Mohammad's Mot. to Dismiss, at 4). They assert that the claim lacks specific allegations of

[3] The Defendants present their arguments in a somewhat disjointed manner rather than organizing them by claim. Nonetheless, the Court will address each argument in the manner laid out by the Defendants.

discrimination and conspiracy and that the only specific allegations are acts of discrimination under Title VI and Title VII. (*Id.* at 5). But, the Defendants argue, individuals are not liable under these statutes, which target employers. (*Id.*).

First, the fact that the Plaintiff's § 1985 claim could fail to state a claim does not automatically deprive this Court of federal question jurisdiction. The test for determining whether a claim arises under federal law "is whether a federal question appears on the face of the plaintiff's well-pleaded complaint." *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1034 (11th Cir. 2022). As such, courts are to "respect the important distinction between the lack of subject matter jurisdiction and the failure to state a claim upon which relief can be granted." *Id.* Thus, save for a rare exception reserved for "extremely weak claims," a finding of failure to state a claim does not preclude the Court's exercise of federal question jurisdiction. *Id.* at 1034-35.

Nor does the Plaintiff completely fail to state a § 1985 claim as to Mohammad and Jouja. Section 1985(3) "created a cause of action against private individuals who, among other things, undertake conspiracies for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *Dean v. Warren*, 12 F.4th 1248, 1257 (11th Cir. 2021) (citation modified). "That § 1985(3) reaches private action does not, however, mean that

it was intended to apply to all tortious, conspiratorial interferences with the rights of others." *Id.* (citation modified).

The Plaintiff hinges his § 1985(3) claim on the alleged violations of his rights under three federal laws: 42 U.S.C. § 1981, 42 U.S.C. § 2000e-2(a)(1), and 42 U.S.C. § 2000d. (2nd Am. Compl. ¶ 189). As the Court has recently held in ruling on other motions in this matter, violations of § 1981 and Title VII cannot serve as the basis of a claim under § 1985(3). *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979); *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010). The Court will dismiss the portions of the Plaintiff's § 1985(3) claim against Mohammad and Jouja that are predicated on these statutes.

This leaves only the portion of the Plaintiff's § 1985(3) claim that relies on 42 U.S.C. § 2000d, also known as Title VI. The Eleventh Circuit does not appear to have addressed whether a violation of Title VI is enforceable against a private conspirator under § 1985(3), so for the reasons the Court expressed in its prior orders, the Court presumes that it is. To state a claim under § 1985(3), a plaintiff must establish that the defendant has

> (1) conspired or gone in disguise on the highway or on the premises of another, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) taken or caused an action to be taken in furtherance of the conspiracy's object, and (4) injured an individual's person or property or deprived her of exercising any right or privilege of a United States citizen.

*Dean*, 12 F.4th at 1255 n.8 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). Title VI provides that no one shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" on the ground of his "race, color, or national origin." 42 U.S.C. § 2000d. To state a claim under § 2000d, a plaintiff must only allege that the defendant receives federal funds, that it discriminated against the plaintiff on the basis of race, color, or national origin, and that it did so in the course of a federally funded program. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1202 (11th Cir. 1999).

The Defendants are correct that individuals generally cannot be liable under Title VI. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1171 (11th Cir. 2003). But the Plaintiff did not raise a standalone Title VI claim against the Defendants, he asserted a § 1985(3) claim based on a conspiracy to induce Emory to violate his Title VI rights. (2nd Am. Compl. ¶¶ 190-99). And for purposes of a motion to a dismiss, he has stated such a claim as to the CAIR Foundation theory.[4] The Plaintiff alleges that CAIR Foundation receives federal funding, making § 2000d enforceable against it. More specifically, he

[4] The Court previously found that the Plaintiff did not properly allege a § 1985(3) claim premised on a Title VI violation under the Emory theory. (*See* Doc. 192 at 18-19). That same reasoning applies equally to the Defendants here, so the Court addresses only the CAIR Foundation theory alleged in paragraph 194 of the Second Amended Complaint.

alleges that CAIR Foundation received federal funding, that it conspired with the other defendants, including Mohammad and Jouja, to subject him to discrimination based on his race and national origin by posting the IG Posts at issue, which he alleges were defamatory and filled with false accusations, and that this discrimination was carried out "in the administration of CAIR Foundation's program or activities receiving Federal financial assistance." (2nd Am. Compl. ¶¶ 194-96). The Plaintiff also identifies the specific actions he alleges the Defendants took in furtherance of the conspiracy, including the statements Mohammad made that Jouja is allegedly responsible for as president of Emory SJP. (*Id.* ¶¶ 5-6, 21, 130-36, 194-96). At this early stage, these allegations satisfy the elements of a § 1985(3) claim predicated on a Title VI violation. *Dean*, 12 F.4th at 1255 n.8; *Burton*, 178 F.3d at 1202. Whether this claim can withstand summary judgment is a question for another day. Accordingly, the Defendants' Motion to Dismiss is denied as to this argument.

**d. National Origin as a Protected Class**

The Defendants next argue that the Plaintiff unfairly conflates anti-Zionism with antisemitism in order to "place an entire area of First Amendment-protected political, legal and ethical discussion off limits." (Mohammad's Mot. to Dismiss, at 11). They assert that reasonable people acting in good faith can criticize Israel and the Israeli government without expressing antisemitism. (*Id.*). In effect, the Defendants contend that treating

Zionism as an element of Jewish identity rather than a political philosophy infringes on the Defendants' First Amendment rights because not all Jewish people are Zionists or are offended by opposition to Zionism, so anti-Zionist rhetoric is not per se antisemitic. (*See id.* at 10-13) ("A finding by this Court that anti-Zionism is antisemitism would violate the Establishment Clause by enacting one religious claim into law and penalizing competing religious claims.").

The Court has made no such finding. The Court presumes that the Defendants' reference to findings regarding Jewish identity goes to the discrimination element of the Plaintiff's § 1985(3) claim as predicated on a violation of Title VI, although the Defendants do not so much as mention Title VI in this section of their argument. *See* 42 U.S.C. § 2000d. At the motion to dismiss stage, the Court is obligated to treat the Plaintiff's factual allegations as true. *See Quality Foods de Centro Am., S.A.*, 711 F.2d at 994-95; *see also Sanjuan*, 40 F.3d at 251 (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). The Defendants essentially argue that because Zionism is (in their view) solely a political philosophy, the Plaintiff has actually alleged that their actions were not truly motivated by his Jewish identity but instead by their opposition to Zionism and serving in the IDF. But taking that view would require the Court to construe the Plaintiff's allegations narrowly and in their favor, which it cannot do at this stage. What the Plaintiff

actually alleges, if construed in his favor—and what the Court must accept as true at this stage—is that his military service resulted from a "sense of duty to serve the Jewish homeland, which is integral to his racial identity as a Jew" and that his association with Zionism is also "an integral part of Jewish identity for a very significant number of Jews." (2nd Am. Compl. ¶¶ 189, 191-92). In essence, the Plaintiff alleges that his military service and association with Zionism are markers of his own personal Jewish identity, and that his Jewish heritage as an Israeli national is a protected class. Critical to this interpretation is the Plaintiff's allegations that his IDF service was tied to the duty he felt based on his nationality and the significance of Zionism in Jewish culture. These allegations suffice at this stage to demonstrate that a discriminatory animus based on a protected class—the Plaintiff's national origin— motivated the Defendants' actions, not mere political differences. *See Twombly*, 550 U.S. at 556 (nothing that a complaint may survive a motion to dismiss even if the possibility of recovery is extremely remote and unlikely).

Importantly, the Plaintiff has not alleged that Zionism is a "cornerstone[ ] of the Jewish religion" as a whole, as the Defendants argue. He has alleged that it is an integral part of *his own* Jewish identity and for "a very significant number" of Jewish people (and notably, not all). The Court's findings here with regard to the interplay between the Plaintiff's Zionist beliefs and a finding that he has plausibly stated the discrimination element of his

§ 1985(3) claim based on national origin are limited to this specific Plaintiff and the Second Amended Complaint presently before the Court. It is decidedly *not* a finding—as the Defendants would have the Court believe—that anti-Zionist beliefs are per se antisemitic. Nor has the Court held that "Zionism [is] a protected class." (*See* Mohammad's Mot. to Dismiss, at 13). The Court declines to adopt such a wide-reaching and stereotypical conclusion. Thus, because the Court has found the Plaintiff properly alleged the national origin component of his § 1985(3) claim at this stage, the Defendants' Motion to Dismiss is denied as to this argument.

**e. First Amendment Protections, Opinion Statements, and Actual Malice**

The Defendants next argue that Mohammad's statements about the Plaintiff are protected by the First Amendment. (Mohammad's Mot. to Dismiss, at 14-15). They assert that the Plaintiff has not alleged that Mohammad's speech fell into one of the unprotected speech categories that the Supreme Court has recognized and that it was in fact speech on matters of public concern. (*Id.* at 15). Though unclear, the Defendants seem to argue that if the Court ultimately finds in the Plaintiff's favor on his claims, the Court itself would be violating the First Amendment. (*See id.* at 15-16).

The Plaintiff responds that Mohammad's speech was not protected because he is not a limited public figure, as the Defendants' argument seems

to imply.[5] (Pl.'s Resp. in Opp'n to Mot. to Dismiss, at 20-21). He argues that the public controversy at issue is the war between Israel and Hamas, but he did not opine on that controversy in his op-ed in such a way as to make himself a public figure. (*Id.*). In any event, the Plaintiff argues, even if he is considered a limited public figure, he has established that Mohammad's statements were made with reckless disregard as to whether they were false. (*Id.* at 21-22). Finally, he contends that Mohammad's statements are not opinions because they imply defamatory facts about him that are capable of being proved false. (*Id.* at 22-24). To tackle this argument, the Court first addresses whether the Plaintiff is a public figure or limited public figure such that an actual malice showing is required. Then, the Court addresses whether the statements at issue are inactionable opinion statements.

In *New York Times Co. v. Sullivan*, the Supreme Court held that a defamatory statement about matters of public concern that might otherwise qualify for First Amendment protection forfeits that protection if the plaintiff is a public figure and actual malice is shown. 376 U.S. at 279-80. But if the plaintiff is not a public figure, no showing of actual malice is required. *Time, Inc. v. Firestone*, 424 U.S. 448, 453-57 (1976). A public figure is someone who "occup[ies] [a] position[ ] of such persuasive power and influence that they are

---

[5] This implication is based on the Defendants' citation to *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

deemed [a] public figure[ ] for all purposes." *Silvester v. American Broadcasting Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988) (citation omitted). A person can also be considered a limited purpose public figure if he has "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.*

Though unclear, the Defendants' citation to *New York Times Co.* leads the Court to believe they are asserting that the Plaintiff is a public figure and thus subject to the higher actual malice bar for stating his defamation and false light claims.[6] The parties here agree that the Plaintiff's op-ed piece discussed matters of public concern but dispute only whether the Plaintiff can be considered a public figure or limited purpose public figure, or whether he is a private individual. The Defendants summarily argue that the Plaintiff is a public figure, but the Court disagrees. There are no allegations in the Second Amended Complaint to support a finding that the Plaintiff, as an oncological surgeon and professor, has "a position of such persuasive power and influence" that he could be deemed a public figure "for all purposes"—a designation typically reserved for someone who has attained "pervasive fame or notoriety." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974); *see also Berisha v.*

---

[6] The Court notes that the Defendants mainly rely on a district court decision from the Southern District of New York involving an institutional defendant and direct Title VI claims. The present action involves neither, so the Defendants' reliance on this decision is misplaced.

*Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020). As to whether the Plaintiff is a limited purpose public figure, the Court applies a two-part test:

> First, [the Court] must determine whether the individual played a central role in the controversy. Second, [the Court] must determine whether the alleged defamation was germane to the individual's role in the controversy. Two "fundamental" criteria help draw the line between public and private figures: (1) public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy; and, more importantly, (2) public figures typically voluntarily expose themselves to increased risk of injury from defamatory falsehoods."

*Berisha*, 973 F.3d at 1310 (citations modified). In this case, the public controversy at issue is the Israel-Hamas war. The Plaintiff explains that he wrote the op-ed as a "reflection on his service" to "highlight[ ] the profound and far-reaching impact of the October 7 attacks on Jewish communities worldwide" and stated that his goal in rejoining the IDF was to "support" Israel as a physician. (2nd Am. Compl. ¶¶ 33-35). It can hardly be said that the Plaintiff played a central role in this controversy; although his op-ed piece undoubtedly offended the Defendants, it had no impact on the war itself or any proposed resolution of it. *Id.*; *see also Silvester*, 839 F.3d at 1494 (noting that the plaintiff must have acted "in order to influence the resolution of the issues involved."). Nor can it be said that the Plaintiff had any "greater access to the media" than the Defendants or any other person such that he had more of an opportunity to counteract false statements. *Berisha*, 973 F.3d at 1310. If anything—taking the facts in the Second Amended Complaint as true—the

Defendants had greater access to the media, as demonstrated by the multiple social media accounts that shared the speech Mohammad gave through a platform given to her by an advocacy organization that supported and shared her views. For these reasons, the Court does not find the Plaintiff to be a limited purpose public figure for purposes of this action. As such, the Plaintiff is not required to plead allegations of actual malice in order for his claims to proceed against the Defendants. *Time, Inc.*, 424 U.S. at 453-57.[7]

The Court next turns to whether the alleged defamatory statements at issue were protected opinion statements or actionable statements of false fact. "True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). The Court applies state substantive law to determine whether the statements at issue are actionable. *See id.* Under Georgia law, a defamation action can only lie for a statement of fact, since statements "that reflect[ ] an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false." *North Atlanta Golf Operations, LLC v. Ward*, 363 Ga. App. 259, 261 (2022) (citation modified). Still, there is no opinion exception to defamation, and "[a]n opinion can constitute actionable defamation if the

[7] The Defendants have not argued that the Plaintiff failed to plead any other elements of his claims, so the Court's analysis ends here with regard to elemental pleading.

opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false." *Id.* at 262 (citation modified) (citing *Cottrell v. Smith*, 299 Ga. 517, 522 (2016)).

The Court begins this analysis by turning to the Second Amended Complaint. The Plaintiff frames the statements at issue as the ones Mohammad made (1) during her Democracy Now! interview, (2) in her Mondoweiss piece, and (3) during the CAIR Georgia press conference on February 11, 2025. (2nd Am. Compl. ¶¶ 36-42, 55-66). As to Jouja, the statements at issue are three IG Posts, made on January 14, February 13, and March 28, 2025, that the Plaintiff alleges adopted and recounted Mohammad's prior statements, including the ones made in her Democracy Now! interview and at the press conference. (*Id.* ¶¶ 130-37). The Court agrees with the Plaintiff that the Defendants can still be liable for defamation per se even if the Mohammad's statements represented political opinion if the opinion can be reasonably interpreted to imply false facts about the Plaintiff, so long as the Plaintiff can prove those facts are false. *See North Atlanta Golf Operations, LLC*, 363 Ga. App. at 261. To that end, the Plaintiff asserts that parts of Mohammad's statement in the Democracy Now! interview are demonstrably false, including her statements that the Plaintiff "aid[ed and abett[ed] a genocide" and "aid[ed] and abett[ed] the destruction of the healthcare system

in Gaza." (2nd Am. Compl. ¶¶ 36-37, 131). Regardless of whether these statements express political opinion, the statements could reasonably "imply defamatory facts about the plaintiff that are capable of being proved false" when the facts are construed in the Plaintiff's favor This is because Mohammad's statements—that the Plaintiff alleges Jouja is responsible for reposting as president of Emory SJP, along with supportive commentary—imply that the Plaintiff actively participated in combat operations during his service in the IDF, but the Plaintiff pled that he served

> solely in his capacity as a physician, providing medical care to wounded soldiers. His involvement in combat was limited to situations in which his unit came under direct attack . . . Mohammad had no factual basis to claim that Plaintiff participated in or approved the bombing of hospitals in Gaza [or] celebrated the killing of Palestinians.

(2nd Am. Compl. ¶¶ 66). The Court agrees with the Defendants' position that characterizing the Israel-Hamas war as a genocide is likely an inactionable opinion because it reflects a "subjective assessment, as to which reasonable minds could differ, [and which] cannot be proved false." *North Atlanta Golf Operations, LLC*, 363 Ga. App. at 261. But the statements at issue here go further and allege personal combat participation in the alleged genocide—a fact which the Plaintiff could prove at a later stage is false. At this stage, his allegations about his role are enough to satisfy the "false and defamatory statement" element of his defamation per se claim and the falsity element of his false light claim. *Smith v. DiFranceso*, 341 Ga. App. 786, 787 (2017);

*Bazemore v. U.S. Bank Nat'l Ass'n*, 363 Ga. App. 723, 730-31 (2022).

The same is true of part of Mohammad's statement during the press conference, in which she stated that

> [h]aving a physician faculty member who participated in a military convicted of committing genocide against Palestinians makes me feel unsafe. It makes black and brown medical students feel unsafe. It makes black and brown and indigenous patients feel unsafe. I cannot learn from a physician who might have fired one of the 355 bullets that landed in 6 year old Hind Rajab's body. Or who might have helped make the decision to bomb one of the hospitals in Gaza . . . a doctor who cannot see Palestinians as human beings will return to Atlanta to offer the same disposability to black and brown patients at home.

(2nd Am. Compl. ¶¶ 62). There are parts of the statement that express Mohammad's opinion, such as the part that the Plaintiff's military service makes her, and "black and brown medical students," feel unsafe. This is a subjective assessment that cannot be proved false, so this part of the statement is not actionable. *See North Atlanta Golf Operations, LLC*, 363 Ga. App. at 261. But the part of the statement that suggests the Plaintiff might have been involved in combat decisions or actions and accuses him of not "see[ing] Palestinians as human beings" and offering "the same disposability to black and brown patients" at Emory certainly implies that the Plaintiff engaged in combat operations while serving in the IDF and that patients of certain races are therefore not safe in his care. The same is true of the statement in Emory SJP's March 28, 2025 collaborative IG Post that described the Plaintiff as "a physician with military combat experience against Palestinians." (2nd Am.

Compl. ¶¶ 133, 136). The Plaintiff has alleged counter-facts that, if accepted as true, prove these portions of the statements false, so the Plaintiff states a claim as to these portions of the press conference statement and the March 28 Emory SJP IG Post.

For these reasons, the Court will dismiss the portion of the Plaintiff's defamation and false light claims predicated on the opinion portions of the statements identified above. The Court will deny the Defendants' Motion to Dismiss as to the remainder of their First Amendment and opinion-based arguments.

## III. Conclusion

For the foregoing reasons, the Defendants Umaymah Mohammad and Ibrahim Jouja's Motions to Dismiss [Docs. 152, 154] are GRANTED in part and DENIED in part. Defendant Rupa Marya's Motion to Dismiss [Doc. 153] is GRANTED on personal jurisdiction grounds. The Plaintiff's Motion to Strike [Doc. 185] is DENIED, and the Defendants Mohammad and Marya's Motion for Extension of Time [Doc. 188] is DENIED as moot.

SO ORDERED, this 18th day of November, 2026.

Thomas W. Thrash

THOMAS W. THRASH, JR.
United States District Judge